07-Civ.-8032 (LAK)(AJP)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SALVATORE COSTA,

Plaintiff,

-against-

THE CITY OF NEW YORK and CHIEF JOE FOX,

Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

# MICHAEL A. CARDOZO
*Corporation Counsel of the City of New York*
Attorney for Defendants
100 Church Street, Room 2-184
New York, N.Y. 10007-2601

Of Counsel:    Ivan A. Mendez, Jr.
Tel:              (212) 788-8688

Matter No.: 2007-029207

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 2

ARGUMENT

       THE COMPLAINT FAILS TO STATE A CLAIM UPON
       WHICH RELIEF CAN BE GRANTED. ....................................................... 4

       A.  The Plaintiff's Equal Protection Clause Claim Fails As
           A Matter Of Law. ............................................................................... 4

       B.  Plaintiff Fails To State A Claim Of First Amendment
           Retaliation. ....................................................................................... 5

       C.  Chief Fox Is Entitled To Qualified Immunity. .................................. 9

CONCLUSION ......................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**                                                                        **Pages**

Anderson v. Creighton,
    483 U.S. 635, 107 S. Ct. 3034 (1987)...............................................................10

Bell Atlantic v. Twombly,
    ___ U.S. ____, 127 S.Ct. 1955 (2007)..............................................................4

Benitez v. Wolff,
    985 F.2d 662 (2d Cir. 1993).........................................................................10

Benvenisti v. City of New York,
    No. 04 CV 3166, 2006 U.S. Dist. LEXIS 73373 (S.D.N.Y. Sept. 23, 2006) ...........5

Boss v. Kelly,
    No. 07 CV 2113, 2007 U.S. Dist. LEXIS 62348 (S.D.N.Y. Aug. 23, 2007)............5

Brewster v. City of Poughkeepsie,
    434 F.Supp.2d 155 (S.D.N.Y.),
    judgment as a matter of law granted on remaining claims,
    447 F. Supp. 2d 342 (S.D.N.Y. 2006)...........................................................7, 8

Cartier v. Lussier,
    955 F.2d 841 (2d Cir. 1992).........................................................................10

Connick v. Meyers,
    461 U.S. 138, 103 S. Ct. 1684 (1983).........................................................5, 6

Fridia v Henderson,
    No. 99 CV 10749, 2000 WL 1772779 (S.D.N.Y. Nov. 30, 2000) ..........................9

Gant v. Wallingford Board of Education,
    195 F.3d 134 (2d Cir. 1999)..........................................................................4

Garcetti v Ceballos,
    547 U.S. ___, 126 S. Ct. 1951 (2006)...............................................1, 5, 6, 7, 8, 11

Harlow v. Fitzgerald,
    457 U.S. 800, 102 S. Ct. 2727 (1982)..........................................................9, 10

Hayden v. County of Nassau,
    180 F.3d 42 (2d Cir. 1999)............................................................................5

Hill v. Rayboy-Brauestein,
    No. 02 CV 3770, 2006 WL 3298383 (S.D.N.Y. Nov. 9, 2006) ...........................9

ii

**Cases** <span style="float:right">**Pages**</span>

James v. New York Racing Association,
    233 F.3d 149 (2d Cir. 2000)..................................................................4

Johnson v. Ganim,
    342 F.3d 105 (2d Cir 2003)..................................................................6

Kaminsky v. Rosenblum,
    929 F.2d 922 (2d Cir. 1991)................................................................10

Katz v Beth Israel Medical Ctr.,
    No. 95 CV 7183, 2001 WL 11064 (S.D.N.Y. Jan. 4, 2001) ................9

Kerman v. City of New York,
    261 F.3d at 229 (2d Cir. 2001)...........................................................10

Malley v. Briggs,
    475 U.S. 335, 106 S. Ct. 1092 (1986).................................................10

McDonnell Douglas Corp. v. Green,
    411 U.S. 792, 93 S.Ct. 1817 (1973).....................................................4

Mitchell v. Forsyth,
    472 U.S. 511, 105 S. Ct. 2806 (1985).................................................10

Pena v. Brattleboro Retreat,
    702 F.2d 322 (2d Cir. 1983)..................................................................9

Robison v. Via,
    821 F.2d 913 (2d Cir. 1987)................................................................10

Sheppard v. Beerman,
    317 F.3d 351 (2d Cir.),
    cert. denied, 540 U.S. 822, 124 S.Ct. 135 (2003) .................................6

Stetson v. NYNEX,
    995 F.2d 355 (2d Cir. 1993)..................................................................9

Swierkiewicz v. Sorema,
    534 U.S. 506, 122 S. Ct. 992 (2002).....................................................4

Texas Department of Community Affairs v. Burdine,
    450 U.S. 248, 101 S. Ct. 1089 (1981)...................................................4

**Cases**                                                                                      **Pages**

Weg v. Macchiavola,
    995 F.2d 15 (2d Cir. 1993)..................................................................................9

Wesolowski v. Bockelman,
    No. 05 CV 0321, 2007 U.S. Dist. LEXIS 64806 (N.D.N.Y Aug. 31, 2007)............................8

Ying Jing Gan v. the City of New York,
    996 F.2d 522 (2d Cir. 1993)................................................................................10

**Statutes**

42 U.S.C. § 1983................................................................................................1, 4

## PRELIMINARY STATEMENT

Plaintiff, a retired Police Lieutenant, formerly employed by the City of New York ("City") in the City's Police Department ("NYPD"), brings this § 1983 action against the City, and NYPD Assistant Commissioner Joseph Fox ("Chief Fox")[1], alleging that he was retaliated against for lawfully performing his duties as an NYPD Lieutenant.  Plaintiff alleges that in 2004, he issued a summons to a "friend" of Chief Fox, and that Chief Fox thereafter initiated a campaign of retaliation against him, including harassment, a transfer, and eventually forcing him to retire prematurely.

Defendants now move to dismiss the Complaint on the grounds that it fails to state a claim upon which relief can be granted.  Plaintiff's Equal Protection Clause claim fails because the Complaint does not allege that defendants intentionally discriminated against plaintiff on account of any protected characteristic.  Nor does it allege that plaintiff was treated worse than or differently than similarly situated individuals on the basis of any protected characteristic.  Thus, the Equal Protection Clause claim must be dismissed.

To the extent that plaintiff is asserting a claim of First Amendment retaliation, that claim also fails as a matter of law.  First, the issuance of a traffic summons is not speech.  Second, inasmuch as plaintiff is alleging that he complained about his treatment following the issuance of the traffic summons, such a complaint was unquestionably connected to the plaintiff's official duties as an NYPD Lieutenant.  Thus, under the Supreme Court's recent decision in Garcetti v. Ceballos, plaintiff's claim is not actionable and must be dismissed.  547 U.S. ___, 126 S. Ct. 1951 (2006).

---

[1] Chief Fox is sued as "Chief Joe Fox."  References to "§ 1983" are to 42 U.S.C. § 1983.

## STATEMENT OF FACTS[2]

Plaintiff was appointed as a Police Officer with the NYPD on July 16, 1984. <u>See</u> Complaint, dated August 27, 2007 ("Complaint"), at ¶ "9," which is annexed hereto as Appendix Exhibit "A," for the convenience of the Court. Plaintiff was promoted to the ranks of Sergeant and Lieutenant in December, 1998, and March, 2002, respectively. <u>Id.</u> at ¶¶ "10," "11." On October 18, 2004, plaintiff issued a summons to retired NYPD Sergeant Louis A. Campanelli for failing to wear a seatbelt while driving a motor vehicle. <u>Id.</u> at ¶¶ "12," "13." Plaintiff alleges that Mr. Campanelli and Chief Fox worked together when they were Police Officers, and that they "continue to be friends today." <u>Id.</u> at ¶¶ "14," 15." According to plaintiff, the day after he issued a summons to Mr. Campanelli, "at the direction of [Chief] Fox, Captain Dominik Collisuano called plaintiff at his home and stated that Plaintiff was in 'big trouble' because he wrote a summons to Campanelli." <u>Id.</u> at ¶ "16." Plaintiff alleges that Captain Collisuano demanded that plaintiff provide him with a copy of the summons he issued to Mr. Campanelli. <u>Id.</u> at ¶ "17."

Two days later, according to plaintiff, two unnamed NYPD Inspectors, Captain Jackle and Lieutenant Richard Tully arrived at the plaintiff's precinct while he was conducting roll call, and searched plaintiff's locker and uniform shirt and pant pockets "purportedly seeking a memo book that Plaintiff reported missing." Complaint at ¶¶ "18," "19." Plaintiff further alleges that on October 28, 2004, plaintiff was sent to the NYPD Inspections Unit where he was "interrogated for two hours as to why he issued a summons to Campanelli." <u>Id.</u> at ¶ "21." Thereafter, plaintiff alleges that he was transferred to the NYPD's 69th Precinct, which, according

---

[2] On a motion to dismiss, the allegations of fact in the complaint are deemed true and the legal sufficiency of the complaint is tested. This statement of facts is drawn from the Complaint and defendants neither admit nor deny any of the facts alleged therein.

to plaintiff, is the farthest from his home. Id. at ¶ "22." Plaintiff alleges that his assignment to the 69th Precinct resulted in a 10% decrease in his salary. Id. at ¶ "23." He also contends that pursuant to orders of Chief Fox, he was not allowed to take time off from work, and was subjected to absurd and unnecessary levels of scrutiny. Id. at ¶¶ "24," and "25." This, according to plaintiff, was done in order to force him to retire prematurely. Id. at ¶¶ "25," "27," and "28." Plaintiff alleges that as a result of the purported harassment he was subjected to at the 69th Precinct, he "chose to retire on December 31, 2004." Id. at ¶ "28."

On September 13, 2007, plaintiff commenced this action, alleging that defendants retaliated against him and constructively terminated his employment because he issued a traffic summons to a friend of Chief Fox.

## ARGUMENT

### THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

**A.    The Plaintiff's Equal Protection Clause Claim Fails As A Matter Of Law.**

   In assessing a § 1983 Equal Protection Clause claim, the Second Circuit applies the McDonnell Douglas burden shifting analysis.  See Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 146 (2d Cir. 1999).  Under that framework, plaintiff initially bears the burden of producing a *prima facie* case, defendants then have the burden of articulating a legitimate reason for their action, and plaintiff must then show that the proffered reason is a  pretext for discrimination.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94 (1981).  A *prima facie* case requires that plaintiff show that (1) plaintiff was within a protected group, (2) plaintiff was qualified for and satisfactorily performed the functions of his position, (3) plaintiff suffered an adverse employment action, and (4) that the adverse action took place under circumstances giving rise to an inference of discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824 (1973).  To demonstrate pretext a plaintiff must demonstrate that (1) the reasons articulated by the employer are false, and (2) the real reason for the employer's conduct was unlawful discrimination.  See James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000).  The burden of production shifts, but the burden of persuasion remains with plaintiff.

   A plaintiff in an employment discrimination case is not required at the pleading stage to establish a *prima facie* case of discrimination.  See Swierkiewicz v. Sorema, 534 U.S. 506, 510, 122 S.Ct. 992, 996-97 (2002).  However, under the Supreme Court's recent holding in Bell Atlantic v. Twombly, plaintiff must allege "enough facts to state a claim to relief that is

plausible on its face." ___ U.S. ____, 127 S.Ct. 1955, 1974 (2007); see Boss v. Kelly, No. 07 CV 2113, 2007 U.S. Dist. LEXIS 62348, at *8 (S.D.N.Y. Aug. 23, 2007)[3].

Here, plaintiff fails to allege sufficient facts to state an Equal Protection Clause claim that is plausible on its face. Plaintiff alleges that he was victimized and retaliated against after he issued a summons to a friend of Chief Fox. See Complaint at ¶¶ "12" through "28." Although plaintiff indicates his national origin (American), and his gender (Male), nowhere in the Complaint does plaintiff allege that he has been treated differently or poorly because of these characteristics. To the contrary, plaintiff's central contention is that he was forced to retire prematurely because he issued a summons to a friend of Chief Fox. See generally Complaint. Plaintiff does not allege that his employer or Chief Fox intentionally discriminated against him because of any protected characteristic such as his color, race, gender, or national origin. This is an end to plaintiff's Equal Protection Clause claim, and that claim must be dismissed. See Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999)("To state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender.").

## B.    Plaintiff Fails To State A Claim Of First Amendment Retaliation.

The Supreme Court has established that while the First Amendment protects public employees' speech in certain instances, it does not empower employees to "constitutionalize the employee grievance." Garcetti v Ceballos, 547 U.S. ___, 126 S. Ct. 1951, 1959 (2006) (quoting Connick v. Meyers, 461 U.S. 138, 154, 103 S.Ct. 1684, 1693-94 (1983)); see Benvenisti v. City of New York, No. 04 CV 3166, 2006 U.S. Dist. LEXIS 73373, at *21

_____

[3] Pursuant to Your Honor's Individual Practice Rules, this and several other unreported decisions which defendants cite to in this Memorandum of Law, are collectively annexed hereto as Appendix "B."

(S.D.N.Y. Sept. 23, 2006). The Supreme Court reasoned that "government employers, like private employers, need a significant degree of control over their employees' words and actions" to operate efficiently and provide necessary services. Garcetti, 547 U.S. at ___, 126 S. Ct. at 1958.

In order to establish a *prima facie* case of First Amendment retaliation, the employee must show, by a preponderance of the evidence, that: (1) the plaintiff spoke "as a citizen on a matter of public concern," Connick, 461 U.S. at 147, 103 S.Ct. at 1690, rather than as an employee on matters of personal interest; (2) plaintiff suffered an adverse employment action; and (3) the speech was a substantial or motivating factor in the adverse employment action. See Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir 2003); Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir.), cert. denied, 540 U.S. 822, 124 S.Ct. 135 (2003). In determining whether an employee is speaking on matters of public concern, the "controlling factor" is whether "his expressions were made pursuant to his official duties." Garcetti, 547 U.S. ___, 126 S.Ct. at 1959-60. As the Supreme Court held in Garcetti:

> When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

Id. at 1960. Finally, the "inquiry into the protected status of speech is one of law, not fact", and thus, is ripe for this Court's adjudication. See Connick, 461 U.S. at 148, n. 7, 103 S.Ct. at 1690, n. 7.

In the instant case, Plaintiff fails to establish a *prima facie* case and, as such, the court should grant defendants' motion to dismiss. As an initial matter, plaintiff does not allege that he spoke out in any way concerning the issuance of the traffic summons to Chief Fox's "friend." Plaintiff simply alleges that he was retaliated against for "lawfully performing his

duties as a lieutenant with the New York City Police Department." Complaint at ¶ "1." The issuance of a summons cannot be considered to be "speech," let alone protected under any definition of that word. Inasmuch as plaintiff is alleging that he complained about his treatment following the issuance of the summons and was subsequently retaliated against, his claim fails as a matter of law.

In <u>Brewster v. City of Poughkeepsie</u>, which was decided after <u>Garcetti</u>, this Court addressed claims which are nearly identical to those interposed in the instant case. 434 F.Supp.2d 155 (S.D.N.Y.)( McMahon, J.), <u>judgment as a matter of law granted on remaining claims</u>, 447 F. Supp. 2d 342 (S.D.N.Y. 2006). In <u>Brewster</u>, plaintiff, the wife of a Police Officer, claimed, *inter alia,* that she was terminated from her position as a civilian Parking Enforcement Agent, as a result of her husband's criticism of the Police Chief's decision to dismiss two pending traffic summonses issued by her husband. 434 F.Supp.2d at 156. In response to the Police Chief's verbal request that plaintiff's husband dismiss the summonses, and the Chief's written directive that the summonses be dismissed, the plaintiff's husband, through counsel, wrote a letter to the Chief and Deputy Chief of Police "strongly object[ing] to the dismissals." <u>Id.</u> (internal citations omitted). One month later, the plaintiff's husband, again through counsel, complained to the District Attorney that the Chief of Police had "abuse[d] his discretion," and requested that the District Attorney's office investigate the matter to determine whether the Chief's actions constituted official misconduct. <u>Id.</u> (internal citations omitted).

In dismissing Brewster's First Amendment retaliation claim, Judge McMahon first reviewed the impact of the <u>Garcetti</u> case, and held that:

> Joseph Brewster was a police officer. His speech related to his supervisor's decision to dismiss two pending traffic summonses he had issued. ...

>Officer Brewster's letters to the Chief and Deputy
>Chief of Police and to the District Attorney related
>to his daily professional activities, which included
>determining whether sufficient evidence existed to
>prosecute pending traffic tickets. Accordingly,
>Officer Brewster's expressions are not protected
>speech, and cannot form the basis of a retaliation
>claim.

Brewster, 434 F.Supp.2d at 156-57 (internal citations omitted)(emphasis supplied).    Judge

McMahon further noted that the fact that plaintiff was alleging she was retaliated against for her

husband's conduct was of no consequence, because "if Officer Brewster does not have a cause of

action based on his own unprotected speech- and he does not- his wife certainly cannot state a

claim for retaliation based on that same unprotected speech."    Id. at 157; see Wesolowski v.

Bockelman, No. 05 CV 0321, 2007 U.S. Dist. LEXIS 64806, at *8-10 (N.D.N.Y Aug. 31, 2007).

Brewster, is practically indistinguishable from this case, and requires the

dismissal of plaintiff's First Amendment retaliation claim.    The instant plaintiff, like the Police

Officer in Brewster, issued a traffic summons while acting in his official capacity as a Police

Officer.    In Brewster, the officer complained to several public officials once his supervisor, the

Chief of Police, directed him to dismiss the summonses.    In the instant case, plaintiff does not

even allege that he complained to anyone about the summons or the alleged harassment he was

subjected to following the issuance of the summons to Mr. Campanelli.    Even assuming,

arguendo, that plaintiff had complained about his treatment, as in Brewster, his complaints

would have concerned his official duties as a Police Officer.    Thus, as in Brewster, and Garcetti,

the instant plaintiff's speech would not have been protected because it would have concerned his

official duties as a Police Officer.    Accordingly, to the extent that the Complaint can be read to

assert a First Amendment retaliation claim, that claim fails as a matter of law and must be

dismissed.

It should also be noted that none of the actions of which plaintiff complains are materially adverse employment actions. See, e.g., Fridia v Henderson, No. 99 CV 10749, 2000 WL 1772779, at *7 (S.D.N.Y. Nov. 30, 2000) (excessive work, denials of requests for leave with pay and a supervisor's general negative treatment of the plaintiff are not materially adverse changes in the terms, conditions or privileges of employment); Katz v Beth Israel Med. Ctr., No. 95 CV 7183, 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001) ("Being yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions"). Nor can the cumulative effect of the individually alleged adverse employment actions substitute for showing an actual adverse action. Hill v. Rayboy-Brauestein, No. 02 CV 3770, 2006 WL 3298383, at *23 n.22 (S.D.N.Y. Nov. 9, 2006). Finally, plaintiff's allegations are patently insufficient to establish that he has a plausible constructive discharge claim. See Pena v. Brattleboro Retreat, 702 F.2d 322, 324-25 (2d Cir. 1983); Stetson v. NYNEX, 995 F.2d 355, 360-61 (2d Cir. 1993)("plaintiff must show that the employer 'deliberately m[ade his] working conditions so intolerable that [he was] forced into involuntary resignation'")(quoting Pena, 702 F.2d at 324). Accordingly, the Complaint must be dismissed and the requested relief denied.

## C.    Chief Fox Is Entitled To Qualified Immunity.

The doctrine of qualified immunity shields government officials from liability for damages in connection with the performance of discretionary official functions, provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738-39 (1982); Weg v. Macchiavola, 995 F.2d 15, 18 (2d Cir. 1993). The purpose of qualified immunity is to avoid unduly chilling official action by exposing officials to personal

damage liability for good faith judgments. Harlow, 457 U.S. at 814-15, 102 S.Ct. at 2736-37. Qualified immunity is "an immunity from suit rather than the mere defense to liability and is effectively lost if the case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2816 (1985).

The availability of the qualified immunity defense turns on the "objective legal reasonableness" of the allegedly unlawful action, "assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038 (1987); Ying Jing Gan v. the City of New York, 996 F.2d 522, 531 (2d Cir. 1993); Benitez v. Wolff, 985 F.2d 662, 666 (2d Cir. 1993). "The objective element of this test requires the court to look beyond the generalized constitutional protection, such as the right to be free of unreasonable searches and seizures, and to determine whether the law is clearly established in a more particularized sense." Kerman v. City of New York, 261 F.3d 229, 236 (2d Cir. 2001).

Even if the constitutional right in question is clearly established, a government actor may still be shielded by qualified immunity if "it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991). The official's actions are objectively reasonable where "officers of reasonable competence could disagree" on whether the conduct at issue violated clearly established rights. In such circumstances qualified immunity applies and shields the individual defendant from suit under section 1983. Cartier v. Lussier, 955 F.2d 841, 847 (2d Cir. 1992); Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987). See also Malley v. Briggs, 475 U.S. 335, 340-41, 106 S.Ct. 1092, 1095-96 (1986). The doctrine of qualified immunity provides protection "to all but the plainly incompetent or those who knowingly violate the law." Id.

In the event the Court denies defendants' motion, it should nevertheless grant Chief Fox qualified immunity for the actions imputed to him. Assuming the facts alleged in the Complaint are true, Chief Fox's actions were not violative of a "clearly established right." This is particularly true in light of the fact that Supreme Court's decision in <u>Garcetti</u>, had not yet been issued, and the law concerning First Amendment retaliation in the context of speech during the course of the employer's business was unsettled. Thus, Chief Fox is entitled to qualified immunity, and all claims against him should be dismissed.

## CONCLUSION

**WHEREFORE**, defendants respectfully request that their motion to dismiss be granted, that an order dismissing the Complaint be issued, that judgment in favor of defendants be entered and that defendants be granted costs, fees, and disbursements together with such other and further relief as the Court deems just and proper.

Dated:     New York, New York
           November 6, 2007

                                **MICHAEL A. CARDOZO**
                                Corporation Counsel of the
                                   City of New York
                                Attorney for Defendants
                                100 Church Street, Room 2-184
                                New York, New York 10007-2601
                                (212) 788-8688

                    By:    **ECF:**          /s/
                                   _____
                                   Ivan A. Mendez, Jr.
                                   Assistant Corporation Counsel

**ALAN M. SCHLESINGER,**
**IVAN A. MENDEZ, JR.**
   Of Counsel

# APPENDIX A

JUDGE KAPLAN

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |

SALVATORE COSTA,

V.

THE CITY OF NEW YORK and CHIEF JOE FOX.

## SUMMONS IN A CIVIL ACTION

CASE NUMBER:

## 07 CIV 8032

TO: (Name and address of Defendant)

Chief Joe Fox
c/o The City of New York
New York City Police Department
One Police Plaza
New York, New York 10038

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

David M. Fish
500 Fifth Avenue
Suite 5100
New York, New York 10110

*EMPIRE PROCESS*

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

_(signature)_

(By) DEPUTY CLERK

DATE

JUDGE KAPLAN

DAVID M. FISH
COUNSELOR AND ATTORNEY AT LAW
*Attorney for Plaintiff*
500 Fifth Avenue
Suite 5100
New York, New York 10110
(212) 869-1040
    David M. Fish (7606)



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SALVATORE COSTA,

             **Plaintiff,**

    **-against-**

**THE CITY OF NEW YORK**
**and CHIEF JOE FOX,**

          **Defendants.**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

07 Cv. _____ (___)(___)

**VERIFIED COMPLAINT**

**PLAINTIFF DEMANDS**
**A TRIAL BY JURY**

Plaintiff, Salvatore Costa, by and through his attorney, David M. Fish, complaining of the Defendants, The City of New York and Police Chief Joe Fox, respectfully alleges as follows:

## INTRODUCTION

1.    This is a proceeding for damages to redress the deprivation of rights secured to the Salvatore Costa under the Fourteenth Amendment of the United States Constitution, 42 U.S.C. §1983, as a result of Defendants retaliation against him for lawfully performing his duties as a lieutenant with the New York City Police Department. This unlawful retaliation has led to the destruction of Costa's professional career, and caused both him and his family extreme emotional distress.

## JURISDICTION AND VENUE

2.    The jurisdiction of the Court over this controversy is based upon 28 U.S.C. §1343(3).

3.    Venue lies in the United States District Court for the Southern District of New York, this being the District in which the claim arose and the Defendants are found.

## PARTIES

4.    Plaintiff Salvatore Costa ("Plaintiff") is a male citizen and is a resident of the State of New Jersey.

5.    Upon information and belief, Defendant the City of New York (the "City") is a municipal corporation within the State of New York.

6.    Upon information and belief, the New York City Police Department ("NYPD") is a department or agency of the City and it is responsible for the appointment, training, supervision, promotion and discipline of all employees of the Defendant NYPD including the police officers at issue.

7.    Upon information and belief, Defendant Chief Joe Fox was, at all relevant times, an employee of the NYPD and the City.

8.    At all times hereinafter mentioned, Defendant Joe Fox ("Defendant Fox") was acting as an agent, servant and employee of the NYPD and the City, and acting under color of state law.

2

## STATEMENT OF FACTS

9.      Plaintiff began his employment as a police officer with the NYPD on July 16, 1984.

10.     In December 1998, Plaintiff was promoted to sergeant.

11.     In March 2002, Plaintiff was promoted to lieutenant.

12.     On October 18, 2004, Plaintiff lawfully issued a summons to Louis A. Campanelli for failing to wear a seatbelt while driving a motor vehicle.

13.     Campanelli is a retired NYPD sergeant.

14.     Campanelli worked with Defendant Fox when they were police officers.

15.     Campanelli and Fox continue to be friends today.

16.     On October 19, 2004, at the direction of Defendant Fox, Captain Dominik Collisuano called Plaintiff at his home and stated that Plaintiff was "in big trouble" because he wrote a summons to Campanelli.

17.     Collisuanno demanded a copy of the summons.

18.     On October 21, 2004, NYPD Inspectors, Captain Jackle and Lieutenant Richard Tully arrived at Plaintiff's precinct while he was conducting roll-call to his platoon of three sergeants and approximately sixty police officers.

19.     Captain Jackle and Lieutenant Tully searched Plaintiff's locker and uniform shirt and pants pockets, purportedly seeking a memo book that Plaintiff reported missing.

20.     This action was against NYPD procedures and done exclusively to embarrass Plaintiff in front of his platoon and undermine his authority.

21.     On October 28, 2004, Plaintiff was sent to the NYPD inspections unit and was interrogated for two hours as to why he issued a summons to Campanelli.

3

22.    Following the interrogation, Plaintiff was transferred to the 69th Precinct, the furthest Brooklyn precinct from Plaintiff's home.

23.    At the 69th precinct, Plaintiff was assigned to the day shift, which resulted in a 10% decrease in salary.

24.    At the 69th precinct, Plaintiff was not permitted any time off, pursuant to orders from Defendant Fox.

25.    At the 69th precinct, Plaintiff's performance came under absurd and unnecessary level of scrutiny – purportedly at Defendant Fox's directions – designed to force Plaintiff to retire.

26.    Captain Collisuanno and representatives from the Lieutenants Benevolent Association informed Plaintiff that he will be under extreme scrutiny until he retires.

27.    Plaintiff did not wish to retire; he loved his job prior to October 19, 2004, and planed to work at least until the age of 55.

28.    However, as a result of the persistent and unrelenting harassment and retaliation, Plaintiff chose to retire on December 31, 2004.

29.    As a result of the acts of Defendants, Plaintiff has suffered economic and emotional harm.

30.    The Defendants' acts were performed with malice and reckless indifference to Plaintiff's protected civil rights.

4

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983
## (EQUAL PROTECTION UNDER THE LAW)

31.     Plaintiff repeats each and every allegation above with the same force and effect as if fully set forth herein.

32.     Defendants forced Plaintiff to retire (constructive discharge) his employment with the NYPD, after they deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourteenth Amendment to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983, by retaliating against him for obeying the law as a police officer.

33.     All of the above mentioned acts of Defendants, their agents, servants and employees, were carried out under color of state law.

34.     All of the above mentioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

35.     The acts complained of were carried out by Defendant Fox in his official capacities as a police officer/police chief, with all of the actual and/or apparent authority attendant thereto.

36.     The acts complained of were carried out by Defendant Fox in his official capacity as a police officer/police chief, pursuant to the customs, usages, practices, procedures, and the rules of the City and the NYPD, all under the supervision of ranking officers of the NYPD.

37.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

5

## SECOND CLAIM FOR RELIEF
## MUNICIPAL LIABILITY

38.    Plaintiff repeats each and every allegation above with the same force and effect as if fully set forth herein.

39.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

40.    The above mentioned customs, policies, usages, practices, procedures and rules of the City and the NYPD included, but were not limited to the use of retaliation against police officers lawfully performing their duties, if such performance tended to implicate a fellow officer in the commission of a crime or violation.

41.    The foregoing customs, policies, usages, practices, procedures and rules of the City and the NYPD constituted deliberate indifference to the well-being and constitutional rights of Plaintiff.

42.    The foregoing customs, policies, usages, practices, procedures and rules of the City and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiff as alleged herein.

43.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City and the NYPD, Plaintiff was compelled to retire from his employment, causing him economic damage and extreme emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays for judgment against the defendants for;

1    Compensatory damages in an amount that the trier of fact considers just and fair;

2    Punitive damages in an amount that the trier of fact considers sufficient to punish and deter each defendant against whom these damages are awarded;

3    Costs of suit;

4    Reasonable attorney's fees; and

5    All other relief that is just and proper.

### JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff herein demands a trial by jury of all issues in this action.

Dated:    New York, New York
          August 27, 2007

DAVID M. FISH
COUNSELOR AND ATTORNEY AT LAW

By: *David Fish*

David M. Fish (7606)
*Attorney for the Plaintiff*
500 Fifth Avenue
Suite 5100
New York, New York 10110
(212) 869-1040

7

## VERIFICATION

STATE OF NEW JERSEY    )
                       ) ss:
COUNTY OF _____ )


I, SALVATORE COSTA, being duly sworn, depose and say: I am the plaintiff in

the above-entitled action; I have read the foregoing Verified Complaint and know the

contents thereof, and same are true to my own knowledge, except for the matters herein

to be alleged upon information and belief, and as to those matters, I believe it to be true.


                                              _____
                                              SALVATORE COSTA


Sworn to before me this
28 day of August 2007


_____
Notary Public

DAVID FISH
Notary Public State of New York
Reg. No. 02FI6106018
Qualified in County of Queens
Commission Expires Feb. 23, 2011


-8-

# APPENDIX B

LEXSEE



Analysis
As of: Nov 03, 2007

**KENNETH BOSS, Plaintiff, -against- RAYMOND W. KELLY, as Police Commissioner of the City of New York, THE POLICE DEPARTMENT OF THE CITY OF NEW YORK, and THE CITY OF NEW YORK, Defendants.**

**07 Civ. 2113 (SHS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 62348*

**August 23, 2007, Decided**

**PRIOR HISTORY:** *Boss v. Kelly, 17 A.D.3d 269, 793 N.Y.S.2d 423, 2005 N.Y. App. Div. LEXIS 4274 (N.Y. App. Div. 1st Dep't, 2005)*

**COUNSEL:** [*1] For Kenneth Boss, Plaintiff: Edward W. Hayes, LEAD ATTORNEY, Edward W. Hayes, PC, New York, NY; Rae Downes Koshetz, LEAD ATTORNEY, New York, NY.

For Raymond W. Kelly, as Police Commissioner of the City of New York, The Police Department of The City of New York, The City of New York, Defendants: Jonathan Michael Bardavid, LEAD ATTORNEY, New York City Law Department, New York, NY; Lisa Marie Griffith, LEAD ATTORNEY, NYC Law Department, Office of the Corporation Counsel, New York, NY.

**JUDGES:** Sidney H. Stein, U.S.D.J..

**OPINION BY:** Sidney H. Stein

**OPINION**

OPINION & ORDER

    SIDNEY H. STEIN, U.S. District Judge.

    This lawsuit constitutes a second attempt by New York City Police Officer Kenneth Boss to convince a court to override the decision made by NYPD Commissioner Raymond W. Kelly to restrict Officer Boss's use of a firearm while on duty. Kelly placed this restriction on Boss because of his involvement in a highly publi-

cized and racially charged incident in 1999 in which Boss and three other police officers fired a large number of gunshots in the fatal shooting of Amadou Diallo. As explained below, the result in the present case is no different than when Boss advanced similar arguments in the course of an Article 78 proceeding [*2] he brought in the New York state courts. Because Boss has failed to state a valid claim for deprivation of any constitutionally protected property or liberty interest without due process, the Complaint must be dismissed.

**I. Background**

    The facts alleged in the Complaint, which are accepted as true for the purposes of this motion, are as follows. Plaintiff Kenneth Boss is a police officer employed by the New York City Police Department ("NYPD"). (Compl. P 11.) On February 4, 1999, Boss was one of four officers involved in the fatal shooting of Amadou Diallo, an unarmed twenty-two year old man of African descent. (Compl. P 14.) The incident received nationwide media attention and triggered protests related to the issue of police brutality. (Compl. P 15.)

    Following the incident, plaintiff surrendered his weapon to the NYPD. (Compl. P 15.) Shortly thereafter, the four officers involved in the shooting of Diallo, including Boss, were indicted by a grand jury for murder, reckless endangerment, manslaughter and criminally negligent homicide. (Compl. P 17.) Upon his indictment, the NYPD suspended Boss for thirty days and then returned him to duty on "modified assignment," which is a

duty status [*3] reserved for officers involved in disciplinary proceedings or criminal charges. (Compl. P 16.)

On February 25, 2000, after a trial, a jury found Boss not guilty of all charges. (Compl. P 18.) Subsequently, the NYPD Firearms Discharge Review Board concluded that Boss had not violated any NYPD firearms guideline, and recommended that plaintiff's duty status be reviewed in one year. (Compl. P 19.)

One year later - in April 2002 - Boss wrote to Commissioner Kelly asking that he be returned to full duty, but that request was denied. (Compl. P 21.) Boss was then assigned to the Emergency Service Unit's training school and repair shop, where he remained on "modified assignment" with no gun. (Compl. P 22.)

In August 2002, Boss commenced a proceeding in New York Supreme Court, New York County, pursuant to Article 78 of the New York Civil Practice Law and Rules, seeking restoration to full duty with a gun. He alleged in that petition that maintaining him on "modified assignment" without a gun was arbitrary and capricious and in excess of Commissioner Kelly's legal authority. (Compl. P 24.) In his affidavit submitted in opposition to Boss's Article 78 petition, Commissioner Kelly explained the reasons [*4] behind his decision to maintain Boss on "modified assignment" without a gun. (Compl. P 25.) Specifically, according to the Complaint, Kelly wrote that in light of the controversy surrounding the Diallo shooting and subsequent criminal trial, if Boss were restored to full duty with a gun, and ever had to take any police action involving the use of force, "he and the Department would be inappropriately subjected to pre-judgment." (Compl. P 26.) This, according to Boss, "brands Plaintiff as incompetent and dangerous on the authority of sheer speculation." (Compl. P 43.)

On April 14, 2004, Justice Michael Stallman of the New York Supreme Court granted in part and denied in part Boss's Article 78 petition in a written opinion. *Boss v. Kelly, 3 Misc. 3d 936, 776 N.Y.S.2d 772 (N.Y. Sup. Ct. 2004).* Justice Stallman wrote that the police commissioner "exercises broad discretion to manage the Police Department, necessarily including deployment of personnel and their assignment to appropriate duties." *Id. at 938.* Nevertheless, Justice Stallman concluded that the Patrol Guide - which sets forth personnel rules governing the NYPD - permitted "modified assignment" status only when there is misconduct [*5] or disciplinary action anticipated. *Id. at 941.* Here, no disciplinary action was anticipated by the time the Article 78 was commenced, and the criminal charges had already been tried to verdict. *Id. at 938, 942.* Thus, the court concluded that Boss could not be kept on "modified assignment," although he could be assigned to a variety of other non-full duty assignments. *Id. at 942.* "It is clear," however, the court

wrote, "that petitioner's demand for full duty status is a demand for restoration of his gun." *Id. at 940.* As to that, the court concluded that the Patrol Guide did not require that Boss's gun had to be restored, and that the decision not to restore the gun was within Commissioner Kelly's "broad discretion to manage the Police Department." *Id. at 938, 940.* Thus, the court granted the petition in part and remanded the matter to the Commissioner for further action consistent with the opinion. *Id. at 943.*

The Appellate Division, First Department, later affirmed that determination, writing that "[t]he Commissioner's determination not to return the petitioner to full duty status does not violate departmental rules, ... and the decision not to restore his weapon was within the Commissioner's [*6] rationally exercised discretion. The Commissioner's stated reasons for denying restoration to full duty are neither irrational nor arbitrary and capricious." *Boss v. Kelly, 17 A.D. 3d 269, 270, 793 N.Y.S.2d 423 (1st Dep't 2005)* (internal citation omitted). Shortly thereafter, the NYPD changed Boss's duty status to "Full Duty No Gun." (Compl. P 25.)

In April 2006, Boss took military leave from the NYPD and deployed to Iraq as a marine, where he saw combat. (Compl. P 27.) Upon his later discharge from active military duty and return to the NYPD, Boss requested that he be restored to full duty with a gun (Compl. P 32); he was, however, given the same assignment and duty status that he had prior to his military leave: "Full Duty No Gun." (Compl. P 31.) As a result, according to the Complaint, his status has earned him the "mocking moniker 'Kenny No-Gun' among his colleagues." (Id.)

On March 12, 2007, Boss initiated the present action pursuant to *42 U.S.C. § 1983*, alleging in Count 1 that the City of New York, the NYPD, and Commissioner Kelly violated his property rights without due process by virtue of his duty assignment and in Count 2 that Commissioner Kelly violated his liberty rights [*7] without due process by filing an affidavit in the Article 78 proceeding that effectively "brands Plaintiff as incompetent and dangerous on the authority of sheer speculation." (Compl. P 43.) Boss seeks injunctive and declaratory relief and compensatory and punitive damages. Defendants now move to dismiss the Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim.

## II. Discussion

### A. Legal Standard

When reviewing a *Rule 12(b)(6)* motion to dismiss, the Court assumes the truth of all facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff. See *Cleveland v. Caplaw*

*Enters., 448 F.3d 518, 521 (2d Cir. 2006).* The Court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003)* (internal quotation marks omitted). At least until May 21 of this year - when the U.S. Supreme Court decided *Bell Atlantic Corp. v. Twombly, 550 U.S. , 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)* - a court could grant a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* "only if 'it [*8] appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *EEOC v. Staten Island Sav. Bank, 207 F.3d 144, 148 (2d Cir. 2000)* (quoting *Conley v. Gibson, 335 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*f.

In the Bell Atlantic opinion, the Supreme Court declared that the "no set of facts" language had "earned its retirement." *Bell Atlantic, 127 S. Ct. at 1969.* The Supreme Court went on to state that a motion to dismiss will be granted only if the plaintiff has not pled "enough facts to state a claim to relief that is plausible on its face." *Id. at 1974.* This articulation does not constitute a "universal standard of heightened fact pleading," but rather a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty, 490 F.3d 143, 2007 U.S. App. LEXIS 13911, at *35 (2d Cir. June 14, 2007).* Under the standard as phrased in either *Conley* or *Bell Atlantic,* defendants' motion should be granted.

**B. Boss's Constitutional Due Process Claims Must be Dismissed.**

The *Due Process Clause of the Fourteenth Amendment to the U.S. Constitution* [*9] provides that no state shall "deprive any person of life, liberty or property, without due process of law." *U.S. Const. amend. XIV.* In order to allege a violation of *Fourteenth Amendment* due process rights pursuant to *42 U.S.C. § 1983,* a plaintiff must first establish that he has suffered a deprivation of a constitutionally-protected liberty interest or property interest. See *Board of Regents v. Roth, 408 U.S. 564, 570-71, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)* (holding limited by *Paul v. Davis, 424 U.S. 693, 696, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976)); Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980); Finley v. Giacobbe, 79 F.3d 1285, 1296 (2d Cir. 1996); Federico v. Board of Educ., 955 F. Supp. 194, 198-99 (S.D.N.Y. 1997).*

If a constitutionally-protected interest is identified, the plaintiff must then show that he was deprived of that interest without the process that was due. See *Narumanchi v. Board of Trustees, 850 F.2d 70, 72 (1988).* "The second step of the analysis thus asks what process was

due to the plaintiff, and inquires whether that constitutional minimum was provided." *Id.* As explained below, both of plaintiff's claims fail as a matter of [*10] law because: 1) Boss cannot establish that he has a constitutional property interest in carrying a gun ·during the course of his employment with the NYPD; and 2) Boss's liberty interest claim - which arises out of Commissioner Kelly's affidavit in the Article 78 proceeding - is defeated by the judicial proceedings privilege, as defendant Kelly had absolute immunity for that affidavit.

*1. Boss Has Established No Property Interest in Carrying a Gun During the Course of His Employment for the NYPD, and Therefore Claim 1 Must Be Dismissed.*

Boss alleges in Claim 1 that even though Boss's duty status is officially "Full Duty No Gun," (Compl. P 25), without a gun he effectively is still on "modified assignment," a form of "disciplinary duty status" (Compl. P 35). By "maintaining him permanently on disciplinary duty status," he alleges all three defendants have "deprive[ed] him of constitutionally protected property rights . . . without providing him with the due process of law mandated by the *Fourteenth Amendment*." (Compl. P 35.)

However, to establish a property interest, a plaintiff must have "more than an abstract need or desire for [the property], [h]e must, instead, have a legitimate claim [*11] of entitlement to it under state or federal law in order to state a § 1983 claim." *Finley, 79 F.3d at 1296* (citing *Roth, 408 U.S. at 577).* Moreover, the U.S. Supreme Court has repeatedly "recognize[d] that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales, 545 U.S. 748, 756, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005)* (citing *Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 462-463, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989)).*

Although federal law controls what process is due, property interests themselves "'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Velez v. Levy, 401 F.3d 75, 85 (2d Cir. 2005)* (quoting *Roth, 408 U.S. at 577*); see also *Martz v. Incorporated Vill. of Valley Stream, 22 F.3d 26, 29-30 (2d Cir. 1994).*

Here, applying New York law, Boss cannot plausibly plead a "legitimate claim of entitlement," *Finley, 79 F.3d at 1296,* to possess a firearm while on duty because "[i]t is well [*12] settled that the possession of a handgun license is a privilege, not a right, which is subject to the broad discretion of the New York City Police Commissioner." *Papaioannou v. Kelly, 14 A.D.3d 459, 460,*

*788 N.Y.S.2d 378 (1st Dep't 2005)* (citing *Matter of Kaplan v Bratton, 249 A.D.2d 199, 201, 673 N.Y.S.2d 66 (1st Dep't 1998)* and *Matter of Fondacaro v Kelly, 234 A.D.2d 173, 177, 652 N.Y.S.2d 604 (1st Dep't 1996)*); accord *Sewell v. New York, 182 A.D.2d 469, 472, 583 N.Y.S.2d 255 (1st Dep't 1992)*. Thus, because defendants may "grant or deny" Boss's access to a firearm "in their discretion," *Town of Castle Rock, 545 U.S. at 756*, he has failed to state a plausible claim that he has a property interest in possessing a gun while on duty.

In response, plaintiff points out that the New York state court cases cited above arise from the Police Commissioner's decision to restrict a civilian's access to firearms, as opposed to his decision to restrict a police officer's access to firearms as part of his employment. However, plaintiff does not cite any legal authority suggesting that the Commissioner has less discretion in granting the right to carry firearms to police officers - employees over whom he [*13] may exercise considerable control within delimited discretion - than he does when granting that right to civilians.

To the contrary, both judicial decisions in Boss's own Article 78 proceeding explain that the Commissioner has considerable discretion in deciding whether an officer may carry a firearm. Justice Stallman noted that "[t]he Patrol Guide does not give an officer an absolute right to have a firearm under any and all circumstances," and therefore concluded that the decision "whether or not to restore an officer's firearm appears to be within the discretion of the officer's superiors, and ultimately, that of the Commissioner, rationally exercised." *Boss, 3 Misc. 3d at 940*. Similarly, the Appellate Division, First Department held that "the decision not to restore his weapon was within the Commissioner's rationally exercised discretion." *Boss, 17 A.D.3d at 270*.

Moreover, other courts have held that "[i]n determining the fitness of candidates, the Police Department, as the agency charged with the responsibility, is afforded 'wide discretion,' which is to be sustained unless clearly abused." *City of New York v. N.Y. City Civ. Serv. Comm'n, 20 A.D.3d 347, 348, 800 N.Y.S.2d 1 (1st Dep't 2005)*; see [*14] also Matter of Bruder v. Kelly, N.Y.L.J., Aug. 6, 2007, at 18 (N.Y. Sup. Ct. Jul. 31, 2007) (deferring to the discretion of the NYPD Commissioner regarding the reinstatement of a police officer involved in another highly-publicized and racially-charged police brutality case "in view of the importance of the public trust in police officers"). Thus, because defendants had "wide discretion" in deciding to place Boss on "Full Duty No Gun" status, Boss has no constitutional property interest in possessing a gun while on duty, and Claim 1 is dismissed with prejudice.

### 2. Commissioner Kelly's Affidavit Was Protected By Absolute Immunity, and Therefore Claim 2 Must Be Dismissed.

Boss contends in Claim 2 that Commissioner Kelly violated Boss's constitutional liberty interests by allegedly defaming Boss in an affidavit that was submitted to the state court in connection with his prior Article 78 proceedings. (Compl. P 43.) In this affidavit, Kelly provided the state court with his opinion as to Boss's competence to serve as an armed police officer, as well as to Boss's potential dangerousness to his fellow officers and to the community. (See Compl. PP 25-26, 43.) Specifically, he wrote that in [*15] light of the controversy surrounding the Diallo shooting and subsequent criminal trial, if Boss ever had to use a gun while on duty, "he and the Department would be inappropriately subjected to pre-judgment." (Compl. P 26.) According to Boss, the affidavit was a "conclusory and legally stigmatizing document" which was "the substantial equivalent of a professional obituary for Plaintiff." (Compl. PP 25, 26.)

Boss's liberty interest claim must "meet a 'stigma-plus' standard, which demands that the plaintiff[] establish 1) that [he] [was] defamed; and 2) that the defamation occurred in the course of the termination of governmental employment or was coupled with a deprivation of a legal right or status." *Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002)* (citing *Easton v. Sundram, 947 F.2d 1011, 1016 (2d Cir. 1991))*. "When the state ... publicly charges that [an employee] acted dishonestly or immorally, due process guarantees the employee an opportunity to defend [his] 'good name, reputation, honor and integrity.'" *Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 630 (2d Cir. 1996)* (citing *Roth, 408 U.S. at 573*).

For purposes of Boss's *section 1983* liberty interest claim, this [*16] Court looks to New York's substantive state law regarding defamation. See *Pisani v. Westchester County Health Care Corp., 424 F. Supp. 2d 710, 718 (S.D.N.Y. 2006)* ("Establishing defamation in the *§ 1983* context is no different than under New York State law."). The New York Court of Appeals has clearly held that statements made in the course of legal proceedings are absolutely privileged. *Park Knoll Associates v. Schmidt, 59 N.Y.2d 205, 209, 464 N.Y.S.2d 424, 451 N.E.2d 182 (1983)* ("a witness is immune from suit for defamatory remarks pertinent to a judicial proceeding"); see also *Mosesson v. Jacob D. Fuchsberg Law Firm, 257 A.D.2d 381, 382, 683 N.Y.S.2d 88 (1st Dep't 1999)* ("The Court of Appeals long ago established that a statement made in the course of legal proceedings is absolutely privileged if it is at all pertinent to the litigation."), app. denied, *93 N.Y.2d 808, 713 N.E.2d 417, 691 N.Y.S.2d 382 (1999)*. Here, because Commissioner Kelly possessed absolute privilege when he submitted the affidavit

to the state court in the course of Boss's Article 78 proceedings, and because Kelly's statements in that affidavit were directly relevant to those proceedings - they set forth his reasons for assigning Boss to duty without a gun - [*17] Boss's defamation claim should be dismissed.

Apparently realizing that Commissioner Kelly's actual affidavit cannot serve as the basis for Boss's defamation claim, plaintiff points out that his Complaint alleges that Kelly violated Boss's liberty interests not by submitting the affidavit itself, but by "standing by and behaving consistent with his sworn affidavit." (Compl. P 43.) However, the Court finds unpersuasive Boss's attempt to reclassify Kelly's privileged affidavit as either conduct or distinct speech because he did not at some later point withdraw or disavow the affidavit. Moreover, the portion of the Complaint describing this second cause of action does not allege any defamatory statements or conduct other than the affidavit submitted by Commissioner Kelly. [1] (See Compl. PP 41-46.) Thus, Boss's attempted distinction is meaningless and does not change the fact that his liberty interest claim is based on a privileged affidavit that the Commissioner submitted as part of a legal proceeding. Accordingly, Claim 2 is dismissed with prejudice.

> [1] In Boss's memorandum in opposition to this motion, he attempts to shift the basis of Claim 2 from Kelly's affidavit to the defendants' decision

[*18] to print the words "Restricted" and "No Firearms" on Boss's NYPD identification card. However, even if this Court were to look beyond the fact that Boss failed to plead in the Complaint that these two statements on his identification card were the basis of Claim 2, see Compl. PP 41-46, that claim would still fail because truth is an absolute defense to defamation. See *Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 301 (2d Cir. 1986)* (applying New York law). Here, plaintiff himself acknowledges that he is restricted insofar as he is not allowed to carry a firearm, and therefore any statement communicating those two accurate facts cannot as a matter of law serve as the basis for a defamation claim.

### III. Conclusion

Because Boss has failed to state a valid claim for deprivation of any constitutionally protected property or liberty interest without due process, defendants' motion to dismiss the Complaint is granted with prejudice.

Dated: New York, New York

August 23, 2007

SO ORDERED:

Sidney H. Stein, U.S.D.J.

3 of 4 DOCUMENTS



Positive
As of: Nov 03, 2007

**RON BENVENISTI, Plaintiff, - against - THE CITY OF NEW YORK and ELIZA-BETH GLAZER, individually and in her Official capacity, Defendants.**

**04 Civ. 3166 (JGK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 73373*

**September 23, 2006, Decided**

**SUBSEQUENT HISTORY:** Motion denied by *Benvenisti v. City of New York, 2007 U.S. Dist. LEXIS 46251 (S.D.N.Y., June 22, 2007)*

**PRIOR HISTORY:** *Benvenisti v. City of New York, 2006 U.S. Dist. LEXIS 396 (S.D.N.Y., Jan. 5, 2006)*

**COUNSEL:** [*1] For Ron Benvenisti, Plaintiff: Rick Ostrove, Leeds Morelli & Brown, P.C., Carle Place, NY.

For The City of New York, The New York City Department of Investigation, Defendants: Terri Feinstein Sasanow, New York City Law Depart. Office of the Corporation Counsel, New York, NY.

For Elizabeth Glazer, individually and in her official capacity, Defendant: Terri Feinstein Sasanow, New York City Law Depart. Office of the Corporation Counsel, New York, NY; John D. Giansello, Orrick, Herrington & Sutcliffe LLP, New York, NY.

**JUDGES:** John G. Koeltl, United States District Judge.

**OPINION BY:** John G. Koeltl

**OPINION**

*OPINION AND ORDER*

**JOHN G. KOELTL, District Judge:**

This dispute arises from a public employee's claim that his employer terminated him in retaliation for his protected speech. The plaintiff, Ron Benvenisti, was employed as a computer operations manager by the City of New York (the "City") in its Department of Investigations ("DOI") from July 2001 until December 18, 2002, when he was terminated. Benvenisti commenced this action in March 2004 against the City and Elizabeth Glazer, the DOI Chief of Staff, contending that his alleged retaliatory discharge violated the *First* [*2] and *Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983*, and the New York City Whistleblower Law, Administrative Code of the City of New York § 12-113 ("Whistleblower Law").[1]

> 1    The plaintiff originally brought these claims against DOI also. However, the plaintiff orally withdrew his claims against DOI at a pre-motion conference held on September 15, 2005. (*See* Defendants' Letter, dated Sept. 14, 2006.)

The defendants move for summary judgment, arguing that the plaintiff cannot satisfy the requisite elements of a *First Amendment* retaliation claim under *Section 1983*, cannot establish liability for the City and Glazer in her official capacity, and has no claim under the New York City Whistleblower Law because there is no private right of action under that statute. The Court has jurisdiction over this action pursuant to *28 U.S.C. §§ 1331* and *1367*.

For the reasons set forth below, the defendants' motion for summary [*3] judgment is **granted.**

**I.**

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).* "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo, 22 F.3d at 1224.* The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. [*4] *Celotex, 477 U.S. at 323.* The substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)); Gallo, 22 F.3d at 1223.* Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. *See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).* If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for [*5] trial." *Fed. R. Civ. P. 56(e).* The non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998).*

## II.

The following facts are undisputed unless otherwise noted. The plaintiff, Ron Benvenisti, was employed as a computer operations manager in the Citywide Informational Security Architecture Formulation Enforcement ("CISAFE") unit of DOI from July 2001 until December 18, 2002, when he was discharged. (Defendants' *Local Civil Rule 56.1* Statement of Undisputed Facts ("Defs.' Stmt.") PP 1-2; Plaintiff's Counter-Statement Pursuant to *Local Rule 56.1* ("Pl.'s Stmt.") PP 1-2; Compl. P 9.) Although many of the facts preceding the plaintiff's discharge are undisputed, the parties fundamentally disagree about the ultimate reason for the plaintiff's discharge.

## A.

The plaintiff alleges that he was discharged because he complained about and eventually threatened [*6] to report formally a conflict of interest involving DOI's employment of Eli Khedouri, a nephew of DOI Chief of Staff Elizabeth Glazer. (See Compl. P 26; Pl.'s Stmt. PP 4, 14, 26, 37, 38-39, 41-42, 45.)

As a computer operations manager, the plaintiff was responsible for managing the City's information security. (See Defs.' Stmt. P 3; Pl.'s Stmt. P 3; Ex. D to Aff. of Ron Benvenisti, May 5, 2006 ("Ben. Aff.").) His duties included managing engineers, analysts, consultants, and technical staff. (*Id.*) The plaintiff's performance evaluation, which the plaintiff signed on November 18, 2002, also evaluated the plaintiff on his "[p]resenting, explaining, and marketing the work unit's activities to higher level supervisors in the agency and/or persons and groups outside the agency." (Ex. D to Ben. Aff.)

One of the individuals that the plaintiff was responsible for supervising was Khedouri. (Defs.' Stmt. P 4; Pl.'s Stmt. P 4.) Khedouri was the nephew of the defendant Elizabeth Glazer. (Defs.' Stmt. P 4; Pl.'s Stmt. P 4; Decl. of Elizabeth Glazer, Oct. 28, 2005 ("Glazer Decl."), at 14.)

DOI first offered Khedouri a position as a volunteer intern in the CISAFE unit during the [*7] summer of 2002. (See Defs.' Stmt. P 5; Pl.'s Stmt. P 5.) Several weeks into the internship, DOI began considering Khedouri for a paid, full-time position. At the time, Benvenisti supported Khedouri was the nephew of the defendant Elizabeth Glazer. [2] (See Defs.' Stmt. P 5; Pl.'s Stmt. P 5; Ex. C to Depo. of Ron Benvenisti, May 25, 2005 ("Ben. Depo. I"), attached as Ex. C to Decl. of Terri Feinstein Sasanow, Oct. 28, 2005 ("Sasanow Decl.").)

---

2  For example, in an email regarding Khedouri's possible employment, the plaintiff stated that as an intern Khedouri had "demonstrated a level of knowledge, skill and hands on expertise that is industry top-tier excellent." (Ex. C. to Ben. Depo. I.) In responding to the current motion, the plaintiff qualified this recommendation by stating that

it was made in part because he was desperate for additional personnel. (Pl.'s Stmt. P 5.)

Before hiring Khedouri as a paid employee, DOI sought and received an official opinion from the City's Conflict of Interest Board ("COIB") to determine whether hiring [*8] Khedouri would violate any of the City's conflict rules because Khedouri was Glazer's nephew. (Defs.' Stmt. P 6; Pl.'s Stmt. P 6.) Based in part on the representation that Glazer would recuse herself from the day-to-day operations of CISAFE, the COIB advised DOI that hiring Khedouri would not violate any of the City's conflict rules. (Ex. T to Glazer Decl. at 2.) DOI then hired Khedouri as a paid, full-time employee in the CISAFE unit in August 2002. [3] (See Glazer Decl. at 14; Ex. C to Ben. Aff.)

> 3   The plaintiff did not learn of Khedouri's relationship with Glazer until right around the time he was hired. (Ben. Depo. I at 64.)

According to the plaintiff, Khedouri's employment created a number of problems within CISAFE. (See Pl.'s Stmt. P 4.) Khedouri worked less than other employees. (Ben. Depo. I at 15-16.) He often did not have his identification or his DOI-issued cell phone. (Id. at 16; Pl.'s Stmt. P 4.) The plaintiff regularly could not locate Khedouri or determine the work he was doing. ( [*9] Id.) When the plaintiff inquired about Khedouri's whereabouts, his staff would tell him that Khedouri was dining with Glazer or DOI Commissioner Rose Gill Hearn or working on special assignments for Glazer. (Ben. Depo. I at 16.)

In addition, the plaintiff alleges that the appearance that Khedouri received specialized treatement lowered office morale. (Id. at 17; Pl.'s Stmt. P 26.) Khedouri received a larger salary than more senior employees. [4] (See Ben. Depo. I at 16, 35; Depo. of David VanderNaalt, June 28, 2005 ("Vander. Depo."), at 80-81, attached as Ex. G to Sasanow Decl.) DOI allegedly hired Khedouri quickly despite the lack of documentation that had delayed past applications. (Ben. Depo. I at 20-21.) The plaintiff also testified that the Commissioner once personally inspected Khedouri's office to ensure that he was comfortable. (Id. at 79.)

> 4   Khedouri received an annual salary of $ 105,000 with benefits. (Vander. Depo. at 82.) However, prior to hiring Khedouri, the plaintiff himself had recommended that Khedouri receive a total salary package worth around $ 125,000 (with the benefits included in that value). (Ex. C. to Ben. Depo. I.)

[*10]  In October 2002, the plaintiff began complaining (and referring his staff's complaints) about Khe-

douri to his supervisor, David VanderNaalt. (See id. at 7-8, 11; Pl.'s Stmt. P 17.) These complaints concerned the alleged negative impact of Khedouri's performance on CISAFE's productivity, efficiency, and functionality. (See Ben. Depo. I at 18, 34-35; Pl.'s Stmt. P 26.) The plaintiff complained that Khedouri's salary and actions lowered office morale. (See Ben. Depo. I at 17-18; Pl.'s Stmt. P 26.) The plaintiff also alleges that he complained that Khedouri's salary was exorbitant and prevented DOI from hiring additional employees. (See Pl.'s Stmt. P 26.)

The plaintiff claims that he lodged these complaints on at least a weekly basis in formal status meetings with his supervisor, David VanderNaalt, and on an ad hoc basis at other times. (Ben. Depo. I at 21; see also Pl.'s Stmt. P 17.) The plaintiff alleges that he voiced similar complaints to other supervisors, Vincent Green and Robert Joyce. [5] (Id. at 28-30.)

> 5   According to the defendants, the precise organizational chart was as follows: the plaintiff was a CISAFE Manager. Above him was David VanderNaalt, the Deputy Director of CISAFE. Above VanderNaalt was Robert Joyce, DOI Inspector General and Assistant Commissioner. Above Joyce was Vincent Green, DOI Assistant Commissioner. Above Green was Dan Brownell, DOI Deputy Commissioner. Above Brownell was Elizabeth Glazer, DOI Chief of Staff. Brownell reported to Glazer on all issues other than those involving CISAFE. Finally, above Glazer was Rose Gill Hearn, DOI Commissioner. The defendants explained this organizational chart at oral argument on September 12, 2006. The plaintiff did not disagree except to note that the plaintiff disputes that Glazer removed herself from all issues involving CISAFE.

[*11]  On the afternoon of December 17, 2002, after several months of inaction, the plaintiff told VanderNaalt that he planned to take his complaints to the New York City Council, the Conflict of Interest Board, or the Public Advocates Office. (Ben. Depo. I at 25-26; Pl.'s Stmt. P 42.) This was the first time that the plaintiff told VanderNaalt that he was intent on making a formal written complaint about Khedouri. (Ben. Depo. I at 37; Pl.'s Stmt. P 42.) [6] According to the plaintiff, VanderNaalt advised him to wait until the following day. (Ben. Depo. I at 26; Pl.'s Stmt. P 42.) The following morning, the plaintiff was discharged. (Id.)

> 6   These allegations are based on the plaintiff's own assertions, which the defendants accepted for purposes of this motion. VanderNaalt denied that the plaintiff ever told him that the plaintiff

intended to complain to the COIB. (Vander. Depo. at 187-88.)

**B.**

The defendants dispute the plaintiff's claim that he was terminated because of his alleged complaints. The defendants [*12] first present a different set of events, which they allege actually led to the plaintiff's discharge. Second, the defendants allege that the relevant decision makers knew nothing of the plaintiff's complaints when they ordered his discharge.

The defendants deny that the plaintiff was discharged because of his complaints about Khedouri. According to the defendants, the plaintiff's discharge concluded a series of progressive disciplinary measures dating back to July 2002, which were unrelated to the plaintiff's alleged complaints.

In November 2001, the plaintiff purchased a 2000 Ford Crown Victoria, Model P71 "Police Interceptor" and installed additional emergency equipment in the vehicle. (Defs.' Stmt. PP 11-12; Pl.'s Stmt. PP 11-12.) He used the lights and sirens he installed in the car to pass other motorists on his way to work, travel quickly to a "computer emergency," and pull over motorists who he believed to be driving erratically. (Defs.' Stmt. P 14; Pl.'s Stmt. P 14.)

The plaintiff was not a police officer, peace officer, or emergency medical technician. (Defs.' Stmt. P 8; Pl.'s Stmt. P 8.) The plaintiff also owned several handguns, which he was licensed to carry, and a pair [*13] of handcuffs, which he may have carried on his person while working at DOI. (Defs.' Stmt. P 9; Pl.'s Stmt. P 9.)

On July 11, 2002, two Assistant Commissioners of DOI met with the plaintiff to discuss his vehicle and his manner of dress, which the defendants contend suggested that the plaintiff was conveying the impression that he was acting as a law enforcement officer. (*See* Defs.' Stmt. PP 10, 15-16; Pl.'s Stmt. PP 10, 15-16; Ben. Depo. I at 158.) The plaintiff disputes that he was told to remove the emergency equipment from his vehicle. (Pl.'s Stmt. P 16.) The plaintiff claims that he was told that he could keep his emergency lights, as long as he moved them from his dashboard to the floor of his car. (*Id.*) The plaintiff does not however dispute that he was told to tone down his appearance at the meeting. (*Id.*) After the meeting, the plaintiff showed one of the Assistant Commissioners that he had met with, Vincent Green, that the police package on his vehicle had been disconnected and was inoperable. (Defs.' Stmt. P 18; Pl.'s Stmt. P 18.)

The defendants allege that on October 1, 2002, the plaintiff flashed his emergency lights at a DOI employee. (Defs.' Stmt. P 20.) [*14] The plaintiff does not recall this incident. (Pl.'s Stmt. P 20.) However, it is undisputed that on October 4, 2002, the plaintiff had another meeting with supervisors where he was given a written warning directing him to remove the emergency equipment from his vehicle. (Defs.' Stmt. P 21; Pl.'s Stmt. P 21.) The warning contained in the memorandum advised the plaintiff that failure to comply with the directive could result in sanctions, including disciplinary action or loss of employment. (Defs.' Stmt. P 22; Pl.'s Stmt. P 22.)

On October 8, 2002, DOI General Counsel Marjorie Landa and Inspector General Robert Joyce interviewed the plaintiff. (Defs.' Stmt. P 23; Pl.'s Stmt. P 23.) At the interview, the plaintiff admitted to using the lights and sirens in his car to pull over drivers. (Defs.' Stmt. P 24; Pl.'s Stmt. P 24.) The plaintiff also admitted to one altercation with a New York Police Department ("NYPD") Traffic Officer over the plaintiff's impermissible use of his parking permit. (*Id.*)

From October to November 2002, there were continuing discussions at executive staff meetings about whether the plaintiff should be terminated because he had exhibited poor judgment in seeking [*15] to convey that he was a member of law enforcement despite the fact that he was a civilian computer technician. (Defs.' Stmt. P 27; Pl.'s Stmt. P 27.) Ultimately, on November 15, 2002, Commissioner Hearn opted to reprimand the plaintiff formally and dock him three days' annual leave. (Defs.' Stmt. P 28; Pl.'s Stmt. P 28; Ex. M. to Glazer Decl.) After that, the plaintiff received a performance evaluation, which the plaintiff signed on November 18, 2002, that stated that "[d]uring the past year, Ron had some performance issues that he adequately addressed and resolved." (Defs.' Stmt. P 29; Pl.'s Stmt. P 29; Ex. D to Ben. Aff.) The plaintiff was given a rating of three on a scale of one to five, which corresponds to "fully meets requirements." (Ex. D to Ben. Aff.)

Then in early December, the plaintiff was involved in another incident when he tried to turn in a defaced handgun to the police on behalf of a member of his synagogue. (Defs.' Stmt. PP 31, 33; Pl.'s Stmt. PP 31, 33.) Some of the events surrounding this incident are in dispute. However, it is undisputed that Robert Joyce, one of the plaintiff's supervisors, was eventually contacted during the incident. (Defs.' Stmt. P 36; Pl. [*16] 's Stmt. P 36.) Joyce produced a memorandum about the incident, where he noted that the police sergeant who contacted him told him that "Benvenisti refused to give answers and had a bad attitude." (Ex. Q to Glazer Decl.)

After that incident, Hearn and Glazer instructed the law department to review whether there was a sufficient basis to terminate the plaintiff for cause, and if so, to confirm the necessary follow up steps to doing so. (Defs.' Stmt. P 38; Pl.'s Stmt. P 38.) The plaintiff hired a lawyer

2006 U.S. Dist. LEXIS 73373, *

after the handgun incident. (Defs.' Stmt. P 37; Pl.'s Stmt. P 37.) The plaintiff expressed fears that he might be fired, and the lawyer informed the plaintiff that his fears were well founded. [7] (*Id.*)

> 7 The plaintiff does not dispute this last fact, but objects to its use on the grounds that it is protected by the attorney-client privilege. (See Pl.'s Stmt. P 37.) However, the plaintiff revealed that he hired a lawyer because he "knew that something was going to happen at work as a result of this," and that his lawyer suggested that he might lose his job, before any objection. (*See* Depo. of Ron Benvenisti, June 6, 2005 ("Ben. Depo. II"), attached as Ex. C (Part II) to Decl. of Terri Feinstein Sasanow, Oct. 28, 2005 ("Sasanow Decl."), at 217-18, 220, 236-37.) This information is therefore not protected by any privilege. *See, e.g., United States v. International Brotherhood of Teamsters, 961 F. Supp. 665, 673 (S.D.N.Y. 1997), aff'd on other grounds, 119 F.3d 210 (2d Cir. 1997); In re Penn Central Commercial Paper Litig., 61 F.R.D. 453, 463 (S.D.N.Y. 1973)* ("It is hornbook law that the voluntary disclosure or consent to the disclosure of a communication, otherwise subject to a claim of privilege, effectively waives the privilege.").

[*17] On December 13, 2002, several of the plaintiff's supervisors received a complaint that the plaintiff had harassed several employees at another City agency and threatened to arrest one of them. (Defs.' Stmt. P 39.) The plaintiff denies that he harassed or threatened anybody, but he does not provide any evidence to rebut the defendants' claim that DOI received these complaints. (Pl.'s Stmt. P 39.) On Monday, December 16, 2002, a supervisor received another complaint that the plaintiff had threatened to arrest a member of the public. (Defs.' Stmt. P 40.) Again, the plaintiff denies making the threat but offers no evidence that the supervisor did not receive the complaint. (Pl.'s Stmt. P 40.)

Based on all of these events, the defendants allege that at a personnel meeting, held the following morning, on Tuesday, December 17, 2002, DOI Commissioner Hearn declared that the timetable to terminate the plaintiff's employment had been accelerated and that he was to be discharged the following day. (Defs.' Stmt. PP 43-44; Hearn Decl. at 2-3.) Glazer carried out the order, and the plaintiff was discharged the following day, on December 18, 2002. (Defs.' Stmt. P 46; Pl.'s Stmt. P 46.)

The defendants [*18] maintain that DOI decided to discharge the plaintiff based on his alleged misconduct. The defendants also maintain that neither Commissioner Hearn, the person who ordered the plaintiff's discharge, nor Glazer, the person who carried it out, had any

knowledge of the plaintiff's alleged complaints about Khedouri.

The defendants first point out that based on the timeline of events, the plaintiff's ultimate threat to file a formal complaint with the Conflict of Interest Board or the other external City agencies was not made until *after* the decision to discharge the plaintiff had already been made.

As noted above, Commissioner Hearn made the decision to discharge the plaintiff and issued the order to that effect at a personnel meeting on the morning of Tuesday, December 17, 2002. (Defs.' Stmt. PP 43-44; Pl.'s Stmt. PP 43-44.) The plaintiff, however, alleges that he threatened to file the formal complaint to the external agencies on the afternoon of December 17, 2002. (Defs.' Stmt. P 42; Ben. Depo. I at 25, 27, 236-37.) Although the plaintiff states that this fact "misrepresents the sequence of events leading to [his] termination" (Pl.'s Stmt. P 42), he offers no facts to show that his [*19] threatened complaint occurred at some time other than that afternoon. As such, the defendants allege that Hearn could not have known about the plaintiff's threat to complain to the COIB or the other City agencies because the plaintiff had not even made the threat at the time Hearn made the decision to discharge the plaintiff at the morning personnel meeting.

Second, both Glazer and Hearn have produced sworn statements that they had no knowledge of any complaints that the plaintiff made about Khedouri until after the order to terminate his employment had already been given. (*See* Defs.' Stmt. PP 43-46; Glazer Decl. at 13-14; Decl. of Rose Gill Hearn, Oct. 28, 2005 ("Hearn Decl."), at 3.) Indeed, VanderNaalt, Joyce, and Green, each of the supervisors that the plaintiff allegedly complained to, denied that they ever forwarded any information about any complaints the plaintiff might have made about Khedouri. (*See* Vander. Depo. at 184-89; Depo. of Robert Joyce, June 24, 2005, attached as Ex. E to Sasanow Decl. ("Joyce Depo."), at 124-25; Depo. of Vincent Green, June 22, 2005, attached as Ex. F to Sasanow Decl. ("Green Depo."), at 138-39, 160.)

The plaintiff disputes this claim, [*20] asserting that VanderNaalt informed him that his complaints were properly reported up the chain of command and that in a paramilitary organization such as DOI, Hearn's and Glazer's knowledge can be inferred. (Pl.'s Stmt. P 45.) However, the plaintiff concedes that VanderNaalt told him that he passed the plaintiff's concerns to Joyce and Green, not to Hearn or Glazer, and the plaintiff candidly admitted that he had no personal knowledge of whether Hearn or Glazer were informed of his concerns. (Ben. Depo. I at 49-50.) The plaintiff offers no evidence to

rebut the defendants' evidence that Hearn and Glazer lacked knowledge of the plaintiff's complaints.

## III.

The plaintiff claims that he was discharged in retaliation for his complaints about Khedouri and his threat to report the alleged conflict of interest involving Khedouri to external agencies in violation of the *First and Fourteenth Amendments to the United States Constitution* and *42 U.S.C. § 1983*.

It is well-established that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers, 461 U.S. 138, 142, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983).* [*21] In defining the protection afforded public employee speech, the Supreme Court has been sensitive to the "public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti v. Ceballos, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006)* Yet "while the *First Amendment* invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti, 126 S. Ct. at 1959* (quoting *Connick, 461 U.S. at 154*). "Government employers, like private employers, need a significant degree of control over their employees' words and actions" in order to provide services to the public efficiently. *Id. at 1958.*

Therefore, in order for a public employee to state a claim for *First Amendment* retaliation, the plaintiff initially must show by a preponderance of the evidence that: (1) the plaintiff spoke "as a citizen upon matters of public concern," *Connick, 461 U.S. at 147*, rather then as an employee on matters of personal interest, (2) the plaintiff suffered an adverse employment action, and (3) the speech at issue was a substantial or motivating factor in the [*22] adverse employment action. *See Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003); Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir. 2003).*

If the public employee successfully states a prima facie case of *First Amendment* retaliation, the government employer may still prevail by showing by a preponderance of the evidence that it would have taken the same action regardless of the employee's speech. *See, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977); Pappas v. Giuliani, 118 F.Supp.2d 433, 443 (S.D.N.Y. 2000), aff'd, 290 F.3d 143 (2d Cir. 2002).* [8]

[8] In the alternative, the government may prevail by showing: (1) the adverse employment action is based on a reasonable prediction that the speech will be disruptive, (2) the disruptive potential of the speech outweighs the value of the speech, and (3) the employer's action is based on the disruptive potential of the speech and not taken in retaliation for the speech. *Johnson, 342 F.3d at 114* (citing *Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995)).* This option embodies the balancing test established by the Supreme Court in *Pickering v. Bd. of Educ., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).* Here the defendants acknowledge that the plaintiff's speech was not disruptive, and thus concede that *Pickering* does not apply.

[*23] The defendants argue that the plaintiff has failed to establish a prima facie case of *First Amendment* retaliation. The defendants further argue under *Mt. Healthy* that DOI would have discharged the plaintiff regardless of his complaints, given the acts of alleged misconduct in which he engaged. For these reasons, the defendants claim they are entitled to summary judgment on the plaintiff's *First Amendment* retaliation claim.

## A.

The threshold question is whether the plaintiff was "speaking as a citizen upon matters of public concern." *Connick, 461 U.S. at 147.* In *Garcetti*, the Supreme Court clarified that this question involves two distinct inquiries. First, the Court must determine whether the plaintiff was speaking as a "citizen" for *First Amendment* purposes. *See Garcetti, 126 S. Ct. at 1957; Freitag v. Ayers, F.3d , 463 F.3d 838, 2006 U.S. App. LEXIS 23383, 2006 WL 2614120, at *11 (9th Cir. Sept. 13, 2006).* After that, the Court must turn to the traditional *Connick* analysis and ask whether, viewing the record as a whole and based on the content, context, and form of a given statement, the plaintiff's speech was made as a citizen upon [*24] "matters of public concern." *461 U.S. at 147-48.* "The inquiry into the protected status of speech is one of law, not fact." *Id. at 148 n.7.*

### 1.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for *First Amendment* purposes..." *Garcetti, 126 S. Ct. at 1960.* In *Garcetti*, Ceballos, a deputy district attorney in Los Angeles who served as a calendar deputy, alleged *First Amendment* retaliation after he drafted and circulated a disposition memorandum recommending the dismissal of a criminal case based on his investigation of, what he perceived to be, serious misrepresentations made by the warrant affiant in the case. *Id. at 1955-56.* The Supreme Court stated that the "controlling" factor in determining that the plaintiff was not entitled to *First Amendment* protection was that the plaintiff's expressions were made "pursuant to his duties as a

calendar deputy." *Id. at 1959-60.* As the Supreme Court explained:

> Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising [*25] attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee.

*Id. at 1960.* In sum, "Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do." *Id.* Following *Garcetti,* courts in this District have dismissed *First Amendment* retaliation claims upon finding that a plaintiff's speech was made pursuant to his official duties. *See, e.g., Ruotolo v. City of New York, 2006 U.S. Dist. LEXIS 49903, 03 Civ. 5045, 2006 WL 2033662, at *3-4 (S.D.N.Y. July 19, 2006)* (finding that a safety officer's report on environmental risks and conversations concerning the report were made pursuant to his official duties); *Brewster v. City of Poughkeepsie, 434 F.Supp.2d 155, 157 (S.D.N.Y. 2006)* (finding that a police officer's letters to the Chief and Deputy Chief of Police and the District Attorney disputing his supervisor's decision to dismiss two traffic summonses were written pursuant to his official [*26] duties).

The question then is whether the plaintiff's speech was made pursuant to his "official duties." [9] In analyzing this issue, the defendants divide the plaintiff's speech into two categories: (1) the plaintiff's weekly complaints to his supervisors about Khedouri and (2) the plaintiff's threat to file a formal complaint to external agencies regarding the Khedouri matter. The defendants argue that the first category of speech is barred by *Garcetti* because the plaintiff's complaints were made pursuant to his official duties as a manager of CISAFE and supervisor of Khedouri. However, the defendants candidly concede that the second category of speech-the alleged threat to report the matter externally-was not part of the plaintiff's official duties and thus is not barred by *Garcetti.* Given the defendants' concession, the Court considers only whether the plaintiff's weekly complaints to his supervisors were made pursuant to his official duties.

[9]    Although the Supreme Court issued its decision in *Garcetti* after this motion for summary judgment was fully briefed, the parties submitted supplemental briefing addressing the issue and discussed the issue at the oral argument.

[*27]    Although the Supreme Court in *Garcetti* declined to articulate a framework for defining the precise contours of a public employee's official duties, the Court noted that the "inquiry is a practical one" and recognized that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *126 S. Ct. 1961-62.* Viewing the evidence as a whole, it is clear that the plaintiff's weekly complaints to his supervisors were made pursuant to his official duties.

First, it is undisputed that the plaintiff was a manager of the CISAFE unit and responsible for supervising Khedouri. [10] The plaintiff concedes these managerial responsibilities but nonetheless argues that his reporting to his supervisors of the specific problems involving Khedouri did not fall within the scope of his "official duties." However, the undisputed evidence in the record belies this assertion.

[10]    The plaintiff states that he was not Khedouri's "direct supervisor" during the relevant time period because Khedouri was "unmanageable." (*See* Pl.'s Stmt. P 4.) However, it is undisputed that the plaintiff was responsible for supervising Khedouri, whether he was successful in that endeavor or not. (*See id.*)

[*28]    As a manager, the plaintiff was responsible for supervising employees and ensuring the productive operation of his unit. Such responsibilities were part of what the plaintiff was "employed to do." *See Garcetti, 126 S. Ct. at 1960.* In addition, the plaintiff was part of an organization and supplying information about his unit's performance to supervisors thus also fell within the plaintiff's official duties. The plaintiff's performance evaluation, signed by the plaintiff on November 18, 2002, included a category for "[p]resenting, explaining, and marketing the work unit's activities to higher level supervisors in the agency and/or persons and groups outside the agency." (Ex. D to Ben. Aff.) The opportunity for the plaintiff to pass along such information to his supervisors was amply provided at "formal status meetings," the place where the plaintiff aired the majority of his alleged complaints about Khedouri. Moreover, the plaintiff admitted that many of the complaints about Khedouri originated with his employees. (*See, e.g.* Ben. Depo. I at 7-11.) Thus, for at least some of the complaints about Khedouri, the plaintiff was merely acting as a conduit through which [*29] information was passed from those he supervised to his supervisors pursuant to his official duties.

Given that keeping his supervisors apprised of his unit's status was one of the tasks he was paid to perform

as a manager of CISAFE, the only question is whether the specific complaints at issue were of the type that the plaintiff would be expected to discuss with his supervisors. According to the plaintiff's characterization of his deposition testimony, the plaintiff complained to his supervisors that: (1) the appearance that Khedouri received specialized treatment had a negative effect on office morale and the ability of the department to function; (2) Khedouri's salary was exorbitant and precluded DOI from hiring additional employees; and (3) Khedouri's performance hindered CISAFE's ability to operate effectively and provide services to the public. (Pl.'s Stmt. P 26; Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") at 9.) These complaints all focused on the impact of Khedouri's employment on CISAFE, its effect on office morale and the unit's financial resources, performance, and operation. As the plaintiff himself stated at his deposition about his purpose for [*30] making these complaints, Khedouri's performance involved a "productivity issue" (Ben. Depo. I at 34), he "just wanted [Khedouri] to take things a little more seriously" (Ben. Depo. II at 154), and he was "[j]ust moving it up the chain of command" (Ben. Depo. I at 36). In sum, the plaintiff's complaints to his supervisors involved precisely the sorts of internal office affairs and employment matters that the plaintiff-as a manager and supervisor-had a duty to address. [11] For these reasons, the plaintiff's weekly complaints about Khedouri to his supervisors were made pursuant to his "official duties" and thus were not made in his capacity as a citizen for *First Amendment* purposes.

> [11] Even assuming that these complaints embedded a discussion about a conflict of interest, and that discussion of the conflict of interest touched on matters of public concern, the speech would still be within the scope of the plaintiff's official duties. *Garcetti* teaches that an employee speaking pursuant to his official duties does not speak as a citizen for *First Amendment* purposes, even when his speech touches on matters of public concern.

[*31] **2.**

As stated above, the defendants concede that the plaintiff's threat to file a formal complaint to the external agencies was not made pursuant to his "official duties" for *Garcetti* purposes. The next issue then is whether the plaintiff's threat to file a formal complaint with the external agencies was made "as a citizen upon matters of public concern" or rather merely "as an employee upon matters only of personal interest." *Connick, 461 U.S. at 147.*

An issue is one of "public concern" that can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Id. at 146.*

Allegations of public corruption or wrongdoing are almost always matters of public concern. *See Johnson, 342 F.3d at 113.* A wide range of other issues have been found to constitute matters of public concern. *See, e.g., Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)* (allegations of racial discrimination); *Lewis v. Cowen, 165 F.3d 154, 164 (2d Cir. 1999)* (mismanagement of public funds); *Blum v. Schlegel, 18 F.3d 1005, 1012 (2d Cir. 1994)* (criticism of the [*32] federal government's national drug control policy); *Collins v. Christopher, 48 F. Supp. 2d 397, 408 (S.D.N.Y. 1999)* (collecting cases). However, "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment' falls outside the realm of constitutional protection." *Schlesinger v. New York City Transit Auth., 2001 U.S. Dist. LEXIS 632, 00 Civ. 4759, 2001 WL 62868, at *5 (S.D.N.Y. Jan. 24, 2001)* (quoting *Lewis, 165 F.3d at 164); see also Cahill v. O'Donnell, 75 F. Supp. 2d 264, 272 (S.D.N.Y. 1999)* ("A public employee's speech on matters of purely personal interest or internal office affairs does not constitute a matter of public concern...").

Although certain issues may clearly touch upon matters of public concern in the abstract, the question in each case is whether the particular speech at issue may be "fairly considered" as relating to such issues. *See Connick, 461 U.S. at 146.* This determination is rarely a simple task "[b]ecause of the enormous variety of fact situations" in which these cases arise. *Id. at 154.* The Supreme Court has cautioned that "[t]o [*33] presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case." *Id. at 149.* "*Connick* made clear that courts must look behind pretextual 'public concern' rationales proffered by plaintiffs and attempt to discern whether their conduct, taken as a whole, was actually meant to address matters of public concern or was simply a vehicle for furthering private interests." *Pappas, 118 F. Supp. 2d at 444* (citing *Connick, 461 U.S. at 146-48*).

Given these considerations, determining whether speech involved matters of public concern requires a practical inquiry into the "content, form, and context of a given statement, as revealed by the whole record." [12] *Connick, 461 U.S. at 147-48.* The issue of "whether an employee's speech addresses a matter of public concern" is a matter of law for the court to decide. *Id. at 148 n.7, 150 n.10.*

> [12] According to *Garcetti*, a public employee can speak on a matter of public concern, yet not speak in the employee's capacity as a citizen. *Garcetti* thus distinguished between the capacity

in which a person speaks and the subject matter of that speech. However, under the traditional *Connick* inquiry, the capacity in which a person speaks has always been a relevant contextual factor in determining whether certain speech touched upon matters of public concern. *See, e.g., Blum, 18 F.3d at 1012* ("The determinative question is whether that interest [in matters of public concern] arises from the speaker's status as a public citizen or from the speaker's status as a public employee."). Nothing in *Garcetti* suggests that courts should ignore the capacity in which a person speaks in situations where, for example, an employee's speech may be close to-but not squarely within-his or her official duties.

[*34] The plaintiff's threat to file a formal complaint to the external agencies did not touch upon matters of public concern. The plaintiff alleges that he threatened to take all of his prior complaints about Khedouri to the external agencies and, to the extent not already covered, an allegation that Glazer was supposed to recuse herself but that Khedouri was doing projects for her. (*See* Pl.'s Stmt. P 42; Ben. Depo. I. at 25-26.)

Most of the plaintiff's alleged complaints provide classic examples of an attempt by a plaintiff to convert what are essentially private employment matters into matters of public concern because the matters happened to have transpired within a government office. *See Connick, 461 U.S. at 149.* The record as a whole reveals that the plaintiff's complaints about office morale, Khedouri's salary, and the impact of Khedouri's employment on the effective operation of the unit all involved internal office affairs, which the plaintiff was concerned about as a manager. The plaintiff admitted as much in his deposition when he stated that his motivation for complaining about Khedouri was to get "Ely to take things a little more seriously" (Ben. Depo. [*35] II at 154) and stated that Khedouri's performance was a "productivity issue" (Ben. Depo. I at 39). The portion of the plaintiff's deposition testimony that discusses his plans to file the formal complaint reveals that the plaintiff was not interested in contributing to the "debate on public issues." *See LaForgia v. Davis, 2004 U.S. Dist. LEXIS 25143, 01 Civ. 7599, 2004 WL 2884524, at *5 (S.D.N.Y. Dec. 14, 2004).* Rather, the plaintiff had received no satisfaction within DOI and sought to remedy the "morale" and "management" issues that were plaguing CISAFE. [13] (*See* Ben. Depo. I at 25-26.) The plaintiff cannot now convert what were essentially internal office affairs into matters of public concern through a revisionist interpretation of his complaints that draws on the incidental connection between events that transpire within a government office and public issues. [14] *Cf. Harris v. Beedle, 845 F. Supp. 1030, 1034 (S.D.N.Y. 1994)* ("Plaintiff attempts to tie her

criticism of the program into a general critique of Authority mismanagement and waste. However, such abstract concern about a particular subject carries no weight if the employee chooses not to articulate it.") (internal [*36] citation and quotation marks omitted), *aff'd, 35 F.3d 553 (2d Cir. 1994).*

13   The Second Circuit Court of Appeals recently stated that "motive is not dispositive as to whether an employee's speech is a matter of public concern," while qualifying that "this is especially true where the motive is not to address an employment grievance." *Reuland v. Hynes, 460 F.3d 409, 2006 WL 2391163, at *5-6 (2d Cir. 2006).* Public concern analysis in this Circuit is "content-based and not... *solely* motivation based." *Cioffi v. Averill Park Central Sch. Dist. Bd. of Educ., 444 F.3d 158, 166 (2d Cir. 2006)* (emphasis added). However, while not dispositive, it remains a factor for courts to consider in analyzing the overall context in which a statement is made. *See id.; see also Saulpaugh v. Monroe Community Hosp., 4 F.3d 134, 143 (2d Cir. 1993)* (employee's complaints about sexual harassment not a matter of public concern where there was "no indication that the plaintiff wanted to debate issues of sex discrimination," that she sought relief against "pervasive or systemic misconduct," or that she sought to "correct allegedly unlawful practices or bring them to public attention") (internal citations and quotation marks omitted); *Ezekwo v. NYC Health & Hosp. Corp., 940 F.2d 775, 781 (2d Cir. 1991)* (finding that complaints were "personal in nature," where the plaintiff "was not on a mission to protect the public welfare" and "her primary aim was to protect her own reputation and individual development"). The Court accepts the plaintiff's own description of the motivations for his threat in deciding this motion for summary judgment. The defendants suggest that the plaintiff's alleged complaints about Khedouri were in fact motivated by his desire to create complaints and thereby deter any sanctions against him and to counter the progressive discipline that was being imposed upon him for his various actions. However, the Court could not accept that disputed motivation on a motion for summary judgment. *See New York State Law Officers Union v. Andreucci, 433 F.3d 320, 330-31 (2d Cir. 2006).*

[*37]

14   For these reasons, the plaintiff's earlier complaints, which are barred by *Garcetti,* also failed to address matters of public concern.

The plaintiff's threat to report an alleged conflict of interest within DOI presents a closer question. Viewed in the abstract, the plaintiff's report of an alleged conflict of interest could, at least minimally, implicate government corruption, mismanagement, or the violation of the City's by-laws, which could fairly be considered as touching upon matters of public concern. *Cf. Gorman-Bakos v. Cornell Coop. Extension of Schnectady County, 252 F.3d 545, 553 n.4* ("Plaintiffs' claims related to the administration of the Cooperative and the allocation of funds were based on alleged mismanagement of government funds and violations of its by-laws, which are clearly matters of public concern.") However when placed in context, even the plaintiff's threat to complain about the alleged conflict of interest cannot be said to touch upon matters of public concern.

First, the plaintiff's threat to file the formal complaint occurred in the course of [*38] a conversation with his supervisor. A private conversation with an employer does not preclude a finding that a public employee was speaking on a matter of public concern. *See Givhan, 439 U.S. at 414*. Nonetheless, the forum that a plaintiff chooses is one factor in determining whether the speech implicated a matter of public concern. *See Dudzik v. City of New York, 2003 U.S. Dist. LEXIS 1287, 01 Civ. 2450, 2003 WL 203226, at *7 (S.D.N.Y. Jan. 29, 2003); Pappas, 118 F. Supp. 2d at 445* (citing *Connick, 461 U.S. at 148*) In this case, although the plaintiff threatened to complain publicly, the plaintiff first discussed his decision to do so with his supervisor and then delayed filing the complaint at his supervisor's request. This fact detracts from the threatened complaint's public character.

Second, the plaintiff's deposition testimony establishes that the alleged complaint regarding the conflict of interest was a minimal part of a broader issue involving internal management. The thrust of the plaintiff's threatened complaint, as testified to by the plaintiff (Ben. Depo. I at 25-26), was not that the alleged conflict of interest was an independent [*39] problem that needed to be brought to the public's attention. Rather, the plaintiff was concerned about the impact of the alleged conflict on his unit's performance-the ability to manage Khedouri and his team's morale. While speech alleging a conflict of interest might implicate a matter of public concern, where the speech is buried in a context that overwhelmingly suggests that the plaintiff was merely speaking as an employee on matters of internal office affairs, such speech is not entitled to *First Amendment* protection. *See, e.g., Ezekwo, 940 F.2d at 781* ("[T]he mere fact that one or two of Ezekwo's comments could be construed broadly to implicate matters of public concern does not alter the general nature of her statements."); *Hellstrom v. United States Dep't of Veterans Affairs, 178 F. Supp. 2d 164, 169 (N.D.N.Y. 2001)* (find-

ing that while affirmative action involves a matter of public concern in the abstract, where comments about affirmative action were given as a personal response to alleged discrimination, those comments did not implicate a matter of public concern), *aff'd, 46 Fed. Appx. 651 (2d Cir. 2002)*.

For these reasons, [*40] the plaintiff's threat to file a complaint with the external agencies did not involve a matter of public concern. Therefore, the plaintiff has failed to establish the first element of his prima facie case.

**B.**

The plaintiff has similarly failed to establish the third element of his prima facie case. The plaintiff has failed to produce sufficient evidence that his complaints were "at least a substantial or motivating factor in the discharge." *Sheppard, 317 F.3d at 355* (internal citation and quotation marks omitted).

A plaintiff can establish proof of causation either directly or indirectly. *See Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)*. Causation may be proved indirectly "by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence." *Id.* In this case, even assuming that the plaintiff's complaints constituted protected speech, the plaintiff has failed to establish any evidence, either directly or indirectly, that DOI discharged him in retaliation for any protected speech.

First, the plaintiff has offered no direct evidence that his complaints [*41] were a substantial or motivating factor in the decision to terminate his employment. Rather, the undisputed evidence clearly establishes the contrary, that the plaintiff's complaints were not the reason for his discharge.

As discussed above, the undisputed facts establish that Commissioner Hearn ordered the plaintiff's discharge at a personnel meeting on the morning of Tuesday, December 17, 2002. This decision marked the culmination of a series of progressive disciplinary measures that had been imposed on the plaintiff based on numerous incidents of alleged misconduct and that dated back as early as July 2002.

These disciplinary measures, detailed above, included a formal reprimand on November 15, 2002, which docked the plaintiff three days annual leave. (Ex. M to Glazer Decl.) Three days later, on November 18, 2002, the plaintiff signed a performance evaluation stating that while the plaintiff had "some performance issues," those issues had been "adequately addressed and resolved." (Ex. D to Ben Aff.) However, about two weeks later, the plaintiff was involved in the incident

with the defaced handgun. The plaintiff stated that he "knew something was going to happen at work as a result [*42] of [the incident]." (Ben. Depo. II at 217.) The plaintiff hired a lawyer who confirmed his concerns. (*See id.* at 217-18, 220, 237.) Based on these events, Commissioner Hearn and Glazer discussed whether there were any impediments to dismissing the plaintiff, and instructed their law department that, if not, they should take the steps necessary to do so. (Glazer Decl. at 12.)

Then on Friday, December 13, 2002, DOI received complaints that the plaintiff had harassed employees in another agency and even threatened to arrest one of them. The following business day, Monday, December 16, 2002, DOI received another complaint that the plaintiff had threatened to arrest a member of the public.

Based on all of these events, Commissioner Hearn announced at the December 17 personnel meeting that the timetable to terminate the plaintiff's employment had been accelerated and that the plaintiff was to be discharged the following day. (Glazer Decl. at 13.)

Hearn's decision to discharge the plaintiff was therefore made on the morning of December 17, 2002. However, the plaintiff's alleged threat to file a formal complaint to the external agencies was not made until the afternoon of that same [*43] day. (*See* Ben. Depo. I at 25, 27, 37.) Although the plaintiff was not discharged until the following day, the undisputed evidence shows that the decision to terminate the plaintiff's employment was made before the plaintiff ever threatened to complain to the COIB or other external agencies. Therefore, the plaintiff's afternoon threat to report the Khedouri matter externally could not have formed any part of Hearn's decision to discharge the plaintiff.

Indeed, the plaintiff has failed to produce any evidence that either Hearn, the decision maker, or Glazer, the person who carried out Hearn's order to terminate the plaintiff's employment, had knowledge of any of the plaintiff's complaints. As detailed above, the defendants have produced affirmative evidence that at the time the order to terminate the plaintiff's employment was given, none of the relevant decision makers had any knowledge whatsoever of the plaintiff's alleged complaints about Khedouri. Both Glazer and Hearn have produced sworn statements that they knew nothing of the plaintiff's alleged complaints about Khedouri, and VanderNaalt, Green, and Joyce all denied having passed on such information.

The plaintiff attempts [*44] to counter this evidence by stating that VanderNaalt told the plaintiff that "his concerns were properly reported up the chain of command" and the plaintiff alleges that "Glazer was in Plaintiff's chain of command." (Pl.'s Mem. at 19.) The plaintiff concludes that "in a paramilitary organization such as

the DOI, Glazer must have known about Plaintiff's protected speech." (*Id.*)

However, this factual assertion is not supported by the deposition testimony on which the plaintiff relies. (*See* Ben. Depo. I at 49-50.) That deposition testimony establishes only that the plaintiff's direct supervisor, VanderNaalt, told the plaintiff that he had reported the plaintiff's complaints to Robert Joyce and Vincent Green. (*Id.*) As explained above, both Joyce and Green denied passing on such complaints. The plaintiff cannot point to any evidence that his complaints were reported by Joyce or Green to anyone else. In fact, the deposition testimony reveals that it was VanderNaalt who told the plaintiff "to report this kind of up the ladder." (Ben. Depo. I at 23.) The plaintiff points to no evidence that VanderNaalt ever told the plaintiff that VanderNaalt would report the plaintiff's complaints [*45] up the chain of command. The plaintiff is thus left with the bare factual assertion that Glazer "must have known." The plaintiff cannot at this stage rely on such "conclusory allegations or unsubstantiated speculation." *Scotto, 143 F.3d at 114.* Therefore, the plaintiff has failed to offer any evidence from which an inference can be drawn that either Hearn or Glazer knew about any of the plaintiff's alleged complaints.

The plaintiff also attempts to prove causation indirectly. The plaintiff argues that he is entitled to an inference of causation because the temporal proximity between the time he made his complaints and the time he was fired establishes an inference of retaliatory animus. In appropriate cases, where an adverse employment action occurs shortly after the protected speech, an inference that the speech was a motivating factor in the adverse action may be drawn. *See, e.g., Cifra v. General Electric Co., 252 F.3d 205, 217 (2d Cir. 2001)* ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."); *Gorman-Bakos, 252 F.3d at 554.* [*46]

However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had even engaged in protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001); Ayiloge v. City of New York, 2002 U.S. Dist. LEXIS 11807, 00 Civ. 5051, 2002 WL 1424589, at *12-13 (S.D.N.Y. June 28, 2002).*

An inference of causation based on temporal proximity is not warranted in this case. Given that the plaintiff has produced no direct evidence of causation, he is left only with timing as the basis for his claim of retaliation. The progressive discipline against the plaintiff began in July 2002, well before the plaintiff's complaints

about Khedouri began in October 2002. While the plaintiff disputes some of the details of the meeting he had with the Assistant Commissioners in July 2002, it is undisputed that the defendants counseled the plaintiff to tone down his appearance and spoke with the plaintiff about modifying the emergency lights on his vehicle. [15]

15    The defendants claim that the plaintiff was told to remove the emergency equipment completely. The plaintiff claims that he was told that he could keep the equipment as long as he removed the lights from the dashboard. Even accepting the plaintiff's version, this marked the beginning of a progressively increasing set of warnings and actions against the plaintiff.

[*47]    In any event, the only complaint that the plaintiff made that even arguably can be considered protected speech and which is not otherwise barred by *Garcetti* was contained in the threat he made to report the Khedouri matter to external agencies. The plaintiff did not make this threatened complaint until December 17, 2002, well after a well-documented series of progressive disciplinary measures. Therefore, the plaintiff here is not entitled to an inference of causation based on temporal proximity.

For these reasons, the plaintiff has failed to establish causation, the third element of his prima facie case.

Given that the Court finds that the plaintiff has failed to establish his prima facie case, it is unnecessary to address the defendants' remaining contention that, even assuming that Hearn or Glazer knew about the plaintiff's complaints, DOI would have discharged the plaintiff regardless of the complaints because of his past alleged misconduct.

Because the plaintiff has failed to show that any genuine issue of fact exists as to whether the defendant Glazer violated the plaintiff's *First Amendment* rights, the defendants' motion for summary judgment on the plaintiff's *Section* [*48] *1983* claim against Glazer is **granted.**

In addition, given that the plaintiff has not established an underlying constitutional violation, the defendants' motion for summary judgment on the plaintiff's *Section 1983* claim against the City of New York is also **granted.** *See, e.g., Segal v. City of New York, 459 F.3d 207, 2006 U.S. App. LEXIS 20118, 2006 WL 2171456, at \*10-11 (2d Cir. 2006); Rivera v. City of New York, 392 F. Supp. 2d 644, 656 (S.D.N.Y. 2005).*

V.

The defendants argue that the plaintiff's state law claim under the Whistleblower Law must be dismissed because the statute provides no private cause of action. However, because the plaintiff's *Section 1983* action is dismissed and there are no remaining federal claims, the Court declines to exercise supplemental jurisdiction over this purely state law claim. *See 28 U.S.C. § 1367(c)(3); Valencia ex rel. Franco v. Lee, 316 F.3d 299, 304-06 (2d Cir. 2003).* Therefore, the plaintiff's state law claims against the defendants under the Whistleblower Law are **dismissed without prejudice.**

### CONCLUSION

The Court has considered all of [*49] the arguments raised by the parties. To the extent not specifically addressed herein, the arguments are either moot or without merit. The motion for summary judgment is **granted.** The Clerk is directed to enter judgment and to close this case.

**SO ORDERED.**

**Dated: New York, New York**

**September 23, 2006**

**John G. Koeltl**

**United States District Judge**

LEXSEE 2007 U.S. DIST. LEXIS 64806

PAUL WESOLOWSKI and LAURA WESOLOWSKI, Plaintiffs, against J. RICH-
ARD BOCKELMAN, Sheriff, County of Ulster, BRADFORD EBEL, Superinten-
dent, RAY ACEVEDO, Warden, and COUNTY OF ULSTER, Defendants.

1:05-CV-0321 (LEK/RFT)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
NEW YORK

*2007 U.S. Dist. LEXIS 64806*

**August 31, 2007, Decided**
**August 31, 2007, Filed**

**COUNSEL:** [*1] For Paul Wesolowski, Plaintiff: Michael H. Sussman, LEAD ATTORNEY, Office of Michael H. Sussman, Goshen, NY.

Laura Wesolowski, Plaintiff, Pro se, Kingston, NY.

For J. Richard Bockelmann, Ulster County Sheriff, Bradford Ebel, Superintendent, Ray Acevedo, Warden, Defendants: Michael E. Catalinotto, Jr., LEAD ATTORNEY, Maynard, O'Connor Law Firm - Saugerties Office, Saugerties, NY; Michael T. Snyder, Maynard, O'Connor Law Firm - Albany Office, Albany, NY.

For County of Ulster, Defendant: Michael E. Catalinotto, Jr., LEAD ATTORNEY, Michael Catalinotto, Sr., Maynard, O'Connor Law Firm - Saugerties Office, Saugerties, NY; Michael T. Snyder, Maynard, O'Connor Law Firm - Albany Office, Albany, NY.

**JUDGES:** Lawrence E. Kahn, U.S. District Judge.

**OPINION BY:** Lawrence E. Kahn

**OPINION**

*MEMORANDUM-DECISION AND ORDER*

1  For printed publication by the Federal Reporters.

**I. Background**

This case concerns alleged acts of retaliation against Plaintiff Paul Wesolowski (hereinafter "Plaintiff") and his wife, Plaintiff Laura Wesolowski for a report made by Plaintiff in October 2004, in violation of rights protected by the *First Amendment*. Amended Complaint (Dkt. No. 9). At that time, Plaintiff was a corrections officer at the Ulster County Jail, [*2] with the rank of Corporal. *Id.* at PP 7-8. In this position, part of his job responsibilities were to "investigate[] incidents, disturbances and complaints occurring during shift and report[] on same in writing, to superior." Plntf's Mem. in Opp. (Dkt. No. 20) at 3. The speech that allegedly prompted the retaliation was a report describing an inmate's alleged beating by a corrections officer, which was written by Plaintiff, pursuant to his job responsibilities. *Id.* at 2-3; Amended Complaint (Dkt. No. 9) at P 9. When Plaintiff gave the report to his superior, Sergeant Winters ("Winters"), Winters told the Plaintiff to take it to Sergeant Knox, who then directed Plaintiff to give the report to Lieutenant Scott. Plntf's Mem. in Opp. (Dkt. No. 20) at 3. Subsequent to the incident, on December 30, 2004, Plaintiff was accused of leaving his post without relief, as well as insubordination, in the form of a verbal altercation with Sergeant Polacco. Amended Complaint (Dkt. No. 9) at PP 12-14; Deft's State. of Facts (Dkt. No. 18, Attach. 20) at P 10-11. The charges were sustained and Plaintiff was suspended for 30 days without pay. Amended Complaint (Dkt. No. 9) at P 16; Deft's State. of Facts [*3] (Dkt. No. 18, Attach. 20) at PP 13-14. Plaintiff asserts that all Defendants involved in the accusation, investigation and discipline related to these incidents were acting in retaliation against him for the report written by Plaintiff in October 2004. Amended Complaint (Dkt. No. 9) at PP 20-21.

In the Spring of 2005, Plaintiff's wife, Plaintiff Laura Wesolowski, applied for a position as Stock Clerk with the Sheriff's Department of Ulster County. Amended Complaint (Dkt. No. 9) at PP 26-30. Despite attaining a score of 95 of the relevant civil service exam and an interview she reports to have gone well, Plaintiff Laura Wesolowski was not hired for the position. *Id.* at P 31. The person who was hired allegedly scored an 85 on the relevant civil service exam. *Id.* at P 32. A few months later, there was a new opening for stock clerk, which Plaintiff Laura Wesolowski was again not hired to fill. *Id.* at 34-37. Plaintiff Laura Wesolowski alleges that she was not hired because Ulster County Sheriff J. Richard Bockelman refused to hire her in retaliation for Plaintiff's report of October 2004 and because of her intimate association with Plaintiff. *Id.* at P 37.

Plaintiffs filed suit on this matter [*4] on March 14, 2005 (amended on August 30, 2005). *See* Docket. Also, Plaintiff grieved the discipline exacted against him under the Ulster County Correctional Officers' collective bargaining agreement. Sussman Affirm. (Dkt. No. 23) at P 5. As of October 2006, the arbitration of this grievance was imminent. *Id.* Currently before the Court is Defendants' Motion for Summary Judgment (Dkt. No. 18).

## II. Discussion

### A. Standard

A party moving for summary judgment is entitled to such relief if there is no genuine issue as to any material fact and the record as a whole could not lead a rational trier of fact to find for the non-moving party. *Bickerstaff v. Vassar College, 196 F.3d 435, 444 (2d Cir. 1999); FED. R. CIV. P. 56(c).* The party seeking summary judgment bears the initial burden of establishing that no genuine issue of material fact exists, at which point the nonmovant must demonstrate that he can establish each element of his case. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* "The nonmoving party must produce evidence in the record and 'may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.'" *Benvenisti v. City of New York, No. 04 Civ. 3166 (JGK), 2006 U.S. Dist. LEXIS 73373, 2006 WL 2777274, at *1 (S.D.N.Y. Sept. 23, 2006)* [*5] (quoting *Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993)).*

### B. Analysis

Defendant argues that Plaintiff's entire complaint must be dismissed because of the United States Supreme Court's recent holding in *Garcetti v. Ceballos, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006),* which ruled that the United States Constitution does not insulate public em-

ployees from employer discipline for statements made pursuant to their official duties. Mem. of Law in Support of MSJ (Dkt. No. 18, Attach. 20) at 3.

In *Garcetti,* the plaintiff was a deputy district attorney who determined that there were significant inaccuracies in an affidavit used to obtain a criminal search warrant. *126 S. Ct. at 1955.* He relayed his concerns to his supervisors and prepared a disposition memorandum, recommending that the case be dismissed, because of these inaccuracies. *Id. at 1955-1956.* When the prosecuting attorney decided to proceed with the case, the plaintiff testified for the defense about the problems with the affidavit. *Id. at 1956.* The plaintiff was then reassigned and denied a promotion, both of which he claims were retaliation for his speech. *Id.* In finding that the plaintiff's actions and speech were not protected by [*6] the *first amendment,* the United States Supreme Court specifically overruled the notion, relied upon by the Court of Appeals for the Ninth Circuit, that the content of the speech, as a matter of public concern, was more important than whether or not the speech was expressed pursuant to an employment responsibility. *Id. at 1956-7.* The plaintiff in *Garcetti* was investigating cases, supervising attorneys and writing memoranda as an employee, not as a citizen; accordingly, governmental action that restricts his behavior in such activities "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id. at 1960.* The Court contrasted the speech at issue with that found to be protected in *Pickering v. Bd. of Educ. of Tp. High School Dist. 205, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968),* in which the plaintiff teacher sent a letter to the local newspaper critical fo the Board of Education. Recent cases in the Northern District have applied the *Garcetti* rule that the crucial inquiry in determining whether the speech at issue is protected from retaliation is whether the speaker was speaking as a private citizen or as part of his official duties. *Jackson v. Jimino, No. 1:03-CV-722, 2007 U.S. Dist. LEXIS 28647, 2007 WL 1160409 (N.D.N.Y. Apr. 17, 2007)* [*7] (Treese, M.J.) (slip); *McLaughlin v. Pezzolla, No. 06-CV-00376, 2007 U.S. Dist. LEXIS 13609, 2007 WL 676674, at *5 (N.D.N.Y. Feb. 28, 2007)* (McAvoy, Senior D.J.) (slip)

Plaintiff argues that the *Garcetti* rule is not applicable to this case because the speech at the root of this case was not pursuant to Plaintiff's official duties. Plaintiff admits that he wrote the report pursuant to his job responsibilities. Plntf's Mem. in Opp. (Dkt. No. 20) at 5. However, he argues that in handing his report to a sergeant and a lieutenant in the chain of command, in addition to his direct superior, Sergeant Winters, his actions were beyond the limits of his job description and thus, private speech. *Id.* at 3-4.

Plaintiff's argument cannot succeed. The claim that a formal job description defines what actions are pursuant to employment duties was explicitly rejected by the *Garcetti* court, which noted that such a finding would suggest "that employers can restrict employees' rights by creating excessively broad job descriptions." *126 S. Ct at 1961-2* (noting also that "the listing of a given task in an employee's job description is neither necessary nor sufficient to demonstrate [*8] that conducting the task is within the scope of the employee's professional duties for *First Amendment* purposes"). Plaintiff's own description of the chain of events makes clear that he was acting at the direction of his superior when he reported the inmate complaint to the other officers. Plntf's Mem. in Opp. (Dkt. No. 20) at 5. Accordingly, the action he declares to be protected, reporting the inmate complaint, was clearly within his job responsibilities and "pursuant to his official duties," as required for the *Garcetti* rule to apply. *See McGuire v. Warren, 490 F. Supp.2d 331, 340 (S.D.N.Y. 2007)* (noting that expressions that "are part and parcel of the speaker's professional activities" are not protected by the *First Amendment*).

Because of this finding, this Court need not determine whether the discipline against Plaintiff was actually retaliation against him for his report. Because this speech is not protected under the *first amendment*, Plaintiff's employer is not prohibited by the *first amendment* from disciplining him because of the report. *Garcetti, 126 S. Ct. at 1960* ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe [*9] any liberties the employee might have enjoyed as a private citizen."). If Plaintiff's allegations are true, they raise significant concerns; it is disturbing that public officials would discipline an employee for honestly meeting his job expectations and reporting official abuse, pursuant to his job. However, the Supreme Court is clear that legal protection for the employee in this situation does not come from the *First Amendment*; other legal recourse may be possible, such as through the employee grievance process. *See Garcetti, 126 S. Ct. at 1959* ("[u]nderlying our cases has been the premise that while the *First Amendment* invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'") (internal citations omitted).

Additionally, the claim of Plaintiff Laura Wesolowski that she was retaliated against for her husband's protected speech also must fail. Since it has been determined that the speech at issue, her husband's report of the inmate complaint, was not protected and there was no constitutional violation, no claims derived from that alleged violation can succeed. In *Brewster v. City of Poughkeepsie*, the plaintiff alleged that [*10] she was terminated in retaliation for a critical letter written by her husband. *434 F. Supp. 2d 155 (S.D.N.Y. 2006)*, The *Brewster* court rejected her claim, stating "if Officer Brewster does not have a cause of action based on his own unprotected speech-and he does not -his wife certainly cannot state a claim for retaliation based on that same unprotected speech." *Id. at 157*. For exactly the same reason, Laura Wesolowski's claim of retaliation based on her husband's speech fails.

Laura Wesolowski also asserts a claim for retaliation based on her intimate association with Plaintiff. She has put forward undisputed facts that establish that she was qualified for the stock clerk position. However, she has not pointed to any evidence of a nexus between Defendant Bockelman's decision not to hire her and her intimate association with Plaintiff. It is not a defendant's burden to "prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001)* [*11] (quoting *Celotex, 477 U.S. at 324*). Plaintiff Laura Wesolowski has not presented "sufficient evidence... for a jury to return a verdict for [her]." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Accordingly, her claim for retaliation based on intimate association must fail.

### III. Conclusion

Based on the foregoing discussion, it is hereby

**ORDERED,** that Defendants' Motion to Dismiss (Dkt. No. 18) is **GRANTED;** and it is further

**ORDERED,** that Plaintiff's Amended Complaint (Dkt. No. 9) is **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court shall **CLOSE** Case No. 1:05-CV-0321(LEK/RFT); and it is further

**ORDERED,** that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED.**

DATED: August 31, 2007

Albany, New York

Lawrence E. Kahn

U.S. District Judge