07-Civ.-8032 (LAK)(AJP)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SALVATORE COSTA,

Plaintiff,

-against-

THE CITY OF NEW YORK and CHIEF JOE FOX,

Defendants.

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
Attorney for Defendants
100 Church Street, Room 2-184
New York, N.Y. 10007-2601

Of Counsel:    Ivan A. Mendez, Jr.
Tel:        (212) 788-8688

Matter No.: 2007-029207

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

ARGUMENT

       THE COMPLAINT FAILS TO STATE A CLAIM UPON
       WHICH RELIEF CAN BE GRANTED. .......................................................... 4

       A.  Plaintiff Fails To State A Claim For Constructive
            Discharge. ...................................................................................... 4

       B.  Plaintiff's "Class of One" Claim Is Fatally Deficient. ....................... 5

       C.  Chief Fox Is Entitled To Qualified Immunity. ................................... 7

CONCLUSION ................................................................................................................ 9

## TABLE OF AUTHORITIES

__Cases__                                                                                   __Pages__

Anderson v. Crei ghton,
    483 U.S. 635, 107 S. Ct. 3034 (1987)...................................................................7

Bishop v. Wood,
    426 U.S. 341, 96 S. Ct. 2074 (1976)...................................................................7

Bizzarro v. Miranda,
    394 F.3d 82 (2d Cir. 2005).............................................................................5, 8

Davis. v. Scherer,
    468 U.S. 183, 104 S. Ct. 3012 (1984).................................................................8

Jermosen v. Smith,
    945 F.2d 547 (2d Cir. 1991)...............................................................................8

Le Clair v. Saunders,
    627 F.2d 606 (2d Cir. 1980)...............................................................................8

Malley v. Briggs,
    475 U.S. 335, 106 S. Ct. 1092 (1986).................................................................7

Neilson v. D'Angelis,
    409 F.3d 100 (2d Cir.  2005)...........................................................................5, 6

Nugent v. St. Luke's/Roosevelt Hospital Ctr.,
    No. 05 CV 5109, 2007 U.S. Dist. LEXIS 28274 (S.D.N.Y April 18, 2007)............................4

Pena v. Brattleboro Retreat,
    702 F.2d 322 (2d Cir. 1983)...............................................................................4

Petrosino v. Bell Atlantic,
    385 F.3d 210 (2d Cir. 2004)...............................................................................4

Querry v. Messar,
    66 F. Supp. 2d 563 (S.D.N.Y. 1999)..................................................................6

Stetson v. NYNEX Service Co.,
    995 F.2d 355 (2d Cir. 1993)............................................................................4, 5

Trinidad v. N.Y. City Department of Corrections,
    423 F. Supp. 2d 151 (S.D.N.Y. 2006)................................................................5

**Cases**                                                                 **Pages**

<u>Village of Willowbrook v. Olech</u>,
    528 U.S. 562, 120 S. Ct. 1073 (2000) ..........................................................5

**Statutes**

42 U.S.C. § 1983 ................................................................................................1

N.Y. Civ. Prac. L. and R. Art. 78, § 7801 ........................................................7

N.Y. Civ. Prac. L. and R. Art. 78, § 7803(3) ...................................................7

## PRELIMINARY STATEMENT

Plaintiff, a retired Police Lieutenant formerly employed by the City of New York ("City") in the City's Police Department ("NYPD"), brought this § 1983 action against the City, and NYPD Assistant Commissioner Joseph Fox ("Chief Fox")[1], alleging that he was retaliated against for lawfully performing his duties as an NYPD Lieutenant. Plaintiff alleges that in 2004, he issued a summons to a "friend" of Chief Fox, and that Chief Fox thereafter initiated a campaign of retaliation against him, including harassment, a transfer, and eventually forcing him to retire prematurely.

Defendants moved to dismiss the Complaint on the grounds that it fails to state an Equal Protection or First Amendment retaliation claim. In an attempt to stave off dismissal of his groundless claims, plaintiff, for the first time in opposition to the defendants' motion, alleges that he intended to assert a "class of one" equal protection claim. Absent from the complaint, however, are any allegations that defendants intentionally treated plaintiff differently than similarly situated individuals. Nor does the Complaint allege that the defendants lacked a rational basis for their alleged actions. Accordingly, the Complaint must be dismissed and the requested relief denied.

It should also be noted that plaintiff did not oppose the defendants' argument that the Complaint fails to state a claim for constructive discharge. Indeed, even were the plaintiff's wild and unsupported allegations true, no reasonable person would find plaintiff's work environment so intolerable that plaintiff was forced into involuntary resignation. Accordingly, to the extent that the Complaint asserts a constructive termination claim, that claim must be dismissed.

---

[1] Chief Fox is sued as "Chief Joe Fox." References to "§ 1983" are to 42 U.S.C. § 1983.

## STATEMENT OF FACTS[2]

Plaintiff was appointed as a Police Officer with the NYPD on July 16, 1984.  See Complaint, dated August 27, 2007 ("Complaint"), at ¶ "9," which is annexed to the Defendants' Memorandum of Law in Support of their Motion to Dismiss as Appendix "A." Plaintiff was promoted to the ranks of Sergeant and Lieutenant in December, 1998, and March, 2002, respectively.  Id. at ¶¶ "10," "11."  On October 18, 2004, plaintiff issued a summons to retired NYPD Sergeant Louis A. Campanelli for failing to wear a seatbelt while driving a motor vehicle. Id. at ¶¶ "12," "13."  Plaintiff alleges that Mr. Campanelli and Chief Fox worked together when they were Police Officers, and that they "continue to be friends today."  Id. at ¶¶ "14," 15." According to plaintiff, the day after he issued a summons to Mr. Campanelli, "at the direction of [Chief] Fox, Captain Dominik Collisuano called plaintiff at his home and stated that Plaintiff was in 'big trouble' because he wrote a summons to Campanelli." Id. at ¶ "16."  Plaintiff alleges that Captain Collisuano demanded that plaintiff provide him with a copy of the summons he issued to Mr. Campanelli. Id. at ¶ "17."

Two days later, according to plaintiff, two unnamed NYPD Inspectors, Captain Jackle and Lieutenant Richard Tully arrived at the plaintiff's precinct while he was conducting roll call, and searched plaintiff's locker and uniform shirt and pant pockets "purportedly seeking a memo book that Plaintiff reported missing."  Complaint at ¶¶ "18," "19."  Plaintiff further alleges that on October 28, 2004, plaintiff was sent to the NYPD Inspections Unit where he was "interrogated for two hours as to why he issued a summons to Campanelli." Id. at ¶ "21." Thereafter, plaintiff alleges that he was transferred to the NYPD's 69th Precinct, which,

---

[2] On a motion to dismiss, the allegations of fact in the complaint are deemed true and the legal sufficiency of the complaint is tested.  This statement of facts is drawn from the Complaint and defendants neither admit nor deny any of the facts alleged therein.

according to plaintiff, is the farthest from his home.  Id. at ¶ "22."  Plaintiff alleges that his assignment to the 69th Precinct resulted in a 10% decrease in his salary.  Id. at ¶ "23."  He also contends that pursuant to orders of Chief Fox, he was not allowed to take time off from work, and was subjected to absurd and unnecessary levels of scrutiny.  Id. at ¶¶ "24," and "25."  This, according to plaintiff, was done in order to force him to retire prematurely.  Id. at ¶¶ "25," "27," and "28."  Plaintiff alleges that as a result of the purported harassment he was subjected to at the 69th Precinct, he "chose to retire on December 31, 2004."  Id. at ¶ "28."

On September 13, 2007, plaintiff commenced this action, alleging that defendants retaliated against him and constructively terminated his employment because he issued a traffic summons to a friend of Chief Fox.

## ARGUMENT

## THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

### A.    Plaintiff Fails To State A Claim For Constructive Discharge.

In their motion to dismiss, defendants argued that the Complaint's claim of constructive discharge failed as a matter of law because plaintiff did not put forth sufficient allegations or facts to show that the defendants "'deliberately m[ade his] working conditions so intolerable that [he was] forced into involuntary resignation.'" Stetson v. NYNEX, 995 F.2d 355, 360-61 (2d Cir. 1993) (quoting Pena v. Brattleboro Retreat, 702 F.2d 322, 324 (2d Cir. 1983)).  In opposition to defendants' motion, plaintiff offers no response to this argument. Indeed, the only allegations in the complaint in support of plaintiff's constructive discharge claim are that his performance came "under absurd and unnecessary scrutiny" and that he was allegedly not allowed to take the time he wanted off from work.  Complaint at ¶¶ "24," and "25." Plaintiff does not allege that he was served with disciplinary charges, or written up while at the 69th Precinct.  Nor does he allege that he was demoted, or otherwise disciplined.

Based on these allegations, the Complaint fails to allege that plaintiff's working conditions were so intolerable that plaintiff was forced into involuntary resignation.  See, e.g., Petrosino v. Bell Atl., 385 F.3d 210, 230 (2d Cir. 2004) (finding no constructive discharge where plaintiff endured "(1) years of harassment in a work environment hostile to women, including years of being denied promotion opportunities because of her sex; (2) recommendations by her [] supervisors that she transfer [] to secure better promotion opportunities, when, in fact, no such promotion would be possible for more than a year ... ."); Nugent v. St. Luke's/Roosevelt Hosp. Ctr., No. 05 CV 5109, 2007 U.S. Dist. LEXIS 28274, at *48 (S.D.N.Y April 18, 2007)("The fact that an employee 'feels that the quality of [her] work has been unfairly criticized,' or that her

working conditions were 'difficult or unpleasant,' is insufficient to support a constructive discharge claim. Stetson v. NYNEX Service Co., 995 F.2d 355, 360 (2d Cir. 1993) (rejecting constructive discharge claim where employee was 'dissatisfied with his assignments, with the criticisms of his work, and [] with his compensation')")[3]. Moreover, that plaintiff does not allege the "discriminatory element of [a] hostile work environment claim is [] fatal to [his] constructive discharge claim." Trinidad v. N.Y. City Dep't of Corr., 423 F. Supp. 2d 151, 168 (S.D.N.Y. 2006)(internal citations omitted). Accordingly, the plaintiff's constructive discharge "claim" must be dismissed.

**B.      Plaintiff's "Class of One" Claim Is Fatally Deficient.**

In response to defendants' motion to dismiss, plaintiff now, for the first time, alleges that he is proceeding under a "class of one" theory under the Equal Protection Clause, and that he wishes to amend his complaint to add allegations that similarly situated persons were not retaliated against for "lawfully" issuing summonses. See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Memo."), at 3-4. In Village of Willowbrook v. Olech, 528 U.S. 562, 120 S. Ct. 1073 (2000), the Supreme Court recognized that an Equal Protection Clause claim may arise in unusual cases where plaintiff is intentionally treated differently from other similarly-situated individuals without any rational basis whatsoever. Id. at 564; accord Bizzarro v. Miranda, 394 F.3d 82, 88 (2d Cir. 2005).

This desperate attempt to save a woefully deficient complaint fails for several reasons. Since the Supreme Court's decision in Olech, the Second Circuit has held that "class of one" plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves. See Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir.

---

[3] Pursuant to Your Honor's Individual Practice Rules, this unreported decision is annexed hereto as Appendix "A."

2005).  This showing is more stringent than that used at the summary judgment stage in the employment discrimination context.  Id. at 105.  This is because "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff" in a "class of one" case "is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose--whether personal or otherwise--is all but certain."  Id.  Accordingly, to succeed on a "class of one" claim, a plaintiff must establish that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

Id.

Here, the Complaint is fatally flawed, as it neither alleges that plaintiff was treated worse than or differently than similarly situated individuals, nor that any alleged poor treatment was intentionally discriminatory or irrational.  Plaintiff should not be permitted to amend his complaint to manufacture new allegations that "similarly situated police officers who lawfully issued a summons were not retaliated against."  Pl. Memo at 4.  In order to state a "class of one" claim, plaintiff, a former Police Lieutenant, must allege that other Police Lieutenants (not Police Officers, Sergeants, Detectives, etc.), who were similarly in all material respects, also issued summonses to "friends" of Chief Fox but were not retaliated against.  See Neilson, 409 F.3d at 104 (similarity between plaintiff and comparators must be extremely high); Querry v. Messar, 66 F. Supp. 2d 563, 572 (S.D.N.Y. 1999)(police officer and police sergeant not similarly situated).

Were the Court to accept plaintiff's "class of one" argument, the Courts would become a general oversight body reviewing the myriad grievances of government employees. The Equal Protection Clause and federal jurisdiction would be substituted for routine "arbitrary or capricious" proceedings in New York State's courts. See N.Y. Civ. Prac. L. and R. Art. 78, §§ 7801, et seq., and § 7803(3) (an Article 78 can test "whether a determination … was arbitrary and capricious or an abuse of discretion …."). The "class of one" theory cannot be read so broadly and the Equal Protection Clause cannot be transformed into a vehicle for routine federal review of state and local government decisions. As the Supreme Court said about a similarly framed Due Process Clause argument more than 30 years ago:

> [w]e must presume that official action was regular, and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

Bishop v. Wood, 426 U.S. 341, 350, 96 S. Ct. 2074, 2080 (1976). Accordingly, plaintiff's "class of one" claim should be dismissed.

## C.    Chief Fox Is Entitled To Qualified Immunity

Plaintiff, in his opposition papers, states that "[i]t cannot be argued in good-faith that Defendant Fox did not know that plaintiff has a right to be free from retaliation for lawfully performing his duties as a New York City Police lieutenant." Pl. Memo at 5. The alleged conduct plaintiff imputes to Chief Fox, however "repugnant to a reasonable person's sensibilities", did not violate a clearly established constitutional right. See Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038 (1987) (the contours of the right must be clearly established and not merely a general right so that the official will know in advance that he or she is violating a constitutional right); Malley v. Briggs, 475 U.S. 335, 340-41, 106 S.Ct. 1092, 1095-96 (1986) (qualified immunity protects "all but the plainly incompetent or those who

- 7 -

knowingly violate the law."). To determine if a right is clearly established, the Court looks to cases from the Supreme Court and the relevant Circuit. See Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991). An allegation that a government official's action might violate a state protected right is insufficient to strip that official of qualified immunity. Davis. v. Scherer, 468 U.S. 183, 193-94, 104 S. Ct. 3012, 3019 (1984).

As noted by the Second Circuit in Bizzarro, the parameters of "class of one" claims under Olech, were unclear when Bizarro, was decided in 2005. 394 F.3d at 88. Even prior to Olech, violations of equal protection predicated not on protected class status, but on "selective treatment motivated by ill-will", were considered to be "lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply." Le Clair v. Saunders, 627 F.2d 606, 608 (2d Cir. 1980). Accordingly, in light of the fact that reasonable officials could disagree whether the conduct imputed to Chief Fox was unconstitutional at the time the alleged acts took place, Chief Fox is entitled to qualified immunity, and all claims against him should be dismissed.

<u>**CONCLUSION**</u>

**WHEREFORE**, defendants respectfully request that their motion to dismiss be granted, that an order dismissing the Complaint be issued, that judgment in favor of defendants be entered and that defendants be granted costs, fees, and disbursements together with such other and further relief as the Court deems just and proper.

Dated:        New York, New York
              November 21, 2007

                                   **MICHAEL A. CARDOZO**
                                   Corporation Counsel of the
                                     City of New York
                                   Attorney for Defendants
                                   100 Church Street, Room 2-184
                                   New York, New York 10007-2601
                                   (212) 788-8688


                          By:      **ECF:**              **/s/**
                                        Ivan A. Mendez, Jr.
                                   Assistant Corporation Counsel




**ALAN M. SCHLESINGER,**
**IVAN A. MENDEZ, JR.**
    Of Counsel

# APPENDIX A

LEXSEE 2007 U.S. DIST. LEXIS 28274



Cited
As of: Nov 21, 2007

CHARLOTTE NUGENT, Plaintiff, -against- THE ST. LUKE'S/ROOSEVELT
HOSPITAL CENTER, THE ADDICTION INSTITUTE OF NEW YORK (formerly
known as the SMITHERS ALCOHOL TREATMENT AND TRAINING
CENTER),: its predecessors and successors, CONTINUUM HEALTH PARTNERS,
INC. and KEVIN HEANEY, individually and in official capacity and John Does 1-
10, Defendants.

05 Civ. 5109 (JCF)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2007 U.S. Dist. LEXIS 28274*

April 18, 2007, Decided
April 18, 2007, Filed

**COUNSEL:** [*1]  For Charlotte Nugent, Plaintiff: Susan Lori Adler, LEAD ATTORNEY, Susan Adler, Esq., New York, NY.

For ST. Luke's Roosevelt-Hospital Center, Continuum Health Partners, Inc., Addiction Institute of New York, formerly known as Smithers Alcoholism Treatment and Training Center, Defendants: Rory J. McEvoy, LEAD ATTORNEY, Edwards Angell Palmer & Dodge, LLP (NYC), New York, NY.

For Kevin Heaney, Individually and in official capacity, Defendant: Chaim B. Book, Moskowitz & Book, LLP, New York, NY.

**JUDGES:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JAMES C. FRANCIS IV

**OPINION**

*MEMORANDUM AND ORDER*

    JAMES C. FRANCIS IV

    UNITED STATES MAGISTRATE JUDGE

    The plaintiff, Charlotte Nugent, brings this action pursuant to (1) Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* ("Title VII"); (2) the Americans with Disabilities Act, *42 U.S.C. § 12101 et seq.* (the "ADA"); (3) the Age Discrimination in Employment Act, *29 U.S.C. § 621 et seq.* (the "ADEA"); and (4) the New York State Human Rights Law, *N.Y. Exec. Law § 290 et seq.* (the "NYSHRL"). Ms. [*2] Nugent also brings various state common law claims. The parties have consented to proceed before me for all purposes pursuant to *28 U.S.C. § 636(c).* The defendants have moved for summary judgment on all of the plaintiff's claims pursuant to *Rule 56 of the Federal Rules of Civil Procedure.* The plaintiff has moved for summary judgment on her hostile work environment and retaliation claims. For the reasons set forth below, the defendants' motions are granted in their entirety and the plaintiff's motion is denied.

*Background*

    Beginning in June 1989, the plaintiff worked as a social work assistant and later as a social worker at Trinity House, a drug and alcohol treatment program at St. Luke's Hospital. (Deposition of Charlotte Nugent ("Nugent Dep.") at 29, 32, 50-51). In either 1989 or 1990, she was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD" or "ADD"). (Nugent Dep. at 21). ADHD

affects Ms. Nugent's ability to organize tasks, attend to details, and manage her time. (Nugent Dep. at 21, 395-99). According to an expert report submitted by the plaintiff, her symptoms include "difficulty sustaining attention [*3] on certain tasks, difficulty organizing tasks and activities, . . . feeling overwhelmed by unclear or complex instructions or tasks, and difficulty following through on tasks or instructions without adequate support." (Report of Thor Bergerson, M.D. dated May 8, 2006 ("Bergerson Report"), attached as Exh. E to Declaration of Susan Adler dated Nov. 30, 2006 ("Adler 11/30/06 Decl."), at 2). At some point between 1997 and 1999, Ms. Nugent began to take Ritalin to treat her ADHD, and subsequently also began to take BuSpar and Paxil, which are anti-anxiety medications. (Nugent Dep. at 22-24).

In October 1999, defendant Kevin Heaney hired Ms. Nugent as a social worker in the Inpatient Rehabilitation Unit (the "Unit") at the Addiction Institute of New York ("AINY"), which is located at Roosevelt Hospital. [1] (Nugent Dep. at 52, 59, 63; Deposition of Kevin Heaney ("Heaney Dep."), excerpts attached as Exh. 2 to Declaration of Rory J. McEvoy dated Sept. 15, 2006 ("McEvoy Decl.") and to Adler 11/30/06 Decl., at 6-7). The Unit staff included seven or eight alcoholism counselors, a social worker, a psychiatrist, and a consulting psychologist, all supervised by Mr. Heaney, who is Director of Inpatient [*4] Rehabilitation. (Nugent Dep. at 63; Heaney Dep. at 5-6). There were also between five and ten nurses. (Nugent Dep. at 64). The nurses were supervised by Aileen Clucas, who was Nursing Clinical Coordinator for the Inpatient Rehabilitation Unit until November 2001. (Deposition of Aileen Clucas ("Clucas Dep."), excerpts attached as Exh. 3 to McEvoy Decl., at 4-5).

> 1    St. Luke's/Roosevelt Hospital Center ("SLRHC") has two locations. One is St. Luke's Hospital, where Trinity House is located, and the other is Roosevelt Hospital, where AINY is located.

The plaintiff was hired to replace the previous social worker, who did "family work." (Nugent Dep. at 54-55). Ms. Nugent was told when she was hired that she "would be doing 40 percent of [her] time as a family worker and 60 percent of [her] time working with [another] worker to . . . triage the patients who were coming into" the Unit. (Nugent Dep. at 59). According to the defendants, this plan was never put into effect because there were not enough staff to implement [*5] it. (Heaney Dep. at 55). As a result, Ms. Nugent was given the title of social worker, and was paid as a social worker, but was "essentially [] a team member with [the] same responsibilities"

as the alcoholism counselors. (Heaney Dep. at 55; Nugent Dep. at 69).

When she began working at AINY, Ms. Nugent led family counseling sessions. (Nugent Dep. at 70, 524-25; Heaney Dep. at 37). The remainder of her work involved alcoholism counseling; her duties included attending daily staff meetings, creating treatment plans, updating charts, leading group therapy sessions, seeing patients, and completing paperwork required by the New York State Office of Alcoholism and Substance Abuse Services. (Nugent Dep. at 69, 73-77; Heaney Dep. at 49, 72). Because of her family counseling responsibilities, Ms. Nugent was given a reduced patient caseload in comparison to the alcoholism counselors. (Nugent Dep. at 525; Heaney Dep. at 37-38; Employee Comments, attached to Performance Appraisal dated Sept. 25, 2000 ("9/25/00 Appraisal"), attached to Adler 11/30/06 Decl.). Ms. Nugent stopped doing "family consultations" in February or March 2001 because her "regular workload became extremely heavy." (Employee [*6] Comments; Nugent Dep. at 281, 548).

Mr. Heaney was "difficult to work with" and "could sometimes[] be a disciplinarian with patients." (Clucas Dep. at 18). According to Ms. Nugent, many of the nurses were "afraid of him." (Nugent Dep. at 356). Ms. Nugent witnessed an incident in which Mr. Heaney "slammed his fist and his papers or something down on the desk and was talking in a very, very nasty tone" to a nurse named Marcie. (Nugent Dep. at 107-08). On March 24, 2000, Mr. Heaney met with Marcie and two other nurses to discuss that incident. (Heaney Dep. at 14; Clucas Dep. at 26-27). During the meeting, Mr. Heaney apparently became "frustrated" when Marcie failed to "warm up to [him]" in the way that [he] wanted her to or didn't accept his apology." (Clucas Dep. at 26). Mr. Heaney slapped his hand against the arm of a chair and walked out of the room. (Heaney Dep. at 14; Clucas Dep. at 26-27; Letter of Elizabeth Moore dated April 4, 2000 ("Moore 4/4/00 Letter"), attached to Adler 11/30/06 Decl.). Mr. Heaney subsequently received a written warning regarding the meeting, stating that his behavior was "intimidating and unprofessional and cannot be tolerated." (Moore 4/4/00 Letter). [*7] According to the plaintiff, on another occasion, when a staff member was late to a staff meeting, Mr. Heaney "yelled out, 'Where is Tina,' and [] slammed [his fist] down on his desk." (Nugent Dep. at 108).

In the spring of 2000, by his own admission, Mr. Heaney referred to a female patient as a "cunt" during a staff meeting. (Nugent Dep. at 89-91; Heaney Dep. at 26). The plaintiff claims that Mr. Heaney later used the word again in reference to a different patient. (Nugent Dep. at 91-92). At some point in 2000, Mr. Heaney and Ms. Nugent discussed Ms. Clucas' view that it was ac-

ceptable for female nurses to observe male patients giving urine samples. (Nugent Dep. at 85). Mr. Heaney referred to Ms. Clucas's opinion as "just her radical lesbian bullshit." (Nugent Dep. at 87; Heaney Dep. at 23).

On September 25, 2000, Ms. Nugent received a performance evaluation from Mr. Heaney in which he indicated that she was "an outstanding member of the staff." (9/25/00 Appraisal). He noted that "[t]here had been some problems in record-keeping and statistics," but that Ms. Nugent "was able to address this difficulty and progress is taking place." (9/25/00 Appraisal).

In October 2000, the [*8] plaintiff and a nurse named Cindy Range complained to Dr. Jeff Foote, Clinical Director of AINY, about Mr. Heaney's behavior. (Nugent Dep. at 122-26). According to the plaintiff, she told Dr. Foote that Mr. Heaney was "abusive" and that the way he spoke to people was "vulgar and coarse." (Nugent Dep. at 125).

On November 28, 2000, Ms. Nugent wrote a memorandum to Ms. Clucas in which she expressed her concerns about "sexist, pejorative, or denigrating comments [made by Mr. Heaney] about other staff members and/or patients." (Memorandum from Charlotte Nugent dated Nov. 28, 2000, attached to Adler 11/30/06 Decl.). She also reported that "[t]here is a feeling among some of the women, both counseling and nursing staff, that men are favored over women," and that the feeling was reinforced by Mr. Heaney's sexist comments. Ms. Nugent claims that she gave the memorandum to Ms. Clucas, and that Ms. Clucas later told her that she gave the memorandum to Elizabeth Moore, a Senior Administrator in the Psychiatry Department. (Moore 4/4/00 Letter; Nugent Dep. at 272-74). Ms. Clucas does not recall "ever being officially in receipt" of the memorandum, and claims that she told the plaintiff to [*9] take her complaints "up [her] own chain of command to [Mr. Heaney's] supervisor." (Clucas Dep. at 22).

Dr. Foote met with the plaintiff on three separate occasions in response to her complaints, once by herself, once with Ms. Range, and once with Ms. Range and Mr. Heaney. (Nugent Dep. at 274-75). Mr. Heaney also received "informal counseling" from Dr. Foote in response to Ms. Nugent's complaints. (Heaney Dep. at 20-22).

Between November 28, 2000 and September 11, 2001, Mr. Heaney took no formal disciplinary action against Ms. Nugent, and Ms. Nugent received no written warnings or any other documents critical of her performance. (Nugent Dep. at 157-59). Although the plaintiff claims that she received verbal criticism from Mr. Heaney during this period, she "can't remember any specifics" (Nugent Dep. at 158-59) other than that Mr. Heaney began to criticize her paperwork more heavily and to reprimand her, but not others, for being late to

meetings. [2] (Affidavit of Charlotte Nugent dated Feb. 13, 2007 ("Nugent Aff."), attached to Declaration of Susan Adler dated Feb. 13, 2007 ("Adler 2/13/07 Decl."), P 3). Ms. Nugent also claims that at some point in 2001, she heard Mr. Heaney refer [*10] to a patient as a "whore." (Nugent Dep. at 97-102).

2  It is not clear when Ms. Nugent claims that Mr. Heaney began to single her out for criticism. The affidavit submitted by Ms. Nugent in opposition to the defendants' motions for summary judgment appears to contradict her earlier testimony that after November 2000, there was a "quiet period" during which Mr. Heaney "wasn't picking on [her]." (Compare Nugent Aff., P 3 with Nugent Dep. at 543-45). Two of Ms. Nugent's co-workers have submitted affidavits in which they variously state that "subsequent to November 2000" and "during 2001 and 2002," Ms. Nugent was chastised for being late while others were not. (Affidavit of Shirley Brooks dated Feb. 13, 2007 ("Brooks Aff."), attached to Adler 2/13/07 Decl., PP 6-8; Affidavit of Ella Ares dated Nov. 24, 2006 ("Ares Aff."), attached to Adler 11/30/06 Decl., P 2). For the purpose of deciding whether to grant summary judgment for the defendants, I will assume that beginning in November 2000, Mr. Heaney began to criticize Ms. Nugent's paperwork more heavily and to single her out for criticism when she was late to meetings.

[*11]  On September 11, 2001, the plaintiff was scheduled to work from 8 a.m. to 7 p.m. (Nugent Dep. at 160; Heaney Dep. at 93). According to the defendants, the Unit went on "standby" after the the attack on the World Trade Center. (Heaney Dep. at 91). The defendants claim that all staff were notified not to leave the hospital until they were given permission to do so. (Heaney Dep. at 92). The plaintiff recalls a discussion "[a]bout whether people could leave or not" during the staff meeting in the morning, during which one person was given permission to leave early, but maintains that she was never told to remain at work until given permission to leave. (Nugent Dep. at 161-64). Ms. Nugent left work at 3:30 p.m. (Heaney Dep. at 90). She claims that the "whole floor was empty of clinical staff," that "it was dark on the unit," and that she thought "everybody had left" by the time she went home. [3] (Nugent Dep. at 162, 167, 169). Ms. Nugent maintains that she believed that she had permission to go home. (Nugent Aff., P 7). After she left the hospital, Ms. Nugent left a voice mail message for Mr. Heaney informing him that she had gone home. (Nugent Dep. at 167; Deposition of Gerald Horowitz [*12] ("Horowitz Dep."), attached as Exh. 4 to McEvoy Decl., at 24).

3 Ms. Nugent's co-worker Ms. Brooks states that on September 11, 2001, she worked until approximately 5 p.m. (Brooks Aff., P 5). After approximately 3 p.m. on that day, Ms. Brooks "did not see any counselors on the floor and believed that they had all left." (Brooks Aff., P 5).

Mr. Heaney told Gerald Horowitz, an AINY Administrator, that Ms. Nugent had gone home early on September 11. (Heaney Dep. at 93; Horowitz Dep. at 24). Mr. Horowitz met with the plaintiff and Mr. Heaney on September 13, 2001. (Horowitz Dep. at 24). At that meeting, Ms. Nugent acknowledged that it was "wrong" to leave early on September 11. (Nugent Dep. at 175). Although Mr. Horowitz wanted to suspend Ms. Nugent for two days, Mr. Heaney asked him to suspend her only for the remainder of that day because the Unit was short staffed. (Heaney Dep. at 94; Horowitz Dep. at 26). Ms. Nugent was docked two and a half hours' pay for leaving early on September 11, and was sent home without [*13] pay for the remainder of the day. (Nugent Dep. at 176-77). Ms. Nugent filed a union grievance, and a hearing officer subsequently ordered the hospital to reimburse her for the pay she lost on September 13. (Nugent Dep. at 181; Letter of Kim D. Moore-Ward dated Jan. 16, 2002, attached as Exh. H to Nugent Dep.).

From then on, according to Ms. Nugent, she suffered "constant harassment" from Mr. Heaney. (Nugent Dep. at 196-98). She felt "extremely harassed, picked upon, singled out, laughed at, mocked." (Nugent Dep. at 200). She alleges that Mr. Heaney treated her differently from other staff members and ignored the fact that other staff members taunted her:

> I would sit in the staff meeting and Cindy Range and Jeff Brown would make fun of me and laugh and hee hee, and then Kevin would say [to me] you are filing your fingernails or reading the paper, and that was a terrible thing. But it was okay for them to sit there and under the words make nasty, mocking remarks.

(Nugent Dep. at 200-01; Nugent Aff., P 3). Ms. Nugent claims that as a result of this harassment, she began to neglect her paperwork. (Nugent Dep. at 201-02).

On May 1, 2002, Ms. Nugent was given a verbal [*14] warning regarding progress notes that were missing from six of her charts, failure to make appropriate plans for psychiatric follow-up after a patient was discharged from the hospital, and failure to discharge a patient. (Nugent Dep. at 186-88; Notice to Employee dated May 1, 2002, attached as Exh. J to Nugent Dep.). On

May 24, 2002, Ms. Nugent was scheduled to lecture patients at 8:45 a.m.; she did not arrive until 9:15 a.m. (Nugent Dep. at 218, 221-22; Notice to Employee dated Sept. 24, 2002 ("9/24/02 Notice"), attached as Exh. R to Nugent Dep.). On June 4, 2002, she was scheduled to arrive at work at 8 a.m., but did not arrive at the scheduled time. She did not notify her supervisor that she would be late until 9 a.m. [4] (Nugent Dep. at 219; 9/24/02 Notice).

4 According to the written warning Ms. Nugent received, hospital policy requires staff to call in at least one hour prior to the start of their shift. (Nugent Dep. at 218-19; 9/24/02 Notice). Ms. Nugent claims that she was not aware of this policy, and that staff on the unit routinely called in "around the time of their shift or sometimes a little later." (Nugent Dep. at 220).

[*15] Ms. Nugent applied for and was granted a medical leave of absence on the basis of depression and anxiety from June 6, 2002 until September 6, 2002. (Nugent Dep. at 208; Letter of Dr. Frederick J. Long dated June 4, 2002, attached as Exh. L to Nugent Dep.). She did not return to work on September 7, 2002. (Nugent Dep. at 209-10). On September 9, 2002, Mr. Heaney sent her a letter regarding her failure to return to her job and enclosed a leave extension form. (Letter of Kevin Heaney dated Sept. 9, 2002, attached as Exh. O to Nugent Dep.). On September 16, 2002, Ms. Nugent filed an application to extend her leave until September 23, 2002. (Nugent Dep. at 211; Leave of Absence Extension Application Form dated Sept. 16, 2002, attached as Exh. P to Nugent Dep.). Her application was granted. (Nugent Dep. at 211).

On September 24, 2002, Ms. Nugent received a written warning regarding the May and June incidents described above. (Nugent Dep. at 216-17; 9/24/02 Notice). The warning also addressed her failure to process ten patient discharge forms, which resulted in the patients being listed in the state registry of substance abuse patients for between five and twenty months after they were [*16] discharged. (Nugent Dep. at 220; Heaney Dep. at 72; 9/24/02 Notice). Finally, the warning stated that Ms. Nugent had failed to notify Mr. Heaney or Human Resources to tell them that she would not return from her leave of absence on September 7, 2002. (Nugent Dep. at 220-21; 9/24/02 Notice).

After her leave of absence, Ms. Nugent was informed that her job duties had been changed. Her new role would be to assess new patients admitted to the Unit. (Memorandum from Kevin Heaney dated Sept. 23, 2002 ("9/23/02 Memo."), attached as Exh. S to Nugent Dep.). Her responsibilities now included meeting new patients, reviewing their "Self-Report Questionnaire," completing

an "Assessment Summary," determining problem areas for the patient, and presenting the case in rounds the following day. (9/23/02 Memo.). Ms. Nugent retained the title of social worker, continued to earn the same salary and benefits, and worked the same hours. (Nugent Dep. at 230). According to the defendants, Mr. Heaney changed Ms. Nugent's responsibilities in an attempt "to revise her workload in order to . . . [protect her] from the type of work" with which she was having difficulty. (Heaney Dep. at 55-56). Ms. Nugent considered [*17] her new role an "upgrade." (Nugent Dep. at 231). She was happy with her new responsibilities and "liked it a lot." (Nugent Dep. at 231).

On December 24, 2002, the plaintiff was scheduled to lead a weekly "community meeting" on the Unit. (Nugent Dep. at 236-37). She missed the meeting because she was Christmas shopping. (Nugent Dep. at 236-37). Ms. Nugent received a written warning regarding the incident, which also indicated that since the date of her last warning, she had "failed to show improvement in [her] written work." (Notice to Employee dated Jan. 10, 2003 ("1/10/03 Notice"), attached as Exh. T to Nugent Dep.). As a result, Ms. Nugent received a one-day "suspension prior to termination" on January 10, 2003. (1/10/03 Notice; Memorandum dated April 3, 2003, attached as Exh. W to Nugent Dep.). Ms. Nugent admits that "some disciplinary action" may have been appropriate under the circumstances. (Nugent Dep. at 238).

At some point after her suspension, Ms. Nugent asked Mr. Heaney if she could bring in an ADHD expert, Hal Meyer, to help her manage the problems she was having. (Nugent Dep. at 295, 699-700). Mr. Heaney told her, "[T]hat would be great." (Nugent Dep. at 296). At [*18] her deposition, Ms. Nugent testified that she did not recall ever attempting to follow up with Mr. Heaney. (Nugent Dep. at 297). In an affidavit submitted in support of her motion for summary judgment, Ms. Nugent claims instead that she did try to follow up with Mr. Heaney, but that whenever she "brought the matter up for scheduling," Mr. Heaney told her they could discuss it another time. (Nugent Aff., P 13).

On April 3, 2003, Ms. Nugent met with Mr. Heaney and Paul Rinaldi, who replaced Dr. Foote after he left AINY, to discuss ongoing issues with her job performance. (Nugent Dep. at 245; Memorandum of Kevin Heaney dated April 3, 2003 ("4/3/03 Memo."), attached as Exh. W to Nugent Dep.). Ms. Nugent also received a written memo from Mr. Heaney indicating that there had been "on-going problems in [her] job functioning" since the January suspension. (4/3/03 Memo.). The warning mentions "lack of timeliness" in attending clinical activities, failure to arrive on time for treatment groups, unprofessional behavior such as filing her nails and reading a newspaper during staff meetings, neglecting a patient

who had been assigned to her, and "problems in attention to routine and detail in [*19] written records." (4/3/03 Memo.). It also states, "You need to make immediate and sustained corrections of your behavior or you will face termination from the hospital." (4/3/03 Memo.).

Ms. Nugent did not come in to work on April 4, 2003. (Nugent Dep. at 309). She states that she "felt completely trapped" because she had talked to other staff members who said, "[W]e heard that if they find one more thing on you, you are going to be fired." (Nugent Dep. at 309). Ms. Nugent believed that if she went to work, "they would find one more thing, because they always can if they want to." (Nugent Dep. at 309). She applied for and was granted a medical leave of absence from April 4, 2003 to June 4, 2003. (Leave of Absence Application Form dated April 7, 2003 ("4/7/03 LOA"), attached as Exh. X to Nugent Dep.).

While on leave, Ms. Nugent sought a transfer to another unit. (Nugent Dep. at 319). On May 29, 2003, she obtained an extension of her leave until August 4, 2003. (Nugent Dep. at 322). However, she now admits that she did not intend to come back to work unless she could transfer out of the Unit. (Nugent Dep. at 322).

On July 7, 2003, after her request to transfer was denied, the plaintiff [*20] submitted a notice of retirement. (Nugent Dep. at 323; Letter of Charlotte Nugent dated July 7, 2003, attached as Exh. BB to Nugent Dep.). She believed that if she returned to work she would be fired, and would thereby lose her benefits. (Nugent Dep. at 323). Ms. Nugent's retirement took effect on November 1, 2003, although she did not return to work at AINY in the meantime. (Nugent Dep. at 322, 326-27; Letter of Charlotte Nugent dated Oct. 9, 2003, attached as Exh. CC to Nugent Dep.).

On May 27, 2005, Ms. Nugent filed a complaint alleging that the defendants had discriminated against her on the basis of gender, age, and disability, that she had been subjected to a hostile work environment, and that the defendants retaliated against her after she complained about Mr. Heaney's behavior. The complaint also sought damages for breach of contract, negligent infliction of emotional distress, and intentional infliction of emotional distress. The defendants moved for summary judgment on all of the plaintiff's claims, and Ms. Nugent moved for summary judgment on her hostile work environment and retaliation claims. At oral argument, Ms. Nugent withdrew her age discrimination claims under the [*21] ADEA and the NYSHRL, as well as her state common law claims. (Tr. at 3). [5] I will address the remaining claims below.

    5   "Tr." refers to the transcript of oral argument held on April 6, 2007.

## Discussion

### A. Summary Judgment Standard

Pursuant to *Rule 56*, summary judgment is appropriate where the evidence offered demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c); see also Tocker v. Philip Morris Companies, Inc., 470 F.3d 481, 486-87 (2d Cir. 2006); Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co., 189 F.3d 208, 214 (2d Cir. 1999).* The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* "In moving for summary judgment against a party who will bear the [*22] ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995); see also Celotex, 477 U.S. at 325; Feurtado v. City of New York, 337 F. Supp. 2d 593, 599 (S.D.N.Y. 2004).*

Where the moving party meets that burden, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e).* In assessing whether the nonmoving party has presented evidence sufficient to raise a genuine issue of material fact, the court resolves all ambiguities and draws all factual inferences in favor of the nonmoving party. [6] *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995).* "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version [*23] of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997)* (internal quotations and citations omitted); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga, 51 F.3d at 18* (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"). If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)).*

[6] The plaintiff's submissions are unclear at best and at times incoherent, with precious few citations to relevant case law. I have nevertheless given her the benefit of the doubt in determining the nature and scope of her claims and have drawn every inference in her favor where appropriate.

[*24] Summary judgment is generally inappropriate where the defendant's state of mind is at issue. *See Gelb v. Board of Elections of the City of New York, 224 F.3d 149, 157 (2d Cir. 2000).* Accordingly, it should be granted with caution in employment discrimination cases. *See Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994).* However, "the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001)* (quoting *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).* Therefore "summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Id. accord Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 609 (2d Cir. 2006).*

### B. Retaliation

#### 1. Legal Standard

Ms. Nugent first contends that she was subjected to retaliation for her complaints about Mr. Heaney's behavior. *Section 704(a) of Title VII* provides in relevant part that "[i]t shall be an unlawful [*25] employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter." [7] *42 U.S.C. 2000e-3(a).* Title VII retaliation claims follow the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).* In order to defeat a motion for summary judgment, a plaintiff must establish a *prima facie* case by putting forth

"evidence sufficient to permit a rational trier of fact to find [1] that she 'engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and

2007 U.S. Dist. LEXIS 28274, *

the adverse action, i.e. that a retaliatory motive played a part in the adverse employment action.'"

*Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001)* (quoting *Sumner v. United States Postal Service, 899 F.2d 203, 208-09 (2d Cir. 1990)).* [*26] [8]

7    Courts apply the same standards to claims brought under Title VII and the NYSHRL. *See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000); Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997).* Accordingly, I will analyze Ms. Nugent's federal and state retaliation, gender discrimination, and hostile work environment claims together.

8    If the plaintiff establishes a *prima facie* case, and the defendant "points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra, 252 F.3d at 216.*

In *Burlington Northern & Santa Fe Railway Co. v. White, U.S.    , 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006),* the Supreme Court "altered the standard previously used by the Second Circuit, which [*27] defined an adverse employment action as a 'materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Spector v. Board of Trustees of Community-Technical Colleges, 463 F. Supp. 2d 234, 248 (D. Conn. 2006)* (quoting *Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005))* (alteration in original); *see also Kessler v. Westchester County Department of Social Services, 461 F.3d 199, 206-209 (2d Cir. 2006).* In *White,* the Court held that in the context of a retaliation claim, an "adverse action" is one that would be "materially adverse to a reasonable employee or job applicant."    *U.S. at    , 126 S. Ct. at 2409.* The Court noted that "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm," *id. at    , 126 S. Ct. at 2414,* and held that an employer's actions are "materially adverse" if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." [*28] *Id. at    , 126 S. Ct. at 2409.* Whether or not a particular employer action is materially adverse "will often depend upon the particular circumstances," but the Court noted that "petty slights, minor annoyances, and simple lack of good man-

ners" will not generally deter employees from complaining about discrimination. *Id. at    , 126 S. Ct. at 2415.*

*2. Adverse Employment Action*

Viewing the evidence in the light most favorable to the plaintiff, Ms. Nugent's October 2000 verbal complaint to Dr. Foote and her November 2000 memorandum to Ms. Clucas constituted protected activity, [9] and the defendants were aware that Ms. Nugent had complained about Mr. Heaney's behavior. Accordingly, Ms. Nugent has satisfied the first two elements of a prima facie case of retaliation. As for the third element, Ms. Nugent claims that after she complained about his behavior, Mr. Heaney took adverse action against her by (1) subjecting her to "nasty looks" and "angry [] silences" (Nugent Dep. at 244, 596); (2) criticizing her paperwork more heavily and singling her out for criticism when she was late to meetings (Nugent Aff., P 3; Pl. Memo. at 13-14); (3) permitting other staff members [*29] to mock her and shun her (Nugent Dep. at 200-01, 378, 432; Pl. Memo. at 13); (4) failing to provide her with written evaluations (Pl. Memo. at 15); (5) reducing her family counseling duties (Nugent Dep. at 227); and (6) giving her written warnings and suspensions for behavior for which other employees were not disciplined (Pl. Memo. at 13-16). I must determine whether these constitute adverse actions, and whether Ms. Nugent has put forward sufficient evidence to create an inference that they were causally connected to her protected activity.

9    The plaintiff also contends that Mr. Heaney retaliated against her for filing a union grievance after her September 13, 2001 suspension. She claims that this grievance was "protected activity" within the meaning of the statute. (Memorandum of Law in Support of Plaintiff Charlotte Nugent's Motion for Summary Judgment and in Opposition to the Motions of the Hospital Defendants' and Kevin Barry Heaney's Motions for Summary Judgment ("Pl. Memo.") at 13, 15). However, there is no evidence that the grievance alleged that the employer's decision to suspend Ms. Nugent and dock her pay after the September 11, 2001 incident was discriminatory or retaliatory. The plaintiff indicates in her brief that the grievance was related to the failure to inform her that she had a right to have a union representative present during the meeting with Mr. Heaney and Mr. Horowitz. (Pl. Memo. at 4). Although the plaintiff claims that the grievance was "so intertwined with [her] earlier complaint[s] that it would be an artificial distinction to separate it from" them (Reply Memorandum of Law in Support of Plaintiff Charlotte Nugent's Motion for Summary Judgment ("Pl. Reply") at 10), she has offered no

evidence to support this claim. *See Turner v. Davidson/Gilmour Pipe Supply*, No. 04 Civ. 3278, 2006 WL 1652613, at *9 (E.D.N.Y. June 14, 2006) (finding that union grievance that fails to allege discrimination is not protected activity); *Carrion v. Local 32B-32J Service Employees International Union*, No. 03 Civ. 1896, 2005 U.S. Dist. LEXIS 4417, 2005 WL 659321, at *15 (S.D.N.Y. March 21, 2005) (same).

[*30] Title VII "does not set forth 'a general civility code for the American workplace.'" *White, U.S. at , 126 S. Ct. at 2415* (quoting *Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)*). Accordingly, "nasty looks" and "angry silences," without more, are not materially adverse actions. *See White, U.S. at , 126 S. Ct. at 2415* (noting that it is important to "separate significant from trivial harms" and that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work"); *Higgins v. Gonzales, 481 F.3d 578, 2007 U.S. App. LEXIS 6402, 2007 WL 817505, at *10 (8th Cir. 2007)* (noting that plaintiff "cannot make her claim based on personality conflicts, bad manners, or petty slights and snubs"); *Gardner v. District of Columbia, 448 F. Supp. 2d 70, 76 (D.D.C. 2006)* (holding that glaring at plaintiff in "an angry and alienating fashion" was not adverse action under *White*). Nor can Mr. Heaney's verbal criticism of Ms. Nugent's tardiness and of her [*31] paperwork be considered a materially adverse action under *White. See, e.g., Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 89-90 (D. Conn. 2006)* ("Plaintiff has not shown that [her supervisor's] criticizing her work, standing over her, not letting her leave, or leaving her a stack of papers, or her comment about being sick and tired of plaintiff's being sick, were anything more than minor annoyances.").

Similarly, mockery by other staff members is not an adverse action. In any case, Ms. Nugent has offered no evidence that her co-workers' hostility was causally related to her complaints about Mr. Heaney. *See Bozeman v. Per-Se Technologies, Inc., 456 F. Supp. 2d 1282, 1346 (N.D. Ga. 2006)* (noting that even if "shunning" by co-workers and supervisors was actionable, plaintiff failed to establish that he was shunned or ostracized because of protected activity, rather than "some lawful factor, such as his co-workers['] simple dislike for him"); *cf. Chan v. NYU Downtown Hospital*, No. 03 Civ. 3003, 2005 U.S. Dist. LEXIS 40243, 2006 WL 345853, at *9 (S.D.N.Y. Feb. 14, 2006) (finding, under pre-*White* standard, that "hostility from co-workers" is not [*32] adverse employment action). With respect to the plaintiff's claim that she was not given a written performance evaluation after September 25, 2001, she has offered no evidence

that it was the employer's regular practice to give such written evaluations or that other employees were given written performance evaluations during the period in question. Nor has she shown that she suffered any "injury or harm" as a result of the failure to provide her with a written evaluation. *White, U.S. at , 126 S. Ct. at 2414*. The elimination of her family counseling duties also cannot constitute retaliation, because it occurred several months *before* she complained to Dr. Foote about Mr. Heaney's behavior. [10] *See Pinero v. Long Island State Veterans Home, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005)* (citing *Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001)*) ("There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity.").

> 10  Ms. Nugent does not appear to contend that the change in her job responsibilities in September 2002 after her first leave of absence was an adverse action. In any case, Ms. Nugent testified that she considered the change to be an "upgrade" at the time it occurred. (Nugent Dep. at 227.) A reasonable person would hardly be dissuaded from complaining about discrimination by the prospect of an improvement in her working conditions.

[*33] Finally, Ms. Nugent claims that she was disciplined on a number of occasions in retaliation for her complaints. Specifically, Ms. Nugent was (1) disciplined for leaving work without permission on September 11, 2001; (2) given a written warning in May 2002 for failure to make appropriate arrangements for the discharge of two patients and for failing to keep up with progress notes on patients' charts; (3) issued a written warning in September 2002 for being late to a patient lecture, for failing to call in on another occasion prior to her shift to say she would be late, for failing to process ten patient discharge forms, and for neglecting to inform the hospital that she would not return from her leave of absence on the scheduled date; (4) given a written warning and suspended for one day in January 2003 for missing a "community meeting" and for failing to improve her written work; and (5) issued a written warning in April 2003 for, among other things, ongoing problems with paperwork, behaving unprofessionally in meetings, and arriving late for clinical activities and patient treatment groups.

The warnings and suspensions that Ms. Nugent received were adverse employment actions under [*34] *White. See Bush v. Fordham University, 452 F. Supp. 2d 394, 416 (S.D.N.Y. 2006)*. However, in order to make out a *prima facie* case of retaliation, Ms. Nugent must estab-

lish a causal connection between these disciplinary actions and her protected activity.

A causal connection may be established either "*indirectly*

> by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant."

*Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991)* (quoting *DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987))* (emphasis in original).

The plaintiff has submitted a letter written by Sandra Surita, an alcoholism counselor, in which she discussed with Mr. Heaney the fact that "two counselors" (presumably Ms. Range and Ms. Nugent) had complained to Dr. Foote about his behavior. (Letter of Sandra Surita dated March 12, 2001 ("Surita [*35] 3/12/01 Letter"), attached to Adler Decl., at 6). According to Ms. Surita, Mr. Heaney "implied that it would be difficult to work with the two counselors from now on because of this." (Surita 3/12/01 Letter at 6). Ms. Nugent contends that this letter is direct evidence of retaliatory animus on the part of Mr. Heaney. [11] (Pl. Memo. at 14). It is not. The letter attests to an inference drawn by Ms. Surita, rather than to a specific statement made by Mr. Heaney.

> 11  The defendants contend that Ms. Nugent may not rely on Ms. Surita's letter because it is inadmissible hearsay. It is not necessary to reach this issue because, even assuming the statement is admissible, it does not constitute proof of retaliatory animus.

Ms. Nugent next contends that she has demonstrated a causal connection by showing that she was given written warnings and suspensions for conduct for which other employees were not disciplined. Ms. Nugent claims that other counselors were often late to staff meetings, acted unprofessionally during [*36] meetings, and had difficulties completing paperwork in a timely fashion, but that she was the only staff member who was disciplined for these infractions. (Nugent Dep. at 146-149, 200-01, 501-02; Nugent Aff., P 10; Brooks Aff., PP 6-8; Ares Aff., P 2). In support of this claim, Ms. Nugent points to Mr. Heaney's deposition testimony that Al Jackson and Ken Lewis, both alcoholism counselors, had

difficulty with their paperwork, and that neither was ever issued a formal warning. (Heaney Dep. at 45-47). Specifically, Mr. Heaney testified that Mr. Jackson "needed counseling and [] assistance in that area," that he received informal counseling and "coaching," and that his paperwork continues to "require[] attention." (Heaney Dep. at 46). Mr. Heaney also testified that he coached Ms. Nugent with respect to her paperwork even more than he coached Mr. Jackson. (Heaney Dep. at 46). He testified that Mr. Lewis "needed help" with paperwork, that he received informal counseling, and that his paperwork was now "much better." (Heaney Dep. at 47). As noted above, there is also some evidence that other counselors were late to staff meetings and engaged in unprofessional behavior during those meetings [*37] without being disciplined. (Ares Aff., P 2; Brooks Aff., PP 6-8). [12]

> 12  Ms. Nugent testified that Ms. Range was among those who mocked her during staff meetings and was not reprimanded. (Nugent Dep. at 200-01). She also referred to Ms. Range as one of Mr. Heaney's "minions" and testified that Ms. Range developed a "cozy relationship" with Mr. Heaney. (Nugent Dep. at 142, 464). Given that Ms. Range also complained to Dr. Foote about Mr. Heaney's behavior, this testimony undermines Ms. Nugent's claim that the hostility between herself and Mr. Heaney was attributable to her complaints.

Ms. Nugent cannot defeat summary judgment simply by relying on Mr. Heaney's vague testimony that other staff had problems with paperwork. Moreover, there is no evidence that other staff members were late to meetings with patients, as opposed to staff meetings, a potentially far more serious infraction. Nor is there evidence that any other staff member missed a community meeting. There is also no evidence that other staff members' [*38] difficulties with paperwork led to delays in patients being discharged or removed from the state registry, or that any other counselors failed to make appropriate arrangements for psychiatric follow-up care after a patient was discharged. Accordingly, Ms. Nugent has not raised an inference of retaliatory animus because she cannot demonstrate that she was treated differently from other similarly situated employees. *See Allen v. St. Cabrini Nursing Home, Inc., 198 F. Supp. 2d 442, 450 (S.D.N.Y. 2002)* ("Because plaintiff does not identify another [] employee who received lighter discipline than she after [engaging in the same conduct], she is unable to rely on the comparison of her situation to that of any other similarly situated employees.").

A plaintiff may also raise an inference of retaliatory motive "'by showing that the protected activity was

closely followed in time by the adverse action.'" *Cifra, 252 F.3d at 217* (quoting *Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)).* Here, the first instance of alleged retaliation occurred in September 2001, approximately ten months after Ms. Nugent wrote the [\*39] memorandum to Ms. Clucas. The plaintiff contends that Ms. Clucas did not "quickly forward the complaint to the appropriate parties," and that the plaintiff "first discussed [the memorandum] with Jeff Foote several months" after she wrote it. (Nugent 2/13/07 Aff., P 4). Even assuming that Dr. Foote and Mr. Heaney became aware of the memorandum "several months" after Ms. Nugent wrote it, however, the gap between Ms. Nugent's protected activity and the disciplinary actions in question is too large to raise an inference of retaliatory motive. "[C]ases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality . . . uniformly hold that the temporal proximity must be very close." *Clark County School District v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)* (internal quotation omitted) (citing cases finding gaps of three and four months insufficient). "No bright line rule exists as to 'when the temporal link becomes too attenuated to demonstrate causation.'" *Butler v. Raytel Medical Corp., No. 98 Civ. 6446, 2004 U.S. Dist. LEXIS 26023, 2004 WL 1961522, at \*4 (E.D.N.Y. Aug. 24, 2004)* [\*40] (quoting *Hawana v. City of New York, 230 F. Supp. 2d 518, 530 (S.D.N.Y. 2002)).* However, in the absence of any other direct or circumstantial evidence, courts have repeatedly found that gaps in time like the one at issue here negate any inference of a causal connection. *See Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997)* (four months); *Donlon v. Group Health Inc., No. 00 Civ. 2190, 2001 U.S. Dist. LEXIS 1001, 2001 WL 111220, at \*3 (S.D.N.Y. Feb. 8, 2001)* (eight and one-half months); *Fitch v. R.J. Reynolds Tobacco Co., 675 F. Supp. 133, 138 (S.D.N.Y. 1987)* (seven months).

Thus, I find that the plaintiff has not presented sufficient evidence to raise an inference that any of the adverse actions taken against her are attributable to retaliatory animus.

### 3. Retaliatory Hostile Work Environment

Ms. Nugent next contends that she was subjected to a retaliatory hostile environment. A hostile work environment may constitute an adverse employment action in the context of a retaliation claim. *See Thomas v. iStar Financial, Inc., 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006).* However, this claim fails because Ms. Nugent [\*41] has not proffered adequate evidence to allow a reasonable factfinder to conclude that she was subjected to a hostile work environment.

A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' . . . ." *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)* (quoting *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986))* (internal citations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Id.* The plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted" to have altered the conditions of her working environment. *Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)* (quoting *Carrero v. New York City Housing Authority, 890 F.2d 569, 577 (2d Cir. 1989)).* [\*42]

When evaluating whether a hostile work environment exists, courts must look at "all the circumstances," including "the frequency of the [retaliatory] conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris, 510 U.S. at 23.* "While the standard for establishing a hostile work environment is high, [the Second Circuit has] repeatedly cautioned against setting the bar too high, noting that . . . the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003)* (quotation marks, citations, and emphasis omitted). "The environment need not be unendurable or intolerable." *Id.* (quotation marks and citation omitted).

Ms. Nugent contends that Mr. Heaney created a hostile environment by creating a "paper trail" and by subjecting her to "intense scrutiny." (Pl. Memo. at 10). As explained above, she claims that he singled her out for criticism for being late to staff meetings, [\*43] for filing her nails, and for reading the newspaper. (Ares Aff., P 2; Brooks Aff., PP 6-8; Nugent Aff., PP 3, 10-11). An affidavit from one of the plaintiff's co-workers states that Mr. Heaney's criticism of Ms. Nugent's lateness "created a certain unpleasant tension at rounds." (Ares Aff., P 2). Ms. Nugent also testified that "there was a tension around [Mr. Heaney] all the time" that could be "just as deadly as the yelling." (Nugent Dep. at 545). She says that she "never felt like [Mr. Heaney] really listened to [her] or took note in staff meetings." (Nugent Dep. at 429).

A plaintiff may not defeat summary judgment by bolstering her claim with "vague, [un]supported allegations" that the work environment was tense and unpleasant and that she suffered "harassment." *Bynog v. SL Green Realty Corp., No. 05 Civ. 0305, 2007 U.S. Dist. LEXIS 19110, 2007 WL 831740, at *8 (S.D.N.Y. March 20, 2007).* There is no evidence in the record here upon which a reasonable factfinder could base a finding that Mr. Heaney's criticism was sufficiently severe or pervasive as to have altered the conditions of the plaintiff's employment. *See, e.g., McGowan v. City of Eufala, 472 F.3d 736, 743-44 (10th Cir. 2006)* [*44] (finding that "petty criticism" of employee's work was "of a trivial nature" and did not create hostile work environment); *Demoret v. Zegarelli, 451 F.3d 140, 150 (2d Cir. 2006)* (rejecting hostile environment claim where supervisor reviewed plaintiff's work "with a fine-toothed comb" and criticized her for being late to meetings while allowing male employees to "skip meetings with impunity"). Ms. Nugent's claims that Mr. Heaney created a "paper trail" and subjected her to discipline for behavior for which others went unpunished also do not establish a hostile work environment. As explained above, Ms. Nugent has admitted that she committed the infractions for which she was disciplined, and she has not demonstrated that others engaged in similar behavior and were not subjected to discipline. Ms. Nugent's complaints are therefore insufficient, as a matter of law, to establish a retaliatory hostile work environment.

### 4. *Constructive Discharge*

Ms. Nugent also contends that she did not retire voluntarily but was constructively discharged in retaliation for her complaints. (Pl. n13 Memo. at 20-21). "An employee is constructively discharged when his employer, rather than [*45] discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry, 336 F.3d at 151-52; accord Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir. 2004).* An employee's "subjective perceptions" do not govern a claim of constructive discharge. *Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1161 (3d Cir. 1993)* (quoting *Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992)); accord Cooper v. Wyeth Ayerst Lederle, 106 F. Supp. 2d 479, 496 (S.D.N.Y. 2000); Victory v. Hewlett-Packard Co., 34 F. Supp. 2d 809, 826 (E.D.N.Y. 1999)* (citing *Nobler v. Beth Israel Medical Center, 702 F. Supp. 1023, 1030 (S.D.N.Y. 1988)).* Rather, "working conditions are intolerable when, viewed as a whole, they are so difficult and unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Terry, 336 F.3d at 152* (internal quotations and citation omitted); *accord Petrosino, 385 F.3d at 230.* Furthermore, the plaintiff must show "'deliberate action [*46] on the part of the

employer . . . . Something beyond mere negligence or ineffectiveness is required.'" *Mack v. Otis Elevator Co., 326 F.3d 116, 128 (2d Cir. 2003)* (quoting *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 73 (2d Cir. 2000)).*

Ms. Nugent has not made out a retaliatory hostile work environment claim or, as explained below, a gender-based hostile work environment claim. Therefore, to the extent that she contends that she was forced to resign as a result of a hostile work environment, her constructive discharge claim must also be denied. *See Baptiste v. Cushman & Wakefield, No. 03 Civ. 2102, 2007 U.S. Dist. LEXIS 19784, 2007 WL 747796, at *11 (S.D.N.Y. March 7, 2007)* (citing *Pennsylvania State Police v. Suders, 542 U.S. 129, 149, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004))* ("Where, as here, a constructive discharge claim is part and parcel of a hostile work environment claim . . . articulating a claim for hostile work environment is a necessary predicate to a finding of constructive discharge.").

To the extent that Ms. Nugent attempts to make out a separate claim of retaliatory constructive discharge, that claim also fails. A constructive [*47] discharge may be found on the basis of

evidence that an employer deliberately sought to place an employee in a position that jeopardized his or her health. But an employer is entitled to insist on as high a standard of work performance as it deems appropriate, and the fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer.

*Spence v. Maryland Casualty Co., 995 F.2d 1147, 1156 (2d Cir. 1993)* (internal citation omitted). The plaintiff contends that she was subjected to such "intense scrutiny and ridicule" that she was forced to take two medical leaves of absence, and subsequently to resign from her position. (Pl. Memo. at 21; Pl. Reply at 6).

However, Ms. Nugent cannot show that she was constructively discharged simply by demonstrating that she was extremely distressed by the reprimands, written warnings, and suspensions that she received. The issue is whether a reasonable person under the circumstances would have [*48] felt compelled to resign. As explained above, Ms. Nugent has not demonstrated that she was subjected to unwarranted disciplinary actions, or that

other employees who engaged in similar conduct were not disciplined. Although she has put forward some evidence that she was subjected to verbal criticism for arriving late to meetings and for unprofessional behavior while other employees were not, "unfair and unwarranted treatment is by no means the same as constructive discharge." *Clowes*, 991 F.2d at 1162. The fact that an employee "feels that the quality of [her] work has been unfairly criticized," or that her working conditions were "difficult or unpleasant," is insufficient to support a constructive discharge claim. *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (rejecting constructive discharge claim where employee was "dissatisfied with his assignments, with the criticisms of his work, and [] with his compensation"). Ms. Nugent has not submitted sufficient evidence to support a finding that the defendants deliberately created working conditions so unpleasant that a reasonable person would have felt compelled to resign.

Because [*49] Ms. Nugent has not raised a genuine issue of material fact regarding her claims for retaliation and constructive discharge under Title VII and the NYSHRL, the defendants' motions for summary judgment on these claims are granted.

C. *Gender Discrimination*

1. *Disparate Treatment*

Ms. Nugent also appears to contend that she was subjected to disparate treatment on the basis of her gender. In order to make out a *prima facie* case of discrimination under Title VII, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred in circumstances giving rise to an inference of discrimination. [14] *See Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2002); *see also McDonnell Douglas*, 411 U.S. at 802. If the plaintiff makes out a *prima facie* case, the defendant may rebut the inference of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Weinstock*, 224 F.3d at 42 (citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). [*50] If the defendant does so, the presumption of discrimination drops away, and the plaintiff must come forward with "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Id.* (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.* (citing *St. Mary's*, 509 U.S. at 519).

14  In this case, the defendants do not contend that Ms. Nugent is not a member of a protected class or that she was not qualified for her position.

The Supreme Court's decision in *White* did not alter the standard for determining what constitutes an adverse employment action in the context of a *prima facie* case of discrimination. *See White*,    U.S. at  , 126 S. Ct. at 2411-14 (holding that unlike Title VII's substantive provision, its anti-retaliation [*51] provision "extends beyond workplace-related or employment-related" actions); *Kessler*, 461 F.3d at 208 (noting that Court held in *White* that different standards should be applied in retaliation and discrimination cases). Accordingly, courts in this Circuit should generally look "to whether the plaintiff has suffered 'a materially adverse change in h[is] employment status' or in the terms and conditions of his employment" when determining whether a plaintiff has suffered an adverse employment action. *Kessler*, 461 F.3d at 207 (quoting *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (alteration in original)).

Several of the disciplinary actions taken against Ms. Nugent, such as her suspension without pay in January 2003 and the April 2003 written warning, qualify as adverse employment actions under this standard. *See Lennon v. New York City*, 392 F. Supp. 2d 630, 642 (S.D.N.Y. 2005) ("Typically, adverse employment actions are economic injuries such as a termination, suspension, failure to promote, or diminution in pay."); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) [*52] (indicating that reprimand could be adverse employment action if accompanied by negative result such as plaintiff being placed on probation). *But see Dobrynio v. Central Hudson Gas & Electric Corp.*, 419 F. Supp. 2d 557, 564-565 (S.D.N.Y. 2006) (holding that one day unpaid suspension was not a materially adverse employment action). However, Ms. Nugent has not demonstrated that any of the disciplinary actions taken against her are attributable, even in part, to discriminatory animus. Assuming for the sake of argument that the plaintiff has established a *prima facie* case, the defendants have met their burden of articulating legitimate non-discriminatory reasons for the discipline that Ms. Nugent received, and Ms. Nugent has not put forward sufficient evidence to support a finding that those stated reasons are pretextual.

Viewing the evidence in the light most favorable to the plaintiff, Ms. Nugent has shown that Mr. Heaney referred to female patients as "cunts" on two occasions, referred to a supervising nurse's "radical lesbian bullshit," and referred to a female patient as a "whore." Such stray remarks are insufficient to demonstrate that the adverse actions taken [*53] against the plaintiff are at-

tributable to gender bias. *See Renz v. Grey Advertising, Inc., 135 F.3d 217, 224 (2d Cir. 1997)* (finding isolated remarks not directed at plaintiff did not establish discrimination when evidence of non-discriminatory reason for adverse action was strong); *Ferrand v. Credit Lyonnais, No. 02 Civ. 5191, 2003 U.S. Dist. LEXIS 17202, 2003 WL 22251313, at \*10 (S.D.N.Y. Sept. 30, 2003)* (finding insufficient evidence of pretext where supervisor's repeated use of sexist epithets to refer to plaintiff and coworker was unrelated to adverse employment action); *Marks v. New York University, 61 F. Supp. 2d 81, 99-100 (S.D.N.Y. 1999)* (sexist remarks not directed at plaintiff insufficient to demonstrate pretext where there was no evidence establishing nexus between remarks and adverse actions taken against plaintiff). Furthermore, Mr. Heaney made the comments several years before Ms. Nugent was disciplined. *See Bagdasarian v. O'Neill, 00-CV-0258E, 2002 U.S. Dist. LEXIS 13328, 2002 WL 1628722, at \*4 (W.D.N.Y. July 17, 2002)* (finding that plaintiff failed to raise genuine issue of material fact regarding discriminatory intent where supervisor made comments about [\*54] plaintiff's age more than one year before plaintiff was denied promotion); *Smith v. Revival Home Health Care, Inc., No. 97 Civ. 4415, 2000 U.S. Dist. LEXIS 4105, 2000 WL 335747, at \*4 (E.D.N.Y. March 28, 2000)* ("Statements made long before and not in the context of the adverse action cannot support a claim of discriminatory motive for that action."). Similarly, the evidence that Mr. Heaney banged chairs, yelled, and generally acted aggressively toward female staff members is also insufficient to support a finding that the defendants' proffered reasons for disciplining Ms. Nugent were pretextual.

Moreover, Ms. Nugent cannot demonstrate that she was treated differently from similarly situated men. As explained above, although Ms. Nugent makes much of Mr. Heaney's deposition testimony that Al Jackson and Ken Lewis also had problems with their paperwork and were not formally disciplined, there is no evidence that their paperwork violations caused the same kinds of problems that Ms. Nugent's did. Nor is there any evidence that they engaged in the other sorts of conduct for which Ms. Nugent was disciplined, such as being late to or failing to attend patient meetings. Ms. Nugent testified that it was [\*55] her "perception" that Mr. Jackson and Mr. Lewis received preferential treatment from Mr. Heaney. (Nugent Dep. at 502-03). However, the plaintiff's "[feelings and perceptions] of being discriminated against [are] not evidence' of discrimination." *Bickerstaff v. Vassar College, 196 F.3d 435,* 456 (2d Cir. 1999)[15] (quoting *Fisher v. Vassar College, 70 F.3d 1420, 1439 (2d Cir. 1995)*) (alterations in original); *accord Hawkins v. City of New York, No. 99 Civ. 11704, 2005 U.S. Dist. LEXIS 15898, 2005 WL 1861855, at \*11 (S.D.N.Y. Aug. 4, 2005); Rochetti v. New York State Department of Motor Vehicles, No. 02 Civ. 1710, 2005 U.S. Dist. LEXIS 21055, 2005 WL 2340719, at \*7 (E.D.N.Y. June 13, 2005)*. Ms. Nugent also testified that Cindy Range and Jenny Pagan were among Mr. Heaney's "pets" on the Unit, and that Mr. Heaney "constantly denigrated" John Taylor, head of AINY's Intake Unit, and Andrew Merling, a staff psychologist. (Nugent Dep. at 141-43, 294, 464-65). Her testimony that Mr. Heaney treated some women better than her and that he treated some men badly further undermines Ms. Nugent's claim that the alleged mistreatment she received is attributable to discriminatory animus. [\*56]

> 15  Ms. Nugent also contends that I should infer from the fact that Mr. Heaney received no formal discipline, aside from the April 2000 memorandum, for his poor behavior, that the reason the plaintiff was disciplined for her infractions is that she was a woman. (Tr. at 72-74). However, Ms. Nugent has not demonstrated that Mr. Heaney, a management-level employee, was subject to the same disciplinary procedures that she was. *See Shumway v. United Parcel Service, 118 F.3d 60, 64 (2d Cir. 1997)* (holding that where plaintiff seeks to raise inference of discrimination by demonstrating that similarly situated individual was treated differently, "the individuals with whom [the plaintiff] attempts to compare herself must be similarly situated in all material respects"); *cf. McGuinness v. Lincoln Hall, 263 F.3d 49, 54-55 (2d Cir. 2001)* (distinguishing *Shumway* in finding that plaintiff raised inference of gender discrimination where she and male employee of roughly equivalent rank were fired at same time and by same people but male employee received higher severance pay); *Stanojev v. Ebasco Services, Inc., 643 F.2d 914, 923 (2d Cir. 1981)* (holding that manager failed to show age discrimination where, among other things, there was no evidence that termination procedures that he alleged were not followed in his case were ever meant to be applied to management-level employees).

[\*57]  Accordingly, Ms. Nugent has not proffered sufficient evidence to establish that the defendants' legitimate, non-discriminatory reasons for the adverse actions taken against her were merely pretext for discrimination.

## 2. Gender-Based Hostile Work Environment

Ms. Nugent also contends that the defendants subjected her to a hostile work environment based on gender. (Pl. Memo. at 10). Ms. Nugent contends that Mr. Heaney created a hostile work environment by using

misogynistic language and behaving abusively toward women. (Pl. Memo. at 10). In addition to his admitted use of misogynistic language, it is also undisputed that on at least one occasion Mr. Heaney slammed his fist down on a chair during a meeting with several nurses, and that he was subsequently issued a written warning. Ms. Nugent testified that she saw him slam his fists on a table on another occasion when a staff member was late to a meeting. (Nugent Dep. at 108). Ms. Nugent has also submitted affidavits from two nurses who testify that Mr. Heaney "spoke loudly and in an intimidating manner to the nursing staff" and that his intimidating behavior included "shouting, insults and slamming furniture and objects." (Ares [*58] Aff., P 2; Brooks Aff., P 3). One affidavit states that the affiant does not recall witnessing Mr. Heaney raising his voice to male employees. (Ares Aff., P 3). The other states that the affiant never observed Mr. Heaney behaving abusively toward men. (Brooks Aff., P 3). Ms. Nugent also relies on the letter from Ms. Surita, in which Ms. Surita voices numerous complaints about Mr. Heaney's management style. Ms. Surita, however, does not appear to attribute Mr. Heaney's behavior to discriminatory animus.

Mr. Heaney's use of derogatory language to refer to patients and staff is plainly inappropriate. However, as a matter of law, a supervisor's occasional use of sexist language does not create a hostile work environment. *See, e.g., Harris, 510 U.S. at 21* ("'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' . . . does not sufficiently affect the conditions of employment to implicate Title VII" (quoting *Meritor Savings Bank, 477 U.S. at 67*)); *Petrosino, 385 F.3d at 223* (noting that "isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment"); [*59] *Augustin v. Yale Club of New York, 03 Civ. 1924, 2006 U.S. Dist. LEXIS 67462, 2006 WL 2690289, at *21-22 (S.D.N.Y. Sept. 15, 2006)* (co-workers' use of phrases including "fucking negrita" and "black bitch" to refer to plaintiff not sufficient to create hostile work environment); *Garone v. United Parcel Service, 436 F. Supp. 2d 448, 469 (E.D.N.Y. 2006)* (supervisor's use of the phrases "office bitch," "Brooklyn bimbettes," and "cat fight" did not create hostile work environment); *Stepheny v. Brooklyn Hebrew School for Special Children, 356 F. Supp. 2d 248, 264 (E.D.N.Y. 2005)* (co-worker's use of the phrase "white bitch" or some variation thereof five times over a five month period did not create racially hostile work environment); *Pagan v. New York State Division of Parole, No. 98 Civ. 5840, 2003 U.S. Dist. LEXIS 20752, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003)* (supervisor's use of racially derogatory language on five occasions did not create racially hostile work environment). "Although the [] comments are despicable and offensive, they fail to constitute discriminatory behavior

that is sufficiently severe or pervasive to cause a hostile environment." *Brown v. Coach Stores, Inc., 163 F.3d 706, 713 (2d Cir. 1998).* [*60]

Even when taken together with Mr. Heaney's occasional use of sexist language, the remainder of Ms. Nugent's claims also fail to establish a hostile work environment based on sex. "The fact that [a supervisor has] an authoritative management style . . . does not transform the occasional off-color remark into harassment or strict managerial decision into chauvinism." *Garone, 436 F. Supp. 2d at 469.* As noted above, the plaintiff cannot establish a hostile work environment by demonstrating that Mr. Heaney subjected her to "intense scrutiny" and criticized her more than he did other employees. Regardless of whether the criticism of which Ms. Nugent complains is attributed to retaliatory animus or to gender discrimination, it does not rise to the level of a hostile work environment. Finally, using a loud and intimidating voice and slamming furniture, without more, does not create a hostile work environment. "The law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or unfortunately, even to behave reasonably and justly when he is peeved.'" *Cardozo v. Healthfirst, Inc., 210 F. Supp. 2d 224, 234 n.15 (S.D.N.Y. 1999)* [*61] (quoting *Christoforou v. Ryder Truck Rental, Inc., 668 F. Supp. 294, 303 (S.D.N.Y. 1987)).* Accordingly, the defendants are entitled to summary judgment on Ms. Nugent's gender-based hostile work environment claims.

D. *Disability Discrimination*

Title I of the ADA, *42 U.S.C. §§ 12101-12213,* prohibits discrimination against persons with disabilities in the terms, conditions, and privileges of employment. *42 U.S.C. § 12112(a).* To establish a *prima facie* case under the ADA, the plaintiff must prove by a preponderance of the evidence that: (1) her employer is subject to the ADA; (2) she is an employee with a disability under the ADA; (3) she is qualified to perform the essential functions of her job, with or without a reasonable accommodation; and (4) she suffered an adverse employment action because of her disability. *See, e.g., Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir. 2005).* An individual may qualify as an "employee with a disability" by showing that: (1) she "has a disability" under *42 U.S.C. § 12102(2)(A);* (2) she "has a record [*62] of" a disability under *42 U.S.C. § 12102(2)(B);* or (3) she is "regarded as" having a disability under *42 U.S.C. § 12102(2)(C).* Ms. Nugent alleges that she is an "employee with a disability" under the ADA because she "has a disability" within the meaning of *42 U.S.C. § 12102(2)(A).* To establish a disability within this provision, a plaintiff must demonstrate that (1) she suffers from a mental or physical impairment; (2) the impair-

ment limits one or more major life activities; and (3) that limitation is substantial. *See Bragdon v. Abbott, 524 U.S. 624, 631, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998); accord Colwell v. Suffolk County Police Department, 158 F.3d 635, 641 (2d Cir. 1998).*

Ms. Nugent has also brought a disability discrimination claim pursuant to the NYSHRL. Courts use a similar framework to analyze disability discrimination claims brought under the NYSHRL, *Johns-Davila v. City of New York, No. 99 Civ. 1885, 2000 U.S. Dist. LEXIS 17012, 2000 WL 1725418, at *11 (S.D.N.Y. Nov. 20, 2000),* but the NYSHRL's definition of "disability" is broader than the ADA definition. *Reeves v. Johnson Controls World Services, Inc., 140 F.3d 144, 154-56 (2d Cir. 1998); [*63] see also Burton v. Metropolitan Transportation Authority, 244 F. Supp. 2d 252, 257 (S.D.N.Y. 2003); Johns-Davila, 2000 U.S. Dist. LEXIS 17012, 2000 WL 1725418, at *11.* The NYSHRL defines a "disability" as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." *N.Y. Exec. Law § 292(21).* "'[A]n individual can be disabled under the [NYSHRL] if his or her impairment is demonstrable by medically accepted techniques; it is not required that the impairment substantially limit that individual's normal activities.'" *Reeves, 140 F.3d at 155* (quoting *Hazeldine v. Beverage Media, Ltd., 954 F. Supp. 697, 706 (S.D.N.Y. 1997))* (alteration in original).

It is undisputed that Ms. Nugent has been diagnosed with ADHD. The defendants concede that Ms. Nugent's ADHD may qualify as a disability under the broader NYSHRL definition, but contend that she does not have a disability as defined by the ADA because she cannot demonstrate that [*64] her impairment substantially limits any major life activity. (Def. Memo. at 17-19). However, it is unnecessary to reach this issue. Regardless of whether Ms. Nugent has a disability within the meaning of either statute, she has not made out a *prima facie* case of disability discrimination.

In order to establish the third and fourth elements of a *prima facie* case, Ms. Nugent must show that she is a qualified individual with a disability and that she was subjected to an adverse employment action because of her disability. The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8).* The plaintiff therefore bears the burden of proving either "that she can meet the requirements of the job without assistance, or that an accommodation exists that permits her to perform the job's essential functions." *Borkowski*

*v. Valley Central School District, 63 F.3d 131, 138 (2d Cir. 1995); accord Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 287 (S.D.N.Y. 1999); [*65] Motta v. Meachum, 969 F. Supp. 99, 113 (D. Conn. 1997).* An employer's failure to provide a reasonable accommodation may constitute an adverse action under the ADA. [16] *42 U.S.C. § 12112(b)(5)(A).*

> 16 Ms. Nugent claims that the defendants failed to accommodate her disability. She also contends that she was constructively discharged "on the basis of her disability." (Pl. Memo. at 21). Because, for the reasons set forth above, Ms. Nugent cannot demonstrate that she was constructively discharged, I will address only the failure to accommodate claim.

Under the ADA, "an employee has no right to any particular accommodation, but merely to a reasonable accommodation." *Equal Employment Opportunity Commission v. Yellow Freight System, Inc., No. 98 Civ. 2270, 2002 U.S. Dist. LEXIS 16826, 2002 WL 31011859, at *21 (S.D.N.Y. Sept. 9, 2002).* To determine what reasonable accommodation is appropriate, federal regulations implementing the ADA provide for an "informal, interactive process" involving [*66] both the employer and the employee. *See 29 C.F.R. § 1630.2(o)(3); see also Jackan v. New York State Department of Labor, 205 F.3d 562, 566 (2d Cir. 2000); Grenier v. Cyanamid Plastics, Inc. 70 F.3d 667, 677 (1st Cir. 1995).* Liability for failure to provide a reasonable accommodation ensues only when the employer is responsible for a breakdown in that process. *Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996); see also Economou v. Caldera, No. 99 Civ. 12117, 2000 U.S. Dist. LEXIS 18231, 2000 WL 1844773, at *24 (S.D.N.Y. Dec. 18, 2000).*

The plaintiff first contends that she began the interactive process specified in the statute when she "requested the assistance of an efficiency expert" as an accommodation for her disability. (Pl. Reply at 11). At some point during the two or three months that preceded her second leave of absence, Ms. Nugent asked Mr. Heaney if she could bring in a friend named Hal Meyer, who is an expert on ADHD, to help identify her problem areas and accommodations that might assist her in completing her paperwork. (Nugent Dep. at 295-96). At her deposition, Ms. [*67] Nugent testified as follows:

Q. What did Mr. Heaney say?

A. Oh, yeah, yeah, that would be great. I mean, that is what he always said to everything. That would be great, that would be wonderful, and then he would just stonewall it.

* * *

Q. [A]fter you had the meeting with Mr. Heaney, did you ever go back to Mr. Heaney and say: I would like to bring Mr. Meyer in on this day?

A. No.

Q. Did you ever attempt to schedule any appointment for Mr. Meyer to come to the unit?

A. I think I tried to schedule. I don't remember exactly. It was kind of late to be doing that. I should have done it much earlier.

(Nugent Dep. at 296-97). By contrast, in an affidavit submitted in opposition to the defendants' motions for summary judgment, the plaintiff states:

I informed Mr. Heaney that I would like to bring in an efficiency expert; however when I brought the matter up for scheduling (as the expert would need to be scheduled through Mr. Heaney), he would tell me that we could discuss it another time and he would wave me away. Because I was extremely intimidated by him at that point, I was afraid to push the matter further.

(Nugent Aff., P 13).

[*68] The Second Circuit has held that "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Department of Corrections, 84 F.3d 614, 619 (2d Cir. 1996)* (quoting *Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).*

[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony. If a party who has been examined at length on deposition could create an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Id.* (internal quotation marks and citations omitted). Of course, "the principle does not apply if the deposition and the later sworn statement are not actually contradictory." *Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 43 (2d Cir. 2000); see also Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)* [*69] ("[A] material issue of fact may be revealed by [] subsequent sworn testimony that amplifies or explains, but does not merely contradict, [a party's] prior testimony, especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation." (internal citation omitted)). In this case, however, Ms. Nugent's affidavit, submitted in opposition to the defendants' motions for summary judgment, plainly contradicts her deposition testimony and must be disregarded.

Ms. Nugent seems to suggests that even if she failed to follow up with Mr. Heaney regarding scheduling an appointment with Mr. Meyer, she has nevertheless made out a *prima facie* case of discrimination because once she raised the possibility with Mr. Heaney, the burden was on the defendants to locate Mr. Meyer and schedule an appointment with him. (Tr. at 55). When determining whether an employer may be held liable for a breakdown in the interactive process, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. . . [*70] . In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Beck, 75 F.3d at 1135.* In this case, it is clear that the cause of the breakdown in the interactive process was Ms. Nugent's failure to follow up with Mr. Heaney regarding scheduling a meeting with Mr. Meyer. Ms. Nugent made it clear that she had a particular expert in mind, and Mr. Heaney indicated a willingness to bring him in. Having failed to hold up her end of the interactive process by setting up an appointment with Mr. Meyer, or, at the very least, providing Mr. Heaney with Mr. Meyer's contact information so that he could set up the meeting himself, the plaintiff cannot now claim that the defendants failed to provide her with the accommodation that she requested.

At oral argument, Ms. Nugent's counsel also claimed that the plaintiff sought "a little extra time" to complete her paperwork, as well as "understanding" and "assistance," as accommodations for her disability. (Tr. at 52, 54). These alleged requests are extremely vague, and it is not clear that they would constitute requests for a reasonable accommodation. In any case, there is no evidence that [*71] Ms. Nugent made these requests. In fact, Ms. Nugent testified only that she "tried to talk to [Mr. Heaney] about [her ADHD] in supervision," and that aside from the conversation about Mr. Meyer, she did not recall specifically asking Mr. Heaney to do anything else

2007 U.S. Dist. LEXIS 28274, *

in connection with her ADHD. (Nugent Dep. at 299-300, 729). The assertions of plaintiff's counsel are entitled to no evidentiary weight, and the plaintiff has pointed to no actual evidence that contradicts her own testimony that the only accommodation that she requested was an efficiency expert. *See Thorner-Green v. New York City Department of Corrections, 207 F. Supp. 2d 11, 14 (E.D.N.Y. 2002)* (citing *Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)* (noting that allegations by counsel in legal memoranda or oral argument cannot serve to raise a genuine issue of material fact)).

Because the plaintiff has not made out a *prima facie* case of disability discrimination under either the ADA or the NYSHRL, the defendants' motions for summary judgment on these claims are granted.

*Conclusion*

For the reasons set forth above, the defendants' motions for summary judgment are [*72] granted in their entirety and the plaintiff's motion is denied. The Clerk of Court is respectfully requested to enter judgment for the defendants dismissing the complaint and to close the case.

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

April 18, 2007