LEXSEE



Cited
As of: Dec 26, 2007

CHARLOTTE NUGENT, Plaintiff, -against- THE ST. LUKE'S/ROOSEVELT
HOSPITAL CENTER, THE ADDICTION INSTITUTE OF NEW YORK (formerly
known as the SMITHERS ALCOHOL TREATMENT AND TRAINING
CENTER),: its predecessors and successors, CONTINUUM HEALTH PARTNERS,
INC. and KEVIN HEANEY, individually and in official capacity and John Does 1-
10, Defendants.

05 Civ. 5109 (JCF)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2007 U.S. Dist. LEXIS 28274

April 18, 2007, Decided
April 18, 2007, Filed

**CORE TERMS:** hostile, work environment, patient, disability, summary judgment, staff, adverse action, retaliation, paperwork, retaliatory, accommodation, written warning, subjected, staff member, prima facie case, protected activity, disciplined, deposition, notice, constructive discharge, discriminatory, supervisor, suspension, counselor, counseling, animus, nurse's, discharged, co-worker's, genuine

**COUNSEL:** [*1]  For Charlotte Nugent, Plaintiff: Susan Lori Adler, LEAD ATTORNEY, Susan Adler, Esq., New York, NY.

For ST. Luke's Roosevelt-Hospital Center, Continuum Health Partners, Inc., Addiction Institute of New York, formerly known as Smithers Alcoholism Treatment and Training Center, Defendants: Rory J. McEvoy, LEAD ATTORNEY, Edwards Angell Palmer & Dodge, LLP (NYC), New York, NY.

For Kevin Heaney, Individually and in official capacity, Defendant: Chaim B. Book, Moskowitz & Book, LLP, New York, NY.

**JUDGES:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JAMES C. FRANCIS IV

OPINION

*MEMORANDUM AND ORDER*

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

The plaintiff, Charlotte Nugent, brings this action pursuant to (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); (2) the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"); (3) the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA"); and (4) the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. (the "NYSHRL"). Ms. [*2] Nugent also brings various state common law claims. The parties have consented to proceed before me for all purposes pursuant to 28 U.S.C. § 636(c). The defendants have moved for summary judgment on all of the plaintiff's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. The plaintiff has moved for summary judgment on her hostile work environment and retaliation claims. For the reasons set forth below, the defendants' motions are granted in their entirety and the plaintiff's motion is denied.

*Background*

Beginning in June 1989, the plaintiff worked as a social work assistant and later as a social worker at Trinity House, a drug and alcohol treatment program at St. Luke's Hospital. (Deposition of Charlotte Nugent ("Nugent Dep.") at 29, 32, 50-51). In either 1989 or 1990, she was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD" or "ADD"). (Nugent Dep. at 21). ADHD affects Ms. Nugent's ability to organize tasks, attend to details, and manage her time. (Nugent Dep. at 21, 395-99). According to an expert report submitted by the plaintiff, her symptoms include "difficulty sustaining attention [*3] on certain tasks, difficulty organizing tasks and activities, . . . feeling overwhelmed by unclear or complex instructions or tasks, and difficulty following through on tasks or instructions without adequate support." (Report of Thor Bergerson, M.D. dated May 8, 2006 ("Bergerson Report"), attached as Exh. E to Declaration of Susan Adler dated Nov. 30, 2006 ("Adler 11/30/06 Decl."), at 2). At some point between 1997 and 1999, Ms. Nugent began to take Ritalin to treat her ADHD, and subsequently also began to take BuSpar and Paxil, which are anti-anxiety medications. (Nugent Dep. at 22-24).

In October 1999, defendant Kevin Heaney hired Ms. Nugent as a social worker in the Inpatient Rehabilitation Unit (the "Unit") at the Addiction Institute of New York ("AINY"), which is located at Roosevelt Hospital. [1] (Nugent Dep. at 52, 59, 63; Deposition of Kevin Heaney ("Heaney Dep."), excerpts attached as Exh. 2 to Declaration of Rory J. McEvoy dated Sept. 15, 2006 ("McEvoy Decl.") and to Adler 11/30/06 Decl., at 6-7). The Unit staff included seven or eight alcoholism counselors, a social worker, a psychiatrist, and a consulting psychologist, all supervised by Mr. Heaney, who is Director of Inpatient [*4] Rehabilitation. (Nugent Dep. at 63; Heaney Dep. at 5-6). There were also between five and ten nurses. (Nugent Dep. at 64). The nurses were supervised by Aileen Clucas, who was Nursing Clinical Coordinator for the Inpatient Rehabilitation Unit until November 2001. (Deposition of Aileen Clucas ("Clucas Dep."), excerpts attached as Exh. 3 to McEvoy Decl., at 4-5).

> 1    St. Luke's/Roosevelt Hospital Center ("SLRHC") has two locations. One is St. Luke's Hospital, where Trinity House is located, and the other is Roosevelt Hospital, where AINY is located.

The plaintiff was hired to replace the previous social worker, who did "family work." (Nugent Dep. at 54-55). Ms. Nugent was told when she was hired that she "would be doing 40 percent of [her] time as a family worker and 60 percent of [her] time working with [another] worker to . . . triage the patients who were coming into" the Unit.

(Nugent Dep. at 59). According to the defendants, this plan was never put into effect because there were not enough staff to implement [*5] it. (Heaney Dep. at 55). As a result, Ms. Nugent was given the title of social worker, and was paid as a social worker, but was "essentially [] a team member with [the] same responsibilities" as the alcoholism counselors. (Heaney Dep. at 55; Nugent Dep. at 69).

When she began working at AINY, Ms. Nugent led family counseling sessions. (Nugent Dep. at 70, 524-25; Heaney Dep. at 37). The remainder of her work involved alcoholism counseling; her duties included attending daily staff meetings, creating treatment plans, updating charts, leading group therapy sessions, seeing patients, and completing paperwork required by the New York State Office of Alcoholism and Substance Abuse Services. (Nugent Dep. at 69, 73-77; Heaney Dep. at 49, 72). Because of her family counseling responsibilities, Ms. Nugent was given a reduced patient caseload in comparison to the alcoholism counselors. (Nugent Dep. at 525; Heaney Dep. at 37-38; Employee Comments, attached to Performance Appraisal dated Sept. 25, 2000 ("9/25/00 Appraisal"), attached to Adler 11/30/06 Decl.). Ms. Nugent stopped doing "family consultations" in February or March 2001 because her "regular workload became extremely heavy." (Employee [*6] Comments; Nugent Dep. at 281, 548).

Mr. Heaney was "difficult to work with" and "could sometimes[] be a disciplinarian with patients." (Clucas Dep. at 18). According to Ms. Nugent, many of the nurses were "afraid of him." (Nugent Dep. at 356). Ms. Nugent witnessed an incident in which Mr. Heaney "slammed his fist and his papers or something down on the desk and was talking in a very, very nasty tone" to a nurse named Marcie. (Nugent Dep. at 107-08). On March 24, 2000, Mr. Heaney met with Marcie and two other nurses to discuss that incident. (Heaney Dep. at 14; Clucas Dep. at 26-27). During the meeting, Mr. Heaney apparently became "frustrated" when Marcie failed to "warm up to [him] in the way that [he] wanted her to or didn't accept his apology." (Clucas Dep. at 26). Mr. Heaney slapped his hand against the arm of a chair and walked out of the room. (Heaney Dep. at 14; Clucas Dep. at 26-27; Letter of Elizabeth Moore dated April 4, 2000 ("Moore 4/4/00 Letter"), attached to Adler 11/30/06 Decl.). Mr. Heaney subsequently received a written warning regarding the meeting, stating that his behavior was "intimidating and unprofessional and cannot be tolerated." (Moore 4/4/00 Letter). [*7] According to the plaintiff, on another occasion, when a staff member was late to a staff meeting, Mr. Heaney "yelled out, 'Where is Tina,' and [] slammed [his fist] down on his desk." (Nugent Dep. at 108).

2007 U.S. Dist. LEXIS 28274, *

In the spring of 2000, by his own admission, Mr. Heaney referred to a female patient as a "cunt" during a staff meeting. (Nugent Dep. at 89-91; Heaney Dep. at 26). The plaintiff claims that Mr. Heaney later used the word again in reference to a different patient. (Nugent Dep. at 91-92). At some point in 2000, Mr. Heaney and Ms. Nugent discussed Ms. Clucas' view that it was acceptable for female nurses to observe male patients giving urine samples. (Nugent Dep. at 85). Mr. Heaney referred to Ms. Clucas's opinion as "just her radical lesbian bullshit." (Nugent Dep. at 87; Heaney Dep. at 23).

On September 25, 2000, Ms. Nugent received a performance evaluation from Mr. Heaney in which he indicated that she was "an outstanding member of the staff." (9/25/00 Appraisal). He noted that "[t]here had been some problems in record-keeping and statistics," but that Ms. Nugent "was able to address this difficulty and progress is taking place." (9/25/00 Appraisal).

In October 2000, the [*8] plaintiff and a nurse named Cindy Range complained to Dr. Jeff Foote, Clinical Director of AINY, about Mr. Heaney's behavior. (Nugent Dep. at 122-26). According to the plaintiff, she told Dr. Foote that Mr. Heaney was "abusive" and that the way he spoke to people was "vulgar and coarse." (Nugent Dep. at 125).

On November 28, 2000, Ms. Nugent wrote a memorandum to Ms. Clucas in which she expressed her concerns about "sexist, pejorative, or denigrating comments [made by Mr. Heaney] about other staff members and/or patients." (Memorandum from Charlotte Nugent dated Nov. 28, 2000, attached to Adler 11/30/06 Decl.). She also reported that "[t]here is a feeling among some of the women, both counseling and nursing staff, that men are favored over women," and that the feeling was reinforced by Mr. Heaney's sexist comments. Ms. Nugent claims that she gave the memorandum to Ms. Clucas, and that Ms. Clucas later told her that she gave the memorandum to Elizabeth Moore, a Senior Administrator in the Psychiatry Department. (Moore 4/4/00 Letter; Nugent Dep. at 272-74). Ms. Clucas does not recall "ever being officially in receipt" of the memorandum, and claims that she told the plaintiff to [*9] take her complaints "up [her] own chain of command to [Mr. Heaney's] supervisor." (Clucas Dep. at 22).

Dr. Foote met with the plaintiff on three separate occasions in response to her complaints, once by herself, once with Ms. Range, and once with Ms. Range and Mr. Heaney. (Nugent Dep. at 274-75). Mr. Heaney also received "informal counseling" from Dr. Foote in response to Ms. Nugent's complaints. (Heaney Dep. at 20-22).

Between November 28, 2000 and September 11, 2001, Mr. Heaney took no formal disciplinary action against Ms. Nugent, and Ms. Nugent received no written warnings or any other documents critical of her performance. (Nugent Dep. at 157-59). Although the plaintiff claims that she received verbal criticism from Mr. Heaney during this period, she "can't remember any specifics" (Nugent Dep. at 158-59) other than that Mr. Heaney began to criticize her paperwork more heavily and to reprimand her, but not others, for being late to meetings. [2] (Affidavit of Charlotte Nugent dated Feb. 13, 2007 ("Nugent Aff."), attached to Declaration of Susan Adler dated Feb. 13, 2007 ("Adler 2/13/07 Decl."), P 3). Ms. Nugent also claims that at some point in 2001, she heard Mr. Heaney refer [*10] to a patient as a "whore." (Nugent Dep. at 97-102).

> 2   It is not clear when Ms. Nugent claims that Mr. Heaney began to single her out for criticism. The affidavit submitted by Ms. Nugent in opposition to the defendants' motions for summary judgment appears to contradict her earlier testimony that after November 2000, there was a "quiet period" during which Mr. Heaney "wasn't picking on [her]." (*Compare* Nugent Aff., P 3 *with* Nugent Dep. at 543-45). Two of Ms. Nugent's co-workers have submitted affidavits in which they variously state that "subsequent to November 2000" and "during 2001 and 2002," Ms. Nugent was chastised for being late while others were not. (Affidavit of Shirley Brooks dated Feb. 13, 2007 ("Brooks Aff."), attached to Adler 2/13/07 Decl., PP 6-8; Affidavit of Ella Ares dated Nov. 24, 2006 ("Ares Aff."), attached to Adler 11/30/06 Decl., P 2). For the purpose of deciding whether to grant summary judgment for the defendants, I will assume that beginning in November 2000, Mr. Heaney began to criticize Ms. Nugent's paperwork more heavily and to single her out for criticism when she was late to meetings.

[*11]   On September 11, 2001, the plaintiff was scheduled to work from 8 a.m. to 7 p.m. (Nugent Dep. at 160; Heaney Dep. at 93). According to the defendants, the Unit went on "standby" after the the attack on the World Trade Center. (Heaney Dep. at 91). The defendants claim that all staff were notified not to leave the hospital until they were given permission to do so. (Heaney Dep. at 92). The plaintiff recalls a discussion "[a]bout whether people could leave or not" during the staff meeting in the morning, during which one person was given permission to leave early, but maintains that she was never told to remain at work until given permission to leave. (Nugent Dep. at 161-64). Ms. Nugent left work at 3:30 p.m. (Heaney Dep. at 90). She claims that the "whole floor was empty of clinical staff," that "it was dark on the unit," and that she thought "everybody had left" by the time she went home. [3] (Nugent Dep. at 162,

167, 169). Ms. Nugent maintains that she believed that she had permission to go home. (Nugent Aff., P 7). After she left the hospital, Ms. Nugent left a voice mail message for Mr. Heaney informing him that she had gone home. (Nugent Dep. at 167; Deposition of Gerald Horowitz [*12] ("Horowitz Dep."), attached as Exh. 4 to McEvoy Decl., at 24).

> 3 Ms. Nugent's co-worker Ms. Brooks states that on September 11, 2001, she worked until approximately 5 p.m. (Brooks Aff., P 5). After approximately 3 p.m. on that day, Ms. Brooks "did not see any counselors on the floor and believed that they had all left." (Brooks Aff., P 5).

Mr. Heaney told Gerald Horowitz, an AINY Administrator, that Ms. Nugent had gone home early on September 11. (Heaney Dep. at 93; Horowitz Dep. at 24). Mr. Horowitz met with the plaintiff and Mr. Heaney on September 13, 2001. (Horowitz Dep. at 24). At that meeting, Ms. Nugent acknowledged that it was "wrong" to leave early on September 11. (Nugent Dep. at 175). Although Mr. Horowitz wanted to suspend Ms. Nugent for two days, Mr. Heaney asked him to suspend her only for the remainder of that day because the Unit was short staffed. (Heaney Dep. at 94; Horowitz Dep. at 26). Ms. Nugent was docked two and a half hours' pay for leaving early on September 11, and was sent home without [*13] pay for the remainder of the day. (Nugent Dep. at 176-77). Ms. Nugent filed a union grievance, and a hearing officer subsequently ordered the hospital to reimburse her for the pay she lost on September 13. (Nugent Dep. at 181; Letter of Kim D. Moore-Ward dated Jan. 16, 2002, attached as Exh. H to Nugent Dep.).

From then on, according to Ms. Nugent, she suffered "constant harassment" from Mr. Heaney. (Nugent Dep. at 196-98). She felt "extremely harassed, picked upon, singled out, laughed at, mocked." (Nugent Dep. at 200). She alleges that Mr. Heaney treated her differently from other staff members and ignored the fact that other staff members taunted her:

> I would sit in the staff meeting and Cindy Range and Jeff Brown would make fun of me and laugh and hee hee, and then Kevin would say [to me] you are filing your fingernails or reading the paper, and that was a terrible thing. But it was okay for them to sit there and under the words make nasty, mocking remarks.

(Nugent Dep. at 200-01; Nugent Aff., P 3). Ms. Nugent claims that as a result of this harassment, she began to neglect her paperwork. (Nugent Dep. at 201-02).

On May 1, 2002, Ms. Nugent was given a verbal [*14] warning regarding progress notes that were missing from six of her charts, failure to make appropriate plans for psychiatric follow-up after a patient was discharged from the hospital, and failure to discharge a patient. (Nugent Dep. at 186-88; Notice to Employee dated May 1, 2002, attached as Exh. J to Nugent Dep.). On May 24, 2002, Ms. Nugent was scheduled to lecture patients at 8:45 a.m.; she did not arrive until 9:15 a.m. (Nugent Dep. at 218, 221-22; Notice to Employee dated Sept. 24, 2002 ("9/24/02 Notice"), attached as Exh. R to Nugent Dep.). On June 4, 2002, she was scheduled to arrive at work at 8 a.m., but did not arrive at the scheduled time. She did not notify her supervisor that she would be late until 9 a.m. [4] (Nugent Dep. at 219; 9/24/02 Notice).

> 4 According to the written warning Ms. Nugent received, hospital policy requires staff to call in at least one hour prior to the start of their shift. (Nugent Dep. at 218-19; 9/24/02 Notice). Ms. Nugent claims that she was not aware of this policy, and that staff on the unit routinely called in "around the time of their shift or sometimes a little later." (Nugent Dep. at 220).

[*15] Ms. Nugent applied for and was granted a medical leave of absence on the basis of depression and anxiety from June 6, 2002 until September 6, 2002. (Nugent Dep. at 208; Letter of Dr. Frederick J. Long dated June 4, 2002, attached as Exh. L to Nugent Dep.). She did not return to work on September 7, 2002. (Nugent Dep. at 209-10). On September 9, 2002, Mr. Heaney sent her a letter regarding her failure to return to her job and enclosed a leave extension form. (Letter of Kevin Heaney dated Sept. 9, 2002, attached as Exh. O to Nugent Dep.). On September 16, 2002, Ms. Nugent filed an application to extend her leave until September 23, 2002. (Nugent Dep. at 211; Leave of Absence Extension Application Form dated Sept. 16, 2002, attached as Exh. P to Nugent Dep.). Her application was granted. (Nugent Dep. at 211).

On September 24, 2002, Ms. Nugent received a written warning regarding the May and June incidents described above. (Nugent Dep. at 216-17; 9/24/02 Notice). The warning also addressed her failure to process ten patient discharge forms, which resulted in the patients being listed in the state registry of substance abuse patients for between five and twenty months after they were [*16] discharged. (Nugent Dep. at 220; Heaney Dep. at 72; 9/24/02 Notice). Finally, the warning stated that Ms. Nugent had failed to notify Mr. Heaney or Human Resources to tell them that she would not return from her leave of absence on September 7, 2002. (Nugent Dep. at 220-21; 9/24/02 Notice).

After her leave of absence, Ms. Nugent was informed that her job duties had been changed. Her new role would be to assess new patients admitted to the Unit. (Memorandum from Kevin Heaney dated Sept. 23, 2002 ("9/23/02 Memo."), attached as Exh. S to Nugent Dep.). Her responsibilities now included meeting new patients, reviewing their "Self-Report Questionnaire," completing an "Assessment Summary," determining problem areas for the patient, and presenting the case in rounds the following day. (9/23/02 Memo.). Ms. Nugent retained the title of social worker, continued to earn the same salary and benefits, and worked the same hours. (Nugent Dep. at 230). According to the defendants, Mr. Heaney changed Ms. Nugent's responsibilities in an attempt "to revise her workload in order to . . . [protect her] from the type of work" with which she was having difficulty. (Heaney Dep. at 55-56). Ms. Nugent considered [*17] her new role an "upgrade." (Nugent Dep. at 231). She was happy with her new responsibilities and "liked it a lot." (Nugent Dep. at 231).

On December 24, 2002, the plaintiff was scheduled to lead a weekly "community meeting" on the Unit. (Nugent Dep. at 236-37). She missed the meeting because she was Christmas shopping. (Nugent Dep. at 236-37). Ms. Nugent received a written warning regarding the incident, which also indicated that since the date of her last warning, she had "failed to show improvement in [her] written work." (Notice to Employee dated Jan. 10, 2003 ("1/10/03 Notice"), attached as Exh. T to Nugent Dep.). As a result, Ms. Nugent received a one-day "suspension prior to termination" on January 10, 2003. (1/10/03 Notice; Memorandum dated April 3, 2003, attached as Exh. W to Nugent Dep.). Ms. Nugent admits that "some disciplinary action" may have been appropriate under the circumstances. (Nugent Dep. at 238).

At some point after her suspension, Ms. Nugent asked Mr. Heaney if she could bring in an ADHD expert, Hal Meyer, to help her manage the problems she was having. (Nugent Dep. at 295, 699-700). Mr. Heaney told her, "[T]hat would be great." (Nugent Dep. at 296). At [*18] her deposition, Ms. Nugent testified that she did not recall ever attempting to follow up with Mr. Heaney. (Nugent Dep. at 297). In an affidavit submitted in support of her motion for summary judgment, Ms. Nugent claims instead that she did try to follow up with Mr. Heaney, but that whenever she "brought the matter up for scheduling," Mr. Heaney told her they could discuss it another time. (Nugent Aff., P 13).

On April 3, 2003, Ms. Nugent met with Mr. Heaney and Paul Rinaldi, who replaced Dr. Foote after he left AINY, to discuss ongoing issues with her job performance. (Nugent Dep. at 245; Memorandum of Kevin Heaney dated April 3, 2003 ("4/3/03 Memo."), attached as Exh. W to Nugent Dep.). Ms. Nugent also received a

written memo from Mr. Heaney indicating that there had been "on-going problems in [her] job functioning" since the January suspension. (4/3/03 Memo.). The warning mentions "lack of timeliness" in attending clinical activities, failure to arrive on time for treatment groups, unprofessional behavior such as filing her nails and reading a newspaper during staff meetings, neglecting a patient who had been assigned to her, and "problems in attention to routine and detail in [*19] written records." (4/3/03 Memo.). It also states, "You need to make immediate and sustained corrections of your behavior or you will face termination from the hospital." (4/3/03 Memo.).

Ms. Nugent did not come in to work on April 4, 2003. (Nugent Dep. at 309). She states that she "felt completely trapped" because she had talked to other staff members who said, "[W]e heard that if they find one more thing on you, you are going to be fired." (Nugent Dep. at 309). Ms. Nugent believed that if she went to work, "they would find one more thing, because they always can if they want to." (Nugent Dep. at 309). She applied for and was granted a medical leave of absence from April 4, 2003 to June 4, 2003. (Leave of Absence Application Form dated April 7, 2003 ("4/7/03 LOA"), attached as Exh. X to Nugent Dep.).

While on leave, Ms. Nugent sought a transfer to another unit. (Nugent Dep. at 319). On May 29, 2003, she obtained an extension of her leave until August 4, 2003. (Nugent Dep. at 322). However, she now admits that she did not intend to come back to work unless she could transfer out of the Unit. (Nugent Dep. at 322).

On July 7, 2003, after her request to transfer was denied, the plaintiff [*20] submitted a notice of retirement. (Nugent Dep. at 323; Letter of Charlotte Nugent dated July 7, 2003, attached as Exh. BB to Nugent Dep.). She believed that if she returned to work she would be fired, and would thereby lose her benefits. (Nugent Dep. at 323). Ms. Nugent's retirement took effect on November 1, 2003, although she did not return to work at AINY in the meantime. (Nugent Dep. at 322, 326-27; Letter of Charlotte Nugent dated Oct. 9, 2003, attached as Exh. CC to Nugent Dep.).

On May 27, 2005, Ms. Nugent filed a complaint alleging that the defendants had discriminated against her on the basis of gender, age, and disability, that she had been subjected to a hostile work environment, and that the defendants retaliated against her after she complained about Mr. Heaney's behavior. The complaint also sought damages for breach of contract, negligent infliction of emotional distress, and intentional infliction of emotional distress. The defendants moved for summary judgment on all of the plaintiff's claims, and Ms. Nugent moved for summary judgment on her hostile work environment and retaliation claims. At oral argument, Ms. Nugent with-

drew her age discrimination claims under the [*21] ADEA and the NYSHRL, as well as her state common law claims. (Tr. at 3). [5] I will address the remaining claims below.

5    "Tr." refers to the transcript of oral argument held on April 6, 2007.

*Discussion*

A. *Summary Judgment Standard*

Pursuant to Rule 56, summary judgment is appropriate where the evidence offered demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Tocker v. Philip Morris Companies, Inc.*, 470 F.3d 481, 486-87 (2d Cir. 2006); *Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co.*, 189 F.3d 208, 214 (2d Cir. 1999). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "In moving for summary judgment against a party who will bear the [*22] ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995); *see also Celotex*, 477 U.S. at 325; *Feurtado v. City of New York*, 337 F. Supp. 2d 593, 599 (S.D.N.Y. 2004).

Where the moving party meets that burden, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In assessing whether the nonmoving party has presented evidence sufficient to raise a genuine issue of material fact, the court resolves all ambiguities and draws all factual inferences in favor of the nonmoving party. [6] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Vann v. City of New York*, 72 F.3d 1040, 1048-49 (2d Cir. 1995). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version [*23] of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997) (internal quotations and citations omitted); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga*, 51 F.3d at 18 (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are

not credible"). If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)).

6    The plaintiff's submissions are unclear at best and at times incoherent, with precious few citations to relevant case law. I have nevertheless given her the benefit of the doubt in determining the nature and scope of her claims and have drawn every inference in her favor where appropriate.

[*24] Summary judgment is generally inappropriate where the defendant's state of mind is at issue. *See Gelb v. Board of Elections of the City of New York*, 224 F.3d 149, 157 (2d Cir. 2000). Accordingly, it should be granted with caution in employment discrimination cases. *See Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994). However, "the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). Therefore "summary judgment may be appropriate even in the fact-intensive context of discrimination claims." *Id. accord Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 609 (2d Cir. 2006).

B. *Retaliation*

1. *Legal Standard*

Ms. Nugent first contends that she was subjected to retaliation for her complaints about Mr. Heaney's behavior. Section 704(a) of Title VII provides in relevant part that "[i]t shall be an unlawful [*25] employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter." [7] 42 U.S.C. 2000e-3(a). Title VII retaliation claims follow the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). In order to defeat a motion for summary judgment, a plaintiff must establish a *prima facie* case by putting forth

"evidence sufficient to permit a rational trier of fact to find [1] that she 'engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e. that a retaliatory motive played a part in the adverse employment action.'"

Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001) (quoting Sumner v. United States Postal Service, 899 F.2d 203, 208-09 (2d Cir. 1990)). [*26] [8]

7    Courts apply the same standards to claims brought under Title VII and the NYSHRL. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000); Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997). Accordingly, I will analyze Ms. Nugent's federal and state retaliation, gender discrimination, and hostile work environment claims together.

8    If the plaintiff establishes a prima facie case, and the defendant "points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Cifra, 252 F.3d at 216.

In Burlington Northern & Santa Fe Railway Co. v. White, _ U.S. _, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), the Supreme Court "altered the standard previously used by the Second Circuit, which [*27] defined an adverse employment action as a 'materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Spector v. Board of Trustees of Community-Technical Colleges, 463 F. Supp. 2d 234, 248 (D. Conn. 2006) (quoting Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005)) (alteration in original); see also Kessler v. Westchester County Department of Social Services, 461 F.3d 199, 206-209 (2d Cir. 2006). In White, the Court held that in the context of a retaliation claim, an "adverse action" is one that would be "materially adverse to a reasonable employee or job applicant." _ U.S. _, 126 S. Ct. at 2409. The Court noted that "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm," id. at _, 126 S. Ct. at 2414, and held that an employer's actions are "materially

adverse" if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." [*28] Id. at _, 126 S. Ct. at 2409. Whether or not a particular employer action is materially adverse "will often depend upon the particular circumstances," but the Court noted that "petty slights, minor annoyances, and simple lack of good manners" will not generally deter employees from complaining about discrimination. Id. at _, 126 S. Ct. at 2415.

2. Adverse Employment Action

Viewing the evidence in the light most favorable to the plaintiff, Ms. Nugent's October 2000 verbal complaint to Dr. Foote and her November 2000 memorandum to Ms. Clucas constituted protected activity, [9] and the defendants were aware that Ms. Nugent had complained about Mr. Heaney's behavior. Accordingly, Ms. Nugent has satisfied the first two elements of a prima facie case of retaliation. As for the third element, Ms. Nugent claims that after she complained about his behavior, Mr. Heaney took adverse action against her by (1) subjecting her to "nasty looks" and "angry [] silences" (Nugent Dep. at 244, 596); (2) criticizing her paperwork more heavily and singling her out for criticism when she was late to meetings (Nugent Aff., P 3; Pl. Memo. at 13-14); (3) permitting other staff members [*29] to mock her and shun her (Nugent Dep. at 200-01, 378, 432; Pl. Memo. at 13); (4) failing to provide her with written evaluations (Pl. Memo. at 15); (5) reducing her family counseling duties (Nugent Dep. at 227); and (6) giving her written warnings and suspensions for behavior for which other employees were not disciplined (Pl. Memo. at 13-16). I must determine whether these constitute adverse actions, and whether Ms. Nugent has put forward sufficient evidence to create an inference that they were causally connected to her protected activity.

9    The plaintiff also contends that Mr. Heaney retaliated against her for filing a union grievance after her September 13, 2001 suspension. She claims that this grievance was "protected activity" within the meaning of the statute. (Memorandum of Law in Support of Plaintiff Charlotte Nugent's Motion for Summary Judgment and in Opposition to the Motions of the Hospital Defendants' and Kevin Barry Heaney's Motions for Summary Judgment ("Pl. Memo.") at 13, 15). However, there is no evidence that the grievance alleged that the employer's decision to suspend Ms. Nugent and dock her pay after the September 11, 2001 incident was discriminatory or retaliatory. The plaintiff indicates in her brief that the grievance was related to the failure to inform her that she had a right to have a union representative present during the meeting with Mr. Heaney and Mr.

Horowitz. (Pl. Memo. at 4). Although the plaintiff claims that the grievance was "so intertwined with [her] earlier complaint[s] that it would be an artificial distinction to separate it from" them (Reply Memorandum of Law in Support of Plaintiff Charlotte Nugent's Motion for Summary Judgment ("Pl. Reply") at 10), she has offered no evidence to support this claim. *See Turner v. Davidson/Gilmour Pipe Supply*, No. 04 Civ. 3278, 2006 WL 1652613, at *9 (E.D.N.Y. June 14, 2006) (finding that union grievance that fails to allege discrimination is not protected activity); *Carrion v. Local 32B-32J Service Employees International Union, No. 03 Civ. 1896, 2005 U.S. Dist. LEXIS 4417, 2005 WL 659321, at *15 (S.D.N.Y. March 21, 2005)* (same).

[*30] Title VII "does not set forth 'a general civility code for the American workplace.'" *White, U.S. at , 126 S. Ct. at 2415* (quoting *Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)*). Accordingly, "nasty looks" and "angry silences," without more, are not materially adverse actions. *See White, U.S. at , 126 S. Ct. at 2415* (noting that it is important to "separate significant from trivial harms" and that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work"); *Higgins v. Gonzales, 481 F.3d 578, 2007 U.S. App. LEXIS 6402, 2007 WL 817505, at *10 (8th Cir. 2007)* (noting that plaintiff "cannot make her claim based on personality conflicts, bad manners, or petty slights and snubs"); *Gardner v. District of Columbia, 448 F. Supp. 2d 70, 76 (D.D.C. 2006)* (holding that glaring at plaintiff in "an angry and alienating fashion" was not adverse action under *White*). Nor can Mr. Heaney's verbal criticism of Ms. Nugent's tardiness and of her [*31] paperwork be considered a materially adverse action under *White*. *See, e.g., Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 89-90 (D. Conn. 2006)* ("Plaintiff has not shown that [her supervisor's] criticizing her work, standing over her, not letting her leave, or leaving her a stack of papers, or her comment about being sick and tired of plaintiff's being sick, were anything more than minor annoyances.").

Similarly, mockery by other staff members is not an adverse action. In any case, Ms. Nugent has offered no evidence that her co-workers' hostility was causally related to her complaints about Mr. Heaney. *See Bozeman v. Per-Se Technologies, Inc., 456 F. Supp. 2d 1282, 1346 (N.D. Ga. 2006)* (noting that even if "shunning" by co-workers and supervisors was actionable, plaintiff failed to establish that he was shunned or ostracized because of protected activity, rather than "some lawful factor, such as his co-workers['] simple dislike for him"); *cf. Chan v.*

*NYU Downtown Hospital, No. 03 Civ. 3003, 2005 U.S. Dist. LEXIS 40243, 2006 WL 345853, at *9 (S.D.N.Y. Feb. 14, 2006)* (finding, under pre-*White* standard, that "hostility from co-workers is not [*32] adverse employment action). With respect to the plaintiff's claim that she was not given a written performance evaluation after September 25, 2001, she has offered no evidence that it was the employer's regular practice to give such written evaluations or that other employees were given written performance evaluations during the period in question. Nor has she shown that she suffered any "injury or harm" as a result of the failure to provide her with a written evaluation. *White, U.S. at , 126 S. Ct. at 2414*. The elimination of her family counseling duties also cannot constitute retaliation, because it occurred several months *before* she complained to Dr. Foote about Mr. Heaney's behavior. [10] *See Pinero v. Long Island State Veterans Home, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005)* (citing *Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001))* ("There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity.").

> [10] Ms. Nugent does not appear to contend that the change in her job responsibilities in September 2002 after her first leave of absence was an adverse action. In any case, Ms. Nugent testified that she considered the change to be an "upgrade" at the time it occurred. (Nugent Dep. at 227). A reasonable person would hardly be dissuaded from complaining about discrimination by the prospect of an improvement in her working conditions.

[*33] Finally, Ms. Nugent claims that she was disciplined on a number of occasions in retaliation for her complaints. Specifically, Ms. Nugent was (1) disciplined for leaving work without permission on September 11, 2001; (2) given a written warning in May 2002 for failure to make appropriate arrangements for the discharge of two patients and for failing to keep up with progress notes on patients' charts; (3) issued a written warning in September 2002 for being late to a patient lecture, for failing to call in on another occasion prior to her shift to say she would be late, for failing to process ten patient discharge forms, and for neglecting to inform the hospital that she would not return from her leave of absence on the scheduled date; (4) given a written warning and suspended for one day in January 2003 for missing a "community meeting" and for failing to improve her written work; and (5) issued a written warning in April 2003 for, among other things, ongoing problems with paperwork, behaving unprofessionally in meetings, and arriving late for clinical activities and patient treatment groups.

The warnings and suspensions that Ms. Nugent received were adverse employment actions under [*34] *White*. See *Bush v. Fordham University*, 452 F. Supp. 2d 394, 416 (S.D.N.Y. 2006). However, in order to make out a *prima facie* case of retaliation, Ms. Nugent must establish a causal connection between these disciplinary actions and her protected activity.

A causal connection may be established either "*indirectly*

> by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant."

*Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) (quoting *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir. 1987)) (emphasis in original).

The plaintiff has submitted a letter written by Sandra Surita, an alcoholism counselor, in which Ms. Surita states that on or about December 7, 2000, she discussed with Mr. Heaney the fact that "two counselors" (presumably Ms. Range and Ms. Nugent) had complained to Dr. Foote about his behavior. (Letter of Sandra Surita dated March 12, 2001 ("Surita [*35] 3/12/01 Letter"), attached to Adler Decl., at 6). According to Ms. Surita, Mr. Heaney "implied that it would be difficult to work with the two counselors from now on because of this." (Surita 3/12/01 Letter at 6). Ms. Nugent contends that this letter is direct evidence of retaliatory animus on the part of Mr. Heaney. [11] (Pl. Memo. at 14). It is not. The letter attests to an inference drawn by Ms. Surita, rather than to a specific statement made by Mr. Heaney.

> 11    The defendants contend that Ms. Nugent may not rely on Ms. Surita's letter because it is inadmissible hearsay. It is not necessary to reach this issue because, even assuming the statement is admissible, it does not constitute proof of retaliatory animus.

Ms. Nugent next contends that she has demonstrated a causal connection by showing that she was given written warnings and suspensions for conduct for which other employees were not disciplined. Ms. Nugent claims that other counselors were often late to staff meetings, acted unprofessionally during [*36] meetings, and had difficulties completing paperwork in a timely fashion, but that she was the only staff member who was disci-

plined for these infractions. (Nugent Dep. at 146-149, 200-01, 501-02; Nugent Aff., P 10; Brooks Aff., PP 6-8; Ares Aff., P 2). In support of this claim, Ms. Nugent points to Mr. Heaney's deposition testimony that Al Jackson and Ken Lewis, both alcoholism counselors, had difficulty with their paperwork, and that neither was ever issued a formal warning. (Heaney Dep. at 45-47). Specifically, Mr. Heaney testified that Mr. Jackson "needed counseling and [] assistance in that area," that he received informal counseling and "coaching," and that his paperwork continues to "require[] attention." (Heaney Dep. at 46). Mr. Heaney also testified that he coached Ms. Nugent with respect to her paperwork even more than he coached Mr. Jackson. (Heaney Dep. at 46). He testified that Mr. Lewis "needed help" with paperwork, that he received informal counseling, and that his paperwork was now "much better." (Heaney Dep. at 47). As noted above, there is also some evidence that other counselors were late to staff meetings and engaged in unprofessional behavior during those meetings [*37] without being disciplined. (Ares Aff., P 2; Brooks Aff., PP 6-8). [12]

> 12    Ms. Nugent testified that Ms. Range was among those who mocked her during staff meetings and was not reprimanded. (Nugent Dep. at 200-01). She also referred to Ms. Range as one of Mr. Heaney's "minions" and testified that Ms. Range developed a "cozy relationship" with Mr. Heaney. (Nugent Dep. at 142, 464). Given that Ms. Range also complained to Dr. Foote about Mr. Heaney's behavior, this testimony undermines Ms. Nugent's claim that the hostility between herself and Mr. Heaney was attributable to her complaints.

Ms. Nugent cannot defeat summary judgment simply by relying on Mr. Heaney's vague testimony that other staff had problems with paperwork. Moreover, there is no evidence that other staff members were late to meetings with patients, as opposed to staff meetings, a potentially far more serious infraction. Nor is there evidence that any other staff member missed a community meeting. There is also no evidence that other staff members' [*38] difficulties with paperwork led to delays in patients being discharged or removed from the state registry, or that any other counselors failed to make appropriate arrangements for psychiatric follow-up care after a patient was discharged. Accordingly, Ms. Nugent has not raised an inference of retaliatory animus because she cannot demonstrate that she was treated differently from other similarly situated employees. See *Allen v. St. Cabrini Nursing Home, Inc.*, 198 F. Supp. 2d 442, 450 (S.D.N.Y. 2002) ("Because plaintiff does not identify another [] employee who received lighter discipline than she after [engaging in the same conduct], she is unable to

rely on the comparison of her situation to that of any other similarly situated employees.").

A plaintiff may also raise an inference of retaliatory motive "'by showing that the protected activity was closely followed in time by the adverse action.'" *Cifra,* 252 F.3d at 217 (quoting *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir. 1996)). Here, the first instance of alleged retaliation occurred in September 2001, approximately ten months after Ms. Nugent wrote the [*39] memorandum to Ms. Clucas. The plaintiff contends that Ms. Clucas did not "quickly forward the complaint to the appropriate parties," and that the plaintiff "first discussed [the memorandum] with Jeff Foote several months" after she wrote it. (Nugent 2/13/07 Aff., P 4.) Even assuming that Dr. Foote and Mr. Heaney became aware of the memorandum "several months" after Ms. Nugent wrote it, however, the gap between Ms. Nugent's protected activity and the disciplinary actions in question is too large to raise an inference of retaliatory motive. "[C]ases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality . . . uniformly hold that the temporal proximity must be very close." *Clark County School District v. Breeden,* 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (internal quotation omitted) (citing cases finding gaps of three and four months insufficient). "No bright line rule exists as to 'when the temporal link becomes too attenuated to demonstrate causation.'" *Butler v. Raytel Medical Corp.,* No. 98 Civ. 6446, 2004 U.S. Dist. LEXIS 26023, 2004 WL 1961522, at *4 (E.D.N.Y. Aug. 24, 2004)" [*40] (quoting *Hawana v. City of New York,* 230 F. Supp. 2d 518, 530 (S.D.N.Y. 2002)). However, in the absence of any other direct or circumstantial evidence, courts have repeatedly found that gaps in time like the one at issue here negate any inference of a causal connection. *See Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir. 1997) (four months); *Donlon v. Group Health Inc.,* No. 00 Civ. 2190, 2001 U.S. Dist. LEXIS 1001, 2001 WL 111220, at *3 (S.D.N.Y. Feb. 8, 2001) (eight and one-half months); *Fitch v. R.J. Reynolds Tobacco Co.,* 675 F. Supp. 133, 138 (S.D.N.Y. 1987) (seven months).

Thus, I find that the plaintiff has not presented sufficient evidence to raise an inference that any of the adverse actions taken against her are attributable to retaliatory animus.

### 3. Retaliatory Hostile Work Environment

Ms. Nugent next contends that she was subjected to a retaliatory hostile work environment. A hostile work environment may constitute an adverse employment action in the context of a retaliation claim. *See Thomas v. iStar Financial, Inc.,* 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006). However, this claim fails because Ms. Nugent [*41] has not proffered adequate evidence to allow a reasonable factfinder to conclude that she was subjected to a hostile work environment.

A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' . . . ." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)) (internal citations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Id.* The plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted" to have altered the conditions of her working environment. *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir. 1997) (quoting *Carrero v. New York City Housing Authority,* 890 F.2d 569, 577 (2d Cir. 1989)). [*42]

When evaluating whether a hostile work environment exists, courts must look at "all the circumstances," including "the frequency of the [retaliatory] conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23. "While the standard for establishing a hostile work environment is high, [the Second Circuit has] repeatedly cautioned against setting the bar too high, noting that . . . the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir. 2003) (quotation marks, citations, and emphasis omitted). "The environment need not be unendurable or intolerable." *Id.* (quotation marks and citation omitted).

Ms. Nugent contends that Mr. Heaney created a hostile environment by creating a "paper trail" and by subjecting her to "intense scrutiny." (Pl. Memo. at 10). As explained above, she claims that he singled her out for criticism for being late to staff meetings, [*43] for filing her nails, and for reading the newspaper. (Ares Aff., P 2; Brooks Aff., PP 6-8; Nugent Aff., PP 3, 10-11). An affidavit from one of the plaintiff's co-workers states that Mr. Heaney's criticism of Ms. Nugent's lateness "created a certain unpleasant tension at rounds." (Ares Aff., P 2). Ms. Nugent also testified that "there was a tension around [Mr. Heaney] all the time" that could be "just as deadly as the yelling." (Nugent Dep. at 545). She says

that she "never felt like [Mr. Heaney] really listened to [her] or took note in staff meetings." (Nugent Dep. at 429).

A plaintiff may not defeat summary judgment by bolstering her claim with "vague, [un]supported allegations" that the work environment was tense and unpleasant and that she suffered "harassment." *Bynog v. SL Green Realty Corp.,* No. 05 Civ. 0305, 2007 U.S. Dist. LEXIS 19110, 2007 WL 831740, at *8 (S.D.N.Y. March 20, 2007). There is no evidence in the record here upon which a reasonable factfinder could base a finding that Mr. Heaney's criticism was sufficiently severe or pervasive as to have altered the conditions of the plaintiff's employment. *See, e.g., McGowan v. City of Eufala, 472 F.3d 736, 743-44 (10th Cir. 2006)* [*44] (finding that "petty criticism" of employee's work was "of a trivial nature" and did not create hostile work environment); *Demoret v. Zegarelli, 451 F.3d 140, 150 (2d Cir. 2006)* (rejecting hostile environment claim where supervisor reviewed plaintiff's work "with a fine-toothed comb" and criticized her for being late to meetings while allowing male employees to "skip meetings with impunity"). Ms. Nugent's claims that Mr. Heaney created a "paper trail" and subjected her to discipline for behavior for which others went unpunished also do not establish a hostile work environment. As explained above, Ms. Nugent has admitted that she committed the infractions for which she was disciplined, and she has not demonstrated that others engaged in similar behavior and were not subjected to discipline. Ms. Nugent's complaints are therefore insufficient, as a matter of law, to establish a retaliatory hostile work environment.

### 4. *Constructive Discharge*

Ms. Nugent also contends that she did not retire voluntarily but was constructively discharged in retaliation for her complaints. (Pl. n13 Memo. at 20-21). "An employee is constructively discharged when his employer, rather than [*45] discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry, 336 F.3d at 151-52; accord Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir. 2004).* An employee's "subjective perceptions" do not govern a claim of constructive discharge. *Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1161 (3d Cir. 1993)* (quoting *Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992)); accord Cooper v. Wyeth Ayerst Lederle, 106 F. Supp. 2d 479, 496 (S.D.N.Y. 2000); Victory v. Hewlett-Packard Co., 34 F. Supp. 2d 809, 826 (E.D.N.Y. 1999)* (citing *Nobler v. Beth Israel Medical Center, 702 F. Supp. 1023, 1030 (S.D.N.Y. 1988)).* Rather, "working conditions are intolerable when, viewed as a whole, they are so difficult and unpleasant that a reasonable person in the employee's shoes

would have felt compelled to resign." *Terry, 336 F.3d at 152* (internal quotations and citation omitted); *accord Petrosino, 385 F.3d at 230.* Furthermore, the plaintiff must show "'deliberate action [*46] on the part of the employer . . . . Something beyond mere negligence or ineffectiveness is required.'" *Mack v. Otis Elevator Co., 326 F.3d 116, 128 (2d Cir. 2003)* (quoting *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 73 (2d Cir. 2000)).*

Ms. Nugent has not made out a retaliatory hostile work environment claim or, as explained below, a gender-based hostile work environment claim. Therefore, to the extent that she contends she was forced to resign as a result of a hostile work environment, her constructive discharge claim must also be denied. *See Baptiste v. Cushman & Wakefield, No. 03 Civ. 2102, 2007 U.S. Dist. LEXIS 19784, 2007 WL 747796, at *11 (S.D.N.Y. March 7, 2007)* (citing *Pennsylvania State Police v. Suders, 542 U.S. 129, 149, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004))* ("Where, as here, a constructive discharge claim is part and parcel of a hostile work environment claim . . . articulating a claim for hostile work environment is a necessary predicate to a finding of constructive discharge.").

To the extent that Ms. Nugent attempts to make out a separate claim of retaliatory constructive discharge, that claim also fails. A constructive [*47] discharge may be found on the basis of

> evidence that an employer deliberately sought to place an employee in a position that jeopardized his or her health. But an employer is entitled to insist on as high a standard of work performance as it deems appropriate, and the fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer.

*Spence v. Maryland Casualty Co., 995 F.2d 1147, 1156 (2d Cir. 1993)* (internal citation omitted). The plaintiff contends that she was subjected to such "intense scrutiny and ridicule" that she was forced to take two medical leaves of absence, and subsequently to resign from her position. (Pl. Memo. at 21; Pl. Reply at 6).

However, Ms. Nugent cannot show that she was constructively discharged simply by demonstrating that she was extremely distressed by the reprimands, written warnings, and suspensions that she received. The issue is

whether a reasonable person under the circumstances would have [*48] felt compelled to resign. As explained above, Ms. Nugent has not demonstrated that she was subjected to unwarranted disciplinary actions, or that other employees who engaged in similar conduct were not disciplined. Although she has put forward some evidence that she was subjected to verbal criticism for arriving late to meetings and for unprofessional behavior while other employees were not, "unfair and unwarranted treatment is by no means the same as constructive discharge." *Clowes*, 991 F.2d at 1162. The fact that an employee "feels that the quality of [her] work has been unfairly criticized," or that her working conditions were "difficult or unpleasant," is insufficient to support a constructive discharge claim. *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (rejecting constructive discharge claim where employee was "dissatisfied with his assignments, with the criticisms of his work, and [] with his compensation"). Ms. Nugent has not submitted sufficient evidence to support a finding that the defendants deliberately created working conditions so unpleasant that a reasonable person would have felt compelled to resign.

Because [*49] Ms. Nugent has not raised a genuine issue of material fact regarding her claims for retaliation and constructive discharge under Title VII and the NYSHRL, the defendants' motions for summary judgment on these claims are granted.

### C. *Gender Discrimination*

#### 1. *Disparate Treatment*

Ms. Nugent also appears to contend that she was subjected to disparate treatment on the basis of her gender. In order to make out a *prima facie* case of discrimination under Title VII, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred in circumstances giving rise to an inference of discrimination. [14] *See Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2002); *see also McDonnell Douglas*, 411 U.S. at 802. If the plaintiff makes out a *prima facie* case, the defendant may rebut the inference of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Weinstock*, 224 F.3d at 42 (citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). [*50] If the defendant does so, the presumption of discrimination drops away, and the plaintiff must come forward with "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Id.* (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742,

125 L. Ed. 2d 407 (1993)). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.* (citing *St. Mary's*, 509 U.S. at 519).

> 14    In this case, the defendants do not contend that Ms. Nugent is not a member of a protected class or that she was not qualified for her position.

The Supreme Court's decision in *White* did not alter the standard for determining what constitutes an adverse employment action in the context of a *prima facie* case of discrimination. *See White, ___ U.S. at ___, 126 S. Ct. at 2411-14* (holding that unlike Title VII's substantive provision, its anti-retaliation [*51] provision "extends beyond workplace-related or employment-related" actions); *Kessler*, 461 F.3d at 208 (noting that Court held in *White* that different standards should be applied in retaliation and discrimination cases). Accordingly, courts in this Circuit should generally look "to whether the plaintiff has suffered 'a materially adverse change in h[is] employment status' or in the terms and conditions of his employment" when determining whether a plaintiff has suffered an adverse employment action. *Kessler*, 461 F.3d at 207 (quoting *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (alteration in original)).

Several of the disciplinary actions taken against Ms. Nugent, such as her suspension without pay in January 2003 and the April 2003 written warning, qualify as adverse employment actions under this standard. *See Lennon v. New York City*, 392 F. Supp. 2d 630, 642 (S.D.N.Y. 2005) ("Typically, adverse employment actions are economic injuries such as a termination, suspension, failure to promote, or diminution in pay."); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) [*52] (indicating that reprimand could be adverse employment action if accompanied by negative result such as plaintiff being placed on probation). *But see Dobrynio v. Central Hudson Gas & Electric Corp.*, 419 F. Supp. 2d 557, 564-565 (S.D.N.Y. 2006) (holding that one day unpaid suspension was not a materially adverse employment action). However, Ms. Nugent has not demonstrated that any of the disciplinary actions taken against her are attributable, even in part, to discriminatory animus. Assuming for the sake of argument that the plaintiff has established a *prima facie* case, the defendants have met their burden of articulating legitimate non-discriminatory reasons for the discipline that Ms. Nugent received, and Ms. Nugent has not put forward sufficient evidence to support a finding that those stated reasons are pretextual.

Viewing the evidence in the light most favorable to the plaintiff, Ms. Nugent has shown that Mr. Heaney referred to female patients as "cunts" on two occasions,

referred to a supervising nurse's "radical lesbian bull-shit," and referred to a female patient as a "whore." Such stray remarks are insufficient to demonstrate that the adverse actions taken [*53] against the plaintiff are attributable to gender bias. *See Renz v. Grey Advertising, Inc.*, 135 F.3d 217, 224 (2d Cir. 1997) (finding isolated remarks not directed at plaintiff did not establish discrimination when evidence of non-discriminatory reason for adverse action was strong); *Ferrand v. Credit Lyonnais*, No. 02 Civ. 5191, 2003 U.S. Dist. LEXIS 17202, 2003 WL 22251313, at *10 (S.D.N.Y. Sept. 30, 2003) (finding insufficient evidence of pretext where supervisor's repeated use of sexist epithets to refer to plaintiff and coworker was unrelated to adverse employment action); *Marks v. New York University*, 61 F. Supp. 2d 81, 99-100 (S.D.N.Y. 1999) (sexist remarks not directed at plaintiff insufficient to demonstrate pretext where there was no evidence establishing nexus between remarks and adverse actions taken against plaintiff). Furthermore, Mr. Heaney made the comments several years before Ms. Nugent was disciplined. *See Bagdasarian v. O'Neill*, 00-CV-0258E, 2002 U.S. Dist. LEXIS 13328, 2002 WL 1628722, at *4 (W.D.N.Y. July 17, 2002) (finding that plaintiff failed to raise genuine issue of material fact regarding discriminatory intent where supervisor made comments about [*54] plaintiff's age more than one year before plaintiff was denied promotion); *Smith v. Revival Home Health Care, Inc.*, No. 97 Civ. 4415, 2000 U.S. Dist. LEXIS 4105, 2000 WL 335747, at *14 (E.D.N.Y. March 28, 2000) ("Statements made long before and not in the context of the adverse action cannot support a claim of discriminatory motive for that action."). Similarly, the evidence that Mr. Heaney banged chairs, yelled, and generally acted aggressively toward female staff members is also insufficient to support a finding that the defendants' proffered reasons for disciplining Ms. Nugent were pretextual.

Moreover, Ms. Nugent cannot demonstrate that she was treated differently from similarly situated men. As explained above, although Ms. Nugent makes much of Mr. Heaney's deposition testimony that Al Jackson and Ken Lewis also had problems with their paperwork and were not formally disciplined, there is no evidence that their paperwork violations caused the same kinds of problems that Ms. Nugent's did. Nor is there any evidence that they engaged in the other sorts of conduct for which Ms. Nugent was disciplined, such as being late to or failing to attend patient meetings. Ms. Nugent testified that it was [*55] her "perception" that Mr. Jackson and Mr. Lewis received preferential treatment from Mr. Heaney. (Nugent Dep. at 502-03). However, the plaintiff's "'[feelings and perceptions] of being discriminated against [are] not evidence' of discrimination." *Bickerstaff v. Vassar College*, 196 F.3d 435, 456 (2d Cir. 1999)[15] (quoting *Fisher v. Vassar College*, 70 F.3d 1420, 1439

(2d Cir. 1995)) (alterations in original); *accord Hawkins v. City of New York*, No. 99 Civ. 11704, 2005 U.S. Dist. LEXIS 15898, 2005 WL 1861855, at *11 (S.D.N.Y. Aug. 4, 2005); *Rochetti v. New York State Department of Motor Vehicles*, No. 02 Civ. 1710, 2005 U.S. Dist. LEXIS 21055, 2005 WL 2340719, at *7 (E.D.N.Y. June 13, 2005). Ms. Nugent also testified that Cindy Range and Jenny Pagan were among Mr. Heaney's "pets" on the Unit, and that Mr. Heaney "constantly denigrated" John Taylor, head of AINY's Intake Unit, and Andrew Merling, a staff psychologist. (Nugent Dep. at 141-43, 294, 464-65). Her testimony that Mr. Heaney treated some women better than her and that he treated some men badly further undermines Ms. Nugent's claim that the alleged mistreatment she received is attributable to discriminatory animus. [*56]

> 15   Ms. Nugent also contends that I should infer from the fact that Mr. Heaney received no formal discipline, aside from the April 2000 memorandum, for his poor behavior, that the reason the plaintiff was disciplined for her infractions is that she was a woman. (Tr. at 72-74). However, Ms. Nugent has not demonstrated that Mr. Heaney, a management-level employee, was subject to the same disciplinary procedures that she was. *See Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir. 1997) (holding that where plaintiff seeks to raise inference of discrimination by demonstrating that similarly situated individual was treated differently, "the individuals with whom [the plaintiff] attempts to compare herself must be similarly situated in all material respects"); *cf. McGuinness v. Lincoln Hall*, 263 F.3d 49, 54-55 (2d Cir. 2001) (distinguishing *Shumway* in finding that plaintiff raised inference of gender discrimination where she and male employee of roughly equivalent rank were fired at same time and by same people but male employee received higher severance pay); *Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 923 (2d Cir. 1981) (holding that manager failed to show age discrimination where, among other things, there was no evidence that termination procedures that he alleged were not followed in his case were ever meant to be applied to management-level employees).

[*57]   Accordingly, Ms. Nugent has not proffered sufficient evidence to establish that the defendants' legitimate, non-discriminatory reasons for the adverse actions taken against her were merely pretext for discrimination.

2. *Gender-Based Hostile Work Environment*

Ms. Nugent also contends that the defendants subjected her to a hostile work environment based on gender. (Pl. Memo. at 10). Ms. Nugent contends that Mr. Heaney created a hostile work environment by using misogynistic language and behaving abusively toward women. (Pl. Memo. at 10). In addition to his admitted use of misogynistic language, it is also undisputed that on at least one occasion Mr. Heaney slammed his fist down on a chair during a meeting with several nurses, and that he was subsequently issued a written warning. Ms. Nugent testified that she saw him slam his fists on a table on another occasion when a staff member was late to a meeting. (Nugent Dep. at 108). Ms. Nugent has also submitted affidavits from two nurses who testify that Mr. Heaney "spoke loudly and in an intimidating manner to the nursing staff" and that his intimidating behavior included "shouting, insults and slamming furniture and objects." (Ares [*58] Aff., P 2; Brooks Aff., P 3). One affidavit states that the affiant does not recall witnessing Mr. Heaney raising his voice to male employees. (Ares Aff., P 3). The other states that the affiant never observed Mr. Heaney behaving abusively toward men. (Brooks Aff., P 3). Ms. Nugent also relies on the letter from Ms. Surita, in which Ms. Surita voices numerous complaints about Mr. Heaney's management style. Ms. Surita, however, does not appear to attribute Mr. Heaney's behavior to discriminatory animus.

Mr. Heaney's use of derogatory language to refer to patients and staff is plainly inappropriate. However, as a matter of law, a supervisor's occasional use of sexist language does not create a hostile work environment. *See, e.g.,* *Harris*, 510 U.S. at 21 ("'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' . . . does not sufficiently affect the conditions of employment to implicate Title VII" (quoting *Meritor Savings Bank*, 477 U.S. at 67)); *Petrosino*, 385 F.3d at 223 (noting that "isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment"); [*59] *Augustin v. Yale Club of New York*, 03 Civ. 1924, 2006 U.S. Dist. LEXIS 67462, 2006 WL 2690289, at *21-22 (S.D.N.Y. Sept. 15, 2006)* (co-workers' use of phrases including "fucking negrita" and "black bitch" to refer to plaintiff not sufficient to create hostile work environment); *Garone v. United Parcel Service*, 436 F. Supp. 2d 448, 469 (E.D.N.Y. 2006) (supervisor's use of the phrases "office bitch," "Brooklyn bimbettes," and "cat fight" did not create hostile work environment); *Stepheny v. Brooklyn Hebrew School for Special Children*, 356 F. Supp. 2d 248, 264 (E.D.N.Y. 2005) (co-worker's use of the phrase "white bitch" or some variation thereof five times over a five month period did not create racially hostile work environment); *Pagan v. New York State Division of Parole*, No. 98 Civ. 5840, 2003 U.S. Dist. LEXIS 20752, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003)

(supervisor's use of racially derogatory language on five occasions did not create racially hostile work environment). "Although the [] comments are despicable and offensive, they fail to constitute discriminatory behavior that is sufficiently severe or pervasive to cause a hostile environment." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 713 (2d Cir. 1998). [*60]

Even when taken together with Mr. Heaney's occasional use of sexist language, the remainder of Ms. Nugent's claims also fail to establish a hostile work environment based on sex. "The fact that [a supervisor has] an authoritative management style . . . does not transform the occasional off-color remark into harassment or strict managerial decision into chauvinism." *Garone*, 436 F. Supp. 2d at 469. As noted above, the plaintiff cannot establish a hostile work environment by demonstrating that Mr. Heaney subjected her to "intense scrutiny" and criticized her more than he did other employees. Regardless of whether the criticism of which Ms. Nugent complains is attributed to retaliatory animus or to gender discrimination, it does not rise to the level of a hostile work environment. Finally, using a loud and intimidating voice and slamming furniture, without more, does not create a hostile work environment. "'The law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or unfortunately, even to behave reasonably and justly when he is peeved.'" *Cardozo v. Healthfirst, Inc.*, 210 F. Supp. 2d 224, 234 n.15 (S.D.N.Y. 1999) [*61] (quoting *Christoforou v. Ryder Truck Rental, Inc.*, 668 F. Supp. 294, 303 (S.D.N.Y. 1987)). Accordingly, the defendants are entitled to summary judgment on Ms. Nugent's gender-based hostile work environment claims.

### D. *Disability Discrimination*

Title I of the ADA, 42 U.S.C. §§ 12101-12213, prohibits discrimination against persons with disabilities in the terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). To establish a *prima facie* case under the ADA, the plaintiff must prove by a preponderance of the evidence that: (1) her employer is subject to the ADA; (2) she is an employee with a disability under the ADA; (3) she is qualified to perform the essential functions of her job, with or without a reasonable accommodation; and (4) she suffered an adverse employment action because of her disability. *See, e.g., Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005). An individual may qualify as an "employee with a disability" by showing that: (1) she "has a disability" under 42 U.S.C. § 12102(2)(A); (2) she "has a record [*62] of" a disability under 42 U.S.C. § 12102(2)(B); or (3) she is "regarded as" having a disability under 42 U.S.C. § 12102(2)(C). Ms. Nugent alleges that she is an "employee with a disability" under the ADA because she

"has a disability" within the meaning of 42 U.S.C. § 12102(2)(A). To establish a disability within this provision, a plaintiff must demonstrate that (1) she suffers from a mental or physical impairment; (2) the impairment limits one or more major life activities; and (3) that limitation is substantial. See Bragdon v. Abbott, 524 U.S. 624, 631, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998); accord Colwell v. Suffolk County Police Department, 158 F.3d 635, 641 (2d Cir. 1998).

Ms. Nugent has also brought a disability discrimination claim pursuant to the NYSHRL. Courts use a similar framework to analyze disability discrimination claims brought under the NYSHRL, Johns-Davila v. City of New York, No. 99 Civ. 1885, 2000 U.S. Dist. LEXIS 17012, 2000 WL 1725418, at *11 (S.D.N.Y. Nov. 20, 2000), but the NYSHRL's definition of "disability" is broader than the ADA definition. Reeves v. Johnson Controls World Services, Inc., 140 F.3d 144, 154-56 (2d Cir. 1998); [*63] see also Burton v. Metropolitan Transportation Authority, 244 F. Supp. 2d 252, 257 (S.D.N.Y. 2003); Johns-Davila, 2000 U.S. Dist. LEXIS 17012, 2000 WL 1725418, at *11. The NYSHRL defines a "disability" as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. Law § 292(21). "'[A]n individual can be disabled under the [NYSHRL] if his or her impairment is demonstrable by medically accepted techniques; it is not required that the impairment substantially limit that individual's normal activities.'" Reeves, 140 F.3d at 155 (quoting Hazeldine v. Beverage Media, Ltd., 954 F. Supp. 697, 706 (S.D.N.Y. 1997)) (alteration in original).

It is undisputed that Ms. Nugent has been diagnosed with ADHD. The defendants concede that Ms. Nugent's ADHD may qualify as a disability under the broader NYSHRL definition, but contend that she does not have a disability as defined by the ADA because she cannot demonstrate that [*64] her impairment substantially limits any major life activity. (Def. Memo. at 17-19). However, it is unnecessary to reach this issue. Regardless of whether Ms. Nugent has a disability within the meaning of either statute, she has not made out a *prima facie* case of disability discrimination.

In order to establish the third and fourth elements of a *prima facie* case, Ms. Nugent must show that she is a qualified individual with a disability and that she was subjected to an adverse employment action because of her disability. The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

The plaintiff therefore bears the burden of proving either "that she can meet the requirements of the job without assistance, or that an accommodation exists that permits her to perform the job's essential functions." Borkowski v. Valley Central School District, 63 F.3d 131, 138 (2d Cir. 1995); accord Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 287 (S.D.N.Y. 1999); [*65] Motta v. Meachum, 969 F. Supp. 99, 113 (D. Conn. 1997). An employer's failure to provide a reasonable accommodation may constitute an adverse action under the ADA. [16] 42 U.S.C. § 12112(b)(5)(A).

> 16   Ms. Nugent claims that the defendants failed to accommodate her disability. She also contends that she was constructively discharged "on the basis of her disability." (Pl. Memo. at 21). Because, for the reasons set forth above, Ms. Nugent cannot demonstrate that she was constructively discharged, I will address only the failure to accommodate claim.

Under the ADA, "an employee has no right to any particular accommodation, but merely to a reasonable accommodation." Equal Employment Opportunity Commission v. Yellow Freight System, Inc., No. 98 Civ. 2270, 2002 U.S. Dist. LEXIS 16826, 2002 WL 31011859, at *21 (S.D.N.Y. Sept. 9, 2002). To determine what reasonable accommodation is appropriate, federal regulations implementing the ADA provide for an "informal, interactive process" involving [*66] both the employer and the employee. See 29 C.F.R. § 1630.2(o)(3); see also Jackan v. New York State Department of Labor, 205 F.3d 562, 566 (2d Cir. 2000); Grenier v. Cyanamid Plastics, Inc. 70 F.3d 667, 677 (1st Cir. 1995). Liability for failure to provide a reasonable accommodation ensues only when the employer is responsible for a breakdown in that process. Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996); see also Economou v. Caldera, No. 99 Civ. 12117, 2000 U.S. Dist. LEXIS 18231, 2000 WL 1844773, at *24 (S.D.N.Y. Dec. 18, 2000).

The plaintiff first contends that she began the interactive process specified in the statute when she "requested the assistance of an efficiency expert" as an accommodation for her disability. (Pl. Reply at 11). At some point during the two or three months that preceded her second leave of absence, Ms. Nugent asked Mr. Heaney if she could bring in a friend named Hal Meyer, who is an expert on ADHD, to help identify her problem areas and accommodations that might assist her in completing her paperwork. (Nugent Dep. at 295-96). At her deposition, Ms. [*67] Nugent testified as follows:

Q. What did Mr. Heaney say?

A. Oh, yeah, yeah, that would be great. I mean, that is what he always said to everything. That would be great, that would be wonderful, and then he would just stonewall it.

* * *

Q. [A]fter you had the meeting with Mr. Heaney, did you ever go back to Mr. Heaney and say: I would like to bring Mr. Meyer in on this day?

A. No.

Q. Did you ever attempt to schedule any appointment for Mr. Meyer to come to the unit?

A. I think I tried to schedule. I don't remember exactly. It was kind of late to be doing that. I should have done it much earlier.

(Nugent Dep. at 296-97). By contrast, in an affidavit submitted in opposition to the defendants' motions for summary judgment, the plaintiff states:

I informed Mr. Heaney that I would like to bring in an efficiency expert; however when I brought the matter up for scheduling (as the expert would need to be scheduled through Mr. Heaney), he would tell me that we could discuss it another time and would wave me away. Because I was extremely intimidated by him at that point, I was afraid to push the matter further.

(Nugent Aff., P 13).

[*68] The Second Circuit has held that "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Department of Corrections, 84 F.3d 614, 619 (2d Cir. 1996)* (quoting *Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969))*.

[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony. If a party who has been examined at length on deposition could create an issue of fact simply by submitting an affidavit contra-

dicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Id.* (internal quotation marks and citations omitted). Of course, "the principle does not apply if the deposition and the later sworn statement are not actually contradictory." *Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 43 (2d Cir. 2000); see also Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)* [*69] ("[A] material issue of fact may be revealed by [] subsequent sworn testimony that amplifies or explains, but does not merely contradict, [a party's] prior testimony, especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation." (internal citation omitted)). In this case, however, Ms. Nugent's affidavit, submitted in opposition to the defendants' motions for summary judgment, plainly contradicts her deposition testimony and must be disregarded.

Ms. Nugent seems to suggests that even if she failed to follow up with Mr. Heaney regarding scheduling an appointment with Mr. Meyer, she has nevertheless made out a *prima facie* case of discrimination because once she raised the possibility with Mr. Heaney, the burden was on the defendants to locate Mr. Meyer and schedule an appointment with him. (Tr. at 55). When determining whether an employer may be held liable for a breakdown in the interactive process, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. . . [*70] . In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Beck, 75 F.3d at 1135.* In this case, it is clear that the cause of the breakdown in the interactive process was Ms. Nugent's failure to follow up with Mr. Heaney regarding scheduling a meeting with Mr. Meyer. Ms. Nugent made it clear that she had a particular expert in mind, and Mr. Heaney indicated a willingness to bring him in. Having failed to hold up her end of the interactive process by setting up an appointment with Mr. Meyer, or, at the very least, providing Mr. Heaney with Mr. Meyer's contact information so that he could set up the meeting himself, the plaintiff cannot now claim that the defendants failed to provide her with the accommodation that she requested.

At oral argument, Ms. Nugent's counsel also claimed that the plaintiff sought "a little extra time" to complete her paperwork, as well as "understanding" and "assistance," as accommodations for her disability. (Tr. at 52, 54). These alleged requests are extremely vague, and it is not clear that they would constitute requests for a reason-

able accommodation. In any case, there is no evidence that [*71] Ms. Nugent made these requests. In fact, Ms. Nugent testified only that she "tried to talk to [Mr. Heaney] about [her ADHD] in supervision," and that aside from the conversation about Mr. Meyer, she did not recall specifically asking Mr. Heaney to do anything else in connection with her ADHD. (Nugent Dep. at 299-300, 729). The assertions of plaintiff's counsel are entitled to no evidentiary weight, and the plaintiff has pointed to no actual evidence that contradicts her own testimony that the only accommodation that she requested was an efficiency expert. *See Thorner-Green v. New York City Department of Corrections, 207 F. Supp. 2d 11, 14 (E.D.N.Y. 2002)* (citing *Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)* (noting that allegations by counsel in legal memoranda or oral argument cannot serve to raise a genuine issue of material fact)).

Because the plaintiff has not made out a *prima facie* case of disability discrimination under either the ADA or the NYSHRL, the defendants' motions for summary judgment on these claims are granted.

*Conclusion*

For the reasons set forth above, the defendants' motions for summary judgment are [*72] granted in their entirety and the plaintiff's motion is denied. The Clerk of Court is respectfully requested to enter judgment for the defendants dismissing the complaint and to close the case.

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

April 18, 2007

LEXSEE



Positive
As of: Dec 26, 2007

**GENEVA BUTTS, Plaintiff, -v- NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT, Defendant.**

**Case No. 00-CV-6307 (KMK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2007 U.S. Dist. LEXIS 6534**

**January 29, 2007, Decided**
**January 29, 2007, Filed**

**PRIOR HISTORY:** Butts v. City of New York Dep't of Hous. Preservation & Dev., 173 F.3d 843, 1999 U.S. App. LEXIS 13028 (2d Cir. N.Y., 1999)

**CORE TERMS:** demotion, summary judgment, vacancy, discriminatory, protected activity, prima facie case, reorganization, promotion, constructive discharge, retaliation, retaliatory, deputy, posted, mainframe, adverse action, salary, posting, statute of limitations, informal, manager, notice, filled, animus, protected class, discretionary, promoted, hiring, intolerable, retirement, male

**COUNSEL:** [*1] Geneva Butts, New York, NY, Pro se, Plaintiff.

Holly R. Winefsky, Esq., Zoe Lynn Davidson, Esq., Corporation Counsel of the City of New York, New York, NY, Counsel for Defendant.

**JUDGES:** KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KENNETH M. KARAS

**OPINION**

OPINION AND ORDER

KENNETH M. KARAS, District Judge:

Plaintiff Geneva Butts filed this action alleging discrimination by the New York City Department of Hous-

ing Preservation and Development. The Complaint alleges several causes of action, including: (1) retaliation against Plaintiff for filing discrimination claims, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 629 et seq.; (2) failure to promote, in violation of Title VII and the ADEA; and (3) constructive termination, in violation of Title VII and the ADEA. [1] In her First Amended Complaint, Plaintiff also alleged that Defendant's conduct violated other federal, state, and local anti-discrimination statutes, notably 42 U.S.C.§§ 1981, 1983, and [*2] 1985, the New York State Human Rights Law, and the New York City Human Rights Law. At the conclusion of discovery, Defendant moved for summary judgment on all counts. For the reasons stated in this Opinion, Defendant's motion for summary judgment is GRANTED.

1 Plaintiff filed two amended complaints, both titled "Amended Complaint and Jury Demand." The Court will refer to Plaintiff's first "Amended Complaint and Jury Demand" as the "First Amended Complaint," and the Court will refer to Plaintiff's most recent submission as the "Second Amended Complaint." Plaintiff's First Amended Complaint is attached as Exhibit D to the Second Amended Complaint.

I. Background

A. The Parties

Plaintiff is an African-American female who was employed by Defendant, the New York City Department of Housing Preservation and Development ("HPD"), [2] from 1972 until she retired in December 2000, at the age of 62. (Def.'s Amended Local Civil Rule 56.1 Statement of Undisputed Facts P 1 ("Def.'s Am. 56.1"). [*3] ) Initially, Plaintiff was hired as a Level 2 Computer Systems Manager ("CSM"). (Second Am. Compl. Ex. C at 1. [3] In 1981, Plaintiff was promoted to a Level 3 CSM.

2  New York City agencies may not be sued in their capacity as agencies. *See* New York City Charter § 396. Thus, for the purposes of this motion, the Court, as did Defendant's counsel, will construe Plaintiff's action as one against the City itself, rather than HPD. The Court does this in recognition of its duty to construe *pro se* Plaintiff's papers to raise the strongest arguments they suggest. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

3  Plaintiff has done an able job as a *pro se* plaintiff in compiling an extensive documentary record of her claims. Many of the facts she alleges, however, are not specifically contained within the Amended Complaint or her Rule 56.1 Statement. Mindful of the Court's obligation to construe her papers to raise the strongest arguments they suggest, many of the facts here are drawn from a variety of Plaintiff's submissions, including the fact section of her memorandum of law in opposition to Defendant's motion.

[*4] B. Alleged Discriminatory Conduct

In March 1996, Plaintiff worked in the Information Systems Development ("ISD") division at HPD, where she was the Director of Technology and Application Development Services and responsible for oversight of the agency's mainframe computer, one of three computer systems at HPD. (Def.'s Am. 56.1 PP 2-3.) At that time, Plaintiff supervised over 40 people. (*Id.* P 3.) By October 1996, Plaintiff's title had changed. She was made the Director of Mainframe Application Development Services ("MADS"), where she supervised nine other employees, including Paget Mack ("Mack"), a programmer who was later promoted to become her deputy. (*Id.* PP 5-6.)

In May 1998, the Chief Information Officer/Assistant Commissioner of ISD was terminated. (*Id.* P 8.) In June 1998, Hector Batista, HPD's Chief of Staff and Deputy Commissioner, sent an email to Plaintiff and the other two director-level employees in ISD indicating that they would have to assume additional responsibilities until a replacement for the Chief Information Officer

was found. He asked the three employees to review their vacation plans given the increased demands that would be placed on them [*5] (*Id.* P 11), and stated that he would review and approve any vacation plans for that summer. (Def.'s Mot. for Summ. J. Ex. S 01672 ("Def.'s Mot.").) Plaintiff submitted her upcoming vacation schedule, in which she stated that she intended to take thirty-one (31) vacation days between June and September 1998. Plaintiff subsequently took thirty-five (35) days of paid leave and nine (9) days of sick leave during that period, nearly triple that of the other two director-level employees. (Def.'s Am. 56.1 PP 13-15.)

Plaintiff expressed interest in the vacancy created by the departure of the Associate Commissioner in an email to Hector Batista dated June 3, 1998. It stated, "if you are going to post this vacancy I am very interested in applying for the position." (Pl.'s Schedule A Docs. Ex. 2.) Plaintiff alleges no notice of vacancy was posted for this position, in violation of the City of New York's rules on filling employment vacancies described in the City's Personnel Services Bulletin 200-9 ("PSB 200-9"). [4] (Pl.'s Am. Aff. in Opp'n to Mot. to Dismiss 5 ("Pl.'s Opp'n Mem.").) In July 1998, Nissim Baruch ("Baruch"), a white male younger than Plaintiff, was "given responsibility" [*6] for mainframe applications (Second Am. Compl. Ex. B at 2), and received a pay increase (Pl.'s Bate [sic] Stamped Docs. at 01602). Plaintiff alleges that the failure to place her in this position was discriminatory. (*Id.*) In August 1998, Kamal Bherwani ("Bherwani"), an Asian male approximately 32 years of age, was hired to fill the Chief Information Officer/Associate Commissioner position. Bherwani had previously worked at HPD from 1989 to 1994 and had 11 years of experience in the relevant field. (Def.'s Am. 56.1 P 16.)

4  PSB 200-9 requires that after a city agency receives authorization to fulfill a vacant position, it must post a vacancy notice. (Def.'s Mot. Ex. A.) If the agency decides to fulfill the position from within the agency, it must post the notice for a period of 10 days within the agency. (*Id.*) If it decides to fulfill the position from outside the agency, it must follow additional procedures for posting the notice at other relevant city agencies.

One of the primary reasons [*7] Bherwani was hired was to prepare HPD for "Y2K," the name which came to describe the set of problems computer experts thought would occur when the internal clocks in older computer systems reached January 1, 2000. (*Id.* PP 17-18.) New York City had determined that HPD was behind other City agencies in Y2K preparation. (*Id.* P 17.) As a result, Bherwani was given more direct access to senior leadership than his predecessor. For example, he reported directly to the Commissioner, as opposed to the

Division of Administration, and, unlike his predecessor, he was invited to attend senior staff meetings. (*Id.* P 20.) In one of Bherwani's first acts as Associate Commissioner, ISD was reorganized and renamed the "Division of Technology and Strategic Development" ("TSD"). (*Id.* P 19.)

The reorganization of TSD in preparation for Y2K was significant. Mack, then Deputy Director of MADS under Plaintiff's supervision, became the Deputy Director of Network and Systems Management, under the Director of that section, Nissim Baruch. (*Id.* P 21.) Later, Mack's title was changed to Y2K Contingency Deputy Director under Baruch, [*8] where he supervised Y2K preparation. (*Id.* P 23.) Plaintiff alleges that this reassignment was meant to undermine the effectiveness of her staff and discriminatorily reassign Y2K preparation duties to Barcuh. (Pl.'s Opp'n Mem. 5.) Many of Mack's duties as Y2K Contingency Deputy Director overlapped with duties formerly performed by Plaintiff's staff. (Pl.'s 56.1 P 23.) Other staff was reorganized at this time as well. Darilynn Lewis ("Lewis"), another director, was given responsibility for Y2K-related procurement. (Def.'s Am. 56.1 P 24.) Mainframe support employees, formerly under Plaintiff's supervision, were transferred to Baruch's division. (Def.'s Mot. Ex. L at 01575.) After the reorganization, Plaintiff supervised only two employees. (Def.'s Am. 56.30 Kan. 25, 1 P 25.)

In October 1998, Plaintiff alleges that in a meeting with Bherwani, he mentioned that he had been informed that Plaintiff's prior discrimination suit had been resolved. (Second Am. Compl. Ex. C at 1.) She also alleges that he implied that if she had further management complaints she should leave her job rather than file additional discrimination complaints. (*Id.*)

[*9] In November 1998, Bherwani reorganized the division again. He created a new position within the Division, "Director of Legacy Systems." (Def.'s Am. 56.1 P 28.) The position was posted (*id.* P 29), and later filled by Michael Hirst ("Hirst"), a 42-year-old white male who had been working in TSD "on loan" from another city department under the direct supervision of Bherwani. (*Id.* P 27-28.) The position required skills with the "Wang" system, which Hirst possessed. (*Id.*) Plaintiff alleges that she was more qualified than Hirst but was not considered for the Director of Legacy Systems position. (Pl.'s Opp'n Mem. 6.) In addition to creating a new director position, Bherwani also decided to re-consolidate Mack's Y2K Contingency group with Plaintiff's Mainframe Applications group.

Bherwani stated in his declaration that the lack of coordination between Mack, as Deputy Director of Y2K Contingency Planning, and Plaintiff, as Director of Mainframe Applications, had caused both groups to miss deadlines. (Def.'s Am. 56.30 Kan. 82, 1 P 32.) Bherwani gave the reconsolidated group a new title, "Y2K Mainframe Applications," and appointed Mack, a [*10] 53-year-old African-American male, as its director. (*Id.* PP 33-34.) He stated Mack was given this position based on "his proven leadership abilities, technical expertise, knowledge and experience as a programmer, historical knowledge and willingness to be a team player." (Decl. of Kamal Bherwani in Supp. of Def.'s Mot. for Summ. J. P 19 ("Bherwani Decl.").) Subsequently, Plaintiff was demoted from a director position to a deputy director position (Def.'s Am. 56.1. PP 36-37), and received a 20% pay cut. (*Id.* P 36.) Bherwani stated that he chose to demote Plaintiff because there was no need for two directors to supervise the mainframe, as its importance to HPD was declining, and that her performance was not "deserving of a Director position." (Bherwani Decl. P 20.) This was because she failed to attend scheduled meetings and did not adjust her personal schedule to meet critical needs of the agency. (*Id.*) This demotion was approved by the Office of the Mayor on November 12, 1998, and went into effect on November 16, 1998. (Pl.'s Bate [sic] Stamped Docs. at 1585; Pl.'s Am. Schedule A Docs. Ex. 36.)

In June 1999, a vacancy notice was posted for the [*11] position of Director of Client Server Application Development. (Pl.'s Opp'n Mem. 7.) Plaintiff expressed interest in the position to Lewis and Bherwani. (*Id.*) The position was filled by Daniel Moliterno, a white male approximately 50 years old. (*Id.*) At the time, Plaintiff had 38 years of experience, while Moliterno had 25 years of experience. (*Id.*)

In August 1999, Bherwani left HPD. (Def.'s Am. 56.1 P 40.) The vacancy in the position of Chief Information Officer/Associate Commissioner was posted from September 13, 1999 to September 24, 1999. (Def.'s Mot. Ex. C.) HPD sought pre-approval to place Cary Peskin ("Peskin"), a white male, in the position on September 13, 1999. (Pl.'s Bate [sic] Stamped Docs. at 1598.) Plaintiff did not apply for the position. (Def.'s Am. 56.1 P 42; Feb. 5, 2002 Deposition of Geneva Butts 133 ("Pl.'s Dep.").) Peskin was hired to fill the vacancy. (Def.'s Am. 56.30 Kan. 57, 1 P 41.)

After the appointment of the new Associate Commissioner, Plaintiff claims she was subjected to mistreatment in the office. She claims she was excluded from management, that she was "harassed" about giving up her office to a new director [*12] after her demotion, that she was not allowed to work on a problem even though she knew the solution, and that she was denied a discretionary pay increase in late 1999. (Pl.'s Opp'n Mem. 9.)

In May 2000, the department was reorganized again. The Y2K Mainframe Applications section, directed by Mack with Plaintiff as deputy director, and the Planning/Client Support Services/Y2K Technical Procurement sections were combined. (Def.'s Mot. Ex. L 0000028, 0000031.) The new section was titled Mainframe/Planning/QA Support/Technical Procurement and was led by Lewis, as a Director. Plaintiff claims that this position was not posted, and that she was not allowed to apply for it. (Pl.'s Opp'n Mem. 9.) Both Mack and Plaintiff were no longer directors or deputy directors, and both worked under Carl Abraham, who supervised Mainframe Quality and Assurance in the new division. (Def.'s Mot. Ex. L at 0000031.)

In December 2000, Plaintiff took an early retirement incentive. (Def.'s Am. 56.1 P 48.) Under the incentive, Plaintiff would receive a lump sum payout of her accrued leave. (*Id.* P 68.) Plaintiff was informed at that time that her past leave would be subject to an [*13] audit. (*Id.*) HPD's initial calculations estimated that Plaintiff was owed $ 58,509.79. (*Id.* P 69.) These calculations were reviewed by the Comptroller's office and adjusted. (*Id.* P 71.) Based on the adjusted calculations of the Comptroller's office, Plaintiff was only owed $ 28,327.43, which was the sum approved for disbursement. (*Id.* PP 71-74, 77.) Plaintiff alleges that this adjustment was in retaliation for an Article 78 proceeding, an administrative claim under New York State law, that she brought against HPD in 1999. [5] (First Am. Compl. 1.)

> 5    On December 15, 2006, after oral argument, Plaintiff submitted an additional set of papers entitled "Facts Related to Article 78 Proceeding." The Court has considered Plaintiff's additional papers, but they are not relevant to the outcome of the present motion.

Prior to her retirement, Plaintiff requested that some of the leave time she had charged to annual leave in 1998 be switched to compensatory time. (First [*14] Am. Compl. 3.) According to Defendant, such a request was unusual. (Def.'s Am. 56.1 P 82.) Plaintiff's supervisor, Lewis, stated that Plaintiff was required to obtain the approval of Bernard Schwarz ("Schwarz"), the Assistant Commissioner for Human Resources. (First Am. Compl. 3.) The request was not approved. (*Id.*) Plaintiff did not receive her lump payment for accrued leave time until July 2001, when the audit of her accrued leave was completed. (Def.'s 56.1 P 77.) She alleges that she was supposed to receive the payment within two months of her retirement, in approximately January 2001. (First Am. Compl. 1.) [6]

> 6    Plaintiff's Second Amended Complaint includes allegations of discriminatory conduct that

were not included in the charge of discrimination she filed with the Equal Employment Opportunity Commission ("EEOC"). Exhaustion is an essential element of a Title VII claim; therefore, conduct not included in a claim of discrimination filed with the EEOC is not actionable unless it is "reasonably related" to the conduct included in the claim. *Williams v. N.Y. City Housing Auth., 458 F.3d 67, 70 (2d Cir. 2006)* (per curiam). Plaintiff's EEOC complaint includes a three page description of Defendant's allegedly discriminatory conduct. As described in that document, Defendant's discriminatory conduct began in approximately November 1998, with Plaintiff's demotion from a Level 3 CSM to a Level 2. Plaintiff's Second Amended Complaint includes numerous additional allegations of discriminatory conduct, including a failure to promote allegation from 1994 and a disparate treatment allegation from a failure to receive a salary increase while assuming additional responsibility in 1995. These pre-1996 allegations of discrimination are not "reasonably" related to the allegations in Plaintiff's EEOC complaint, which all concern events surrounding the reorganization of Plaintiff's department and the hiring of new division heads. Thus, the pre-1995 allegations are not actionable. *See id.* The remaining allegations in Plaintiff's Second Amended Complaint concern failure to promote and retaliation claims that arise out of the same facts that Plaintiff alleged in her EEOC complaint. Thus, they are reasonably related to the allegations included in Plaintiff's EEOC complaint. *See id.*("This Circuit has recognized that [a] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." (internal citations and quotation marks omitted)). Plaintiff's state and local law claims, however, are not subject to Title VII's exhaustion requirement. *See Waterman v. Register.com, Inc., No. 05 Civ. 2191, 2005 U.S. Dist. LEXIS 24893, 2005 WL 2759825, at *1 (S.D.N.Y. Oct. 19, 2005).* The pre-1996 claims, however, fall outside those statutes' limitations on the filing of claims, which require a discrimination claim be filed within three years of the discriminatory conduct. *See infra.*

[*15] C. Procedural History

Plaintiff filed an administrative appeal of her demotion with HPD on December 30, 1998. (Def.'s Mot. Ex. P.) This appeal was denied, and Plaintiff continued to appeal her demotion to higher authorities. (*Id.*) Her final

appeal was denied by William J. Diamond, Commissioner of the New York City Department of Citywide Administrative Services, on August 23, 1999. [7] On September 14, 1999, Plaintiff filed a charge of discrimination with the EEOC, alleging racial, gender, and age discrimination by HPD. The EEOC issued a right-to-sue letter on April 12, 2000. Plaintiff filed the Complaint in the instant action on August 23, 2000. Defendant answered on January 2, 2001. Plaintiff amended her Complaint on March 14, 2001, and again on November 15, 2002. On September 27, 2004, this case was reassigned to the undersigned.

> 7   At some point in late 1999, Plaintiff filed a state law claim under Article 78 of the New York Civil Practice Law and Rules. Oral argument was heard in December 1999, and in January 2001, the Supreme Court for the State of New York found for Plaintiff. As a result of that action, the reduction in Plaintiff's salary and benefits were lessened. (Def.'s Mot. Ex. X.)

[*16] II. Discussion

A. Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. See Tufariello v. Long Island R.R., 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Segal v. City of New York, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). [*17] "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'" Id. (quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991)); see also McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant] must do more than simply show that there is

some metaphysical doubt as to the material facts." (internal quotations omitted)).

The materiality of the facts considered by the Court will be governed by substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). At summary judgment, the Court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. See Castro v. Met. Transp. Auth., No. 04 Civ. 1445, 2006 U.S. Dist. LEXIS 32842, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006); Westinghouse Elec. Corp. v. N.Y. City Transit Auth., 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). A court's goal should be to "isolate [*18] and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24.

While courts are to be "particularly cautious" about granting summary judgement to employers in cases where the discriminatory intent of the employer is contested, Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997), "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). Though district courts must pay careful attention to affidavits and depositions which may reveal circumstantial proof of discrimination, see Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994), courts are not to "treat discrimination differently from other ultimate questions of fact." Abdu-Brisson, 239 F.3d at 466 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

Pro se parties are entitled to "extra consideration" and "special latitude" on summary judgment motions. Salahuddin v. Coughlin, 999 F. Supp. 526, 535 (S.D.N.Y. 1998). [*19] Therefore, this Court must read a pro se litigant's supporting papers liberally, interpreting them "to raise the strongest arguments that they suggest." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (internal quotations and citations omitted); see also Burgos, 14 F.3d at 790. This does not, however, "relieve plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotations and citations omitted). In particular, "a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Lyerly v. Koenigsmann, No. 04 Civ. 3904, 2006 U.S. Dist. LEXIS 49124, 2006 WL 1997709, at *2 (S.D.N.Y. July 17, 2006) (internal quotation marks omitted).

B. Procedural Requirements

1. Federal Claims

Both Title VII and the ADEA require that a plaintiff file a charge with the EEOC prior to filing a federal court action. *See Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001)* (per curiam) ("Under both Title VII and the ADEA, [*20] a claimant may bring suit in federal court only if she has filed a timely complaint with the EEOC and obtained a right-to-sue letter."). In cases such as this one, where a plaintiff has initially instituted state or local proceedings challenging the allegedly discriminatory conduct, that charge must be filed no more than 300 days from the date of the alleged discriminatory conduct. *See 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d); see also Hill v. Citibank Corp., 312 F. Supp. 2d 464, 472 (S.D.N.Y. 2004).* [8] The filling deadlines for a charge of discrimination act as a "statute of limitations" and a failure to timely file a charge acts as a bar to a plaintiff's action. *See Hill, 312 F. Supp. 2d at 472.* This "statute of limitations" begins to run when each discrete discriminatory act occurs. *See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002); Hill, 312 F. Supp. 2d at 472.*

[8] *42 U.S.C. § 2000e-5(e)(1)* reads in full:

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

*29 U.S.C. § 626(d)* reads in full:

No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such a charge shall be filed--

(1) within 180 days after the alleged unlawful practice occurred; or (2) in a case to which section 633(b) of this title applies, within 300 days after the alleged unlawful practice occurred, or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier.

Upon receiving such a charge, the Commission shall promptly notify all persons named in such charge as prospective defendants in the action and shall promptly seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion.

[*21] Here, Plaintiff filed her charge of discrimination with the EEOC on September 14, 1999. As a result, the statute of limitations had already run on any discriminatory acts that occurred prior to November 18, 1998, 300 days prior to the filing of Plaintiff's charge of discrimination. Thus, the statute of limitation for federal Title VII and ADEA claims has run on three of Plaintiff's claims, namely those regarding her failure to be consid-

ered for the positions filled by Nissim Baruch in June 1998 and Kamal Bherwani in August 1998, and, potentially, her demotion during the 1998 reorganization, which occurred on November 16, 1998 (Pl.'s Am. Schedule. A Docs. Ex. 36).

Plaintiff gives two justifications for why these claims are timely. First, she claims that these acts were part of a continuing pattern of discrimination that began in the mid-1990s and continued until the filing of her charge in September 1999. Second, she argues that she was required to exhaust her administrative appeals prior to filing her federal claim, which is correct, and that her appeal was not exhausted until August 23, 1999. The September 13, 1999 filing date for her charge of discrimination is therefore, she [*22] argues, timely, as it is within 30 days from when she received notice that her state proceedings were terminated.

When a claim is based on a continuous pattern or practice of discrimination that occurs over time, the statute of limitations period does not begin until the final act of discrimination in the pattern. *See Washington v. County of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004). This is known as the "continuing violation" doctrine. *Id.* However, as the Supreme Court noted in *Morgan*, this doctrine does not apply to discrete discriminatory acts: "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113. Failure to promote, demotion, retaliation, and termination claims are all viewed as "discrete" incidents of discrimination. *See id. at 114; see also Petrosino v. Bell Atlantic*, 385 F.3d 210, 220 (2d Cir. 2004) ("The law is clear that termination and promotion claims may not be based on discrete acts falling outside the [*23] limitations period."). Thus, Plaintiff's claims do not fall within the "continuing violation" doctrine and her allegations that her timely claims were part of a pattern of discrimination will not save her untimely claims from dismissal.

Plaintiff's second argument fares a little better. Under both the ADEA and Title VII, a plaintiff has 30 days from the receipt of notice that the state or local claim has been terminated to file a charge of discrimination. [9] *See* 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d). Here, Plaintiff filed an administrative appeal related only to her demotion, not her failure to be promoted to the positions filled by Baruch and Bherwani. Thus, the tolling period for state or local law claims related to her demotion does not save her untimely federal failure to promote claims, as they were not included in the state or local proceeding. Plaintiff's administrative appeal did challenge her demotion, however. Therefore, the Court considers Plaintiff's November 1998 demotion claim to be timely. [10]

[9]   Whether an intra-agency administrative appeal is a claim under local law that tolls the statute of limitations period for Title VII and the ADEA was not briefed by the parties and is not at issue in the Court's decision. As the parties did not contest the point, the Court assumes without deciding that Plaintiff's internal HPD appeal is sufficient to invoke the 30-day notice of termination exception in the relevant sections of the ADEA and Title VII.

[*24]

[10]   statute of limitations for federal claims filed under 42 U.S.C. §§ 1981, 1983, and 1985 is three years. Although the statute of limitations for these claims differs from that of Title VII and the ADEA, the substantive framework for evaluating them is identical to claims raised under those statutes and the relevant state and local anti-discrimination statutes, the New York State Human Rights Law and New York City Human Rights Law. *See Martinez v. Sulner*, No. 04 Civ. 2728, 2006 U.S. Dist. LEXIS 12448, 2006 WL 737137, at *4 (S.D.N.Y. Mar. 23, 2006) ("Discrimination claims under [Sections 1981, 1983, and 1985] . . . are assessed pursuant to standards similar to those applicable to Title VII claims."). Plaintiff's federal claims under 42 U.S.C. §§ 1981, 1983, and 1985 are discussed *infra*.

2. State and Local Claims

Section 296 of the New York State Human Rights Law ("NYSHRL") gives complainants three years from the date of any allegedly discriminatory acts to [*25] file suit. *See Forsyth v. Fed'n Employment & Guidance Serv.*, 409 F.3d 565, 572 (2d Cir. 2005). Section 8-502 of the New York City Human Rights Law ("NYCHRL") does the same. *See* N.Y. City Admin. Code § 8-502(d). As a result, any conduct that occurred between September 14, 1996, and the filing of her charge of discrimination on September 14, 1999, is not time barred under the NYSHRL and the NYCHRL. Thus, Plaintiff's failure to promote claims relating to the hiring of Baruch and Bherwani are timely under the NYSHRL and NYCHRL. [11]

[11]   Defendant asks the Court to decline to exercise pendent jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c)(3). However, this provision is discretionary, and a district court may exercise pendent jurisdiction over state law claims arising out of facts similar to those that form the basis of federal claims over which the court has original jurisdiction, even if all federal claims have been dismissed. *See Purgess v.*

*Sharrock*, 33 F.3d 134, 139 (2d Cir. 1994). Although it is true, as Defendant notes, that it is not an abuse of discretion for a federal court to dismiss pendant state law claims if all federal claims have been dismissed prior to trial, *see Castellano v. City of New York*, 142 F.3d 58, 74 (2d Cir. 1998), requiring the parties to engage in exactly the same discovery as has already occurred in this case is a waste of scarce judicial resources. Thus, the Court will consider Plaintiff's state law claims.

[*26] C. Intentional Discrimination Claims

1. Analytical Framework

Title VII and ADEA claims are subject to the burden shifting framework outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Plaintiff must first establish a prima facie case of discrimination. *See id. at 802* (Title VII); *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 187 (2d Cir. 2006) (ADEA). To establish a prima facie case, the *McDonnell Douglas* test requires that a plaintiff show: "(1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) (Title VII); *see also Fagan v. N.Y. State Elec. & Gas Corp.*, 186 F.3d 127, 132 (2d Cir. 1999) (ADEA). Plaintiff's burden in establishing a prima facie case is "de minimis." *Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust*, 207 F. Supp. 2d 282, 289 (S.D.N.Y. 2002). [*27]

If the plaintiff satisfies this initial burden, the burden of production (but not persuasion) shifts to the employer to articulate a legitimate, non-discriminatory reason for the action. *See Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). If the employer carries this burden, the burden of production shifts back to the plaintiff to demonstrate that the legitimate reasons offered are pretextual. *Id.* The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff, and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate. *Id.* This analysis is the same for claims under the NYSHRL and NYCHRL. *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 217 (2d Cir. 2005); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000); *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997); [*28] *Ferrante v. Am. Lung Assoc.*, 90 N.Y.2d 623, 687

N.E.2d 1308, 1312, 665 N.Y.S.2d 25 (N.Y. 1997). [12] It is undisputed in this case that Plaintiff was a member of the relevant protected classes and that she had the qualifications listed for the positions at issue. Thus, the only questions in dispute are whether Plaintiff suffered an adverse employment action, and whether that action occurred under circumstances giving rise to an inference of discrimination.

12 Where, as here, parties in a discrimination action do not distinguish the applicable levels of proof for federal, state, and local claims, the Second Circuit has treated them as identical. *See Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003). Therefore, for all purposes other than the relevant statutes of limitations, discussed *infra*, the Court's analysis of Plaintiff's discrimination claims under Title VII and the ADEA applies equally to her state and local law claims. *See Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 331 n.2 (S.D.N.Y. 2005) (citing cases and granting summary judgment in favor of defendants on Title VII and NYSHRL claims).

[*29] 2. Reorganization and Demotion Claim [13]

13 In her papers, Plaintiff classified this cause of action as a failure to promote claim. However, it is better argued as a reorganization or restructuring claim. As the Court must read Plaintiff's papers to raise the strongest arguments they suggest, the Court will evaluate it as a reorganization claim. Additionally, as this claim is outside the scope of the Title VII and ADEA statute of limitations' periods, Plaintiff's claim is only cognizable under 42 U.S.C. §§ 1981, 1983, 1985, the NYSHRL, and the NYCHRL. However, as discussed *supra*, the analytic framework for evaluating these claims is identical to that of Title VII and ADEA claims.

Plaintiff alleges that she was discriminated against when, during the reorganization of TSD in November 1998, [14] HPD promoted Mack, a 53-year-old African American male, to Director of the newly created Y2K Mainframe Applications group. The group that Plaintiff [*30] had directed was eliminated and she was demoted to Deputy Director. It is well settled that a demotion is an adverse employment action. *See Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006).

14 It is impossible to establish, based on the current record, whether this reorganization was complete, or even announced, prior to November 18, 1998. Bherwani stated that it occurred in No-

vember 1998. The organizational chart that reflects these changes is dated November 16, 1998 (Def.'s Mot. Ex. L at 01585), and the administrative record of Plaintiff's demotion, which occurred during this reorganization, is dated November 12, 1998 (Pl.'s Am. Schedule. A Docs. Ex. 36). Events prior to November 18, 1998, as discussed *supra*, fall outside the statute of limitations. As the exact date of the reorganization is unclear, however, the Court will construe Plaintiff's claims liberally to fall within the statute of limitations period.

Thus, the only question remaining is [*31] whether Plaintiff's demotion occurred under circumstances giving rise to an inference of discrimination. Plaintiff alleges this reorganization was discriminatory. Her allegation is based on the fact that (1) she was replaced by a person, not of her protected class, who had fewer qualifications and less experience than Plaintiff, [15] and (2) other white managers in similar reorganizations were notified of the demotion and given opportunity to find new positions, courtesies that Plaintiff alleges were denied to her. [16] An employer's choice of a less qualified employee not from Plaintiff's protected class raises an inference of discrimination sufficient to establish a prima facie case of discrimination, *see* Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003), as does treating similarly-situated employees not in a plaintiff's protected class differently, *see* Abdu-Brisson, 239 F.3d at 467-68.

15  Because Mack was also African-American, this allegation only raises an inference of gender and age discrimination. The eight-year difference in age between Plaintiff and Mack is sufficient to raise an inference of age discrimination. *See* Tarshis v. Riese Org., 211 F.3d 30, 38 (2d Cir. 2000) *abrogated on other grounds by* Swierkiewicz v. Sorema N. A., 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); Ranieri v. Highland Falls-Fort Montgomery Sch. Dist., 198 F. Supp. 2d 542, 544 (S.D.N.Y. 2002).

[*32]

16  Plaintiff specifically names three managers who allegedly received different treatment: Robert Sousa, Dean Plummer, and Harvey Blum. As Plaintiff does not provide the age of these employees, this allegation is insufficient to raise an inference of age discrimination. In addition, Plaintiff has provided no evidence to substantiate her allegations of differential treatment other than a reference to the employees' names. Finally, these events occurred at least four years prior to Plaintiff's alleged demotion, which makes it difficult, if not impossible, to determine if these em-

ployees were in fact similarly situated to Plaintiff. (Second Am. Compl. Ex. B at 2.)

That does not end the inquiry. It simply shifts the burden of production to Defendant to come forth with a legitimate, non-discriminatory reason for Plaintiff's termination. Defendant produced the declaration of Bherwani, who stated that the reorganization was necessary to prepare the division for Y2K. (Bherwani Decl. P 17.) He also stated that the current separation of responsibilities between Mack's Y2K Contingency group and Plaintiff's [*33] Mainframe Applications group was inefficient and ineffective. (*Id.* P 17-18.) He justified Mack's promotion over Plaintiff by saying that Mack was chosen to lead the consolidated group because he was well qualified for the position. (*Id.* P 18.) Bherwani noted that Mack had "proven leadership abilities, technical expertise, knowledge and experience as a programmer, historical knowledge and willingness to be a team player." (*Id.*) He also stated that Plaintiff was demoted because Plaintiff's skills, which focused on mainframe computers, were no longer as relevant to HPD, which was shifting to networked computers. (*Id.* P 21.) In addition, Bherwani stated that Plaintiff's performance was not deserving of a Director position, based on her failure to attend scheduled meetings and her refusal to make accommodations to her vacation schedule. (*Id.* P 18-20.) Bherwani explained that the reduction in Plaintiff's salary brought her compensation in line with that of Mack's, which he felt was fair. (*Id.* P 19.) In addition to Bherwani's statements, Defendant produced a memo from Batista which stated, "Geneva Butts . . . is one of the most unproductive employees and must be monitored [*34] closely." (Pl.'s Bate [sic] Stamped Docs. at 01725.) Defendant, however, has produced no documentary evidence of any non-performance. Defendant did, however, provide statistical evidence regarding Bherwani's hiring practices. During Bherwani's tenure as Associate Commissioner, he promoted thirty-two people. Of those thirty-two, seventeen were African-American, eleven were female, and all eleven females were African-American. Eight were over the age of forty. (Bherwani Decl. P 22.)

In response to Plaintiff's allegation that white male managers were treated differently than she was during reorganizations, Defendant produced a declaration from Bernard Schwarz ("Schwarz"), Deputy Commissioner of the Office of Administration of HPD. (Decl. of Bernard F. Schwarz in Supp. of Def.'s Mot. for Summ. J. PP 14-18 ("Schwarz Decl.").) Schwarz provided three examples of white HPD managers, two male and one female, who received reductions in salary when they were demoted. (*Id.* P 16-18.) Schwarz also specifically rebutted Plaintiff's allegations concerning Sylvia Maraia, a white female manager, who Plaintiff alleged was allowed to keep her salary during a reorganization. Schwarz stated that

[*35]  Maraia did not receive a demotion in that reorganization, thus, she kept her salary. (*Id.* P 15.)

Plaintiff alleges that these justifications are merely a pretext for discrimination, but no support for this claim is found in Plaintiff's papers. When asked at oral argument what evidence she bases that allegation upon, she pointed to little else than her own lack of advancement within the ranks of HPD and a general allegation that HPD has, over the past 20 years, sought to remove African Americans from management positions and that her previous positions were generally filled by persons not of her protected classes. Defendant has produced much evidence that rebuts this allegation, however, namely: (1) that HPD, during Plaintiff's tenure, promoted large numbers of African-Americans, females, African-American females, and older employees; (2) that Plaintiff was not treated differently than similarly situated employees not of Plaintiff's protected class; and (3) that HPD had a detailed, legitimate business reason for Plaintiff's demotion. In light of this evidence, Plaintiff's general and speculative allegations of discrimination are insufficient to allow a rational juror to find that [*36] Plaintiff's demotion was the result of unlawful discrimination. As a result, summary judgment in favor of Defendant on Plaintiff's demotion claim is granted. *See Phillips v. Chertoff, No. 03 Civ. 4266, 2005 U.S. Dist. LEXIS 34359, 2005 WL 3466033, at *12 (S.D.N.Y. Dec. 16, 2005)* (granting summary judgment, in part, because overall promotion record of defendant refuted any claim of race or gender discrimination).

3. Failure to Promote Claims

a. Analytical Framework

In the context of failure to promote cases, the Second Circuit has developed a specific application of the *McDonnell Douglas* test. A plaintiff satisfies the *McDonnell Douglas* test in a Title VII failure to promote case when the plaintiff "demonstrate[s] that: (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Petrosino, 385 F.3d at 226* (internal quotation marks and citation omitted). The same framework applies to ADEA cases. *See Mauro v. S. New Eng. Telecomms., Inc., 208 F.3d 384, 386 (2d Cir. 2000)* [*37] (per curiam). There is a parallel line of cases that holds that a plaintiff may also raise an inference of discrimination, thereby satisfying the fourth prong of the *McDonnell Douglas* test, by demonstrating that a person, not of the plaintiff's class, was given the position. *See de la Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996)* (Title VII); *Owens v. N.Y. City Housing Auth., 934 F.2d 405, 408-09 (2d Cir. 1991)* (ADEA); *Gomez v. Pellicone, 986 F. Supp. 220, 228 (S.D.N.Y. 1997)*.

The application requirement is not satisfied by a general request to be considered for the position. *See Petrosino, 385 F.3d at 227*. A "specific application" for a given position is required. *Id.* However, there is a "narrow" exception to the specific application requirement. *Id.* An employee may be excused from the specific application requirement if he or she demonstrates "that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer.  [*38]  " *Id.* The Second Circuit also uses this same framework to evaluate state and local law claims that arise under the NYSHRL and NYCHRL. *See Brown v. Coach Stores, Inc., 163 F.3d 706, 709-10 (2d Cir. 1998)* (upholding dismissal of NYSHRL and NYCHRL claims for failure to show a specific application); *Storms v. Elec. Data Sys. Corp.,* No. 01 Civ. 665A, 2004 WL 2480857, at *1 n.1 (W.D.N.Y. Nov. 3, 2004) ("[C]laims under the [New York State] Human Rights Law are analyzed under the same standards as Title VII claims.").

For all of Plaintiff's claims, it is undisputed that she meets the first and third requirements of her prima facie case. Plaintiff is an African American female over the age of 40. This makes her a member of the relevant protected classes. It is also undisputed that Plaintiff did not receive any of the promotions in question.

b. Unspecified Mainframe Applications Vacancy in July 1998 [17]

> 17  As this claim is outside the scope of the Title VII and ADEA statute of limitations' periods, Plaintiff's claim is only cognizable under 42 U.S.C. §§ 1981, 1983, 1985, the NYSHRL, and the NYCHRL.

[*39]  Plaintiff alleges that the failure of HPD to place her in the unspecified position filled by Nissim Baruch in July 1998 was discriminatory. (Second Am. Compl. Ex. B at 2.) However, Plaintiff has failed to meet her prima facie burden to establish a failure to promote claim regarding this position. There is no evidence that Plaintiff applied for this position, either formally or informally; nor is there evidence in the record of any vacancy. HPD's organizational charts in the record show that Baruch held the same position, "Director of Network and Systems Management," from at least March 1996 until August 2000. Plaintiff has also failed to show, or even allege, that she applied for the position. Moreover, Plaintiff has not alleged that the vacancy was not posted or that HPD engaged in an improper job search. Therefore, Plaintiff cannot establish a prima facie case for this

claim, and summary judgment in favor of Defendant on this claim is granted. *See Petrosino, 385 F.3d at 227; Butts v. City of New York Dep't of Pres. & Devel., No. 91 Civ. 5325, 1998 U.S. Dist. LEXIS 337, 1998 WL 13851, at \*4-5 (S.D.N.Y. Jan. 15, 1998)* (dismissing plaintiff's Title VII claims for failure [\*40] to produce any evidence plaintiff was actually excluded from promotion opportunities).

c. CIO/Associate Commissioner Vacancy in 1998 [18]

18   As this claim is outside the scope of the Title VII and ADEA statute of limitations' periods, Plaintiff's claim is only cognizable under *42 U.S.C. §§ 1981, 1983, 1985*, the NYSHRL, and the NYCHRL.

Plaintiff also claims that she requested consideration for the Associate Commissioner Vacancy filled by Bherwani in 1998, but that she was never considered. (Second Am. Compl. Ex. B at 1.) After former Associate Commissioner Gonzalez left HPD in 1998, Plaintiff sent an email to Deputy Commissioner Batista that stated "if you are going to post this vacancy I am very interested in applying for the position." (Pl.'s Am. Schedule. A Docs. Ex. 2.) There is no evidence in the record that Plaintiff followed up this email with an application. A specific application for a promotion is required to establish a prima [\*41] facie case of discrimination due to a failure to promote. *See Petrosino, 385 F.3d at 227*. As the Second Circuit observed in *Petrosino*,

> [T]he requirement ensures that the fact finder is not left to speculate as to the qualifications of the competing candidates, the damages to be derived from the salary of unknown jobs, the availability of alternative positions, the plaintiff's willingness to serve in them (e.g., in other locales or on other shifts), etc. The requirement also protects employers from the unfair burden of having "to keep track of all employees who have generally expressed an interest in promotion and [to] consider each of them for any opening for which they are qualified but did not specifically apply."

*Id. at 227* (quoting *Brown, 163 F.3d at 710*).

Plaintiff alleges, and Defendant offers no evidence to dispute the allegation, that this position was not posted. That alone, however, is insufficient to meet her prima facie burden. [19] Plaintiff must also show that she had no knowledge of the vacancy or that she attempted to apply through informal procedures endorsed by the employer. *See Petrosino, 385 F.3d at 227*. [\*42] [20]

19   Inconsistent posting practices are insufficient as a matter of law to waive the specific application requirement. In *Brown*, the Second Circuit rejected the plaintiff's argument that the lack of posting alone was enough to make her prima facie case: As to the posting practices of [defendant], [plaintiff's] complaint impliedly concedes that some positions not requiring a college degree were posted, albeit infrequently. There is no allegation in the complaint that [plaintiff] was not aware of positions, posted or not, as they came open. [Plaintiff] does not charge, for example, that [defendant] refused to accept applications for positions or hand-picked individuals for promotion to a position without considering applicants. In fact, the complaint asserts that "dozens to hundreds" of positions were "open" for which she was qualified.

> Thus, we see no reason that the posting practices as alleged should exempt [plaintiff] from having to avow that she made some specific effort to apply for a particular position or positions.

*163 F.3d at 710*. There is no reason that inconsistent posting practices by HPD, though potentially in violation of Personnel Services Bulletin 200-9, command a different result here.

[\*43]

20   In *Mauro*, the Second Circuit held that a generally expressed interest in a specific class of positions was sufficient to meet the application requirement. *See Mauro, 208 F.3d at 387*. *Mauro*, however, does not conflict with the Court's decision here. In that case, the defendant had promised plaintiff a specific promotion to a particular class of jobs when one came open. After the plaintiff was not promoted despite two consecutive openings in the preferred class, the Second Circuit found that a jury could infer that the defendant had improperly refused to notify the plaintiff of job opportunities. Although the Court did not discuss the "informal procedures" requirement later announced in *Petrosino*, a promise from a supervisor that a person would not just be considered for the next available promotion, but would in fact receive it, is similar to the informal procedures discussed by the Second Circuit in *Petrosino*. This case is different on the

facts, as no such promise to promote was made, and no such informal promotion procedures existed, *see infra*.

Plaintiff [*44] cannot show that she was unaware of the vacancy. In fact, her email to Deputy Commissioner Batista is concrete evidence of her awareness that there was a vacancy and that she was interested in applying. (Pl.'s Schedule. A. Docs. Ex. 2.) Plaintiff must, therefore, show that her email to the Deputy Commissioner constitutes an informal way of applying for jobs that was endorsed by her employer or that she was discriminatorily excluded from whatever informal hiring procedures existed.

The only evidence in the record regarding HPD's official hiring policies comes from Schwarz. He has described two different procedures, one for "vacancies," which occur when an incumbent separates from service and his or her position needs to be filled or when a newly created position needs to be filled, and another for "reorganizations," which occur when HPD reorganizes and current employees are simply assigned different responsibilities. (Schwarz Decl. PP 4-9.) Although the line between the two is somewhat fuzzy at best, there is no dispute that the Associate Commissioner position, created by the departure of an incumbent, Associate Commissioner Gonzalez, was a vacancy. When a vacancy is created and an [*45] agency receives approval to hire a replacement, PSB 200-9 requires that the agency post the position and invite qualified employees to apply. (*Id.* P 4.) All postings contain a contact person to whom resumes and cover letters are to be directed. (*Id.* P 6.) There is no allowance for an informal email to a supervisor, like Plaintiff's.

Plaintiff alleges in her Rule 56.1 Statement that an informal promotion system existed, and she points to a deposition of Deputy Commissioner Schwarz to support this claim. (Pl.'s 56.1 P 42.) [21] In the deposition, Schwarz discussed his own promotion and stated that he does not recall whether the position was posted or whether he was required to submit a resume and cover letter. (Pl.'s Schedule A Docs. Ex. 28 at 47.) He simply stated that he engaged in discussions with the then-Commissioner, and that, during a reorganization, he was moved to become Deputy Commissioner. At best, this evidence shows that reorganization promotions occur differently than vacancy promotions, a fact conceded by Defendant and not applicable to Plaintiff's claim here, which concerns a vacancy. Also, there is no evidence that this was a general practice at [*46] HPD, or that such practice was endorsed by HPD in the summer of 1998, when the conduct that forms the basis for this claim of discrimination occurred.

21   This deposition was taken on February 15, 1996, more than two years prior to the filing of

this action. The questions asked concern HPD's practices in the late 1980s and early 1990s, which were the subject of a previous discrimination claim against HPD filed by Plaintiff in 1991.

Plaintiff also states in her Rule 56.1 Statement that not all positions required the submission of resumes. She bases this statement on another portion of Schwarz's deposition, which discussed internal hiring practices in 1990. (*Id.*) This testimony concerned the hiring practices of HPD at least seven years prior to the passage of Personnel Services Bulletin 200-9, which went into effect on June 30, 1998. (Def.'s Mot. Ex. A.) That Bulletin, which establishes the procedures described by Schwarz as the then-current practices of HPD, requires a posting of vacancies. (*Id.*) The [*47] posting form attached to that Bulletin includes a form box which states, "TO APPLY, PLEASE SUBMIT RESUME TO:" and then a blank space where a contact person's information may be entered. In addition, all the posting forms included in the record require applicants to "indicate their transmittal number on [the applicant's] resume or cover letter when responding." (Def.'s Mot. Exs. C, D.)

The record does not suggest a dispute over a material fact. Both Plaintiff's and Defendant's evidence comes from the same source, Schwarz. Defendant's evidence, however, concerns HPD's practices at the time of the alleged discrimination, while Plaintiff's evidence covers practices in place at least seven years prior. Even if the process involved in Deputy Commissioner Schwarz's hiring, which also occurred more than seven years before the events at issue here, was probative evidence, it is insufficient to create a question of material fact on whether there was an endorsed informal application procedure at HPD. In *Petrosino*, the Second Circuit held that informal procedures must be "endorsed" by the employer in question. [385 F.3d at 227.](#) Here, there is no evidence that the process that [*48] resulted in Deputy Commissioner Schwarz's hiring was "endorsed" by HPD or the City of New York. Indeed, Personnel Services Bulletin 200-9 explicitly states otherwise, as it delineates the formal requirements for job posting and filling vacancies in city employment. In those cases where courts have found that an informal hiring practice was endorsed, it has been part of an ongoing policy or practice - not in direct contravention of posted regulations, as Plaintiff alleges occurred here. *See, e.g.,* [EEOC v. Metal Serv. Co., 892 F.2d 341, 349 (3d Cir. 1990)](#) (finding that company in question had specific procedures that potential applicants were required to go through, including the use of a specific job service, and the plaintiff had met the requirements). Here, the specific procedures require an application and there is no proof Plaintiff submitted one. Therefore, Plaintiff has failed to raise a question of material fact regarding the existence of an informal hiring proce-

dure that would excuse her failure to apply for the position. Thus, summary judgment in favor of Defendant on Plaintiff's state law claims for a failure to promote her to the Associate Commissioner [*49] position is granted.

### d. Director of Legacy Systems Vacancy

Plaintiff next alleges that she was not considered for the newly-created position of Director of Legacy Systems in November 1998. Plaintiff claims that she was never considered for the position, and that this lack of consideration was discriminatory. (Second Am. Compl. Ex. B.) However, there is no evidence in the record that she applied for the position.

As Plaintiff's own evidence shows, this position was posted. (Pl.'s Bate [sic] Stamped Docs. at 1604.) Plaintiff alleges that the posting was "not serious" because she received a "draft copy" of an organizational chart which listed Michael Hirst as Director of Legacy Systems on December 15, 1998. The record does not contain this "draft copy." It does contain a copy of the HPD organizational chart dated November 16, 1998, which lists Hirst as Director of the "Wang Legacy Applications" group within HPD. (Def.'s Mot. Ex. L at 01585.) The position was supposed to be posted, and thus applications were to be solicited, from November 23, 1998, to December 15, 1998, which corroborates Plaintiff's account. Plaintiff's argument that this should excuse the application requirement [*50] is also supported by dicta in *Brown*, where the Second Circuit implied that a plaintiff who alleged that a posting was in fact illusory because an employer had already hand-picked an employee to promote would not need to meet the specific application requirement. *See Brown, 163 F.3d at 710.* The Second Circuit, however, foreclosed this line of argument in *Petrosino*. Although the Court recognized that the specific application requirement could sometimes be "quixotic," it specifically limited the exception to those instances where there was no posting. *See Petrosino, 385 F.3d at 227.* As this vacancy was posted, Plaintiff cannot establish a prima facie case for a failure to promote claim and therefore summary judgment in favor of Defendant on this claim is granted. *See id.*

### e. Associate Commissioner Vacancy in 1999

Plaintiff next alleges that she was denied a promotion to Associate Commissioner in 1999, after Bherwani's departure. This vacancy was posted from September 13, 1999 until September 24, 1999. (Def.'s Mot. Ex. C.) Plaintiff admitted in her deposition that she did not remember seeing the posting and that she did not formally apply [*51] for this position. (Def.'s Mot. Ex. Q at 133.) Thus, Plaintiff cannot establish a prima facie case for failure to promote her to this position and summary judgment in favor of Defendant on this claim is granted. *See Petrosino, 385 F.3d at 227.*

### f. Director of Mainframe/Planning/QA Support/Technical Procurement Reorganization

Plaintiff also challenges the appointment of Lynn Lewis in May 2000 as Director of Mainframe/Planning/QA Support Technical Procurement. Lewis's previous title was Director of TSD Planning/Client Support, Y2K Technical Procurement. Lewis is an African-American female, who was 49 years of age at the time she was promoted in May 2000. [22] It is undisputed that this position was not posted. Defendant claims that this position was not required to be posted and that Lewis, who was already a director, was not given a promotion, but simply received a title more in line with her responsibilities at the time. (Def.'s Am. 56.1 P 62.)

> [22] Because the person who filled the position has the same gender and race as the Plaintiff, the only potential inference of discrimination that can be drawn from this incident is of age discrimination.

[*52] Plaintiff has not plead sufficient allegations to survive summary judgment on this claim. First, there is no evidence in the record regarding Plaintiff's awareness of the vacancy. Second, there is no evidence that Plaintiff informally applied for the position. Thus, Plaintiff has failed to meet her prima facie burden to establish a failure to promote claim based on this reorganization. *See Petrosino, 385 F.3d at 227; Lyerly, 2006 U.S. Dist. LEXIS 49124, 2006 WL 1997709, at *5.* [23]

> [23] Plaintiff alleged for the first time in her opposition papers to Defendant's motion that she was also discriminated against when she was not considered for a Director of Client Server Applications Development position that was created in 1999. (Pl.'s Opp'n Mem. 7.) Even though the Court has liberally construed Plaintiff's papers, a plaintiff may not raise new issues or arguments when they were not included within the Complaint. *See Kearney v. County of Rockland, 373 F. Supp. 2d 434, 441 (S.D.N.Y. 2005)* (citing cases). Plaintiff has submitted two amended complaints and has had ample time to assert her claims. A new claim, for which Defendant had no opportunity to respond, is inappropriate. Even if the Court were to consider the claim, however, it would not survive summary judgment. The position was posted (Pl.'s Bate [sic] Stamped Docs. at 01605-06), and Plaintiff's only evidence that she applied for the position is an email to Lynn Lewis, the designated contact person, expressing interest in the position and asking for more information. (Pl.'s Schedule A Docs. Ex. 10.) As previously noted, an expression of general inter-

est does not satisfy the specific application requirement for failure to promote claims. *See Petrosino*, 385 F.3d at 227.

[*53] D. Retaliation Claims

Plaintiff alleges that numerous events that occurred during her tenure at HPD, including her demotion, all of the alleged failures to promote discussed above, the failure to receive a discretionary salary increase in September 1999, and the readjustment of her lump sum benefits calculation post-retirement, were in retaliation for discrimination lawsuits she had filed against HPD. To establish a prima facie case of retaliation, Plaintiff must show that: (1) she was engaged in protected activity; (2) Defendant knew of this activity; (3) Defendant took an adverse action against Plaintiff; and (4) there is a causal connection between the adverse actions and the protected activity, i.e., that the Defendant had a retaliatory motive. *See Kessler*, 461 F.3d at 205-06 (both ADEA and Title VII); *Hawana v. City of New York*, 230 F. Supp. 2d 518, 529 (S.D.N.Y. 2002). Proof of causation can be shown either: (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant; or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment or through other circumstantial [*54] evidence such as disparate treatment of fellow employees who engaged in similar conduct. *See Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *Gilford v. City of New York*, No. 03 Civ. 0091, 2004 U.S. Dist. LEXIS 13150, 2004 WL 1574695, at *7 (S.D.N.Y. July 14, 2004). "Title VII is violated if a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause, and if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the discharge." *See Sumner*, 899 F.2d at 209 (internal citations omitted). Plaintiff must make these showings by a preponderance of the evidence. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1038 (2d Cir. 1993). However, even if Plaintiff states a prima facie case, retaliation claims are still subject to *McDonnell Douglas* burden shifting. *See Sumner*, 899 F.2d at 209.

Plaintiff cites two instances of her own protected activity. First, Plaintiff filed a lawsuit alleging discrimination by HPD on August 5, 1991. That [*55] litigation was protracted, and it concluded on March 25, 1999, when the Second Circuit upheld summary judgment in favor of HPD. *See Butts v. City of New York, Dep't of Housing Pres. & Devel.*, 173 F.3d 843, No. 98-7209, 1999 WL 187912 (2d Cir. 1999) (unpublished disposition). [24] A discrimination lawsuit is protected activity. *See* 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d). Second,

Plaintiff brought an action in New York state court under Article 78 of the Civil Practice Law and Rules of the State of New York. In that proceeding, Plaintiff apparently challenged her demotion. [25] The Parties have produced little evidence regarding that proceeding, however. The only evidence in the record about when the proceeding commenced came from Plaintiff's deposition testimony, where she stated that her claim was filed soon before this case, in approximately September 1999. (Def.'s Mot. Ex. Y at 39-40.) The Article 78 proceeding concluded on April 11, 2001. (First Am. Compl. 1; Def.'s Mot. Ex. X.) Defendant does not challenge that filing an anti-discrimination lawsuit constitutes protected activity. Thus, for the purposes of this Motion only, [*56] the Court will assume that Plaintiff's Article 78 suit constitutes protected activity. [26]

> 24   Judge Stein granted summary judgment in favor of HPD on January 15, 1998. *See Butts*, 1998 U.S. Dist. LEXIS 337, 1998 WL 13851, at *7.

> 25   It is unclear from the record what the basis of Plaintiff's Article 78 action actually was. The State Justice's opinion, however, ordered that Plaintiff's salary and benefits be restored to their pre-demotion levels. (Def.'s Mot. Ex. X.) According to that court, Plaintiff's salary had been reduced in violation of City Personnel Services Bulletin 230-1R. (*Id.*)

> 26   Article 78 of the New York Civil Practice Law and Rules allows a New York citizen to challenge state and local government decisions that are arbitrary, capricious, or abuses of lawful discretion. N.Y.C.P.L.R. § 78. Title VII and the ADEA, on the other hand, only prohibit retaliation for engaging in activity protected by those statutes, namely challenges to unlawful discrimination. Whether Plaintiff's Article 78 proceeding constitutes protected activity, therefore, depends upon the extent to which she argued that HPD's decision was the product of discrimination. Again, for the purposes of this motion, the Court assumes that Plaintiff's Article 78 action constitutes protected activity.

[*57]  Regarding the second element, Plaintiff has produced evidence that Defendant knew of her protected activity. General knowledge of Plaintiff's protected activity is sufficient to make out a prima facie case. *See Kessler*, 461 F.3d at 210 ("'Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.'" (quoting *Gordon*, 232 F.3d at 116)). In

both instances, Plaintiff's suits were against HPD. Thus, Plaintiff has satisfied the second element of her prima facie case.

Next, Plaintiff must show that she suffered an adverse action. To constitute an adverse action for a retaliation claim, the allegedly retaliatory action must be "materially adverse;" in other words, it must be the type of action that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S.    , 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006); accord Kessler, 461 F.3d at 207* (quoting *White, 126 S. Ct. at 2415*). [*58]  The actions Plaintiff alleges are adverse actions are: (1) her demotion from Director to Deputy Director in November 1998, with concomitant decrease in salary and responsibility in November 1998; (2) the numerous allegations of a discriminatory failure to promote from July 1998 to May 2000 described above; (3) her failure to receive a discretionary salary increase in 1999; (4) HPD's refusal to convert some of the time she charged in 1998 from annual leave to compensatory time in December 2000; and (5) the recalculation of her lump-sum retirement benefits in December 2000. Demotion, failure to promote, and a reduction of benefits are materially adverse actions. *See Joseph, 465 F.3d at 90* ("'Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits [or] significantly diminished material responsibilities.'" (quoting *Terry, 336 F.3d at 136*)). The failure to receive a discretionary salary increase can also constitute an adverse action.

At this stage, all facts must be construed and all inferences drawn in favor of Plaintiff. Plaintiff [*59]  alleges that persons not of her protected class received the salary increase, but she did not. This type of activity could dissuade a reasonable worker from engaging in protected activity, and thus constitutes an adverse action. *See White, 126 S. Ct. at 2420.* The refusal to recalculate Plaintiff's charged time, however, does not constitute an adverse action. There is no evidence that any employee was ever allowed to re-allocate charged time prior to retirement, and Schwarz testified that the request was denied because it was untimely. (Schwarz Decl. P 27.) Plaintiff does not suggest that her request was timely. Thus, the denial of an untimely request is not the type of action that would dissuade a reasonable person from engaging in protected activity. *See White, 126 S. Ct. at 2420.*

The final element of Plaintiff's prima facie case is proof of causation - namely, evidence of a discriminatory animus that links the adverse actions to unlawful discrimination. Plaintiff has tendered two pieces of evidence of retaliatory animus. First, in October 1998,

Plaintiff alleges that she was told by Bherwani that he had been informed her previous discrimination [*60] complaint had been recently resolved, and that he "questioned why [Plaintiff] would even bring a charge of discrimination." (Second Am. Compl. Ex. C at 1.) She also stated that Bherwani asked why an employee in that situation would not just leave her job. (*Id.*) Second, Plaintiff alleges that Lewis told her that she "doesn't care about lawsuits." (Pl.'s Am. Schedule A Docs. Ex. 27.) Plaintiff's evidence of this statement is a handwritten note Plaintiff took, allegedly documenting a meeting that occurred on July 27, 2000. Aside from this evidence, the temporal proximity between Plaintiff's protected activity and the allegedly retaliatory acts of Defendant can constitute indirect evidence of discriminatory animus. *See Gilford, 2004 U.S. Dist. LEXIS 13150, 2004 WL 1574695, at *7.*

Plaintiff's evidence of retaliatory animus is thin, at best. First, Bherwani's alleged statements questioning why Plaintiff would bring a lawsuit, as described by Plaintiff at oral argument, were not the of the kind meant to intimidate or cow an employee engaged in protected activity. Indeed, at that time, Plaintiff's prior lawsuit was more than six years old, and Bherwani was not involved in it in any way. From the [*61]  way Plaintiff described the conversation to the Court at oral argument, there is little evidence that Bherwani's statements were meant to affect Plaintiff's behavior at all, nor is there evidence that any of Bherwani's decisions regarding Plaintiff's employment, such as her demotion, were related to the lawsuit. Second, these statements were not linked to the numerous adverse actions Plaintiff alleges were retaliatory. Plaintiff has not alleged that Bherwani was involved in the failure to provide her with a discretionary raise, the refusal to convert her charged leave, or the recalculation of her lump-sum retirement benefits. Only two of the alleged adverse actions occurred during Bherwani's tenure, Plaintiff's failure to be promoted to the Director of Legacy Systems position and her demotion. At this stage, however, the Court must draw all reasonable inferences in favor of Plaintiff. Although drawing an inference that Bherwani's employment decisions were motivated by retaliatory animus for a lawsuit that did not involve him from his statements regarding what he would do if faced with discrimination stretches the boundary of reasonability, Bherwani's statements are sufficient to meet [*62] Plaintiff's prima facie burden on her demotion claim and her failure to promote claim related to the Director of Legacy Systems vacancy, if only for their temporal proximity.

Second, Lewis's statement that she "doesn't care about lawsuits" is not evidence of retaliatory animus. [27] Plaintiff has never alleged that she was retaliated against by Lewis, nor has she alleged that Lewis played any part

in HPD's allegedly retaliatory acts. A single statement by a co-worker, unrelated to any particularly activity or adverse action, does not raise an inference of retaliation. *See Riley v. N.Y. State Office of Alcoholism & Substance Abuse*, No. 1:01-CV-1803, 2006 U.S. Dist. LEXIS 6657, 2006 WL 266537, at *3 (N.D.N.Y. Feb. 1, 2006).

> 27  Although the note itself is hearsay, and therefore cannot be considered on summary judgment, *see LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005), Plaintiff stated at oral argument that Lewis made these statements directly to her. Thus, they could be admitted at trial and may be considered on summary judgment.

[*63]  Finally, few of the allegedly retaliatory adverse actions were actually proximate to Plaintiff's protected activity. The longer the time between a plaintiff's protected activity and the adverse employment action, the weaker the inference of discriminatory retaliation. In general, a time differential of greater than three months, without additional direct evidence of discrimination, is insufficient to survive summary judgment. *See Gilford, 2004 U.S. Dist. LEXIS 13150, 2004 WL 1574695, at *7* (citing cases). Here, Plaintiff's protected activity occurred when she filed a discrimination case against HPD in 1991, when summary judgment was granted in March 1999, [28] and when Plaintiff filed an Article 78 proceeding against New York City in September 1999. As all of [29] the adverse employment actions in this case took place more than six years after her initial suit was filed in 1991, a reasonable inference of retaliation cannot be drawn regarding the *filing* of her 1991 suit. The Article 78 proceeding occurred in the spring and fall of 1999. However, most of the alleged adverse actions occurred in 1998, including (1) her demotion (November 1998), (2) the failure to promote her to the unspecified [*64]  mainframe applications position filled by Nissim Baruch (July 1998), (3) the failure to promote her to the Associate Commissioner vacancy left by the departure of Bherwani (August 1998), and (4) the failure to promote her to the newly created Director of Legacy Systems position (November 1998). Actions taken prior to Plaintiff's protected activity cannot be retaliatory, as the protected activity had not yet occurred. *See McFadden v. Memorial Sloan-Kettering Cancer Ctr.*, No. 04 Civ. 9629, 2006 U.S. Dist. LEXIS 74250, 2006 WL 2930200, at *6 (S.D.N.Y. Oct. 11, 2006) ("[A]ny hiring decision made *before* McFadden had ever filed her charge with the EEOC cannot sustain a prima facie case of retaliation.").

> 28  Retaliation need not be proximate to the filing of a case. Proximity to the conclusion of a case is also actionable. *See Bennett v. Goord*, 343 F.3d 133, 137-38 (2d Cir. 2003); *Hill v. Rayboy-*

> *Brauestein*, No. 02 Civ. 3770,     F. Supp.    , 467 F. Supp. 2d 336, 2006 U.S. Dist. LEXIS 82759, 2006 WL 3298383, at *17 (S.D.N.Y. Nov. 9, 2006).

> 29  Oral argument on Plaintiff's Article 78 claim occurred in state court in December 1999. (Def.'s Mot. Ex. X.)

[*65]  Many of the remaining adverse employment actions took place too long after Plaintiff's protected activity to raise an inference of discrimination. Plaintiff was allegedly passed over for the Director position filled by Lewis in May 2000, more than five months after her last protected activity. Plaintiff's lump sum retirement benefit was calculated in December 2000, more than one year after Plaintiff's last protected activity. These gaps between protected activity and alleged discrimination are too great to raise any inference of discrimination. *See Gilford, 2004 U.S. Dist. LEXIS 13150, 2004 WL 1574695, at *7* (holding that four month gap too attenuated to raise inference of discrimination); *Hill, 312 F. Supp. 2d at 480-81* (granting summary judgment where only evidence of causation is temporal proximity of two months); *Allen v. St. Cabrini Nursing Home, Inc.*, 198 F. Supp. 2d 442, 450 (S.D.N.Y. 2002) (noting that three months is considered too attenuated and finding that sixteen month gap did not raise inference of discrimination).

However, Plaintiff has established her prima facie case as to four adverse actions: (1) her November 1998 demotion, based on Bherwani's [*66]  October 1998 statements; (2) her failure to be promoted to Director of Legacy Systems in November 1998, also based on Bherwani's October 1998 statements; (3) the failure to promote Plaintiff to the Associate Commissioner vacancy filled by Peskin in August 1999, based on its temporal proximity to Plaintiff's protected activity; and (4) her failure to receive a discretionary salary increase in September 1999, also based on temporal proximity. Thus, the burden of production shifts to Defendant to show that these two actions were not based on any retaliatory animus.

Defendant has offered legitimate business reasons for all of these events, which were described in detail *supra*. Plaintiff was not considered for the Director of Legacy Systems position because she did not apply for it. Plaintiff was demoted because her skills were becoming outdated, there was no need for two directors in her division, and her supervisor felt that Plaintiff had not demonstrated leadership qualities. Plaintiff was not considered for the Associate Commissioner vacancy because, as she admitted, she did not apply for it either. (Def.'s Mot. Ex. Q at 133.) Defendant has also provided a legitimate business reason [*67]  for Plaintiff's failure to receive a discretionary pay increase. Defendant argues that (1)

Plaintiff was an "unproductive employee" based on the Batista memo described *supra*, and (2) that Plaintiff's excessive use of vacation at a time of agency need justified the agency decision to give Plaintiff no raise. (Def.'s Mem. 13.) Defendant also argues that the decision to deny Plaintiff a raise was approved by an African-American supervisor.

Thus, the burden shifts back to the Plaintiff to show that these legitimate business reasons were merely pretexts for discrimination. As discussed above, Plaintiff has not produced any evidence that the legitimate business reasons provided by HPD for her demotion were pretexts for discrimination or retaliation. In addition, her failure to be promoted to the Director of Legacy Systems and Associate Commissioner positions were due to her failure to apply, and there is no evidence this failure was the result of any type of retaliation by HPD. As no rational jury could find that these actions were motivated by retaliatory animus for Plaintiff's protected activity, summary judgment on these claims in favor of Defendant is granted. *See Hill*, 312 F. Supp. 2d at 482 [*68] (granting summary judgment where plaintiff failed to adduce evidence of a connection between adverse employment action and discriminatory animus).

Plaintiff argues that her failure to receive the discretionary raise was retaliatory because a white male manager received a raise (Second Am. Compl. Ex. B at 3) and an article from *New York City Manager* reported that many managers were unhappy with the arbitrary manner in which raises were granted (Pl.'s Am. Schedule A Docs. Ex. 15). This evidence is also insufficient to show that Defendant's legitimate business reason was a pretext for retaliation. Plaintiff's own evidence shows that, whatever the motivation for HPD's refusal to grant Plaintiff the discretionary raise, it was not discrimination. Roughly 85% of the managers in HPD received some type of raise. (*Id.*) Thus, the fact that a single white male received a raise is not an atypical event, nor is it any proof of discrimination on the part of HPD. In addition, twenty managers besides Plaintiff received no raise. There is no evidence that the distribution of raises was based on Plaintiff's protected activity, as the raise was discretionary and numerous other managers were [*69] also denied the raise. Although Plaintiff disagrees with her superiors' evaluation of her work, there is simply no evidence that their decision was based on retaliatory animus. Plaintiff's own statements that this refusal must have been the result of discrimination are insufficient. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Rayboy-Brauestein*, 2006

U.S. Dist. LEXIS 82759, 2006 WL 3298383, at *18 (dismissing claim where plaintiff's allegations of pretext were conclusory and speculative). Thus, summary judgment in favor of Defendant on Plaintiff's retaliation claim related to the discretionary raise is also granted.

E. Constructive Discharge

Plaintiff's final claim is that the conduct of HPD described above, including her demotion and HPD's failure to promote Plaintiff, constituted a constructive discharge that forced her to resign. Not every slight in the workplace, nor even every adverse employment [*70] action, can form the basis of a constructive discharge claim under Title VII or the ADEA. "To establish a prima facie case of unlawful termination under the ADEA, like Title VII, plaintiff must show: (1) that she was qualified for the job, (2) that she was within the protected group, (3) that she was either actually or constructively discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of discrimination." *See Nakis v. Potter*, 422 F. Supp. 2d 398, 413 (S.D.N.Y. 2006).

Here, the first five elements of Plaintiff's prima facie case are not in question. As Plaintiff voluntarily retired, her claim relies on a showing of constructive discharge. "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *See Terry*, 336 F.3d at 151-52. A work atmosphere is intolerable when working conditions, viewed as a whole, are "'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* at 152 (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)). [*71] As with a retaliation claim, the fourth element of the prima facie case can be shown directly through evidence of a retaliatory animus, or indirectly through evidence of disparate treatment or temporal proximity to activity protected by Title VII or the ADEA. *Id.*

Plaintiff alleges that all of the conditions described above were part of a scheme to force her to retire. She also includes a number of minor incidents, including refusal to accept her help on certain projects and the relocation of her office. To prevail, Plaintiff must show (1) that this conduct was intentional, and (2) that it was designed to create a workplace that a reasonable person would find intolerable. She can do neither. In the context of a constructive discharge claim, "intentional" means something beyond negligence or recklessness. *See Whidbee v. Garazelli Food Specialities, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000); *Wright v. Goldman, Sachs & Co.*, 387 F. Supp. 2d 314, 325 (S.D.N.Y. 2005). There is no evidence that any of the actions by HPD were intended to create intolerable working conditions. The demotion

and promotion decisions of which Plaintiff complains were made by a number [*72] of different supervisors, some of whom were members of the same protected classes as Plaintiff. Plaintiff has provided no evidence that any of these supervisors intended to create a work atmosphere that was intolerable, rather, they merely promoted other employees.

Even if Plaintiff had produced some evidence of a deliberate intent on the part of HPD, she has not shown that her working conditions were such that a reasonable person would find the conditions intolerable. A single reduction in pay, without additional evidence of malicious intent, is insufficient to establish a claim of constructive discharge. See _Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993)_ (holding that plaintiff's allegation that he did not receive sufficient pay increases did not constitute constructive discharge); _Muller v. U.S. Steel Corp., 509 F.2d 923, 929 (10th Cir. 1975)_ (holding that discriminatory failure to promote and demotion were insufficient to demonstrate intent to make workplace intolerable); _see also Mathurin v. Skrivaneck, No. 00 Civ. 1762, 2003 U.S. Dist. LEXIS 10200, 2003 WL 23744279, at *14 (S.D.N.Y. June 10, 2003)_ (Report and Recommendation) (holding that [*73] intense scrutiny of plaintiff, even if coupled with "economic consequences," was insufficient to show workplace was intolerable); _Rodriguez v. Graham-Windham Servs. to Families & Children, No. 99 Civ. 10447, 2001 U.S. Dist. LEXIS 362, 2001 WL 46985, at *6 (S.D.N.Y. Jan. 18, 2001)_ (finding no constructive discharge when employer demoted employee instead of terminating her); _Phillips v. General Dynamics Corp., 811 F. Supp. 788, 794 (N.D.N.Y. 1993)_ ("Lower pay resulting from gender discrimination is not sufficient."). Indeed, as the record shows, demotions were relatively commonplace in HPD, where Director positions were limited and there were numerous qualified applicants. (Schwarz Decl. PP 15-18.) In addition, when a plaintiff remains in a position after conduct which is allegedly designed to force him or her to resign, it undermines any claim of intolerable working conditions. See _Petrosino, 385 F.3d at 230;_ _Flaherty v. Metromail Corp., No. 98 Civ. 8611, 2001 U.S. Dist. LEXIS 10828, 2001 WL 868011, at *5 (S.D.N.Y. July 31, 2001)_. Here, Plaintiff continued working at HPD for more than two years after her demotion. Thus, the demotion is insufficient to meet Plaintiff's prima [*74] facie burden.

A failure to promote alone also is insufficient to establish a claim of constructive discharge. See _Petrosino, 385 F.3d at 231_ ("Because the law is clear that a constructive discharge claim cannot be proved by demonstrating that an employee is dissatisfied with the work assignments she receives within her job title, or even with the failure to receive an anticipated raise, or a bonus

after having received one in previous years, it is doubtful that a constructive discharge claim can be established by an employee dissatisfied with reduced promotion opportunities." (internal citations omitted)); _Loucar v. Boston Market Corp., 294 F. Supp. 2d 472, 482 (S.D.N.Y. 2003)_ ("A denial of promotion does not constitute an intolerable work atmosphere amounting to a constructive discharge." (internal quotations and citations omitted)). This is especially true in this case, where Plaintiff cannot establish that she applied for the vast majority of positions for which she claims she was overlooked for promotion. Additionally, approximately six months passed between the last alleged failure to promote and Plaintiff's acceptance of HPD's voluntary retirement [*75] plan. A six month passage of time is sufficient to undermine a claim that working conditions were intolerable. See _Flaherty, 2001 U.S. Dist. LEXIS 10828, 2001 WL 868011, at *5_.

Even when all of the incidents Plaintiff alleges are combined, they fall short of the mark. Numerous courts in this district have refused to find constructive discharge in situations much more egregious than those alleged here. See _Spence v. Maryland Cas. Co., 995 F.2d 1147, 1149-52 (2d Cir. 1993)_ (no constructive discharge despite ridicule, threats of termination, constant harassment, and improper discipline); _Nakis, 422 F. Supp. 2d at 415-16_ (citing cases);_Katz v. Beth Israel Medical Ctr., No. 95 Civ. 7183, 2001 U.S. Dist. LEXIS 29, 2001 WL 11064 at *12 (S.D.N.Y. Jan. 4, 2001)_ (finding no constructive discharge where a plaintiff alleged that she was told to retire, unfairly disciplined, and threatened with termination). In addition, much of the behavior Plaintiff complains of occurred long before her retirement (and under different supervisors). Thus, Plaintiff has failed to establish a prima facie case of constructive discharge.

Even if these actions did constitute constructive discharge, Plaintiff [*76] cannot show that her discharge occurred under circumstances that give rise to an inference of discrimination. The retirement incentive that Plaintiff accepted was offered to all employees with her title. (Pl.'s Schedule A Docs. Ex. 41.) Plaintiff chose to accept it. There is no evidence that this offer arose under any discriminatory circumstances. Plaintiff alleges she received her notice of the offer later than Mack, whose notice letter was dated more than one month prior to Plaintiff's. At best, however, this evidence raises a non-discriminatory inference, as it implies that HPD did not want Plaintiff to retire. Therefore, there is no evidence, direct or otherwise, that raises an inference of discrimination regarding Plaintiff's retirement from HPD. See _Ferraro v. Kellwood Co., No. 03 Civ. 8492, 2004 U.S. Dist. LEXIS 23482, 2004 WL 2646619, at *7-8 (S.D.N.Y. Nov. 18, 2004)_ (holding that plaintiff failed to raise an inference of discrimination because, though plaintiff had been demoted, other allegedly similarly

situated managers not of plaintiff's protected class were fired); *Buchanan v. Conn. Transit, Inc.*, No. 3:98cv1145, 2000 WL 435546, at *6-7 (D. Conn. Mar. 10, 2000) (dismissing [*77] constructive discharge claim where plaintiff failed to show that demotion and change in work assignments were intended to force resignation). As Plaintiff has failed to make a prima facie case of constructive discharge, summary judgment in favor of Defendant on Plaintiff's claim of constructive discharge is granted.

F. Sections 1981, 1983, and 1985 Claims

Plaintiff's First Amended Complaint, based on a standard form, stated that Defendant's actions were in violation of 42 U.S.C. §§ 1981, 1983 and 1985. Neither Plaintiff nor Defendant specifically argued these claims in their papers. However, they are governed by the same standards as those under Title VII and the ADEA. *See Martinez, 2006 U.S. Dist. LEXIS 12448, 2006 WL 737137, at *4* ("Discrimination claims under [Sections 1981, 1983, and 1985] . . . are assessed pursuant to standards similar to those applicable to Title VII claims.").

1. Sections 1981 and 1983

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a) [*78] . Section 1981 thus protects a plaintiff's right to enjoy "all of the benefits, privileges, terms and conditions" of his or her employment contracts. 42 U.S.C. § 1981(b). Section 1983 provides a federal remedy for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983.

To establish liability against a municipal agency for a violation of section 1981 or section 1983, a plaintiff must show "that the challenged acts were performed pursuant to a municipal policy or custom." *See Patterson, 375 F.3d at 226; Hayes v. Kerik, 414 F. Supp. 2d 193, 209 (E.D.N.Y. 2006)*. A plaintiff need not show the existence of an expressly discriminatory rule or regulation, but can make a claim by demonstrating that a discriminatory practice of municipal officials was so "persistent or widespread as to constitute a custom or usage with the force of law." *Patterson, 375 F.3d at 226* (internal quotation marks omitted). Here, Plaintiff has not alleged that any policy or practice was discriminatory, or that any of the discriminatory [*79] actions taken against her, e.g., the demotion, the failure to promote, or any of the retaliatory acts, was done pursuant to any policy or practice of the City of New York or HPD. [30] Therefore, sum-

mary judgment in favor of Defendant on any claim arising under section 1981 or section 1983 is granted. *See Hayes, 414 F. Supp. 2d at 209* (dismissing section 1981 claim for failure to allege that discriminatory actions were performed pursuant to a municipal policy or custom).

> 30    At argument, Plaintiff suggested that there was a policy of eliminating African-American managers at HPD dating back to 1987. However, this conclusory allegation, made for the first time at oral argument, is insufficient to resuscitate this cause of action.

2. Section 1985

Section 1985 prohibits conspiracies to deprive individuals of the equal protection of the laws. *See 42 U.S.C. § 1985(3)*. "In order to maintain an action under Section 1985, a plaintiff 'must provide some factual basis supporting [*80] a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.'" *Webb v. Goord, 340 F.3d 105, 110-11 (2d Cir. 2003)* (quoting *Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)*. Conclusory allegations of conspiracies cannot withstand a motion to dismiss, let alone a motion for summary judgment. *See Gyadu v. Hartford Ins. Co., 197 F.3d 590, 591 (2d Cir. 1999)* (per curiam). Here, Plaintiff has made no allegations of a conspiracy at all, nor has she adduced any evidence that there was any agreement between any of the defendants to violate her rights. Thus, summary judgment in favor of Defendant on any claim arising under section 1985 is granted. *See Sylla v. City of New York, No. 04 Civ. 5692, 2005 U.S. Dist. LEXIS 31817, 2005 WL 3336460, at *7 (E.D.N.Y. Dec. 8, 2005)* (granting summary judgment in favor of defendants when plaintiff failed to make any allegations regarding an agreement).

III. Conclusion

In conclusion, Defendant's Motion for Summary Judgment is GRANTED. The Clerk of the Court is directed to grant judgment in favor of Defendant and to close this case.

SO [*81] ORDERED.

Dated: January 29, 2007

New York, New York

KENNETH M. KARAS

UNITED STATES DISTRICT JUDGE

LEXSEE



Positive
As of: Dec 26, 2007

**Edward Cunningham, Plaintiff, - against - Consolidated Edison Inc., Defendant.**

**CV-03-3522 (CPS)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2006 U.S. Dist. LEXIS 22482**

**March 28, 2006, Decided**

**SUBSEQUENT HISTORY:** Reconsideration denied by Cunningham v. Consol. Edison, 2007 U.S. Dist. LEXIS 19111 (E.D.N.Y., Mar. 19, 2007)

**CORE TERMS:** supervisor, retaliation, protected activity, co-worker, suspension, e-mail, summary judgment, termination, age discrimination, reimbursement, arbitration, environmental, tuition, harassment, lunch, causal connection, suspended, disclose, responded, van, constructive discharge, fired, altercation, complain, you're, preclusion, proximity, warning, coal tar, managers

**COUNSEL:** [*1] For Edward Cunningham, Plaintiff: Neil Frank, Frank & Associates, P.C., Farmingdale, NY.

For Consolidated Edison, Inc., Defendant: David T. Reilly, Mary Schuette, New York, NY; Barbara Jane Carey, Consolidated Edison Company, New York, NY; Jonathan A. Fields, Consolidated Edison Company of New York, Inc., New York, NY; David J. Reilly, Con Edison Law Department, New York, NY.

**JUDGES:** By: Charles P. Sifton, United States District Judge.

**OPINION BY:** Charles P. Sifton

**OPINION**

MEMORANDUM OPINION AND ORDER

SIFTON, Senior Judge.,

Plaintiff, Edward Cunningham, commenced this action by filing a complaint invoking this Court's federal question and supplementary jurisdiction against defendant, Consolidated Edison Inc. ("Con Edison"). The complaint sets forth claims for relief based on race discrimination and hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. ("Title VII") and the New York State Human Rights Law, Executive Law § 296 et seq. ("NYSHRL"), age discrimination and hostile work environment in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 [*2] et. seq. ("ADEA"), and the New York City Human Rights Law, N.Y.C. Admin Code § 8-101 et seq. ("NYCHRL"), and retaliation in violation of Title VII, NYSHRL and NYCHRL. Defendant Con Edison now moves for summary judgment dismissing the complaint pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below the defendant's motion for summary judgment is granted.

**BACKGROUND**

The following facts are taken from the submissions of the parties in connection with the present motion. They are undisputed unless otherwise noted.

Plaintiff Edward Cunningham is a white male, born January 9, 1962. (Amended Complt. P14). On January 18, 2000, he commenced his employment with defendant Con Edison as a General Utility Worker ("GUW"). (Id. at P15).

Con Ed Procedures For Complaints

Con Ed maintained internal procedures to address employee concerns about environmental, health, and

safety issues. These procedures were laid out in its Code of Conduct, which was distributed to every employee.

The Code of Conducts section on environmental, health and safety laws, provided: [1]

> If you have an environmental concern or [*3] problem, follow these guidelines:
>
> First, report the matter to your immediate supervisor . . . If you feel uncomfortable raising concerns with your immediate supervisor, you can contact your Environmental, Health and Safety (EH&S) Manager or your local EH&S representative, or you may call the EH&S Compliance Administrator . . . If you have a more serious concern, including suspected violations of this Code, environmental or health and safety regulations, you can contact the Corporate Ombudsman at (212)-206-0949. The Corporate Ombudsman is overseeing [Con Edison's] ethical and environmental performance on behalf of the Company (see **Reporting Wrongdoing** section on pages 35-27) . . . The Company's Environment, Health and Safety Excellence Program and this Code assure all employees that they will not be subject to retaliation and harassment of any kind for raising a concern or allegation in this area.

("Living Our Values, Your Guide to the Code of Conduct for Consolidated Edison, Inc.," § 1.1, Carey Aff. Ex. DD, Dobrini Dec. Ex. C.).

1  The Code of Conduct had minor modifications during the time of plaintiff's employment. The ellipses and bracketed portions in the quote reflect these changes, which did not alter the process of filing an internal complaint.

[*4]  The Code of Conduct and Con Ed's Corporate Policy on Equal Opportunity lay out the process for raising an Equal Opportunity in Employment Complaint. The Code of Conduct states:

> Con Edison men and women are fully committed to Equal Employment Opportunity (EEO) for all employees and applicants for employment. We do not discriminate . . . on the basis of race, color, religion, creed, national origin, sex, age, marital status, sexual orientation, disability, citizenship or veteran status. More-

over, sexual or any other form of harassment will not be tolerated . . . . Acts or threats of violence towards employees or any other form of intimidation based on fear of violence, cannot be tolerated. Each reported incident will be promptly investigated and appropriate disciplinary action, up to and including termination of employment, will be taken.

("Living Our Values, Your Guide to the Code of Conduct for Consolidated Edison, Inc.," § 1.1, Carey Aff. Ex. DD, Dobrini Dec. Ex. C.). The Corporate Policy States:

> In order to ensure implementation of its EEO policy, the Company shall continue to
>
> . . . Maintain an Equal Employment Opportunity Affairs [office or department]. [*5]
>
> . . . Accept and investigate, through the Director, Equal Employment Opportunity Affairs . . . complaints of violations of this EEO policy . . . and implement appropriate actions, including discipline . . . for violations of [the EEO] policy.

(Id.).

Van Nest Assignment - January 18, 2000 to April 8, 2000

Cunningham was initially assigned to the "Van Nest" facility as part of the Company's Maintenance and Construction Services Department ("M&C"). (Carey Aff. Ex. K). At the Van Nest facility Cunningham worked under several supervisors, including Supervisor Robert Colucci.

According to Cunningham, in March 2000 Supervisor Bob Collucci told Cunningham that he was shocked that Cunningham was a new hire and said "you should be an 'A' mechanic at your age." (Cunningham Aff. P7). Subsequently, when Cunningham refused to operate a two-hundred ton crane without training, Collucci told Cunningham that Con Edison was used to younger, more aggressive workers. Collucci further told Cunningham, "I think you're not going to last at Con Ed." (Cunningham Dep. 54, 71-74).

On March 10, 2000, Collucci issued an unsatisfactory performance evaluation for Cunningham. The review stated [*6]  that Cunningham was not "someone who is willing to give a hand unless asked or told to. (Carey Aff. Ex. K.)

According to Cunningham, he complained about Collucci's age based remarks to Pat Boland, an administrative supervisor who reported to General Manager Mike O'Donnell. (Cunningham Dep. 80). Cunningham did not report the comment to the Company's internal Equal Employment Opportunity Affairs Department ("EEO"). (Carey Aff. Ex. DD, P10).

On March 24, 2000, Cunningham received a satisfactory review from supervisor Kevin Sweeny. Supervisor Troy Bruce changed this review to a negative review, because Cunningham had not properly cleaned a work station. (Cunningham Dep. 74-5, 88, 91; Carey Aff. Ex. K).

Coal Tar Gang Assignment, Maintenance Services: April 9, 2000 - May 26, 2001

Beginning on April 9, 2000, Cunningham began a year long assignment to the Coal Tar Gang of Maintenance services. This assignment involved removing coal tar insulation from cables in the street. (Cunningham Dep. 94-95).

*Relationship with Supervisor Lew*

Beginning in April of 2000 and continuing through October of that year, Cunningham received weekly job evaluations from Supervisor Lew. On April 18, 2000, Lew [*7] commented in his evaluation that, "Ed is very cooperative, is getting the hang of things, assisting in setting up the work site, e.g. traffic control, retrieval unit, manhole entry setup, shows positive attitude." On April 22, 2000, Lew noted in his evaluation, "Ed is showing good work habits, is cooperative, show [sic] desire to learn." On May 6, 2000, Lew wrote, "Ed is a good worker, dependable, cooperative and accepted by his fellow workers." On May 17, 2000, Lew stated, "Ed is working out good [sic], is cooperative, has a good attitude towards the job." (Pl. Ex. C). Cunningham initially received mostly "satisfactories" on his job evaluation, but his evaluations improved and by October Cunningham was receiving mostly "very good" evaluations. At no time did he receive less than a satisfactory rating. In April 2000, Supervisor Lew promoted Cunningham from General Utility Worker to Mechanic B. (Cunningham Dep. 152). Despite the positive evaluations, Cunningham claims that Supervisor Lew "didn't like [him]" (Cunningham Dep. 121) and that in July, Supervisor Lew told Cunningham that he was, "too old and overeducated to do this kind of work." (Cunningham Dep. 147).

[*8] *Relationship with Co-Workers*

Cunningham claims that during his assignment to the coal tar gang, co-workers made age and race based comments to him. On one instance, Cunningham states,

an unidentified co-worker asked him, "what the fuck are you doing here, old man?" (Cunningham Dep. 119).

Cunningham further alleges that during this same period, two employees, Mike Hansel and Carlos Gordon, made derogatory racist remarks to him such as, "why do you have to come into this company guns blazing like a white boy from Long Island." (Cunningham Dep. 118; Cunningham Aff. P11), and "I was treated like shit when I came in and that means I get to treat you like the shit that you are, white boy." (Cunningham Aff. P11). Cunningham also alleges that in December 2000, Hansel demanded that Cunningham step outside a work vehicle and physically threatened him. (Cunningham Dep. 116).

*Altercation with Supervisor Tranchina*

In January or February of 2001, Cunningham had an altercation with supervisor John Tranchina. Cunningham had previously objected to Tranchina's method of doing work and instructed Tranchina as to the method he believed was correct. On the day in question, the coal tar gang [*9] was working in a trench near Columbia University. Tranchina told the work crew, "you guys get up, you can't eat lunch anymore; we've got to get this project done." (Cunningham Dep. 215-216). Cunningham says Tranchina then said to him, "get in the hole, prick." Cunningham went into the trench as requested but then jumped out because a backhoe was spilling sand into the hole threatening to dislodge the supports. (Cunningham Dep. 220-221).

*Altercation with Supervisor Murphy*

On May 4, 2001, Cunningham asked his supervisor, Dennis Murphy, for what Murphy considered to be an obsolete and inappropriate respirator. (Lew. Dep. 66). Several of his coworkers described Cunningham's request as abrupt and confrontational. (Carey Aff. Ex. L). When Murphy began to respond, Cunningham demanded, "just give me a yes or no answer." (Id.) Afterward, Cunningham heard from a co-worker that Murphy had commented, "Ed's going to bury himself here." (Cunningham Dep. 186-87).

*Cunningham's Complaints Concerning the Coal Tar Gang*

According to Cunningham, in May 2001 [2] he complained to Con Edison's Corporate Ombudsman, Robert McGuire and Deputy Ombudsman Richard Bagwell that he was experiencing [*10] race and age discrimination. (Cunningham Aff. P12). The defendant claims that Cunningham's complaints focused on safety issues and management's response to Cunningham's having raised such issues, and made only a passing reference to his age and college education. (Carey Aff. Ex. N). Cunningham re-

quested that his complaints remain confidential. (Cunningham Aff. P14). Cunningham claims that Bagwell and McGuire assured him that his complaints would remain confidential. However, Cunningham believes that they did not honor this promise because Supervisor Lew was aware of Cunningham's complaints. (Lew Dep. 35). Further, according to Cunningham, supervisor Marovic told auditors he was aware that Cunningham had sent an e-mail about him to Bagwell.

2    On May 9, 2001 Cunningham spoke with Bagwell on the phone and met with him away from work on May 14, 2001. On May 21, Tabone was assigned to investigate.

Bagwell did not refer any of Cunningham's complaints to the Corporate EEO, but rather, referred them to George Tabone [*11] in the Auditing Department. (Bagwell Dep. 18). Tabone told Cunningham that he would refer the matter to the EEO, but Tabone did not do so. (Cunningham Aff. P13).

16th Street Assignment

On May 27, 2001, Cunningham was transferred to an assignment in the 16th street yard under supervisors Andre Sahai and Joe Busacca. (Cunningham Dep. 108, 103). Defendant claims that Cunningham did not get along with his co-workers at this site. According to Project Manager Massoni, "Cunningham was acting up a little bit and the other employees were not happy to work with him, that all he did was ramble about his dogs . . . that he felt the job was beneath him." (Lew. Tr. 72-73). Cunningham was heard saying to other employees, "I am a white educated man," "what the hell are we doing?" and "this job is stupid." (Id. at 73-74).

Tuition Reimbursement

On May 29, 2001, Cunningham was told that he needed a management signature in order to obtain tuition reimbursement for classes he was attending. (Cunningham Dep. 225). This was a general requirement for employees seeking reimbursement. (Id.). Cunningham asserts that his tuition reimbursement was delayed by supervisors Massoni, Murphy, Boland, [*12] and Delabastide in retaliation for his having raised age, race, and safety issues (Id. at 229). Defendant asserts that these supervisors had not been informed of Cunningham's complaints. (Carey Aff. Ex. BB P7-9). Defendant also asserts that Bagwell was not made aware of any complaints. (Carey Aff. Ex. X, Bagwell Sec. Aff. P3-5).

Complaints to Tabone

On June 4, 2001, Cunningham raised several harassment and safety issues in a meeting with Tabone. According to Tabone, none of these issues involved race or age discrimination. (Carey Aff. Ex. BB, Tabone Aff. P4). Over the next months Cunningham phoned and e-mailed Tabone to inform him of problems Cunningham felt he was facing. Only one of these e-mails raised an issue Tabone considered EEO related: a co-worker, Gonzalez, made a false accusation in April 2000 that Cunningham had deliberately "opened the stop van back doors on" female co-worker Fleming while she was changing. (Carey Aff. Ex. N). Cunningham did not feel that Gonzalez had been sufficiently punished for lying. (Id). Tabone notified the director of the Company's EEO Affairs Department of this allegation. On August 1, 2001, Cunningham sent Tabone an e-mail complaining [*13] that he was being harassed by managers and was worried about being fired. (Pl. Ex. D).

Cunningham's Late Return and Failure to Check Out

On June 12, 2001, Cunningham was instructed to work with co-worker Hansel to inspect a manhole. (Cunningham Dep. 110). Cunningham claims that this work took place during his lunch hour. After the job Hansel and Cunningham were supposed to return to a designated work location to be dismissed, as was the normal practice of employees returning from jobs. (Cunningham Dep. 235). However, Cunningham asked co-worker Hansel to tell Supervisor Sahai that he was leaving without waiting to be dismissed because he did not want to be late for his class at Nassau Community College. (Cunningham Dep. 198). Supervisor Andre Sahai docked plaintiff's pay because he left a half hour early. (Id.). Cunningham felt he was entitled to a half hour of overtime for working during lunch. Cunningham believes he was docked in retaliation for his complaints of discrimination to Tabone. (Id.).

Transmission Operations - October 2001 to February 22, 2002 [3]

3    Plaintiff was re-assigned to the Van Nest facility from July 2001 to October 6, 2001. However, nothing of relevance happened during that time.

[*14]    In October 2001, Cunningham was transferred to Transmission Operations. Defendant asserts that Cunningham irritated his co-workers and supervisors in Transmission Operations by repeated reference to the fact that he had graduated from college and by implying that he knew more than they did about the work, despite being new at Con Edison. (Lew Dep. 73-74).

Age Based Comments

During Cunningham's four months in Transmission Operations three comments were made to him that referred to his age or education. Cunningham claims that a supervisor he identified as "Joe Girard" told him that,

2006 U.S. Dist. LEXIS 22482, *

"you're an older worker, and . . . because you have an education, you're not going to be well liked here." (Cunningham Dep. 295-96). Supervisor Abbitelli told Cunningham, "you got to move your ass, old man, you're working too slow." (Id. at 122.) Supervisor Freddie Haymack belittled Cunningham by saying, "you're the new-timer that's the old-timer that knows more than the old times." (Cunningham Dep. 124). Cunningham did not report any of these comments to the Con Ed's EEO. (Carey Aff. Ex. DD, Dobrini Dec. P10).

*Report on Cunningham's Complaints*

On January 16, 2002, Con Ed's Auditing Department [*15]  [4] issued two reports on "Allegations of Ignored Safety Procedures," which included a discussion of the various allegations Cunningham had made to Bagwell and Tabone. (Carey Aff. Ex. BB P9; Carey Aff. Ex. L). The reports characterized all of Cunningham's claims, except the one pertaining to Gonzalez's alleged false accusations of sexual harassment, as claims relating to safety and environmental issues. (Id.).

> 4    The Auditing Department is responsible, among other things, for investigating employee complaints referred to it by the Office of the Corporate Ombudsman. [Tabone Dec. P2).

*Altercation with Co-Worker Otero*

On January 29, 2002, Cunningham was involved in an altercation with Otero, a co-worker, after Cunningham objected to Otero's smoking in the company van. (Carey Aff. Ex. P.). Cunningham claims that Otero initiated the altercation and made the first threat. Cunningham further states that Otero said, "you're a real motherfucker in this department, you think you're a tough guy, you don't like [*16]  me smoking" and "fuck you and your dog, I'll kill your dog and I'll come to your house and I'll fuck you up." (Cunningham Dep. 251). Cunningham states that in response he threatened to "fuck up" Mr. Otero and to shoot Mr. Otero if Mr. Otero killed his dog. (Cunningham Dep. 258-260).

*Cunningham's Suspension, Arbitration, and Complaints*

As a result of the altercation, both employees were suspended; Otero for 10 days, Cunningham for 17.5 days. This discrepancy was explained by Manager Delabastide as a result of Cunningham's "prior discipline." On his return to work, after his suspension, Cunningham received an "all inclusive warning."

Cunningham filed a grievance concerning his suspension and receipt of an all-inclusive warning. His union sought arbitration and, on October 17, 2002, an arbitration hearing was held. Relying on the fact that Otero

did not take Cunningham's threats seriously, and that there was no record of formal prior discipline against Cunningham, Arbitrator Mackenzie upheld the suspension, but removed the "all inclusive warning." (Opinion and Award of Arbitrator Mackenzie, pg. CUN00000164).

On January 29, 2002, Cunningham sent Tabone an e-mail in which he [*17]  complained that he had been suspended in retaliation for raising safety and environmental complaints and questioning why he had never heard from the EEO department. (Carey Aff. Ex. BB P7, Carey Aff. Ex. N). On February 5, 2002, Cunningham sent Deputy Ombudsman Richard Bagwell an e-mail about his suspension, identifying the reason for the suspension as related to his having complained about a safety issue. (Carey Aff. Ex. O). In this e-mail Cunningham also asserted that he had made charges of age discrimination, stating, "it is also ridiculous to have management spend almost a year to investigate charges of age discrimination and harassment." (Id). Bagwell wrote back and told Cunningham that neither Bagwell nor Tabone had heard from Cunningham that he had any age discrimination concerns, but rather had heard only about safety concerns and harassment. (Carey Aff. Ex. BB P7). Bagwell stated that if Cunningham had mentioned age discrimination issues "we would have forwarded that information to Corporate EEO." (Id.)

As a result of Tabone's failure to refer his complaints to the EEO, Cunningham then filed a charge of discrimination with the EEOC, which was accepted for investigation by [*18]  the EEOC on February 26, 2002. (Plaintiff's Affidavit P13; Douglas Affidavit). Cunningham states that even after filing his complaint he continued to inform Bagwell of further instances of discrimination and retaliation.

*Cunningham Returns to Work*

When Cunningham returned to work on February 22, 2002, after his suspension, he was assigned to the ASM PURRS plant, a special department within the substation department which maintains the cooling temperatures of high voltage feeders. Cunningham's supervisors were Dave Mocera and Ralph Gangi. (Cunningham Dep. 244).

Cunningham's first paycheck after his reinstatement was in the amount of $ 1.50. (Cunningham Aff. 20; Pl. Ex. E). Cunningham complained about the paycheck to Bagwell and told Bagwell that he believed the paycheck to be continued harassment. Cunningham further alleges that defendant suspended his e-mail account in order to restrict his access to Bagwell. (Cunningham Aff. 21).

*Cunningham Requests a New Assignment*

Shortly after returning to work Cunningham requested a transfer to a new work assignment, (Bagwell Dep. 67) either in Substation Operations or as a cable splicer in System and Transmission Operations [*19] (Pl. Ex. G, H). Cunningham did not receive a response to his request. (Bagwell Dep. 105). When he inquired about his requested transfer, Bagwell responded that the company kept giving him different dates. (Bagwell Dep. 107.) Cunningham was ultimately denied both positions. (Bagwell Dep. 75.)

*Cunningham Fails Precision Instruments Test*

In April 2002, Cunningham took a Precision Instruments Practical Test, a prerequisite for a title change to "A" mechanic, but failed. (Pl. Ex. I). Cunningham complained to Bagwell that the Learning Center deliberately failed him and his co-worker Ariel Antomarchi because of O'Donnell's animosity towards them, due to their discrimination and retaliation complaints (Bagwell Dep. 89; Pl. Ex. F, H, I). Cunningham believes, that out of 142 individuals who took the exam, he and Antomarchi were the only two who failed. In contrast, Con Ed provides records indicating that four other employees failed the test. [Def. Reply Ex. B]

*Cunningham Sends E-Mails resulting in his Termination*

On March 6, 2002, Cunningham sent an e-mail to Henry Watson, a fellow employee, requesting that he, or Supervisor Silva, explain in writing what they knew about Cunningham's [*20] having been denied a transfer to a cable splicer job and suggesting that the transfer had been denied because Watson said that he didn't think Cunningham would be a good splicer because he was "too overly concerned for safety," and that Watson had also said, "we bend the rules around here." (Carey Aff. Ex. R.). Watson responded denying he had made such statements. (Carey Aff. Ex. R). Cunningham then replied alleging that one of them must be lying and suggesting that Watson, "refrain from making foolish statements." (Id.). Silva also responded to Cunningham's e-mail explaining that he did not have the power to decide when an application was accepted or rejected and that that decision was made by human resources. Cunningham responded accusing Silva of lying and said, "I'll wait for your fabrication." (Id.).

In June 2002, Cunningham received an e-mail, forwarded by supervisor Dave Mocera, from senior office assistant, Dennis Kieran, notifying him of a scheduled training. Cunningham responded indicating that he believed his training was scheduled for a different day and saying, "maybe you guys have to check that to make sure the left hand knows what the right hand is doing." (Carey Aff. [*21] Ex S). Kieran wrote back indicating that Cunningham was correct about the day of training and,

evidently in response to plaintiff's accusatory tone, stated, "I guess your pencils do not have any erasers on them. You have a nice day." Cunningham then responded, "its great to see someone from MCS admit to their shortcomings! Keep up the good work lackey!" (Id.). Kieran responded, "I resent your remark, you seem to have a problem, maybe you should seek some help?" (Id.) Cunningham replied, "maybe you need to retire." (Id.) Kieran forwarded this e-mail to General Manager O'Donnell and Thomas Delabastide. After a consultation with the Human Resources Department, Cunningham was fired. (Carey Aff. P.) At his disciplinary interview Cunningham was told that he had engaged in "inappropriate and discourteous conduct directed at both supervisors and fellow co-workers . . .in violation of the Company's values of concern, courtesy and teamwork" (Id.) Cunningham maintains that he was fired in retaliation for his complaints to Bagwell.

*Arbitration and Reinstatement*

Cunningham's union sought arbitration of his discharge. An arbitration hearing was held on January 7, 2003. Arbitrator Riegel determined [*22] that the company had reasonable and sufficient cause to discipline Cunningham for his discourteous e-mail messages, but that because the All Inclusive final Warning had been rescinded in an earlier arbitration, and plaintiff's remarks that led to his termination were, unlike his previous remarks analyzed in the earlier arbitration, unrelated to the Con Edison Violence in the Workplace Policy, termination was inappropriate and should be converted to a three day suspension. Cunningham was awarded back pay for the period since his termination, less three days pay for suspension, and given a final warning. (Id.). Cunningham was reinstated on or about March 3, 2003. He then reiterated his request to Bagwell for a transfer to the Substations Department. (Pl. Ex. L.). In March 2003 Bagwell informed Cunningham that he would not be transferred. (Cunningham Aff. 27). Plaintiff alleges that defendant also retaliated against him by failing to process his back pay for three months. (Cunningham Aff. 26). Cunningham complained to Bagwell about the alleged retaliation. (Bagwell Dep. 125, Pl. Ex. L).

*EEOC Issues Notice of Right to Sue; Complaint Filed*

On April 23, 2003 the EEOC issued Cunningham [*23] a Notice of Right to Sue. According to Cunningham this was in reference to charge no 160-A2-00779 [the 2002 charge]. (Pl. Ex. Q). In contrast, defendant claims the Notice of Right to Sue was in reference to charge no. 160-2002-00779 [the 2003 charge]. (Dobrini Dec. P14).

On July 18, 2003, plaintiff filed his complaint in this action. On September 26, 2003, defendant timely filed its answer to the complaint.

*Final Work Assignment*

After his reinstatement Cunningham was assigned to a Maintenance Services Facility at the 27th and Third Avenue trailer yard in Brooklyn. (Cunningham Dep. 245). On November 20, 2003, Cunningham was reinstalling a stop sign with co-workers. Believing that they were unqualified to do the work, Cunningham "called a time out" (stopped work for a safety reason, pursuant to a program authorized by the company to assure that workers need not continue to work where they believe hazardous conditions exist, unless and until a safety professional has determined that no hazard exists). (Carey Aff Exhibit U, V). While waiting for safety personnel, Cunningham received permission from Supervisor Renny Linton to get lunch. While Cunningham was eating lunch in [*24] his truck Supervisor Marovic approached and told him that Gregory Rucco, an environment, health and safety representative, was on the telephone. Cunningham told Marovic that he was eating lunch. A few minutes later Marovic returned to the truck. According to Cunningham, Marovic opened the door to the truck and forced the telephone on to him in response to which Cunningham asked Marovic to stop harassing him and allow him to finish his lunch. (Pl. Ex. M). Defendant asserts that when Marovic approached his truck a second time to inquire if Cunningham was ready to speak to Rucco, Cunningham responded, "I am still on fucking lunch, don't fucking harass me, I'm not fucking talking to you, I cleared my lunch with my supervisor." (Id.) Cunningham claims that Marovic falsely accused him of directing profanity towards him as retaliation for Cunningham's complaint to the Ombudsman's office. (Cunningham Aff. P29).

On November 21, 2003, Cunningham refused to attend a meeting when instructed to do so by supervisor Linton. (Def. R. 56.1 P19). Cunningham does not dispute that he refused to do so, but explains that he refused because he was experiencing extreme emotional distress due to his supervisors' [*25] continued harassment. Plaintiff says he felt "ill and threatened" and requested permission to go home (Pl. Ex. M). On December 29, 2003, Cunningham refused to speak with Con Edison Human Resources Representative David Burke (Carey Aff. Ex. U). Cunningham states that this was because defendant refused to permit him to be represented by his attorney at this meeting.

On January 12, 2004, plaintiff submitted a resignation letter to Con Edison. Plaintiff maintains that his resignation was involuntary and was a constructive discharge caused by defendant's retaliatory conduct. (Cunningham Aff. P30).

On February 25, 2004, plaintiff filed an amended complaint. On March 30, 2004, defendant filed its answer to the amended complaint. On May 14, 2004, defendant served plaintiff with a set or interrogatories and documents requests, including a requested copy of "each charge of discrimination filed by plaintiff with the U.S. Equal Employment Opportunity Commission ("EEOC")." On June 1, 2004, plaintiff served his response to interrogatory including a copy of the 2002 charge of discrimination under docket number 160-A2-00079.

Ariel Antonmarchi:

Cunningham submits an affidavit from his co-worker, [*26] Ariel Antonmarchi, as evidence that Con Ed retaliated against employees who complained of discrimination, and specifically that Con Ed retaliated against Cunningham. Antonmarchi is a forty year old Puerto Rican male (Antonmarchi Aff. P1). He began working for Con Ed in July of 2000. He states that throughout the course of his employment he experienced discriminatory treatment on the basis of his race and national origin and that in October of 2000 he complained to Tabone that he was suffering race and national origin discrimination. (Id. at P5). Antonmarchi states that he continued to complain of discrimination to both Bagwell and Tabone. (Id. at P12).

In 2001 Antonmarchi met Cunningham when they worked together at the Van Nest location. (Id. at P6).

In July 2001, Antonmarchi states that a co-worker at the Van Nest location, Rosa Rodriguez, warned him to be careful because Con Ed was determined to get rid of him and Cunningham because they had complained of discrimination. (Id. at P10).

In August 2001 Antonmarchi reports that he was summoned to a meeting with Boland and Debastide, informed that he [Antonmarchi] and Cunningham were causing trouble by complaining about discrimination [*27] and warned that they would be removed from the department and given the least desirable assignments. (Id. at P11).

On October 18, 2002, Antonmarchi attended Cunningham's arbitration because he wished to testify on Cunningham's behalf. However, Antonmarchi asserts that he was not permitted to do so by defendant's representatives, including Delabastide. (Atonmarchi Aff. P17).

On July 27, 2002, one day prior to Cunningham's termination, Antonmarchi states that Bagwell called him to advise him that his investigation was complete he

would receive a promotion (Id. at P18). However, Antonmarchi claims that when he met Bagwell the next day to sign some papers in connection with his promotion, Bagwell informed him that he was signing papers stating that Cunningham was disgruntled. (Id. at P19). When Antonmarchi refused to sign the papers, he claimed that Bagwell told him that his investigation was not complete. Three days later Antonmarchi claims Bagwell informed him he would not get a promotion. (Id. at P20).

On August 28, 2002, O'Donnell and Boland told Antonmarchi he was being terminated. Antonmarchi claims they told him this was due to his refusal to assist in the investigation of a [*28] co-worker. (Id. at P21).

## DISCUSSION

Summary Judgment Standard

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate "when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000).* Although all facts and inferences therefrom are to be construed in the light most favorable to the party opposing the motion, *see Harlen Assocs. v. Vill. of Mineola, 273 F.3d 494, 498 (2d Cir. 2001),* the nonmoving party must raise more [*29] than just "metaphysical doubt as to the material facts," *Matsushita, 475 U.S. at 586.*

In the employment discrimination context, where a case often turns on the intent of the employer a "trial court must be cautious about granting summary judgment." *Gallo v. Prudential, 22 F.3d 1219, 1224 (2d Cir. 1994); Chambers v. TRM, 43 F.3d 29, 40 (2d Cir. 1994); Morris v. Amalgamated Lithographers, Local One, 994 F. Supp. 161, 168 (S.D.N.Y. 1998); Hernandez v. New York City Law Dep't, 1997 U.S. Dist. LEXIS 620, 1997 WL 27047 at *7 (S.D.N.Y. 1997).* "Because the employer rarely leaves direct evidence of its discriminatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the defendant's explanations for its actions." *Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 387 (S.D.N.Y. 1998); Gallo, 22 F.3d at 1224; Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990); Morris,*

*994 F.Supp. at 168; Hernandez, 1997 U.S. Dist. LEXIS 620, 1997 WL 27047 at *7.* However, mere conclusory allegations of discrimination by plaintiff will [*30] not prevail when defendant has provided convincing evidence to explain its conduct. *Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir.1997); Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir.1995); Burger v. Litton, 1996 U.S. Dist. LEXIS 5560, 1996 WL 421449, *7 (S.D.N.Y. 1996); Engelmann v. National Broad. Co., 1996 U.S. Dist. LEXIS 1865, 94 Civ. 5616, 1996 WL 76107 at *7 (S.D.N.Y. Feb. 22, 1996).* In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern, 131 F.3d at 312.*

Claims Abandoned by the Plaintiff

Plaintiff's complaint sets forth nine claims for relief. Claims 1-6 concern plaintiff's hostile work environment claims. Claims 7-9 concern his retaliation claims. Defendant's motion for summary judgment requests dismissal of all claims, but plaintiff's response addresses only claims 7-9. Further, plaintiff concedes that summary judgment is appropriate with respect to claims 1-6 when he states, [*31] "Plaintiff opposes Defendant's motion inasmuch as it seeks to dismiss the Seventh, Eight and Ninth Claims for Relief in the Complaint." (Pl. Mem. Law, pg. 2, note 2). "Where [a] claim was alleged in the complaint but 'not raised elsewhere in the record,' a court deems the claim 'abandoned' and grants defendants' summary judgment motion." *Douglas, 21 F.Supp. 2d at 393* (quoting *Singleton v. City of Newburgh, 1 F.Supp 2d 306, 312 (S.D.N.Y 1998); Anti-Monopoly, Inc., v. Hasbro, Inc., 958 F.Supp. 895, 907 & n. 11 (S.D.N.Y. 1997)* ("the failure to provide argument on a point at issue constitutes abandonment of the issue"), aff'd, *130 F.3d 1101 (2d Cir. 1997); National Communications Ass'n, Inc. v. American Tel. & Tel. Co., 1998 U.S. Dist. LEXIS 3198, 1998 WL 118174, *28 (S.D.N.Y. 1998).*

Are Plaintiff's Federal Claims Time Barred? [5]

5  Plaintiff's state law claims under NYHRL and NYCHRL are governed by a three year statute of limitations. *N.Y. Civ Prac. L. & R. 214(2); Van Zant v. KLM Royal Dutch Airlines, 80 F. 3d 708 (2d Cir. 1996), Koerner v. State, 62 N.Y.2d 442, 467 N.E.2d 232, 478 N.Y.S.2d 584 (1984).* Recovery is therefore precluded under these statutues only for events that occurred before July 18, 2000.

[*32]  A district court has jurisdiction over private Title VII claims only when the plaintiff first files a

charge with the EEOC. 42 U.S.C. § 2000e-5; *Findlay v. Reynolds Metals Co., Inc.,* 82 F.Supp. 2d 27, 32 (N.D.N.Y. 2000); *Butts v. City of New York Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397, 1401 (2d Cir. 1993) ("When a plaintiff fails to file a timely charge with the EEOC [in a Title VII case], the claim is time barred. . . . A district court only has jurisdiction to hear Title VII claims that . . . are included in an EEOC charge"). This statutory requirement is analogous to a statute of limitations. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 394, 102 S. Ct. 1127, 71 L. Ed. 2d 234, (1982).

A charge must be accepted by the EEOC within "one hundred and eighty days after the alleged unlawful employment practice occurred" or "in a case of an unlawful employment practice with respect to within the person aggrieved has initially instituted proceedings with a State or local agency . . . within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). As the [*33] parties agree that the three hundred day limit applies, it may be accepted as a stipulated fact. *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir. 1996).

The parties agree that the plaintiff filed an EEOC charge on February 10, 2003. Three hundred days prior to that date is April 15, 2002. However, plaintiff asserts that he filed an earlier charge of discrimination with the EEOC, pro se, in February 2002 and that the EEOC accepted the charge for investigation on February 26, 2002. Three hundred days prior to February 26, 2001 is May 1, 2001.

As evidence of a February 2002 charge, plaintiff submits (1) a letter dated February 12, 2002 from the EEOC, responding to plaintiff's request, and providing information on how to file a EEOC charge; (2) a certified mail receipt indicating that plaintiff mailed a letter to the EEOC on February 19, 2002; (3) a letter from plaintiff to the EEOC dated February 19, 2002 outlining plaintiff's grievances against his employer including allegations of age and race based discrimination and retaliation; and (4) the affidavit of John Douglass, supervisor of the charge receipt/technical information Unit for the EEOC's New York [*34] District Office stating that charge No. 160-2002-00779 was accepted for investigation on February 26, 2002, that on April 24, 2003 a notice of right to sue was issued on that charge, and that on July 23, 2004 the case file concerning that charge was destroyed.

However, defendant complains that plaintiff's response to an interrogatory requesting a copy of "each charge of discrimination filed by plaintiff with the U.S. Equal Employment Opportunity Commission ("EEOC")" included only the February 10, 2003 charge. At plaintiff's deposition, both he and his attorney confirmed that the

February 10, 2003 charge was the charge produced during discovery, without making any mention of an earlier charge. Defendant states, and plaintiff does not dispute, that no reference to an earlier charge was made until a subsequent conference before this Court. Further, plaintiff does not appear to have produced evidence of this charge until it submitted the evidence in connection with this motion.

Defendant argues that plaintiff's failure to properly disclose the February 26, 2002 charge and the affidavit of John Douglass confirming the charge, should now preclude its use. Under Federal Rule of Civil Procedure 26(e)(2) [*35] :

a party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Further, under Federal Rule of Civil Procedure 37(c)(1).

a party that without substantial justification fails to disclose information required . . . by Rule 26(e)(2) is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any . . . information not so disclosed.

Plaintiff should have amended his interrogatory response and given the defendant evidence of the earlier charge. However, "the imposition of sanctions under this rule is discretionary, and preclusion is ordered only rarely." *Potter v. Phillips,* 2004 U.S. Dist. LEXIS 27460, 2004 WL 3250122, *2 (E.D.N.Y. 2004) (internal citations omitted); *Semi-Tech Litigation LLC v. Bankers Trust Co.,* 219 F.R.D. 324, 325 (S.D.N.Y. 2004). There has been no [*36] suggestion that plaintiff's failure to produce the earlier charge was anything but a mistake. As there does not appear to have been any bad faith, this is not one of the rare cases where preclusion is appropriate. *Potter* 2004 WL 3250122 *1 (granting preclusion where defense counsel intentionally lied about having retained an expert and did not correct the lie for more than nine months). Furthermore, defendant has not been harmed by this oversight as is required for preclusion under Rule 37, because defendant investigated, considered, and addressed the issue of retaliation occurring before April 15, 2002, despite arguing that it was precluded. Plaintiff's

claims concerning events which occurred prior to February 26, 2002 are thus timely.

Defendant further argues that plaintiff's claims arising after the acceptance of his EEOC charge are barred because plaintiff has not exhausted his administrative procedures and remedies in regard to those claims. However, where subsequent claims are "reasonably related" to claims brought in an EEOC charge, the subsequent claims are not barred. A claim is "reasonably related" in three situations:

> 1) where "the conduct complained [*37] of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination;'" 2) where the complaint is "one alleging retaliation by an employer against an employee for filing an EEOC charge;" and 3) where the complaint "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Terry v. Ashcroft,* 336 F.3d 128, 151 (2d Cir. 2003) (quoting, *Butts v. City of New York Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1402-03 (2d Cir. 1993) (superceded on other grounds).

In this case, plaintiff alleges that events occurring after the EEOC charge, namely defendant's failure to process his back pay for three months, Marovic's fabricated allegations of Cunningham's profanity, and Cunningham's second suspension, were all retaliation by Con Edison against him for filing an EEOC charge and for complaining to the Ombudsman. These complaints thus fit squarely into the second "reasonably related" category and can be asserted against the defendant despite the fact that no separate EEOC charge was filed as to these claims.

Precluded Testimony

[*38] Defendant argues that the affidavit of Ariel Antonmarchi submitted by plaintiff must be excluded under Rule 37(c)(1). As discussed above, Rule 37(c)(1) states that:

> a party that without substantial justification fails to disclose information required . . . by Rule 26(a) or 26(e)(2) is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any . . . information not so disclosed.

On February 23, 2004, the plaintiff served the defendant with plaintiff's Rule 26(a) Automatic Disclosures, which identified fifteen persons with pertinent information to the case. The list did not contain Ariel Antonmarchi's name and was never amended to include Antonmarchi's name. It was not until the last day of plaintiff's deposition, ten months later, that plaintiff's counsel first mentioned that Antonmarchi might be used as a witness in the present action. Moreover, plaintiff never formally amended his disclosures to include Antonmarchi's name. Because plaintiff's deposition occurred at the very end of the discovery period, defendant did not have the opportunity to depose Antonmarchi or to prepare questions for Cunningham concerning Antonmarchi. [*39] "Although preclusion is ordered only rarely" under this rule, *Potter v. Phillips,* 2004 WL 3250122, *2 (E.D.N.Y. 2004), such preclusion is at the discretion of the trial court.

The disclosing party is excused if it offers a "substantial justification for its failure to disclose." Rule 37(c). The rule "places the burden on the non-disclosing party to demonstrate substantial justification." *Potter v. Phillips,* 2004 WL 3250122, *2 (E.D.N.Y. 2004). However, plaintiff has offered no explanation of his delay in providing Antonmarchi's name to the defendant. Plaintiff was clearly aware that Antonmarchi had relevant information, as the two worked together and Antonmarchi attended Cunningham's arbitration.

It is also the non-disclosing party's burden to show that its failure to disclose was harmless. *Potter v. Phillips,* 2004 WL 3250122 at *2. Plaintiff's failure to disclose Antonmarchi's name will harm the defendant if his affidavit is admitted. Antonmarchi's affidavit is the sole direct evidence suggesting that Con Ed was retaliating against Cunningham. However, the affidavit is vague, conclusory, and in parts, implausible. [6] The affidavit [*40] references "discrimination" without specifying whether such discrimination was race or age based discrimination or was discrimination based on plaintiff's having made safety complaints. [7] The affidavit references comments by other employees without specifying when, in what context, or by whom such comments were made. Furthermore, the affidavit discusses statements by third parties which constitute hearsay. [8]

> 6   It is not the role of a trial court to consider credibility on a motion for summary judgment. However, Antonmarchi's lack of credibility is relevant here because it suggests that had defendant been allowed the opportunity to question him defendant might well have succeeded in exposing Antonmarchi's statements as irrelevant or untrue.

7   Retaliation against an employee for making safety complaints is not actionable under Title VII or the parallel state statutes. See section below defining a "protected activity."

8   Only admissible evidence may be considered on summary judgment. *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir.)*; *Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d. 256, 271 (2d Cir. 1002)*. Hearsay is inadmissible evidence. Thus, even if parts of Antonmarchi's affidavit are admitted, the hearsay statements cannot be admitted.

[*41]   If defendant had been permitted to depose Antomarchi and/or to question Cunningham about his relationship to Antonmarchi, defendant might have been able to show that Antonmarchi was actually talking about retaliation on the basis of safety concerns, to elicit information about why Antonmarchi had been fired which would show a motive to retaliate against Con Ed, or to question the veracity of his statement that Deputy Ombudsmen Bagwell, whose job it is to hear internal complaints, offered Antonmarchi a promotion in return for his testimony against Cunningham, and then fired Antonmarchi when he refused.

Rule 26 "is intended to allow "opposing parties to have a reasonable opportunity [to] prepare for effective cross examination," and to question other witnesses in order to rebut a witness's testimony. *Lamarca v. U.S., 31 F.Supp. 2d 110, 122 (E.D.N.Y. 1998)* (quoting *Complaint of Kreta Shipping, S.A., 181 F.R.D. 273, 275 (S.D.N.Y. 1998)*. Where a party is denied the opportunity for such preparation, the testimony must be excluded. Moreover, it is of no significance that had defendant deposed Antonmarchi or asked Cunningham about Antonmarchi, defendant [*42] might not have shown Antonmarchi's statements to be untrue or irrelevant. A party's failure to disclose is harmful even where it prevents the other side from attempting to acquire evidence which *might* contradict the undisclosed testimony. *Giladi v. Strauch, 2001 U.S. Dist. LEXIS 4645, 2001 WL 388052.* (holding that plaintiff's failure to disclose expert witness's prior testimony was not harmless because it precluded defendant from attempting to acquire the prior testimony, which might contradict expert's current testimony). Thus, where as here, defendant has been denied the opportunity to cross-examine a witness or to prove his testimony inaccurate through alternative witnesses, the defendant is harmed and the affidavit must be excluded. [9]

9   By letter dated December 13, 2005 the plaintiff, against the advice of his lawyer, wrote to the

Court requesting that he be allowed to add an omitted statement from the affidavit of Ariel Antonmarchi and to submit new evidence. For those reasons explained further above, no new evidence may be submitted at this stage. Because the affidavit of Antonmarchi is not admissible at all, no additional statement added to it is admissible either.

[*43]   The Retaliation Claim [10]

10   Courts apply the same standard used in Title VII cases in analyzing NYHRL and NYCHRL retaliation claims. *Whidbee v. Garzarelli Food Specialties, 223 F.3d 62, 69 (2d Cir. 2000)*; *Cruz v. Coach Stores, Inc., 202 F.3d 560, 565, n.1 (2d Cir. 2000)*; *Gordon v. New York City Bd. of Education., 232 F.3d 111 (2d Cir. 2000)*;

In order to establish a *prima facie* case of retaliation a plaintiff must show that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; (3) the defendant was aware of the activity; and (4) there was a causal connection between the protected activity and the adverse employment action. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998)*; *Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426 (2d Cir. 1999)*; *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir.1996)*.

[*44]   Protected Activity:

A protected activity is an "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc. 202 F.3d 560, 566 (2d Cir. 2000)*. Such opposition may be voiced as an informal or formal complaint. *Lamberson v. Six West Retail Acquisition, Inc., 122 F.Supp.2d 502, 511 (S.D.N.Y 2000)*; *Iannone v. Frederic R. Harris, Inc., 941 F.Supp. 403, 410 (S.D.N.Y. 1996)*. Protected activities include "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000)* (quoting *Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir.1990)*). However, in order to constitute a "protected activity" the opposition must be directed against something that is an "unlawful employment practice." *Manoharan v. Columbia University College of Physicians and Surgeons, 842 F.2d 590, 594 (2d Cir. 1988)*. Because Title VII prohibits retaliation based only [*45] on complaints of "race, color, religion, sex or national origin" discrimination, *42 U.S.C. § 2000e-2(a)(1)*, plaintiff's allegations that he was

retaliated against because of his safety or environmental health complaints are not relevant here.

Construing the facts in the light most favorable to the non-moving party, plaintiff complained to Supervisor Boland about Collucci's age based comments. Plaintiff also complained to Bagwell and Tabone about his supervisors' age based remarks. Plaintiff then told Bagwell he was going to file an EEOC charge. He did in fact file it, and defendant was notified of the charge. Finally, plaintiff filed the complaint in this case. Each of the above actions constitute a "protected activity."

Defendant was Aware of Plaintiff's Protected Activity

Plaintiff does not have to show that the individual supervisors who subjected him to adverse employment action knew of his age and race discrimination complaints. [11] Rather, it is enough to show that Con Edison had a "general corporate knowledge." _Gordon v. New York City Board of Education, 232 F.3d 111, 116 (2d Cir. 2000)_ (holding that where the Board of Education [*46] knew of a teacher's protected activity it did not matter that there was a lack of evidence that the individual Board agents who took the adverse employment action knew of the protected activity); _Alston v. New York City Transit Auth., 14 F.Supp.2d 308, 311 (S.D.N.Y. 1998)_ ("In order to satisfy the second prong of her retaliation claim, plaintiff need not show that individual decision-makers within the NYCTA knew that she had filed . . . [an] EEOC complaint."); _Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996)_.

> 11   "Lack of knowledge on the part of particular individual agents is admissible as some evidence of lack of causal connection, countering [a] plaintiff's circumstantial evidence of proximity or disparate treatment" _Gordon, 232 F.3d at 117_.

After Cunningham filed the EEOC charge and Con Edison received notice, and certainly after Cunningham filed the complaint in this case, Con Edison can be said to have "general corporate knowledge" [*47] and any adverse employment actions thereafter can be seen as retaliation. Further, although defendant asserts that the Ombudsman and Auditing personnel did not believe that Cunningham's complaints concerned age, a jury might decide that Cunningham did complain to the Ombudsman and Auditing about age discrimination and that the Con Edison management's denials were untrue. As the facts here must be construed for the plaintiff, and a rational jury could decide to credit the plaintiff's allegations, plaintiff has met his burden on this prong.

Adverse Employment Action

An adverse employment action is a "material adverse change in the terms and conditions of employment." _Torres v. Pisano 116 F.3d 625 (2d Cir. 1997)_ (quoting _McKenney v. New York City Off-Track Betting Corp., 903 F.Supp. 619, 623 (S.D.N.Y. 1995))_. To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities, but "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished [*48] internal responsibilities, or other indices . . . unique to a particular situation." _Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)_. "In the usual case, the alleged retaliatory action [will have clearly] affected the terms, privileges, duration or conditions of the plaintiff's employment" _Rooney v. Witco Corp., 722 F. Supp. 1040, 1046 (S.D.N.Y 1989)_.

In this case plaintiff alleges the following adverse employment actions: (1) plaintiff's June 2002 termination; [12] (2) plaintiff's unpaid suspension in January 2002; (3) plaintiff's unpaid suspension in November 2003; (4) defendant's delay in processing plaintiff's back pay; (5) defendant's delay of plaintiff's tuition reimbursement; (6) defendant's docking plaintiff one half-hour; (7) Supervisor Marovic's false allegations of profanity against Cunningham; (8) defendant's denial of plaintiff's application to transfer to Substations Systems and Transmission Operations; (9) defendant's failure of plaintiff on the precision instruments practical test, (10) defendant's suspension of plaintiff's e-mail address; and (11) constructive discharge.

> 12   Defendant does not challenge the fact that the termination and suspensions qualify as adverse employment actions.

[*49]   Termination is clearly an adverse employment action. _Quinn v. Green Tree Credit Corporation, 159 F.3d 759, 769 (2d Cir. 1998); Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004); Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000); Woodman v. WWOR-TV, Inc., 411 F.3d 69 (2d Cir. 2005)_.

Suspension without pay is also an adverse employment action. _LoveJoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001)_. Thus, plaintiff's two suspensions are adverse employment actions. This is true even where the employee is eventually reimbursed for his lost wages, because the employee suffers the "loss of use" of his wages until they are reimbursed. _Id. at 223_. Even unaccompanied by a suspension, "the lost use of wages for a period of time is, by itself, an economic injury that can qualify as a tangible employment action." _Min Jin v. Metropolitan Life Ins. Co., 310 F.3d 84, 100_

(2d Cir. 2002). Thus, Con Edison's deliberate failure to process Cunningham's back pay for three months is also an adverse employment action because plaintiff [*50] lost the use of his wages for those months. Since tuition reimbursement, like wages, is money owed to the employee by the employer, a deliberate delay in tuition reimbursement is also an adverse employment action. *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) ("failure to process teacher's insurance forms" was an adverse employment action). Finally, docking of an employee's pay is an adverse employment action. *Mills v. George R. Funaro & Co.,* 2001 U.S. Dist. LEXIS 396, 2001 WL 50893 (S.D.N.Y. 2001).

An employer's failure to promote an employee, or the demotion of an employee is an adverse employment action. *Mormol v. Costco Wholesale Corp.,* 364 F.3d 54, 57 (2d Cir. 2004), *Burlington Indus. v. Ellerth,* 524 U.S. 742, 761, 118 S. Ct. 2257 141 L. Ed. 2d 633) Defendant's deliberately failing plaintiff on an exam which would have granted him a promotion is thus an adverse employment action. [13] Similarly, Supervisor Marovic's false allegations against Cunningham may be considered an adverse employment action in its own right since it caused the adverse employment action of his suspension. Alternatively, since "express accusations of lying" have been held to [*51] be an adverse employment action, express accusations of profanity should be an adverse employment action as well. *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir. 1999).

> [13] Plaintiff does not have strong evidence that he was deliberately failed. However, construing the evidence in his favor and taking heed of the *Gallo* court's warning that district courts must be careful in granting summary judgment where, as here, the issue is one of intent, this Court finds that a reasonable jury could find that where 6 of 142 employees failed an exam and 2/6 were those who had made complaints of discrimination, the failure of those 2 was retaliation for their complaints. 22 F.3d 1219.

Defendant's failure to transfer plaintiff to Substations and System and Transmission Operations is not an adverse employment action. Plaintiff's request for the new position appears to stem not from the job attributes of the new position, but rather, from a desire for a fresh start. The denial of a request for a [*52] lateral transfer is not an adverse employment action. *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123 (2d Cir. 2004). This is true even where employee has a personal preference for the transfer, as here, where the plaintiff wished for a "new start." *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 532-33 n. 6 (10th Cir. 1998).

Defendant's suspension of plaintiff's e-mail address also does not rise to the level of an adverse employment action. An adverse employment action must be more than a "mere inconvenience." *Galabya,* 202 F.3d at 640. Thus, for example, the loss of a phone, standing alone, is not an adverse employment action. *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462 (2d Cir. 1997). Since in the modern office environment e-mail serves essentially the same function as a phone, the loss of e-mail is also not an adverse employment action.

Finally, plaintiff alleges that his constructive discharge was an adverse employment action. "In order to establish a constructive discharge, an employment discrimination plaintiff must demonstrate that his employer acted deliberately to 'make [his] working conditions so intolerable [*53] that [he] is forced into an involuntary resignation.'" *Linden v. Sherman,* 79 Fed. Appx. 458, 2003 WL 22441998, *1 (2d Cir. 2003) (quoting *Lopez v. S.B. Thomas,* 831 F.2d 1184, 1188 (2d Cir. 1987)). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pa. State Police v. Suders,* 542 U.S. 129, 137, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).

The relevant working conditions in this case include the following: plaintiff was twice suspended, terminated but reinstated, experienced delays in the processing of his back pay and tuition reimbursement, was intentionally failed on a precision instruments practical test and had his e-mail suspended. These working conditions do not rise to the level of constructive discharge. *Spence v. Maryland Cas. Co.,* 995 F.2d 1147 (2d Cir. 1993) (holding that criticism for poor performance, denial of salary increase, being placed on probation, rough treatment by supervisor, and comments that supervisor wished plaintiff to become ill not sufficient); *Katz v. Beth Israel Medical Center,* 2001 U.S. Dist. LEXIS 29, 2001 WL 11064, *14 (S.D.N.Y., 2001) [*54] (An employee is not constructively discharged because she does not like her assignments, receives unfair criticism, or is yelled at by supervisors); *Stetson v. NYNEX Service Co.,* 995 F.2d 355, 360 (2d Cir.1993) (evidence of employee's dissatisfaction with work assignments, or disagreement with criticism of work quality, insufficient to establish constructive discharge); *Muller v. United States Steel Corp.,* 509 F.2d 923, 929 (10th Cir.), cert. denied, 423 U.S. 825, 96 S. Ct. 39, 46 L. Ed. 2d 41 (1975) (unfavorable job assignment and discriminatory failure to promote does not constitute constructive discharge).

Causal Connection

The final element plaintiff must prove in a retaliation claim is a causal connection between the protected activity and the adverse employment action taken by the

employer. Where, as here, direct causal evidence to connect the protected activity and the adverse employment action is not available, the causal connection "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) [*55] (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996); *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir. 1986). However, "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509, (2001). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554-555 & n. 5 (2d Cir. 2001) (collecting cases). Despite this, a passage of two months between the protected activity and the adverse employment action seems to be the dividing line. *Hussein v. Hotel Employees & Restaurant Union, Local 6,* 108 F.Supp.2d 360, 367 (S.D.N.Y. 2000) ("the passage of more than two months [*56] defeats any retaliatory nexus"); *Ponticelli v. Zurich American Ins. Group*, 16 F.Supp.2d 414, 436 (S.D.N.Y., 1998) (two-and-a-half months is "hardly the close proximity of time contemplated . . .for allowing a plaintiff to establish the "causal connection" element of retaliation claim"); *Ashok v. Barnhart*, 289 F.Supp.2d 305, 315 (E.D.N.Y 2003) ("a period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally proximate and causally related"); *Lamberson v. Six West Retail Acquisition, Inc.*, 122 F.Supp.2d 502, 512 (S.D.N.Y. 2000) (employee fired 2 months after making complaints was a sufficiently close temporal proximity to infer a causal connection); *Quinn*, 159 F.3d at 769 (discharge following less than two months after filing a complaint was sufficient evidence of a causal connection to preclude summary judgment).

Thus, plaintiff engaged in five protected activities and experienced eight adverse employment actions.[14] Three of these adverse employment actions follow sufficiently closely behind plaintiff's protected activity that an inference [*57] of causation is appropriate.

14

| Date | Protected Activity | Adverse Action |
|---|---|---|
| March 2000 | Cunningham complains to Boland about Collucci's remarks. | |
| May 2001 | Cunningham makes initial complaint to Bagwell and Tabone (Cunningham alleges that he continued to complain for several months and continued to inquire as to when Bagwell's inquiry into his complaints would finish). | |
| May 2001 | | Cunningham's tuition reimbursement is delayed |
| June 2001 | | Cunningham's pay is docked |
| January 2002 | | Cunningham is suspended for 17.5 days |
| February 2002 | Cunningham tells Bagwell he | |

2006 U.S. Dist. LEXIS 22482, *

| Date | Protected Activity | Adverse Action |
|---|---|---|
| | intends to file with the EEOC (and does so). | |
| May 13, 2002 | | Cunningham takes employment exam, which he fails. |
| June 28, 2002 | | Cunningham is fired. |
| March 3, 2003 | | Defendant is reinstated, but his back pay is delayed three months. |
| July 18, 2003 | Cunningham files complaint in this case | |
| November 20, 2003 | | Marovic fraudulently claims that Cunningham cursed at him |
| November 21, 2003 | | Cunningham suspended |

[*58] Beginning on May 9, 2001, Cunningham complained to Bagwell and Tabone that he was experiencing age discrimination. Later in May, and thus less than a month later, Cunningham's tuition reimbursement was delayed. Because of the close temporal proximity, an inference that the delay was a response to his complaints is appropriate. Cunningham claims that he continued to complain to Bagwell and Tabone over the next few months. Cunningham specifically states that on June 4, 2001 he raised harassment issues in a meeting with Tabone. Thus, the docking of his pay later in June also followed a protected activity by less than a month and again the inference that the delay was a response to his complaints is appropriate.

In January 2002, Bagwell issued his report concerning Cunningham's complaints. Cunningham claims that he continued to complain to Bagwell and Tabone in the months after his initial May 2001 complaint. Cunningham further states that he repeatedly inquired about the status of Bagwell's report. A jury could thus reasonably infer that Cunningham's protected activity of complaining to Bagwell and Tabone continued until Bagwell's report was issued on January 16, 2002. If so, then Cunningham's [*59] January 29, 2002 suspension followed as close as thirteen days after his protected activity, but in any case, certainly within two months. Thus, an inference that the 2002 suspension was caused by Cunningham's protected activity is appropriate.

In contrast, the most recent protected activity preceding Cunningham's May 13, 2002 test failure, June 28, 2002 termination and March 3, 2003 back pay delay is his statement to Bagwell in February 2002 that he intended to file an EEOC complaint and the filing of that complaint. This lag of three, four, and fourteen months is too long for a causal inference to be appropriate. Similarly, the closest protected activity preceding Marovic's November 20, 2003 allegedly fraudulent allegations and Cunningham's November 21, 2003 suspension is Cunningham's filing of the complaint on July 18, 2003. This seven month lag is also too long for a causal inference.

Burden Shifting and Pretext

Where the plaintiff has established a *prima facie* case of retaliation, the burden shifts to the defendant to rebut that presumption by articulating a legitimate, non-discriminatory reason for its actions. *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426 (2d Cir. 1999); [*60] *Van Zant,* 80 F.3d at 713. "The defendant need not persuade the court that it was actually motivated by the proffered reasons. (internal citations omitted). It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

Defendant in this case presents the following legitimate, non-discriminatory reason for its actions: that Cunningham's work performance was unsatisfactory, that he left work early without permission, that he had a hostile and abusive manner of interacting with his co-workers and supervisors, that he threatened and fought with co-worker Otero, that he directed profanity to Supervisor Marovic, refused to speak with a environment, health and safety representative, and despite an order from supervisor Linton, refused to speak with Human Resources Representative Burke.

Once defendant has met this burden, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that employer's explanation is merely a pretext for impermissible retaliation." *Cifra,* 252 F.3d at 216; [*61] *Richardson v. New York State Department of Correctional Service,* 180 F.3d 426, 443 (2d Cir.1999); *Gallagher v. Delaney,* 139 F.3d 338, 349. "Although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production (internal citations omitted), the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *Burdine, at 255, n. 10.* Furthermore, plaintiff "is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203.

After plaintiff has made his prima facie case and defendant has offered a non-discriminatory reason, what usually remains is a question of fact to be resolved by a fact-finder at trial. *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 135 (2d Cir. 2000).* [*62] *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir. 1995); *Chambers, 43 F.3d at 38.* "Summary judgment is appropriate at this point only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Id.*

Plaintiff has offered no reason to suggest that Con Ed's proffered reasons are a pretext. Plaintiff argues that he had a good record before he complained of discrimination, but that after his first complaint to Boland the retaliation began. However, after Cunningham's first complaint to Boland he received several positive evaluations from supervisor Lew, and in fact, was promoted by supervisor Lew.

Plaintiff himself admits that he returned to the yard late and failed to check out on June 12, 2001, the day he was docked. He admits that he threatened his co-worker Otero, and said he would "fuck him up." He admits that he was twice suspended. He admits that he sent an e-mail to Watson suggesting that he refrain from making foolish statements, an e-mail to Supervisor Silva stating, "I'll wait for your fabrication" and an e-mail to Kieran calling him a lackey. Cunningham does not dispute that after shutting [*63] down a project for safety concerns he refused to speak to Environment, Health and Safety employee Greg Rucco and refused to speak with Supervisor Dave Mavrovic. Cunningham also admits that he refused to attend a meeting when told to do so by Supervisor Ronnie Linton and refused to speak with Con Ed Human resources Representative David Burke. Moreover, Cunningham has not presented any evidence to refute the defendant's statements that he was hostile and abusive to his co-workers and supervisors and that he made himself unpopular by repeated references to his superiority and education level. Accordingly, plaintiff has not come forward with evidence sufficient to persuade a reasonable juror that defendant's non-discriminatory reasons for its actions were a pretext.

CONCLUSION

For the reasons set forth above defendant's motion for summary judgment is granted.

The clerk is directed to transmit a copy of the within to the parties and the Magistrate.

Dated: Brooklyn, New York

March 28, 2006

By: /s/ Charles P. Sifton (electronically signed)

United States District Judge

LEXSEE



Positive
As of: Dec 26, 2007

**RON BENVENISTI, Plaintiff, - against - THE CITY OF NEW YORK and ELIZABETH GLAZER, individually and in her Official capacity, Defendants.**

**04 Civ. 3166 (JGK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2006 U.S. Dist. LEXIS 73373**

**September 23, 2006, Decided**

**SUBSEQUENT HISTORY:** Motion denied by Benvenisti v. City of New York, 2007 U.S. Dist. LEXIS 46251 (S.D.N.Y., June 22, 2007)

**PRIOR HISTORY:** Benvenisti v. City of New York, 2006 U.S. Dist. LEXIS 396 (S.D.N.Y., Jan. 5, 2006)

**CORE TERMS:** public concern, supervisor, official duties, retaliation, summary judgment, undisputed, discharged, external, public employee's, conflict of interest, manager, emergency, causation, terminate, morale, salary, deputy, staff, protected speech, deposition testimony, prima facie case, speaking, hiring, hired, personnel, morning, Whistleblower Law, chain of command, supervising, progressive

**COUNSEL:** [*1] For Ron Benvenisti, Plaintiff: Rick Ostrove, Leeds Morelli & Brown, P.C., Carle Place, NY.

For The City of New York, The New York City Department of Investigation, Defendants: Terri Feinstein Sasanow, New York City Law Depart. Office of the Corporation Counsel, New York, NY.

For Elizabeth Glazer, individually and in her official capacity, Defendant: Terri Feinstein Sasanow, New York City Law Depart. Office of the Corporation Counsel, New York, NY; John D. Giansello, Orrick, Herrington & Sutcliffe LLP, New York, NY.

**JUDGES:** John G. Koeltl, United States District Judge.

**OPINION BY:** John G. Koeltl

**OPINION**

*OPINION AND ORDER*

**JOHN G. KOELTL, District Judge:**

This dispute arises from a public employee's claim that his employer terminated him in retaliation for his protected speech. The plaintiff, Ron Benvenisti, was employed as a computer operations manager by the City of New York (the "City") in its Department of Investigations ("DOI") from July 2001 until December 18, 2002, when he was terminated. Benvenisti commenced this action in March 2004 against the City and Elizabeth Glazer, the DOI Chief of Staff, contending that his alleged retaliatory discharge violated the First [*2] and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the New York City Whistleblower Law, Administrative Code of the City of New York § 12-113 ("Whistleblower Law"). [1]

> 1   The plaintiff originally brought these claims against DOI also. However, the plaintiff orally withdrew his claims against DOI at a pre-motion conference held on September 15, 2005. (*See* Defendants' Letter, dated Sept. 14, 2006.)

The defendants move for summary judgment, arguing that the plaintiff cannot satisfy the requisite elements of a First Amendment retaliation claim under Section 1983, cannot establish liability for the City and Glazer in her official capacity, and has no claim under the New York City Whistleblower Law because there is no pri-

vate right of action under that statute. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

For the reasons set forth below, the defendants' motion for summary [*3] judgment is **granted**.

## I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. [*4] Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)); Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for [*5] trial." Fed. R. Civ. P. 56(e). The non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996

F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998).

## II.

The following facts are undisputed unless otherwise noted. The plaintiff, Ron Benvenisti, was employed as a computer operations manager in the Citywide Informational Security Architecture Formulation Enforcement ("CISAFE") unit of DOI from July 2001 until December 18, 2002, when he was discharged. (Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' Stmt.") PP 1-2; Plaintiff's Counter-Statement Pursuant to Local Rule 56.1 ("Pl.'s Stmt.") PP 1-2; Compl. P 9.) Although many of the facts preceding the plaintiff's discharge are undisputed, the parties fundamentally disagree about the ultimate reason for the plaintiff's discharge.

## A.

The plaintiff alleges that he was discharged because he complained about and eventually threatened [*6] to report formally a conflict of interest involving DOI's employment of Eli Khedouri, a nephew of DOI Chief of Staff Elizabeth Glazer. (See Compl. P 26; Pl.'s Stmt. PP 4, 14, 26, 37, 38-39, 41-42, 45.)

As a computer operations manager, the plaintiff was responsible for managing the City's information security. (See Defs.' Stmt. P 3; Pl.'s Stmt. P 3; Ex. D to Aff. of Ron Benvenisti, May 5, 2006 ("Ben. Aff.").) His duties included managing engineers, analysts, consultants, and technical staff. (Id.) The plaintiff's performance evaluation, which the plaintiff signed on November 18, 2002, also evaluated the plaintiff on his "[p]resenting, explaining, and marketing the work unit's activities to higher level supervisors in the agency and/or persons and groups outside the agency." (Ex. D to Ben. Aff.)

One of the individuals that the plaintiff was responsible for supervising was Khedouri. (Defs.' Stmt. P 4; Pl.'s Stmt. P 4.) Khedouri was the nephew of the defendant Elizabeth Glazer. (Defs.' Stmt. P 4; Pl.'s Stmt. P 4; Decl. of Elizabeth Glazer, Oct. 28, 2005 ("Glazer Decl."), at 14.)

DOI first offered Khedouri a position as a volunteer intern in the CISAFE unit during the [*7] summer of 2002. (See Defs.' Stmt. P 5; Pl.'s Stmt. P 5.) Several weeks into the internship, DOI began considering Khedouri for a paid, full-time position. At the time, Benvenisti supported Khedouri for the position. [2] (See Defs.' Stmt. P 5; Pl.'s Stmt. P 5; Ex. C to Depo. of Ron Benvenisti, May 25, 2005 ("Ben. Depo. I"), attached as Ex. C to Decl. of Terri Feinstein Sasanow, Oct. 28, 2005 ("Sasanow Decl.").)

2  For example, in an email regarding Khedouri's possible employment, the plaintiff stated that as an intern Khedouri had "demonstrated a level of knowledge, skill and hands on expertise that is industry top-tier excellent." (Ex. C. to Ben. Depo. I.) In responding to the current motion, the plaintiff qualified this recommendation by stating that it was made in part because he was desperate for additional employment. (Pl.'s Stmt. P 5.)

Before hiring Khedouri as a paid employee, DOI sought and received an official opinion from the City's Conflict of Interest Board ("COIB") to determine whether hiring [*8] Khedouri would violate any of the City's conflict rules because Khedouri was Glazer's nephew. (Defs.' Stmt. P 6; Pl.'s Stmt. P 6.) Based in part on the representation that Glazer would recuse herself from the day-to-day operations of CISAFE, the COIB advised DOI that hiring Khedouri would not violate any of the City's conflict rules. (Ex. T to Glazer Decl. at 2.) DOI then hired Khedouri as a paid, full-time employee in the CISAFE unit in August 2002. [3] (See Glazer Decl. at 14; Ex. C to Ben. Aff.)

3  The plaintiff did not learn of Khedouri's relationship with Glazer until right around the time he was hired. (Ben. Depo. I at 64.)

According to the plaintiff, Khedouri's employment created a number of problems within CISAFE. (See Pl.'s Stmt. P 4.) Khedouri worked less than other employees. (Ben. Depo. I at 15-16.) He often did not have his identification or his DOI-issued cell phone. (Id. at 16; Pl.'s Stmt. P 4.) The plaintiff regularly could not locate Khedouri or determine the work he was doing. ( [*9] Id.) When the plaintiff inquired about Khedouri's whereabouts, his staff would tell him that Khedouri was dining with Glazer or DOI Commissioner Rose Gill Hearn or working on special assignments for Glazer. (Ben. Depo. I at 16.)

In addition, the plaintiff alleges that the appearance that Khedouri received specialized treatement lowered office morale. (Id. at 17; Pl.'s Stmt. P 26.) Khedouri received a larger salary than more senior employees. [4] (See Ben. Depo. I at 16, 35; Depo. of David VanderNaalt, June 28, 2005 ("Vander. Depo."), at 80-81, attached as Ex. G to Sasanow Decl.) DOI allegedly hired Khedouri quickly despite the lack of documentation that had delayed past applications. (Ben. Depo. I at 20-21.) The plaintiff also testified that the Commissioner once personally inspected Khedouri's office to ensure that he was comfortable. (Id. at 79.)

4  Khedouri received an annual salary of $ 105,000 with benefits. (Vander. Depo. at 82.) However, prior to hiring Khedouri, the plaintiff

himself had recommended that Khedouri receive a total salary package worth around $ 125,000 (with the benefits included in that value). (Ex. C. to Ben. Depo. I.)

[*10]  In October 2002, the plaintiff began complaining (and referring his staff's complaints) about Khedouri to his supervisor, David VanderNaalt. (See id. at 7-8, 11; Pl.'s Stmt. P 17.) These complaints concerned the alleged negative impact of Khedouri's performance on CISAFE's productivity, efficiency, and functionality. (See Ben. Depo. I at 18, 34-35; Pl.'s Stmt. P 26.) The plaintiff complained that Khedouri's salary and actions lowered office morale. (See Ben. Depo. I at 17-18; Pl.'s Stmt. P 26.) The plaintiff also alleges that he complained that Khedouri's salary was exorbitant and prevented DOI from hiring additional employees. (See Pl.'s Stmt. P 26.)

The plaintiff claims that he lodged these complaints on at least a weekly basis in formal status meetings with his supervisor, David VanderNaalt and on an ad hoc basis at other times. (Ben. Depo. I at 21; see also Pl.'s Stmt. P 17.) The plaintiff alleges that he voiced similar complaints to other supervisors, Vincent Green and Robert Joyce. [5] (Id. at 28-30.)

5  According to the defendants, the precise organizational chart was as follows: the plaintiff was a CISAFE Manager. Above him was David VanderNaalt, the Deputy Director of CISAFE. Above VanderNaalt was Robert Joyce, DOI Inspector General and Assistant Commissioner. Above Joyce was Vincent Green, DOI Assistant Commissioner. Above Green was Dan Brownell, DOI Deputy Commissioner. Above Brownell was Elizabeth Glazer, DOI Chief of Staff. Brownell reported to Glazer on all issues other than those involving CISAFE. Finally, above Glazer was Rose Gill Hearn, DOI Commissioner. The defendants explained this organizational chart at oral argument on September 12, 2006. The plaintiff did not disagree except to note that the plaintiff disputes that Glazer removed herself from all issues involving CISAFE.

[*11]  On the afternoon of December 17, 2002, after several months of inaction, the plaintiff told VanderNaalt that he planned to take his complaints to the New York City Council, the Conflict of Interest Board, or the Public Advocates Office. (Ben. Depo. I at 25-26; Pl.'s Stmt. P 42.) This was the first time that the plaintiff told VanderNaalt that he was intent on making a formal written complaint about Khedouri. (Ben. Depo. I at 37; Pl.'s Stmt. P 42.) [6] According to the plaintiff, VanderNaalt advised him to wait until the following day. (Ben. Depo. I at 26; Pl.'s Stmt. P 42.) The following morning, the plaintiff was discharged. (Id.)

6    These allegations are based on the plaintiff's own assertions, which the defendants accepted for purposes of this motion. VanderNaalt denied that the plaintiff ever told him that the plaintiff intended to complain to the COIB. (Vander. Depo. at 187-88.)

**B.**

The defendants dispute the plaintiff's claim that he was terminated because of his alleged complaints. The defendants [*12] first present a different set of events, which they allege actually led to the plaintiff's discharge. Second, the defendants allege that the relevant decision makers knew nothing of the plaintiff's complaints when they ordered his discharge.

The defendants deny that the plaintiff was discharged because of his complaints about Khedouri. According to the defendants, the plaintiff's discharge concluded a series of progressive disciplinary measures dating back to July 2002, which were unrelated to the plaintiff's alleged complaints.

In November 2001, the plaintiff purchased a 2000 Ford Crown Victoria, Model P71 "Police Interceptor" and installed additional emergency equipment in the vehicle. (Defs.' Stmt. PP 11-12; Pl.'s Stmt. PP 11-12.) He used the lights and sirens he installed in the car to pass other motorists on his way to work, travel quickly to a "computer emergency," and pull over motorists who he believed to be driving erratically. (Defs.' Stmt. P 14; Pl.'s Stmt. P 14.)

The plaintiff was not a police officer, peace officer, or emergency medical technician. (Defs.' Stmt. P 8; Pl.'s Stmt. P 8.) The plaintiff also owned several handguns, which he was licensed to carry, and a pair [*13] of handcuffs, which he may have carried on his person while working at DOI. (Defs.' Stmt. P 9; Pl.'s Stmt. P 9.)

On July 11, 2002, two Assistant Commissioners of DOI met with the plaintiff to discuss his vehicle and his manner of dress, which the defendants contend suggested that the plaintiff was conveying the impression that he was acting as a law enforcement officer. (*See* Defs.' Stmt. PP 10, 15-16; Pl.'s Stmt. PP 10, 15-16; Ben. Depo. I at 158.) The plaintiff disputes that he was told to remove the emergency equipment from his vehicle. (Pl.'s Stmt. P 16.) The plaintiff claims that he was told that he could keep his emergency lights, as long as he moved them from his dashboard to the floor of his car. (*Id.*) The plaintiff does not however dispute that he was told to tone down his appearance at the meeting. (*Id.*) After the meeting, the plaintiff showed one of the Assistant Commissioners that he had met with, Vincent Green, that the

police package on his vehicle had been disconnected and was inoperable. (Defs.' Stmt. P 18; Pl.'s Stmt. P 18.)

The defendants allege that on October 1, 2002, the plaintiff flashed his emergency lights at a DOI employee. (Defs.' Stmt. P 20.) [*14] The plaintiff does not recall this incident. (Pl.'s Stmt. P 20.) However, it is undisputed that on October 4, 2002, the plaintiff had another meeting with supervisors where he was given a written warning directing him to remove the emergency equipment from his vehicle. (Defs.' Stmt. P 21; Pl.'s Stmt. P 21.) The warning contained in the memorandum advised the plaintiff that failure to comply with the directive could result in sanctions, including disciplinary action or loss of employment. (Defs.' Stmt. P 22; Pl.'s Stmt. P 22.)

On October 8, 2002, DOI General Counsel Marjorie Landa and Inspector General Robert Joyce interviewed the plaintiff. (Defs.' Stmt. P 23; Pl.'s Stmt. P 23.) At the interview, the plaintiff admitted to using the lights and sirens in his car to pull over drivers. (Defs.' Stmt. P 24; Pl.'s Stmt. P 24.) The plaintiff also admitted to one altercation with a New York Police Department ("NYPD") Traffic Officer over the plaintiff's impermissible use of his parking permit. (*Id.*)

From October to November 2002, there were continuing discussions at executive staff meetings about whether the plaintiff should be terminated because he had exhibited poor judgment in seeking [*15] to convey that he was a member of law enforcement despite the fact that he was a civilian computer technician. (Defs.' Stmt. P 27; Pl.'s Stmt. P 27.) Ultimately, on November 15, 2002, Commissioner Hearn opted to reprimand the plaintiff formally and dock him three days' annual leave. (Defs.' Stmt. P 28; Pl.'s Stmt. P 28; Ex. M. to Glazer Decl.) After that, the plaintiff received a performance evaluation, which the plaintiff signed on November 18, 2002, that stated that "[d]uring the past year, Ron had some performance issues that he adequately addressed and resolved." (Defs.' Stmt. P 29; Pl.'s Stmt. P 29; Ex. D to Ben. Aff.) The plaintiff was given a rating of three on a scale of one to five, which corresponds to "fully meets requirements." (Ex. D to Ben. Aff.)

Then in early December, the plaintiff was involved in another incident when he tried to turn in a defaced handgun to the police on behalf of a member of his synagogue. (Defs.' Stmt. PP 31, 33; Pl.'s Stmt. PP 31, 33.) Some of the events surrounding this incident are in dispute. However, it is undisputed that Robert Joyce, one of the plaintiff's supervisors, was eventually contacted during the incident. (Defs.' Stmt. P 36; Pl. [*16] 's Stmt. P 36.) Joyce produced a memorandum about the incident, where he noted that the police sergeant who contacted him told him that "Benvenisti refused to give answers and had a bad attitude." (Ex. Q to Glazer Decl.)

After that incident, Hearn and Glazer instructed the law department to review whether there was a sufficient basis to terminate the plaintiff for cause, and if so, to confirm the necessary follow up steps to doing so. (Defs.' Stmt. P 38; Pl.'s Stmt. P 38.) The plaintiff hired a lawyer after the handgun incident. (Defs.' Stmt. P 37; Pl.'s Stmt. P 37.) The plaintiff expressed fears that he might be fired, and the lawyer informed the plaintiff that his fears were well founded. [7] (*Id.*)

7  The plaintiff does not dispute this last fact, but objects to its use on the grounds that it is protected by the attorney-client privilege. (See Pl.'s Stmt. P 37.) However, the plaintiff revealed that he hired a lawyer because he "knew that something was going to happen at work as a result of this," and that his lawyer suggested that he might lose his job, before any objection. (*See* Depo. of Ron Benvenisti, June 6, 2005 ("Ben. Depo. II"), attached as Ex. C (Part II) to Decl. of Terri Feinstein Sasanow, Oct. 28, 2005 ("Sasanow Decl."), at 217-18, 220, 236-37.) This information is therefore not protected by any privilege. *See, e.g., United States v. International Brotherhood of Teamsters, 961 F. Supp. 665, 673 (S.D.N.Y. 1997), aff'd on other grounds, 119 F.3d 210 (2d Cir. 1997); In re Penn Central Commercial Paper Litig., 61 F.R.D. 453, 463 (S.D.N.Y. 1973)* ("It is hornbook law that the voluntary disclosure or consent to the disclosure of a communication, otherwise subject to a claim of privilege, effectively waives the privilege.").

[*17]  On December 13, 2002, several of the plaintiff's supervisors received a complaint that the plaintiff had harassed several employees at another City agency and threatened to arrest one of them. (Defs.' Stmt. P 39.) The plaintiff denies that he harassed or threatened anybody, but he does not provide any evidence to rebut the defendants' claim that DOI received these complaints. (Pl.'s Stmt. P 39.) On Monday, December 16, 2002, a supervisor received another complaint that the plaintiff had threatened to arrest a member of the public. (Defs.' Stmt. P 40.) Again, the plaintiff denies making the threat but offers no evidence that the supervisor did not receive the complaint. (Pl.'s Stmt. P 40.)

Based on all of these events, the defendants allege that at a personnel meeting, held the following morning, on Tuesday, December 17, 2002, DOI Commissioner Hearn declared that the timetable to terminate the plaintiff's employment had been accelerated and that he was to be discharged the following day. (Defs.' Stmt. PP 43-44; Hearn Decl. at 2-3.) Glazer carried out the order, and the plaintiff was discharged the following day, on December 18, 2002. (Defs.' Stmt. P 46; Pl.'s Stmt. P 46.)

The defendants [*18]  maintain that DOI decided to discharge the plaintiff based on his alleged misconduct. The defendants also maintain that neither Commissioner Hearn, the person who ordered the plaintiff's discharge, nor Glazer, the person who carried it out, had any knowledge of the plaintiff's alleged complaints about Khedouri.

The defendants first point out that based on the timeline of events, the plaintiff's ultimate threat to file a formal complaint with the Conflict of Interest Board or the other external City agencies was not made until *after* the decision to discharge the plaintiff had already been made.

As noted above, Commissioner Hearn made the decision to discharge the plaintiff and issued the order to that effect at a personnel meeting on the morning of Tuesday, December 17, 2002. (Defs.' Stmt. PP 43-44; Pl.'s Stmt. PP 43-44.) The plaintiff, however, alleges that he threatened to file the formal complaint to the external agencies on the afternoon of December 17, 2002. (Defs.' Stmt. P 42; Ben. Depo. I at 25, 27, 37.) Although the plaintiff states that this fact "misrepresents the sequence of events leading to [his] termination" (Pl.'s Stmt. P 42), he offers no facts to show that his [*19]  threatened complaint occurred at some time other than that afternoon. As such, the defendants allege that Hearn could not have known about the plaintiff's threat to complain to the COIB or the other City agencies because the plaintiff had not even made the threat at the time Hearn made the decision to discharge the plaintiff at the morning personnel meeting.

Second, both Glazer and Hearn have produced sworn statements that they had no knowledge of any complaints that the plaintiff made about Khedouri until after the order to terminate his employment had already been given. (*See* Defs.' Stmt. PP 43-46; Glazer Decl. at 13-14; Decl. of Rose Gill Hearn, Oct. 28, 2005 ("Hearn Decl."), at 3.) Indeed, VanderNaalt, Joyce, and Green, each of the supervisors that the plaintiff allegedly complained to, denied that they ever forwarded any information about any complaints the plaintiff might have made about Khedouri. (*See* Vander. Depo. at 184-89; Depo. of Robert Joyce, June 24, 2005, attached as Ex. E to Sasanow Decl. ("Joyce Depo."), at 124-25; Depo. of Vincent Green, June 22, 2005, attached as Ex. F to Sasanow Decl. ("Green Depo."), at 138-39, 160.)

The plaintiff disputes this claim, [*20]  asserting that VanderNaalt informed him that his complaints were properly reported up the chain of command and that in a paramilitary organization such as DOI, Hearn's and Glazer's knowledge can be inferred. (Pl.'s Stmt. P 45.) However, the plaintiff concedes that VanderNaalt told him that he passed the plaintiff's concerns to Joyce and

Green, not to Hearn or Glazer, and the plaintiff candidly admitted that he had no personal knowledge of whether Hearn or Glazer were informed of his concerns. (Ben. Depo. I at 49-50.) The plaintiff offers no evidence to rebut the defendants' evidence that Hearn and Glazer lacked knowledge of the plaintiff's complaints.

## III.

The plaintiff claims that he was discharged in retaliation for his complaints about Khedouri and his threat to report the alleged conflict of interest involving Khedouri to external agencies in violation of the *First* and *Fourteenth Amendments to the United States Constitution* and *42 U.S.C. § 1983*.

It is well-established that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers, 461 U.S. 138, 142, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983).* [*21] In defining the protection afforded public employee speech, the Supreme Court has been sensitive to the "public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti v. Ceballos, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006)* Yet "while the *First Amendment* invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti, 126 S. Ct. at 1959* (quoting *Connick, 461 U.S. at 154*). "Government employers, like private employers, need a significant degree of control over their employees' words and actions" in order to provide services to the public efficiently. *Id. at 1958.*

Therefore, in order for a public employee to state a claim for *First Amendment* retaliation, the plaintiff initially must show by a preponderance of the evidence that: (1) the plaintiff spoke "as a citizen upon matters of public concern," *Connick, 461 U.S. at 147*, rather than as an employee on matters of personal interest, (2) the plaintiff suffered an adverse employment action, and (3) the speech at issue was a substantial or motivating factor in the [*22] adverse employment action. *See Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003); Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir. 2003).*

If the public employee successfully states a prima facie case of *First Amendment* retaliation, the government employer may still prevail by showing by a preponderance of the evidence that it would have taken the same action regardless of the employee's speech. *See, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977); Pappas v. Giuliani, 118 F.Supp.2d 433, 443 (S.D.N.Y. 2000), aff'd, 290 F.3d 143 (2d Cir. 2002).* [8]

8   In the alternative, the government may prevail by showing: (1) the adverse employment action is based on a reasonable prediction that the speech will be disruptive, (2) the disruptive potential of the speech outweighs the value of the speech, and (3) the employer's action is based on the disruptive potential of the speech and not taken in retaliation for the speech. *Johnson, 342 F.3d at 114* (citing *Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995))*. This option embodies the balancing test established by the Supreme Court in *Pickering v. Bd. of Educ., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).* Here the defendants acknowledge that the plaintiff's speech was not disruptive, and thus concede that *Pickering* does not apply.

[*23]   The defendants argue that the plaintiff has failed to establish a prima facie case of *First Amendment* retaliation. The defendants further argue under *Mt. Healthy* that DOI would have discharged the plaintiff regardless of his complaints, given the acts of alleged misconduct in which he engaged. For these reasons, the defendants claim they are entitled to summary judgment on the plaintiff's *First Amendment* retaliation claim.

## A.

The threshold question is whether the plaintiff was "speaking as a citizen upon matters of public concern." *Connick, 461 U.S. at 147.* In *Garcetti,* the Supreme Court clarified that this question involves two distinct inquiries. First, the Court must determine whether the plaintiff was speaking as a "citizen" for *First Amendment* purposes. *See Garcetti, 126 S. Ct. at 1957; Freitag v. Ayers, F.3d , 463 F.3d 838, 2006 U.S. App. LEXIS 23383, 2006 WL 2614120, at *11 (9th Cir. Sept. 13, 2006).* After that, the Court must turn to the traditional *Connick* analysis and ask whether, viewing the record as a whole and based on the content, context, and form of a given statement, the plaintiff's speech was made as a citizen upon [*24] "matters of public concern." *461 U.S. at 147-48.* "The inquiry into the protected status of speech is one of law, not fact." *Id. at 148 n.7.*

### 1.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for *First Amendment* purposes..." *Garcetti, 126 S. Ct. at 1960.* In *Garcetti,* Ceballos, a deputy district attorney in Los Angeles who served as a calendar deputy, alleged *First Amendment* retaliation after he drafted and circulated a disposition memorandum recommending the dismissal of a criminal case based on his investigation of, what he perceived to be, serious misrepresentations made by the warrant affiant in

the case. *Id. at 1955-56*. The Supreme Court stated that the "controlling" factor in determining that the plaintiff was not entitled to First Amendment protection was that the plaintiff's expressions were made "pursuant to his duties as a calendar deputy." *Id. at 1959-60*. As the Supreme Court explained:

> Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising [*25] attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee.

*Id. at 1960*. In sum, "Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do." *Id.* Following *Garcetti*, courts in this District have dismissed First Amendment retaliation claims upon finding that a plaintiff's speech was made pursuant to his official duties. *See, e.g., Ruotolo v. City of New York,* 2006 U.S. Dist. LEXIS 49903, 03 Civ. 5045, 2006 WL 2033662, at *3-4 (S.D.N.Y. July 19, 2006) (finding that a safety officer's report on environmental risks and conversations concerning the report were made pursuant to his official duties); *Brewster v. City of Poughkeepsie,* 434 F.Supp.2d 155, 157 (S.D.N.Y. 2006) (finding that a police officer's letters to the Chief and Deputy Chief of Police and the District Attorney disputing his supervisor's decision to dismiss two traffic summonses were written pursuant to his official [*26] duties).

The question then is whether the plaintiff's speech was made pursuant to his "official duties." [9] In analyzing this issue, the defendants divide the plaintiff's speech into two categories: (1) the plaintiff's weekly complaints to his supervisors about Khedouri and (2) the plaintiff's threat to file a formal complaint to external agencies regarding the Khedouri matter. The defendants argue that the first category of speech is barred by *Garcetti* because the plaintiff's complaints were made pursuant to his official duties as a manager of CISAFE and supervisor of Khedouri. However, the defendants candidly concede that the second category of speech-the alleged threat to report the matter externally-was not part of the plaintiff's official duties and thus is not barred by *Garcetti*. Given the defendants' concession, the Court considers only whether the plaintiff's weekly complaints to his supervisors were made pursuant to his official duties.

[9] Although the Supreme Court issued its decision in *Garcetti* after this motion for summary judgment was fully briefed, the parties submitted supplemental briefing addressing the issue and discussed the issue at the oral argument.

[*27] Although the Supreme Court in *Garcetti* declined to articulate a framework for defining the precise contours of a public employee's official duties, the Court noted that the "inquiry is a practical one" and recognized that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." 126 S. Ct. 1961-62. Viewing the evidence as a whole, it is clear that the plaintiff's weekly complaints to his supervisors were made pursuant to his official duties.

First, it is undisputed that the plaintiff was a manager of the CISAFE unit and responsible for supervising Khedouri. [10] The plaintiff concedes these managerial responsibilities but nonetheless argues that his reporting to his supervisors of the specific problems involving Khedouri did not fall within the scope of his "official duties." However, the undisputed evidence in the record belies this assertion.

[10] The plaintiff states that he was not Khedouri's "direct supervisor" during the relevant time period because Khedouri was "unmanageable." (*See* Pl.'s Stmt. P 4.) However, it is undisputed that the plaintiff was responsible for supervising Khedouri, whether he was successful in that endeavor or not. (*See id.*)

[*28] As a manager, the plaintiff was responsible for supervising employees and ensuring the productive operation of his unit. Such responsibilities were part of what the plaintiff was "employed to do." *See Garcetti, 126 S. Ct. at 1960*. In addition, the plaintiff was part of an organization and supplying information about his unit's performance to supervisors thus also fell within the plaintiff's official duties. The plaintiff's performance evaluation, signed by the plaintiff on November 18, 2002, included a category for "[p]resenting, explaining, and marketing the work unit's activities to higher level supervisors in the agency and/or persons and groups outside the agency." (Ex. D to Ben. Aff.) The opportunity for the plaintiff to pass along such information to his supervisors was amply provided at "formal status meetings," the place where the plaintiff aired the majority of his alleged complaints about Khedouri. Moreover, the plaintiff admitted that many of the complaints about Khedouri originated with his employees. (*See, e.g,* Ben. Depo. I at 7-11.) Thus, for at least some of the complaints about Khedouri, the plaintiff was merely acting as a conduit through which [*29] information was passed from those he supervised to his supervisors pursuant to his official duties.

Given that keeping his supervisors apprised of his unit's status was one of the tasks he was paid to perform as a manager of CISAFE, the only question is whether the specific complaints at issue were of the type that the plaintiff would be expected to discuss with his supervisors. According to the plaintiff's characterization of his deposition testimony, the plaintiff complained to his supervisors that: (1) the appearance that Khedouri received specialized treatment had a negative effect on office morale and the ability of the department to function; (2) Khedouri's salary was exorbitant and precluded DOI from hiring additional employees; and (3) Khedouri's performance hindered CISAFE's ability to operate effectively and provide services to the public. (Pl.'s Stmt. P 26; Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") at 9.) These complaints all focused on the impact of Khedouri's employment on CISAFE, its effect on office morale and the unit's financial resources, performance, and operation. As the plaintiff himself stated at his deposition about his purpose for [*30] making these complaints, Khedouri's performance involved a "productivity issue" (Ben. Depo. I at 34), he "just wanted [Khedouri] to take things a little more seriously" (Ben. Depo. II at 154), and he was "[j]ust moving it up the chain of command" (Ben. Depo. I at 36). In sum, the plaintiff's complaints to his supervisors involved precisely the sorts of internal office affairs and employment matters that the plaintiff-as a manager and supervisor-had a duty to address. [11] For these reasons, the plaintiff's weekly complaints about Khedouri to his supervisors were made pursuant to his "official duties" and thus were not made in his capacity as a citizen for First Amendment purposes.

> 11  Even assuming that these complaints embedded a discussion about a conflict of interest, and that discussion of the conflict of interest touched on matters of public concern, the speech would still be within the scope of the plaintiff's official duties. _Garcetti_ teaches that an employee speaking pursuant to his official duties does not speak as a citizen for First Amendment purposes, even when his speech touches on matters of public concern.

[*31] **2.**

As stated above, the defendants concede that the plaintiff's threat to file a formal complaint to the external agencies was not made pursuant to his "official duties" for _Garcetti_ purposes. The next issue then is whether the plaintiff's threat to file a formal complaint with the external agencies was made "as a citizen upon matters of public concern" or rather merely "as an employee upon matters only of personal interest." _Connick_, 461 U.S. at 147.

An issue is one of "public concern" that can be "fairly considered as relating to any matter of political, social, or other concern to the community." _Id._ at 146. Allegations of public corruption or wrongdoing are almost always matters of public concern. See _Johnson_, 342 F.3d at 113. A wide range of other issues have been found to constitute matters of public concern. See, e.g., _Givhan v. W. Line Consol. Sch. Dist._, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979) (allegations of racial discrimination); _Lewis v. Cowen_, 165 F.3d 154, 164 (2d Cir. 1999) (mismanagement of public funds); _Blum v. Schlegel_, 18 F.3d 1005, 1012 (2d Cir. 1994) (criticism of the [*32] federal government's national drug control policy); _Collins v. Christopher_, 48 F. Supp. 2d 397, 408 (S.D.N.Y. 1999) (collecting cases). However, "'speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment' falls outside the realm of constitutional protection." _Schlesinger v. New York City Transit Auth._, 2001 U.S. Dist. LEXIS 632, 00 Civ. 4759, 2001 WL 62868, at *5 (S.D.N.Y. Jan. 24, 2001) (quoting _Lewis_, 165 F.3d at 164); see also _Cahill v. O'Donnell_, 75 F. Supp. 2d 264, 272 (S.D.N.Y. 1999) ("A public employee's speech on matters of purely personal interest or internal office affairs does not constitute a matter of public concern...").

Although certain issues may clearly touch upon matters of public concern in the abstract, the question in each case is whether the particular speech at issue may be "fairly considered" as relating to such issues. See _Connick_, 461 U.S. at 146. This determination is rarely a simple task "[b]ecause of the enormous variety of fact situations" in which these cases arise. _Id._ at 154. The Supreme Court has cautioned that "[t]o [*33] presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case." _Id._ at 149. "_Connick_ made clear that courts must look behind pretextual 'public concern' rationales proffered by plaintiffs and attempt to discern whether their conduct, taken as a whole, was actually meant to address matters of public concern or was simply a vehicle for furthering private interests." _Pappas_, 118 F. Supp. 2d at 444 (citing _Connick_, 461 U.S. at 146-48).

Given these considerations, determining whether speech involved matters of public concern requires a practical inquiry into the "content, form, and context of a given statement, as revealed by the whole record." [12] _Connick_, 461 U.S. at 147-48. The issue of "whether an employee's speech addresses a matter of public concern" is a matter of law for the court to decide. _Id._ at 148 n.7, 150 n.10.

12    According to *Garcetti,* a public employee can speak on a matter of public concern, yet not speak in the employee's capacity as a citizen. *Garcetti* thus distinguished between the capacity in which a person speaks and the subject matter of that speech. However, under the traditional *Connick* inquiry, the capacity in which a person speaks has always been a relevant contextual factor in determining whether certain speech touched upon matters of public concern. *See, e.g., Blum,* 18 F.3d at 1012 ("The determinative question is whether that interest [in matters of public concern] arises from the speaker's status as a public citizen or from the speaker's status as a public employee."). Nothing in *Garcetti* suggests that courts should ignore the capacity in which a person speaks in situations where, for example, an employee's speech may be close to-but not squarely within-his or her official duties.

[*34]    The plaintiff's threat to file a formal complaint to the external agencies did not touch upon matters of public concern. The plaintiff alleges that he threatened to take all of his prior complaints about Khedouri to the external agencies and, to the extent that already covered, an allegation that Glazer was supposed to recuse herself but that Khedouri was doing projects for her. (*See* Pl.'s Stmt. P 42; Ben. Depo. I. at 25-26.)

Most of the plaintiff's alleged complaints provide classic examples of an attempt by a plaintiff to convert what are essentially private employment matters into matters of public concern because the matters happened to have transpired within a government office. *See Connick,* 461 U.S. at 149. The record as a whole reveals that the plaintiff's complaints about office morale, Khedouri's salary, and the impact of Khedouri's employment on the effective operation of the unit all involved internal office affairs, which the plaintiff was concerned about as a manager. The plaintiff admitted as much in his deposition when he stated that his motivation for complaining about Khedouri was to get "Ely to take things a little more seriously" (Ben. Depo. [*35] II at 154) and stated that Khedouri's performance was a "productivity issue" (Ben. Depo. I at 39). The portion of the plaintiff's deposition testimony that discusses his plans to file the formal complaint reveals that the plaintiff was not interested in contributing to the "debate on public issues." *See LaForgia v. Davis,* 2004 U.S. Dist. LEXIS 25143, 01 Civ. 7599, 2004 WL 2884524, at *5 (S.D.N.Y. Dec. 14, 2004). Rather, the plaintiff had received no satisfaction within DOI and sought to remedy the "morale" and "management" issues that were plaguing CISAFE. 13 (*See* Ben. Depo. I at 25-26.) The plaintiff cannot now convert what were essentially internal office affairs into matters of public concern through a revisionist interpretation of

his complaints that draws on the incidental connection between events that transpire within a government office and public issues. 14 *Cf. Harris v. Beedle,* 845 F. Supp. 1030, 1034 (S.D.N.Y. 1994) ("Plaintiff attempts to tie her criticism of the program into a general critique of Authority mismanagement and waste. However, such abstract concern about a particular subject carries no weight if the employee chooses not to articulate it.") (internal [*36] citation and quotation marks omitted), *aff'd,* 35 F.3d 553 (2d Cir. 1994).

13    The Second Circuit Court of Appeals recently stated that "motive is not dispositive as to whether an employee's speech is a matter of public concern," while qualifying that "this is especially true where the motive is not to address an employment grievance." *Reuland v. Hynes,* 460 F.3d 409, 2006 WL 2391163, at *5-6 (2d Cir. 2006). Public concern analysis in this Circuit is "content-based and not... *solely* motivation based." *Cioffi v. Averill Park Central Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 166 (2d Cir. 2006) (emphasis added). However, while not dispositive, it remains a factor for courts to consider in analyzing the overall context in which a statement is made. *See id.; see also Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 143 (2d Cir. 1993) (employee's complaints about sexual harassment not a matter of public concern where there was "no indication that the plaintiff wanted to debate issues of sex discrimination," that she sought relief against "pervasive or systemic misconduct," or that she sought to "correct allegedly unlawful practices or bring them to public attention") (internal citations and quotation marks omitted); *Ezekwo v. NYC Health & Hosp. Corp.,* 940 F.2d 775, 781 (2d Cir. 1991) (finding that complaints were "personal in nature," where the plaintiff "was not on a mission to protect the public welfare" and "her primary aim was to protect her own reputation and individual development"). The Court accepts the plaintiff's own description of the motivations for his threat in deciding this motion for summary judgment. The defendants suggest that the plaintiff's alleged complaints about Khedouri were in fact motivated by his desire to create complaints and thereby deter any sanctions against him and to counter the progressive discipline that was being imposed upon him for his various actions. However, the Court could not accept that disputed motivation on a motion for summary judgment. *See New York State Law Officers Union v. Andreucci,* 433 F.3d 320, 330-31 (2d Cir. 2006).

[*37]

14   For these reasons, the plaintiff's earlier complaints, which are barred by *Garcetti,* also failed to address matters of public concern.

The plaintiff's threat to report an alleged conflict of interest within DOI presents a closer question. Viewed in the abstract, the plaintiff's report of an alleged conflict of interest could, at least minimally, implicate government corruption, mismanagement, or the violation of the City's by-laws, which could fairly be considered as touching upon matters of public concern. *Cf. Gorman-Bakos v. Cornell Coop. Extension of Schnectady County,* 252 F.3d 545, 553 n.4 ("Plaintiffs' claims related to the administration of the Cooperative and the allocation of funds were based on alleged mismanagement of government funds and violations of its by-laws, which are clearly matters of public concern.") However when placed in context, even the plaintiff's threat to complain about the alleged conflict of interest cannot be said to touch upon matters of public concern.

First, the plaintiff's threat to file the formal complaint occurred in the course of [*38]  a conversation with his supervisor. A private conversation with an employer does not preclude a finding that a public employee was speaking on a matter of public concern. *See Givhan,* 439 U.S. at 414. Nonetheless, the forum that a plaintiff chooses is one factor in determining whether the speech implicated a matter of public concern. *See Dudzik v. City of New York,* 2003 U.S. Dist. LEXIS 1287, 01 Civ. 2450, 2003 WL 203226, at *7 (S.D.N.Y. Jan. 29, 2003); *Pappas,* 118 F. Supp. 2d at 445 (citing *Connick,* 461 U.S. at 148) In this case, although the plaintiff threatened to complain publicly, the plaintiff first discussed his decision to do so with his supervisor and then delayed filing the complaint at his supervisor's request. This fact detracts from the threatened complaint's public character.

Second, the plaintiff's deposition testimony establishes that the alleged complaint regarding the conflict of interest was a minimal part of a broader issue involving internal management. The thrust of the plaintiff's threatened complaint, as testified to by the plaintiff (Ben. Depo. I at 25-26), was not that the alleged conflict of interest was an independent [*39]  problem that needed to be brought to the public's attention. Rather, the plaintiff was concerned about the impact of the alleged conflict on his unit's performance-the ability to manage Khedouri and his team's morale. While speech alleging a conflict of interest might implicate a matter of public concern, where the speech is buried in a context that overwhelmingly suggests that the plaintiff was merely speaking as an employee on matters of internal office affairs, such speech is not entitled to First Amendment protection. *See, e.g., Ezekwo,* 940 F.2d at 781 ("[T]he mere fact that one or two of Ezekwo's comments could be construed broadly to implicate matters of public concern does not alter the general nature of her statements."); *Hellstrom v. United States Dep't of Veterans Affairs,* 178 F. Supp. 2d 164, 169 (N.D.N.Y. 2001) (finding that while affirmative action involves a matter of public concern in the abstract, where comments about affirmative action were given as a personal response to alleged discrimination, those comments did not implicate a matter of public concern), *aff'd,* 46 Fed. Appx. 651 (2d Cir. 2002).

For these reasons, [*40]  the plaintiff's threat to file a complaint with the external agencies did not involve a matter of public concern. Therefore, the plaintiff has failed to establish the first element of his prima facie case.

**B.**

The plaintiff has similarly failed to establish the third element of his prima facie case. The plaintiff has failed to produce sufficient evidence that his complaints were "at least a substantial or motivating factor in the discharge." *Sheppard,* 317 F.3d at 355 (internal citation and quotation marks omitted).

A plaintiff can establish proof of causation either directly or indirectly. *See Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000). Causation may be proved indirectly "by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence." *Id.* In this case, even assuming that the plaintiff's complaints constituted protected speech, the plaintiff has failed to establish any evidence, either directly or indirectly, that DOI discharged him in retaliation for any protected speech.

First, the plaintiff has offered no direct evidence that his complaints [*41]  were a substantial or motivating factor in the decision to terminate his employment. Rather, the undisputed evidence clearly establishes the contrary, that the plaintiff's complaints were not the reason for his discharge.

As discussed above, the undisputed facts establish that Commissioner Hearn ordered the plaintiff's discharge at a personnel meeting on the morning of Tuesday, December 17, 2002. This decision marked the culmination of a series of progressive disciplinary measures that had been imposed on the plaintiff based on numerous incidents of alleged misconduct and that dated back as early as July 2002.

These disciplinary measures, detailed above, included a formal reprimand on November 15, 2002, which docked the plaintiff three days annual leave. (Ex. M to Glazer Decl.) Three days later, on November 18, 2002, the plaintiff signed a performance evaluation stating that while the plaintiff had "some performance is-

sues," those issues had been "adequately addressed and resolved." (Ex. D to Ben Aff.) However, about two weeks later, the plaintiff was involved in the incident with the defaced handgun. The plaintiff stated that he "knew something was going to happen at work as a result [*42] of [the incident]." (Ben. Depo. II at 217.) The plaintiff hired a lawyer who confirmed his concerns. (*See id.* at 217-18, 220, 237.) Based on these events, Commissioner Hearn and Glazer discussed whether there were any impediments to dismissing the plaintiff, and instructed their law department that, if not, they should take the steps necessary to do so. (Glazer Decl. at 12.)

Then on Friday, December 13, 2002, DOI received complaints that the plaintiff had harassed employees in another agency and even threatened to arrest one of them. The following business day, Monday, December 16, 2002, DOI received another complaint that the plaintiff had threatened to arrest a member of the public.

Based on all of these events, Commissioner Hearn announced at the December 17 personnel meeting that the timetable to terminate the plaintiff's employment had been accelerated and that the plaintiff was to be discharged the following day. (Glazer Decl. at 13.)

Hearn's decision to discharge the plaintiff was therefore made on the morning of December 17, 2002. However, the plaintiff's alleged threat to file a formal complaint to the external agencies was not made until the afternoon of that same [*43] day. (*See* Ben. Depo. I at 25, 27, 37.) Although the plaintiff was not discharged until the following day, the undisputed evidence shows that the decision to terminate the plaintiff's employment was made before the plaintiff ever threatened to complain to the COIB or other external agencies. Therefore, the plaintiff's afternoon threat to report the Khedouri matter externally could not have formed any part of Hearn's decision to discharge the plaintiff.

Indeed, the plaintiff has failed to produce any evidence that either Hearn, the decision maker, or Glazer, the person who carried out Hearn's order to terminate the plaintiff's employment, had knowledge of any of the plaintiff's complaints. As detailed above, the defendants have produced affirmative evidence that at the time the order to terminate the plaintiff's employment was given, none of the relevant decision makers had any knowledge whatsoever of the plaintiff's alleged complaints about Khedouri. Both Glazer and Hearn have produced sworn statements that they knew nothing of the plaintiff's alleged complaints about Khedouri, and VanderNaalt, Green, and Joyce all denied having passed on such information.

The plaintiff attempts [*44] to counter this evidence by stating that VanderNaalt told the plaintiff that "his concerns were properly reported up the chain of command" and the plaintiff alleges that "Glazer was in Plaintiff's chain of command." (Pl.'s Mem. at 19.) The plaintiff concludes that "in a paramilitary organization such as the DOI, Glazer must have known about Plaintiff's protected speech." (*Id.*)

However, this factual assertion is not supported by the deposition testimony on which the plaintiff relies. (*See* Ben. Depo. I at 49-50.) That deposition testimony establishes only that the plaintiff's direct supervisor, VanderNaalt, told the plaintiff that he had reported the plaintiff's complaints to Robert Joyce and Vincent Green. (*Id.*) As explained above, both Joyce and Green denied passing on such complaints. The plaintiff cannot point to any evidence that his complaints were reported by Joyce or Green to anyone else. In fact, the deposition testimony reveals that it was VanderNaalt who told the plaintiff "to report this kind of up the ladder." (Ben. Depo. I at 23.) The plaintiff points to no evidence that VanderNaalt ever told the plaintiff that VanderNaalt would report the plaintiff's complaints [*45] up the chain of command. The plaintiff is thus left with the bare factual assertion that Glazer "must have known." The plaintiff cannot at this stage rely on such "conclusory allegations or unsubstantiated speculation." *Scotto, 143 F.3d at 114.* Therefore, the plaintiff has failed to offer any evidence from which an inference can be drawn that either Hearn or Glazer knew about any of the plaintiff's alleged complaints.

The plaintiff also attempts to prove causation indirectly. The plaintiff argues that he is entitled to an inference of causation because the temporal proximity between the time he made his complaints and the time he was fired establishes an inference of retaliatory animus. In appropriate cases, where an adverse employment action occurs shortly after the protected speech, an inference that the speech was a motivating factor in the adverse action may be drawn. *See, e.g., Cifra v. General Electric Co., 252 F.3d 205, 217 (2d Cir. 2001)* ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."); *Gorman-Bakos, 252 F.3d at 554.* [*46]

However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001); Ayiloge v. City of New York, 2002 U.S. Dist. LEXIS 11807, 00 Civ. 5051, 2002 WL 1424589, at *12-13 (S.D.N.Y. June 28, 2002).*

An inference of causation based on temporal proximity is not warranted in this case. Given that the plaintiff has produced no direct evidence of causation, he is

left only with timing as the basis for his claim of retaliation. The progressive discipline against the plaintiff began in July 2002, well before the plaintiff's complaints about Khedouri began in October 2002. While the plaintiff disputes some of the details of the meeting he had with the Assistant Commissioners in July 2002, it is undisputed that the defendants counseled the plaintiff to tone down his appearance and spoke with the plaintiff about modifying the emergency lights on his vehicle. [15]

> 15   The defendants claim that the plaintiff was told to remove the emergency equipment completely. The plaintiff claims that he was told that he could keep the equipment as long as he removed the lights from the dashboard. Even accepting the plaintiff's version, this marked the beginning of a progressively increasing set of warnings and actions against the plaintiff.

[*47]   In any event, the only complaint that the plaintiff made that even arguably can be considered protected speech and which is not otherwise barred by *Garcetti* was contained in the threat he made to report the Khedouri matter to external agencies. The plaintiff did not make this threatened complaint until December 17, 2002, well after a well-documented series of progressive disciplinary measures. Therefore, the plaintiff here is not entitled to an inference of causation based on temporal proximity.

For these reasons, the plaintiff has failed to establish causation, the third element of his prima facie case.

Given that the Court finds that the plaintiff has failed to establish his prima facie case, it is unnecessary to address the defendants' remaining contention that, even assuming that Hearn or Glazer knew about the plaintiff's complaints, DOI would have discharged the plaintiff regardless of the complaints because of his past alleged misconduct.

Because the plaintiff has failed to show that any genuine issue of fact exists as to whether the defendant Glazer violated the plaintiff's First Amendment rights, the defendants' motion for summary judgment on the plaintiff's Section [*48]  1983 claim against Glazer is **granted.**

In addition, given that the plaintiff has not established an underlying constitutional violation, the defendants' motion for summary judgment on the plaintiff's Section 1983 claim against the City of New York is also **granted.** *See, e.g., Segal v. City of New York,* 459 F.3d 207, 2006 U.S. App. LEXIS 20118, 2006 WL 2171456, at *10-11 (2d Cir. 2006); *Rivera v. City of New York,* 392 F. Supp. 2d 644, 656 (S.D.N.Y. 2005).

**V.**

The defendants argue that the plaintiff's state law claim under the Whistleblower Law must be dismissed because the statute provides no private cause of action. However, because the plaintiff's Section 1983 action is dismissed and there are no remaining federal claims, the Court declines to exercise supplemental jurisdiction over this purely state law claim. *See* 28 U.S.C. § 1367(c)(3); *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 304-06 (2d Cir. 2003). Therefore, the plaintiff's state law claims against the defendants under the Whistleblower Law are **dismissed without prejudice.**

*CONCLUSION*

The Court has considered all of [*49] the arguments raised by the parties. To the extent not specifically addressed herein, the arguments are either moot or without merit. The motion for summary judgment is **granted.** The Clerk is directed to enter judgment and to close this case.

**SO ORDERED.**

**Dated: New York, New York**

**September 23, 2006**

**John G. Koeltl**

    **United States District Judge**